IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| EDWARD R. FLYNN, GENE DAISEY, DOUGLAS J. ABBOTT, and CATHERINE HOSICK, individually and on behalf of all others similarly situated | ) ) ) ) ) | CIVIL ACTION<br><br>CLASS ACTION |
| Plaintiffs, | ) ) ) | No. 2:17-CV-04806-WB |
| v. | ) ) | |
| M & T BANK CORPORATION and MANUFACTURERS AND TRADERS TRUST COMPANY a/k/a M&T BANK | ) ) ) ) | |
| Defendants. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

1.     Representative Plaintiffs Edward Flynn ("Flynn"), Gene E. Daisey ("Daisey"), Douglas Abbott ("Abbott") and Catherine Hosick ("Hosick) (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, hereby file this Second Amended Class Action Complaint against Defendants M&T Bank Corporation ("M&T Bank Corporation") and Manufacturers and Traders Trust Company a/k/a/ M & T Bank ("M&T" or the "Bank") and allege as follows:

## I.     INTRODUCTION

2.     Plaintiffs bring this consumer class action on behalf of similarly situated residents of Pennsylvania, seeking monetary, injunctive and declaratory relief, exclusively through the Pennsylvania Commercial Code ("UCC"), necessitated by Defendants' conduct in foreclosing on vehicle loans and repossessing and reselling the chattel consisting of the financed vehicles of class members. Specifically, in their servicing of the vehicle loans of class members, Defendants have failed to comply with the strict statutory requirements for the written consumer disclosure notices

that must be sent to vehicle owners after the repossession of a motor vehicle and engaging in other related activities including failing to include an accurate description of a debtors' liability for a disputed deficiency balances, transferring customer's title to and selling chattel mistakenly, improperly collecting payments towards debts that have been extinguished.

3.      The statutory violations at issue do not relate to the extension or denial of credit.

## II.      PARTIES

4.      Edward R. Flynn is an adult individual who, at all relevant times resided at 218 William Street, Lilly, PA 15938. He presently resides in Jacksonville, North Carolina.

5.      Gene E. Daisey is an adult individual who at all relevant times resided at 770 Slocum Road, Wapwallopen, PA 18660.

6.      Douglas J. Abbott is an adult individual who at all relevant times has resided at 2821 State Route 18, Hookstown, PA  15050.

7.      Catherine Hosick is an adult individual who at all relevant times has resided at 940 Brown Ave., Conneaut Lake, PA  16316.

8.      Manufacturers and Traders Trust Company, a/k/a M&T Bank, is a bank with branches located throughout New York and Pennsylvania.

9.      M & T Bank Corporation, the parent company of M&T Bank, is a publicly-traded bank holding company which has assets of $123.4 billion. (2016 Annual Report, p. 1).

10.      M&T Bank Corporation's and the Bank's headquarters are both located at One M&T Plaza, Buffalo, New York 14203.

11.      At all relevant times, the Bank was the holder and secured party, by way of assignment, sale, and/or merger, of the consumer retail instalment sales contracts secured by the vehicles of the Plaintiffs and all Class Members.

12.     At all relevant times, M&T Bank Corporation and/or the Bank established, supervised, and/or implemented policy, procedure, and business practices relating to all matters complained of herein.

13.     At all relevant times, M&T Bank Corporation dominated the activities of the Bank. As such, the Bank must be treated as an "alter ego" of M&T Bank Corporation. In the alternative and/or in addition, M&T Bank Corporation intervened in the management of the Bank so as to treat it as a mere department of its own business.

14.     In the alternative and/or in addition, at all relevant times M&T Bank Corporation has acted (and continues to act) as the Bank's principal.   At all relevant times, M&T Bank Corporation exercised (or had the right to exercise) control and oversight over the Bank and/or audited the Bank's functions at issue here. At all relevant times, M&T Bank Corporation ratified the activities challenged herein. In the alternative and/or in addition, at all relevant times these Defendants were engaged in a joint venture or joint enterprise relative to the activities challenged herein.

15.     M&T Bank Corporation is vicariously and/or jointly liable for the actions and/or omissions of the Bank that are averred in this Complaint.

16.     M&T Bank Corporation has employed a standard of care which also applies to the Bank and is set forth in its *Code of Business Conduct and Ethics* (**Exhibit 1**) which states, *inter alia*, as follows:

> **Introduction.** This Code, together with hose policies and procedures, do not cover every issue that may arise, but they set out basic principles to guide M&T Bank Corporation and/or any direct or indirect subsidiaries thereof and all employees, officers, directors, advisors (including members of any advisory councils and committees), agents, representatives and consultants of M & T (collectively, "M&T Personnel"; individually, "you"). … All M&T Personnel must conduct themselves in accordance with the Code and seek to avoid conduct that could give rise to the appearance of impropriety.

3

Section 1. **Compliance with Laws, Rules and Regulations.** "Obeying the law, both in letter and in spirit, is the foundation on which M & T's ethical standards are built."

Section 5. **Competition and Fair Dealing.** "M&T Personnel should endeavor to respect the rights of and deal fairly with M&T customers….M&T Personnel should not take unfair advantage of…anyone through… concealment…"

Section 8. **Record Keeping.** M & T requires honest and accurate recording and reporting of information. … All of M & T's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect M & T's transactions, and must conform both to applicable legal requirements and to M&T's system of internal controls.

17.     This standard of care was in effect at all relevant times and is what the Bank and M&T Bank Corporation have undertaken as their internal benchmark for what they deem to be commercially reasonable conduct, applicable to their servicing of the vehicle loans of class members. These Defendants breached this standard of care, as more fully set forth below.

## III.  DEFINITIONS

18.     **Administrative Fee**: The term "Administrative Fee" refers to a fee/expense, generally in the amount of approximately $50, for which the Bank, repossessor, Millennium Capital Recovery Corporation ("MCRC"), or the auction selling the repossessed vehicle charged though which provided the Class Member with no benefit. This fee/expense is a precondition to Reinstatement or Redemption and, in such instance is not incurred by the Bank.

19.     **Form RISC**: The term "Form RISC" refers to a standardized retail instalment sale contract routinely used by the Bank.  Plaintiffs Daisey, Flynn and Hosick executed a Form RISC, as did most class members.  Copies of these will be obtained from Defendants in discovery.  Each Form RISC contained, *inter alia*, the following uniform or substantially similar language:

**Redemption**: You have the right to buy back (redeem) the Vehicle within 15 days of the mailing of the Notice and at any other time before we sell the Vehicle. *If you redeem the Vehicle, we will deliver the Vehicle to you at a place as provided by law*, as soon as is reasonable possible, but in to more than ten (10) business days of

4

our receipt of the funds required. If you do not redeem, you give up all claim to the Vehicle. ...

**Expenses**: You agree to pay the costs of repossessing, storing, repairing, preparing for sale and selling the Vehicle as may be allowed by law. These costs will only be due *if*:

1. Default exceeds fifteen [15] days at the time of repossession;
2. *The amount of costs are actual, necessary, and reasonable*; and,
3. *We can prove the costs were paid*.

Form RISC at ¶¶ 20.b. and 20.e. (Emphasis added).

20.     **Good Faith**:  The term "Good Faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing. 13 Pa. C.S.A. §9102, UCC Comment 19, 2001 Pa Legis. Serv. Act 2001-18 (S.B. 330)(§9101(a), amended 2008 Pa. Legis. Serv. Act 2008-13 (H.B. 1152; §1201(20). "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." 13 Pa. C.S.A. §1304.

21.     **Motor Vehicle**:  Except as otherwise stated, the term "Motor Vehicle" has the same meaning as is set forth in 12 Pa.C.S.A. §6202: a device in which, upon which or by which a person or property is or may be transported or drawn upon a public highway and including an automobile, a truck, a sports utility vehicle, a van, a minivan, a camper, a recreational vehicle, a motorcycle, or a truck. For purposes of this Complaint, the term is not intended to include a semitrailer or manufactured home.

22.     **Notice of Repossession**: The term "Notice of Repossession" has the same meaning as the term "notification of disposition," in 13 Pa.C.S.A. §§9611, 9613, and 9614.  The Bank used at least two standardized, uniform forms throughout the class period. Plaintiffs refer to **Exhibit 2** and **Exhibit 3** herein as two standardized templates, "Notice of Repossession Form 1" and "Notice of Repossession Form 2," respectively. The only information modified in these disclosure notices (similar to any other form used by the Bank) which is unique to each customer are figures, the

personally identifiable information, data pertaining to the repossessed vehicle, and the customer's loan information which is redacted in these forms. The unique information typically modified by each class member in all of the Bank's Notices of Repossession used throughout the class period are shown as redacted in Exhibits 2 and 3.

23. **Post-Sale Notice**: The term "Post-Sale Notice" has the same meaning as the term "Explanation of Calculation of Surplus or Deficiency" in 13 Pa.C.S.A. §9616.  An exemplar of M&T's form Post-Sale Notice is attached hereto as **Exhibit 4**. The only information modified in this notice which is unique to each class member are figures, the personally identifiable information, data pertaining to the repossessed vehicle, and the customer's loan information which is redacted in these forms. The unique information typically modified by each Post-Sale Notice Class Member's Post-Sale Notice is shown as redacted in Exhibit 4.

24. **Personal Property Fee**: The term "Personal Property Fee" refers to a fee all class members paid (or had to pay) to retrieve his/her personal possessions left in the repossessed vehicle when repossessed.

25. **Prepare/Repair Expense**: The term "Prepare/Repair Expense" is an amount (generally $200) referenced in the Bank's Notice of Repossession forms and/or Post-Sale Notice forms as a "sale preparation expense" or an "expense of preparing/repairing the Vehicle for sale."

26. **Redeem/Redemption**: Unless stated otherwise, the terms "Redeem" and "Redemption" mean a "buy back" of the repossessed vehicle by terminating the contract upon payment of the Redemption Amount.

27. **Redemption Amount**: The term "Redemption Amount" is the amount a debtor, obligor, or co-obligor would need to pay to buy back his/her repossessed vehicle.  This is defined by the UCC at 13 Pa. C.S.A. §9623(b) as the "(1) fulfillment of all obligations secured by the

collateral; and, (2) the reasonable expenses…described in 13 Pa. C.S.A. §9615(a)(1)." 13 Pa. C.S. §9615(a)(1) speaks of "reasonable *__expenses__* of retaking, holding, preparing for disposition, processing and disposing … *__incurred__* by the secured party." (emphasis added).

28.     __Redemption Fee__: The term "Redemption Fee" is a fee Class Members either paid or had to pay as a precondition to redeem his/her repossessed vehicle or to reinstate his/her vehicle loan.

29.     __Reinstatement__:  The term "Reinstatement" occurs when a borrower pays some or all of the past due instalments plus late charges, costs of suit, and actual incurred costs of retaking, repairing and storing the vehicle (12 Pa.C.S.A. §6258), in order to bring the contract current, to reacquire possession of the repossessed vehicle, and to resume making instalment payments.

30.     __Schumer Box__:  The term "Schumer box" is a table with a standardized format that discloses the rates, fees, terms and conditions of a credit card or other lending agreement terms as required under the federal Truth in Lending Act (TILA). An exemplar of a Schumer Box is shown in Paragraph 101 below.

31.     __Storage Expense__:  The term "Storage Expense" is a fee/expense listed on the Notices of Repossession and/or Post-Sale Notices purportedly for the storage of the repossessed vehicle.

## IV.  FACTUAL BACKGROUND

### A.     The Repossession and Redemption of Gene Daisey's Vehicle

32.     In February 2013, the Bank, as secured creditor by assignment of a Form RISC entered into in Pennsylvania, foreclosed on Daisey's vehicle loan and caused Daisey's vehicle to be repossessed in Pennsylvania.

33.     The Bank hired Millennium Capital Recovery Corporation ("MCRC"), a company that provides nationwide recovery management, skip tracing and impound services. MCRC contracts with repossession agents in all 50 states, who, in turn, hired Don's Auto to repossess Daisey's vehicle.

34.     The Bank or its agents sent Daisey a Form 1 Notice of Repossession, attached as **Exhibit 5**.

35.     The Bank or its agent sent Daisey a Notice of Repossession which set forth the following as being **"the full amount you owe (not just the past due payments), including *our* expenses. To redeem the Vehicle, you must pay the total redemption amount set forth below ..."** (emphasis added)

| | | |
|---|---|---|
| Past Due Payments: | $   750.68 | |
| Accrued late charges: | $     61.60 | |
| Collection charges: | $       0.00 | |
| Expense of repossessing the Vehicle: | $   385.00 | |
| **Expense** of storing the Vehicle: | $   175.00 | [5  days at $35.00 per day] |
| **Expense** of preparing/repairing the Vehicle for sale: | $   200.00 | |
| Other expenses: (Specify) | $       0.00 | |
| **Total redemption amount:** | **$1,572.28** (emphasis added) | |

36.     One of the items making up the $1,572.28 "Total redemption amount" was the "Expense of storing the Vehicle" of $175.00, purportedly for five (5) days of storage at the rate of "$35.00 per day" and an "Expense of preparing/repairing the Vehicle for sale." of $200.00.

37.     The Bank, however, did not pay or otherwise incur *any* expense which it paid to any third party for storing the repossessed vehicle or for preparing/repairing the repossessed vehicle for sale, or in the alternative, the Bank only incurred an expense of approximately $8.00 a day for only a few days.

38.     Daisey tendered *at least* $1,572.28 (the "Total redemption amount" as shown on his Notice of Repossession) to Redeem (or buy back) his repossessed vehicle.

8

39.     Although the Bank, Don's Auto, and/or MCRC accepted the Redemption Amount and other payment(s), the Bank:

> (a) Refused to return the vehicle to him until Daisey paid additional and previously undisclosed sums (including the Personal Property Fee, a Redemption Fee, an inflated and/or un-incurred Storage Expense, and/or an Administrative Fee); and,
>
> (b) Failed to return his redeemed vehicle to the county where Daisey lived (Luzerne County) or the county where the vehicle was purchased (Columbia County) or where the vehicle was repossessed (Luzerne County) as required by (12 Pa. C.S. §6259(c)(2))(Form RISC, ¶20.b.) and, therefore, 13 Pa. C.S.A. §9610, forcing him to travel approximately 50 miles to Don's Auto, the repossessor's lot, in Carbon County; and,
>
> (c) Refused to convey title to his repossessed vehicle until he made additional monthly payments which totaled approximately $2,466.13.

### B.     The Repossession and Sale of Edward Flynn's Vehicle

40.     In October 2012, the Bank, as secured creditor by assignment of a Form RISC entered into in Pennsylvania, foreclosed on Flynn's vehicle loan and caused Flynn's vehicle to be repossessed in Pennsylvania.

41.     Like Daisey, the Bank or its agent sent Flynn a Form 1 Notice of Repossession, attached at **Exhibit 6**.

42.     Two of the items making up the $3,118.60 "Total redemption amount" was the "Expense of storing the Vehicle" of $75.00, purportedly for three (3) days of storage at the rate of "$25.00 per day" and an "Expense of preparing/repairing the Vehicle for sale" of $200.00.

43.     The Bank, however, did not pay to any third party or otherwise incur these expenses, in the alternative, the Bank only incurred an expense of storing the vehicle of approximately $10.00 a day for only a few days.

44.     Commonwealth Recovery, the repossessor of Flynn's vehicle, charged the Bank nothing to store the repossessed vehicle. (*See,* Affidavit of Carin Trice of Commonwealth Recovery, the repossessor agent, attached hereto as **Exhibit 7**).

45.     The Bank enjoyed free storage for the first 10 days after the repossession of Flynn's vehicle. *Id.*

46.     After the first 10 days, the Bank would have been charged only approximately $10.00 per day, not the inflated, commercially unreasonable fee of $35.00 which Flynn's Notice of Repossession represented.  *Id.*

47. Like all auctions the Bank used to sell Plaintiff's and Class Members' repossessed vehicles, Central Pa Auto Auction (who auctioned Flynn's vehicle) did not charge the Bank either: (1) a Storage Expense and, if such was charged to the Bank, it was not charged at the inflated, commercially unreasonable rate stated in the Class Members Notice of Repossession; or, (2) a $200 Prepare/Repair Expense *See*, Affidavit of Doug Miller, Vice President and Chief Operating Officer of Central Pa Auto Auction, Inc. attached as **Exhibit 8**.

48.     On or about October 31, 2012, the Bank completed and executed a PennDOT Form MV-217A in order to facilitate the transfer of the title from Flynn to the Bank. In this connection, the Bank's authorized agent falsely certified that it had "complied with all applicable laws and regulations of Pennsylvania." (**Exhibit 9**)

49.     After Flynn's vehicle was sold, the Bank did not send a Post-Sale Notice to Flynn or to his counsel.

C.     **The Repossession and Sale of Douglas Abbott's Vehicle**

50.     In November, 2015, the Bank, as secured creditor, foreclosed on Abbott's vehicle retail instalment sales contract entered into in Pennsylvania and caused Abbott's vehicle to be repossessed in Pennsylvania.

51.     The Bank or its agents sent Abbott a Form 2 Notice of Repossession. A copy of this Notice of Repossession is attached as **Exhibit 10**.

52.     One of the items making up the $7,504.61 "Amount Required to Redeem" was the "Storage Expenses" of $75.00, purportedly for three (3) days of storage at the rate of "$25.00 per day" and "Sale preparation expenses" of $200.00.

53.     The Bank, however, did not pay any third party or otherwise incur the listed expenses for "Storage" or for "Sale Preparation Expenses" associated with Abbott's repossessed vehicle, as the disclosure notice represented, or in the alternative, the Bank only incurred an expense of approximately $10.00 a day for only a few days.

54.     The Bank completed and executed a PennDOT Form MV-217A in order to facilitate the transfer of the title from Abbott to the Bank. In this connection, the Bank's authorized agent falsely certified that it had "complied with all applicable laws and regulations of Pennsylvania."

55.     After the sale of Abbott's vehicle, the Bank sent Abbott a Post-Sale Notice (attached hereto as **Exhibit 11**).

D.     **The Repossession and Sale of Catherine Hosick's Vehicle**

56.     In May of 2015, the Bank, as secured creditor by assignment of a Form RISC entered into in Pennsylvania, foreclosed on Hosick's vehicle loan and caused Hosick's vehicle to be repossessed in Pennsylvania.

57.     Like Abbott, the Bank or its agents sent Hosick a Form 2 Notice of Repossession, which is attached hereto as **Exhibit 12**.

58.     One of the items making up the $7,464.99 "Amount Required to Redcem" was the "Storage expenses" of $40.00, purportedly for five (2) days of storage at the rate of "$20.00 per day" and a "Sale Preparation Expense" of $200.00.

59.     The Bank, however, did not pay any third party or otherwise incur the listed expenses

for "storage" or for "Sale Preparation" associated with Hosick's repossessed vehicle as the Notice of Repossession represented, or in the alternative, the Bank only incurred an expense of approximately $10.00 a day for only a few days.

60.     As in Daisey's case, the Bank contracted for the repossession with MCRC (as shown in Hosick's Notice of Repossession) who subcontracted with First Credit Resources, a repossessor. As a precondition to reinstate her loan or redeem the repossessed vehicle, consistent with MCRC's fee schedule, Hosick would have had to pay: (a) a daily Storage Expense of approximately $30 per day; a Redemption Fee of approximately $50; and an Administrative Fee, and/or a Personal Property Fee of approximately $25.00.

61.     The Bank completed and executed a New York Department of Motor Vehicle form MV-950 in order to facilitate the transfer of the title from Hosick to the Bank. In this connection, the Bank's authorized agent falsely certified that it had "complied with . . . .any applicable laws in the state where the vehicle was repossessed."

62.     After Hosick's vehicle was sold, the Bank did not send a Post-Sale Notice to Hosick or to her counsel.

12

## V.   STATUTORY VIOLATIONS

### A.   BANK'S OBLIGATION OF GOOD FAITH AND REQUIREMENT TO PROCEED IN COMMERCIALLY REASONABLE MANNER

63.     There are two overarching principles that must guide a secured creditor's conduct in foreclosing on a vehicle loan and repossessing and selling a financed vehicle. The first is that all aspects of its conduct must be "commercially reasonable." Second, regardless of whether there is ultimately a reinstatement of the loan or a redemption or sale of the repossessed vehicle, the Bank must fulfill its obligation of good faith: to conduct itself honestly and that it observe reasonable commercial standards of fair dealing. See,13 Pa. C.S.A. §9610(b); 13 Pa. C.S §9102; and §1304.

64.     13 Pa. C.S.A. §9610(b) prohibits the sale of the vehicle collateral if **all aspects** of the sale are not commercially reasonable. That provision states, in relevant part, as follows:

> Commercially reasonable disposition – <u>Every</u> aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable. **[Only]  If  commercially  reasonable,  a secured  party  may  dispose  of  collateral** by  public  or  private proceedings…. (Emphasis added).

65.     As described herein, many aspects of the Bank's conduct were not commercially reasonable, in violation of one or more statutes, regulations, and/or the Bank's self-imposed duties or obligations. As such, the Bank's sale of Class Members' repossessed vehicles are void *ab initio*. While the UCC statutes described below are independently violated, they also violate the Bank's obligation of good faith and to proceed in a commercially reasonable manner.

## B. FAKE EXPENSES IN THE NOTICES OF REPOSSESSION

### The UCC requires notices of repossession to contain accurate information

66.     After foreclosing on a vehicle loan and then repossessing a vehicle, the Bank had a statutory obligation to provide a "reasonable authenticated notification of disposition" (i.e. Notice of Repossession). 13 Pa.C.S.A. §9611(b).

67.     13 Pa.C.S.A. §9614 sets forth what information must be included in a Notice of Repossession.

68.     A Notice of Repossession that lacks **any** of the required information is *insufficient as a matter of law*. 13 Pa.C.S.A. §9614, Comment 2 ("A notification that lacks any of the information set forth in paragraph (1) is insufficient as a matter of law.").

69.     The Form 1 and 2 Notices of Repossession violated the UCC because, *inter alia*, they listed fake (i.e. un-incurred in part or in whole) expenses and, thereby, misstated the redemption amount.

70.     Section 9623(b) of the UCC states:

> "...[t]o redeem the collateral, a person shall tender ... (2) the reasonable expenses and attorney <u>fees described in section 9615(a)(1)(relating to application of proceed)</u>." (emphasis added).

71.     Thus, the Bank's Notices of Repossession, which claim to inform the vehicle owner how much he/she will have to tender to Redeem the vehicle, can only include in that Redemption Amount, those expenses listed in Section 9615(a)(1).

72.     Section 9615(a)(1) limits these expenses to:

> "the reasonable expenses of retaking, holding, preparing for disposition, processing and disposing...<u>incurred by the secured party</u>." (emphasis added).

14

73.     The "safe harbor" notice language set forth in Section 9614(3) also makes clear that only expenses ***actually incurred*** and **by the secured party** can be passed on to the vehicle owner:

> "You can get the property back at any time before wc sell it by paying us the full amount you owe (not just the past due payments), including **our expenses**." (emphasis added).

### Storage Expenses

74.     At all relevant times during the class period, the Bank had a secret agreement with MCRC and repossessors whereby the Bank would be insulated from any storage expense associated with any repossession of Class Members' vehicles for the first approximately 15 days after repossession; only thereafter, the Bank would be charged approximately $8 per day. In most all instances, the Bank did not incur any storage expense because the Bank transported the repossessed vehicle from the repossessor's lot before any storage expense would begin to be incurred by the Bank. Only in the few cases when a Class Member would redeem or reinstate the loan, the Class Member would pay a storage expense directly to the repossessor.

75.     According to Donald Dayton, the repossessor involved with Edward Flynn's vehicle, Don's Auto does not charge any storage fee for the first 15 days after the date of repossession, and only about $8 per day—not $35 per day—thereafter. *See*, Affidavit of Donald Dayton of Don's Auto, attached hereto as **Exhibit 13** at ¶3.

76.     It was the Bank's policy and practice to include in the redemption amount shown on every Notice of Repossession (including Form 1 and 2 Notices of Repossession), a Storage Expense which was, at the very least, is inflated approximately 4 times the amount the Bank would incur, in the oft-chance it would have to pay a storage expense. The Bank would never pay the $20.00-$35.00 per day as it systematically represented to Class Members in the Notice of Repossession as being due and owing.

15

**Prepare/Repair Fee**

77.      Another purported expense included in the alleged redemption amount was a $200.00 fee mistakenly labelled as an "Expense of preparing/repairing the Vehicle for sale" or "Sale preparation Expense." This $200 charge is also not an actual expense of the Bank. It is not an amount that the Bank paid to any third party or owes to anyone. It is a fictitious "expense."

78.      Indeed, as a matter of standardized policy and practice, at the time it sends a Notice of Repossession, M&T has not authorized any repairs to the Class Member's repossessed vehicle nor has made any "preparations" for its sale. In fact, in all instances when the Bank sends the Class Member a Notice of Repossession, it does not know for certain whether it will sell the vehicle or whether the Class Member will choose to redeem.

**Additional Impact of Bogus Expenses in the Notices of Repossession**

79.      Form 1 Notice of Repossession (**Exhibit 2**) improperly included expenses in the "Total redemption amount", such as the "Expense of storing the Vehicle" and the "Expense of preparing/repairing the Vehicle for sale", which do not represent costs that the Bank *actually* incurred and inflates the stated redemption amount.

80.      Similarly, Form 2 Notice of Repossession (**Exhibit 3**) improperly includes expenses in the "Amount Required to Redeem" such as the "Storage expenses" and the "sale preparation expenses," which do not represent costs that the Bank actually incurred and inflates the stated redemption amount.

81.      Accordingly Notices of Repossession Forms 1 and 2 (**Exhibits 2** and **Exhibit 3**) failed to comply with the requirements for Notices of Repossession set out by the UCC by failing to limit the Notice to the *actual expenses incurred*, which violates 13 Pa.C.S.A. §§9614(1)(ii), 9615(a)(1), and 9623(b), and is otherwise commercially unreasonable in violation of Pa.C.S.A.

§9610, 13 Pa. C.S §9102; and §1304 by, *inter alia*, also failing to conform to its obligation in most all of the retail installment sales contracts.

### C. <u>UNDISCLOSED FEES</u>

**The Redemption Fee, Personal Property Fee, and Administrative Fee**

82.     As a matter of uniform practice, all Class Members who redeemed his/her vehicle were similarly forced to pay an undisclosed Redemption Fee (approximately $40) and a Personal Property Fee (approximately $40) and usually an Administrative Fee (rates varied), as a further precondition to the recovery of his/her vehicle and belongings.

83.     These fees do not constitute "the reasonable <u>expenses</u> of retaking, holding, preparing for disposition, processing and disposing" of the collateral, as required by 13 Pa.C.S.A. § 9615(a)(1).  Thirteen Pa.C.S.A. § 9623(b)(2) allows a debtor to redeem his vehicle by tendering, *inter alia*, the reasonable expenses and attorney fees described in 13 Pa.C.S.A. §§9615(a)(1). The above expenses were not "reasonable" as they were, as a matter of course, never incurred by the Bank. The collection of such amounts from class members as a condition of recovering their vehicles or a precondition to regain access to their personal possession was a violation of both Section 9615(a)(1) and 9623(b)(2).

84.     As a matter of a standardized policy and practice, while the Bank did not charge directly for a Redemption Fee, the Personal Property Fee, or an Administrative Fee, it had <u>actual</u> knowledge that these illegal fees (not expenses) were being assessed by third parties. Indeed, the Bank entering into contracts with repossessors and MCRC expressly permitting these charges to be assessed.

85.     This deceptive and unfair practice had the effect to impose a non-consensual lien

on the personal property owned by Class Members which neither the Bank nor any third party had a right to assert. This conduct is akin to a trespass to chattel claim.

### D. COMMERCIALLY UNREASONABLE REDEMPTION PRACTICES

86.     In Form 1 Notice of Repossession, the Bank's listed a "Total redemption amount," but when this amount was paid by an owner, the Bank would treat it as a Reinstatement and require the owner to make additional payments, even though the Form RISC provides "This Notice [of Repossession] will tell you how to buy back (redeem) the Vehicle.  You will NOT have the right to reinstate this Contract."

87.     Also, the Bank employed a standardized policy not to permit a redemption after the repossessed vehicle was transported to auction, in breach of the material terms in its disclosure notices (i.e., "You can get the Vehicle back at any time before we sell it...") and 13 Pa. C.S. §9623(c)(2).

88.     At least during the period of time when the Bank employed Form 1 Notice of Repossession, or in the alternative at all relevant times, in cases where class members wanted to redeem his/her vehicle and paid the Redemption Amount listed in their notice of repossession (and sometimes more), M&T refused to transfer the title to the owner, as it was obligated to do. Instead, in those cases, as a precondition to transferring the title to the owner, M&T insisted that the debtor(s) either resume making monthly payments to M&T or pay one or more "fees" such as a Personal Property Fee, a Redemption Fee, an Administrative Fee, an inflated Storage Fee.

89.     When owners of repossessed vehicles redeemed, M&T failed to return the redeemed vehicle to one of the statutorily (12 Pa.C.S. §6259(c)(2)) and contractually required locations: namely, the county where the person lived or the county where the vehicle was purchased or repossessed. Also, Form RISC requires the return of the redeemed collateral.

## E.  POST-SALE NOTICE CLAIMS

90.     13 Pa.C.S.A. §9616 states that after a consumer's vehicle is sold, the holder is required to send to the debtor (in this case the former owner of the vehicle) an "Explanation of Surplus or Deficiency" (a Post-Sale Notice). §9616(C) specifies the information that must be contained in such a Post-Sale Notice.  Among that information is:

> The amount, in aggregate or by type, and types of expenses, including expenses of retaking, holding, preparing for disposition, processing and disposing of the collateral and attorney fees secured by the collateral which are known to the secured party and relate to the current disposition. 13 Pa.C.S.A. §9616(c)(4).

91.     As part of a pattern or practice of non-compliance, the form of standardized form Post-Sale Notice sent to Class Members such as Plaintiff Abbott (**Exhibit 4**) including inflated and/or fictitious expenses such as those described above which do not fall within the purview of the enumerated to be charged, in violation of 13 Pa.C.S.A. §9616(c)(4). While other standardized forms may have been used by the Bank, they all included these improper expenses.

92.     Also, as part of a pattern or practice of non-compliance, the Bank routinely neglected to properly reflect in its Post-Sale Notices the rebates and other credits to which the consumer buyers were entitled and when it readily had that information at the time the notice was sent, in violation of Section 9616(c)(1) or to send any Post-Sale Notice at all.

## F.  EVIDENCE OF ADDITIONAL STATUTORY VIOLATIONS OF OBLIGATION OF GOOD FAITH AND COMMERCIAL UNREASONABLENESS

### The Retitling Process

93.     For all Class members who did not redeem their vehicle, including Plaintiffs Flynn, Abbott, and Hosick, the Bank or its agent submitted to PennDOT Form MV-217A, a New York Department of Motor Vehicle Form 950, or similar form (hereafter "Retitling Forms") to obtain a new title to each repossessed vehicle.  Exemplars of the MV-217A and 950 are attached as **Exhibit**

19

**14** and **Exhibit 15**, respectively.

94.     In executing and submitting Retitling Forms, the Bank (directly or through its authorized agent) routinely certified that it had either "complied with all applicable laws and regulations of Pennsylvania" (PennDOT) or "complied with . . . .any applicable laws in the state where the vehicle was repossessed" (NY DMV 950). Other states have similar certification requirements.

95.     While the Bank did not intend for these certifications to be false, they were false for reasons described herein.

96.     PennDOT, the NY DMV, or any other state which issued a new title to the Bank which has a similar certification provision would not have done so if these agencies had known that the Bank made false certifications. Most all of the class members vehicles were sold in either Pennsylvania or New York.

97.     The improper transfer of title resulted in property damage in the form of the loss of the use of the vehicle and loss of ownership for each and every class member whose vehicle title was transferred through the use of these Retitling Forms.

98.     The use of false certifications on these retitling forms to retitle repossessed vehicles was commercially unreasonable in violation of 13 Pa.C.S. §9610(b). Plaintiffs are not attempting to enforce any administrative remedy which PennDOT or a DMV may pursue. Rather, Plaintiffs and Class Members assert that, as a result of the underlying UCC deficiencies described herein, the Bank did not have the right to sell and/or transfer title.

99.     While the Bank did not intend that its loan servicing actions described herein would ultimately invalidate the title transfers of the repossessed vehicles and sale, they did.

**Other Statutes Violated**

100.    **MVSFA:** [1] At all relevant times, the Bank had a contemporaneous obligation to also comply with 12 Pa.C.S.A. §6254(c)(1)[misstating redemption rights: Form 1 Notice of Repossession], §6256(2)[listing expenses in NOR which were not "actual, necessary, and reasonable"], §6259(b)[failing to permit redemption after Redemption Amount paid], and §6259(b)(c)(1)[failure to comply with 9623]; and §6259(b)(2)[failure to deliver redeemed vehicle to consumer].

101.    **MVSFA and UCC in *pari materia*:** Furthermore, the UCC and the MVSFA must be read in *pari materia. Industrial Valley Bank & Trust Co. v. Nash*, 349 Pa. Super. 27, 502 A.2d 1254 (1985); *Coy v. Ford Motor Credit Co.*, 422 Pa. Super. 76, 79, 618 A.2d 1024, 1025 (1993); *Whiteman v. Degnan Chevrolet, Inc.*, 217 Pa. Super 424, 272 A.2d 244 (1970); *McCall v. Drive Financial Services, L.P., et al.*, January Term, 5 (2009) (**Exhibit 16**), and 13 Pa. C.S.A. §9620, Comment 9. [2]

102.    In addition, or in the alternative, the UCC and MVSFA must be interpreted in *pari materia* because certain provision(s) of the UCC is (are) ambiguous in a manner as described below. The ambiguity can be resolved by applying the MVSFA statutory requirements. Relevant ambiguities in the UCC include:

---

[1] The MVSFA was originally found in Chapter 7 of Title 69 of Purdon's Statutes.  In 2014, it was repealed and recodified in Chapter 62 of Title 12 of Pennsylvania Consolidated Statutes.  Substantively, the recodified provisions are substantially the same as the original provisions, although the arrangement is somewhat different.  Each of these versions of the MVSFA controlled during a portion of the class period.  Plaintiffs have cited only the recodified version of the statute, but intend that the corresponding provision of the original statute apply to the older transactions.

[2] Further, Comment 9 to 13 Pa. C.S.A. §9620 states: "**Applicability of Other Law.** This section does not purport to regulate all aspects of the transaction by which a secured party may become the owner of collateral previously owned by the debtor. For example, a secured party's acceptance of a motor vehicle in satisfaction of secured obligations may require compliance with the applicable motor vehicle certificate-of-title law. **State legislatures should conform those laws so that they mesh well with this section and Section 9-610, and courts should construe those laws and this section harmoniously.** A secured party's acceptance of collateral in the possession of the debtor also may implicate statutes dealing with a seller's retention of possession of goods sold." (Emphasis added).

(a) Whether Comment 9 to §9620 implies the incorporation of the MVSFA;

(b) Whether reference to "this section" in §9620 refers to Article 9, not just Section 9620; and/or,

(c) Whether the MVSFA and the regulation promulgating the use of the MV-217 and NY DMV Form 950 constitute "certificate-of-title laws" as referenced in Comment 9 to §9620.

103. **18 Pa. C.S.A. §4911(a)(1) and (2)**: The Bank similarly had an obligation to ensure that its certifications were truthful though violated 18 Pa. C.S.A. §4911(a)(1) and (2) when it submitted false certifications in PennDOT.

104. **12 U.S.C.A. §5536(a)**: The Bank similarly failed to comply with 12 U.S.C.A. §5536(a) which provides "It shall be unlawful for…any covered person or service provider…to engage in any unfair, deceptive, or abusive act or practice." A "covered person" is, *inter alia*, any person [including the Bank] engaged in "collecting debt related to any consumer financial product or service." 12 U.S.C.A. § 5481(15)(A)(x), which includes the Bank.

## Retail Instalment Sales Contracts Violated

105. In all instances, Class Members executed a Form RISC or a similar retail instalment contract in which the Bank obligated itself to charge only for "expenses" – meaning actual charges which the Bank paid. As seen above, it failed to do so. In the Form RISC, executed by most class members, the Bank assumed a duty also to prove that it incurred such expenses, which for the challenged expenses described above, it cannot do as a matter of course. Additionally, the Form RISC required the Bank to return the redeemed collateral to the debtor as required by law (which, as a matter of policy and practice, is not performed by the Bank).

### Self-Imposed Duty

106.     In disregard for its Code of Business Conduct and Ethics, though its actions and consequences were not intended, the Bank and M & T Corporation executed, supervised, participated, or implemented a deceptive scheme to conceal material facts from Plaintiffs and Class Members as described above -- all wrongdoing which was set in motion, overseen, governed, ratified, and/or encouraged by both Defendants.

### Failure to Comply with it Obligation of Good Faith

107.     The Bank failed to with its obligation of good faith in its performance of its contracts, duties, and statutory obligations in violation of 13 Pa. C.S. 1304 as set forth above or by ways to be discovered.

## VI.     DAMAGES

### The UCC Provides for Actual or Minimum Compensatory Statutory Damages

108.     13 Pa. C.S.A. §9625(c)(2) allows consumer debtors such as Plaintiffs (and members of the putative class) to recover statutory damages of not less than the credit service charge (finance charge) plus 10% of the principal amount of the obligation (amount financed). These figures are readily determinable simply by a review of the Schumer Box of each Class Members' retail instalment sales contract.

109.     By way of example, the minimum compensatory §9625(c)(2) statutory damage calculation for Plaintiff Hosick is 10% of $15,696.64 + $3,648.32 = $5,217.98. The Schumer Box from Hosick's retail instalment sales contract is set forth below.

110.     The Official Comments to the UCC are entitled to great weight under Pennsylvania law. Comment 4 to Section 9625 makes clear that these statutory damages are intended to establish a secured party's liability for violations of, *inter alia*, the notice provisions in consumer goods

transactions, regardless of whether "actual damages" are greater, lesser, or even absent. That Comment states in pertinent part:

> 4. **Minimum Damages in Consumer-Goods Transactions.** Subsection (c)(2) provides a minimum, statutory, damage recovery for a debtor and secondary obligor in a consumer-goods transaction. It is patterned on former Section 9507(1) and is designed to ensure that every noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, regardless of any injury that may have resulted. Official Comment to §9625(c)(2).

111.   Plaintiffs and Class Members seek the greater of actual and minimum statutory damages pursuant to 13 Pa. C.S. §9625(c)(2) and (b). Duplicative damage are not sought.

112.   Actual damages may entail, *inter alia*, the following:

(a)   The amounts collected by M&T for unlawful or inflated fees and expenses;

(b)   Loan payments collected from class members after they had redeemed their vehicles;

(c)   Payments made by class members towards invalid deficiencies;

(d)   Expenses incurred in retrieving their redeemed vehicle from a county other than one statutorily and contractually required.

(e)   Except in cases of redemption and reinstatement, the value of the vehicles which: (1) were invalidly sold notwithstanding that Section 9-610 had been violated; and (2) whose titles were transferred notwithstanding that the false certifications in the Retitling Forms.

113.   Plaintiffs also seek damages under 13 Pa.C.S.A. §9625(e)(5) which provides for $500 in statutory damages for each violation of Section 9616.

114.   Statutory damages are not in the nature of the repayment of principal or interest already paid by Plaintiffs and Class Members. Regardless of whether the class member may choose damages pursuant to 13 Pa. C.S. 9625(c)(2) or (b) and may also be entitled to additional damages pursuant to 9625(e), all such statutory damages are compensatory; they are not in the nature of a fine or penalty. *See, Cubler v. TruMark Financial Credit Union*, 83 A.2d 235 (Pa. Super. 2013).

**Deficiency Balances Must be Extinguished and all Payments Must be Returned**

115.    The commercial reasonableness requirement of 13 Pa. C.S.A. §9610(b)
applies to the sending of both statutorily-compliant Notices of Repossession and Post-Sale Notices.

116.    A secured creditor's failure to conduct itself in a commercially reasonable
manner while servicing a vehicle loan gives rise to a presumption that the value of the vehicle
collateral is precisely equal to the indebtedness it secures.  Based on that presumption, the sale of
the vehicle would entirely extinguish the indebtedness, because by definition, no deficiency could
result. *Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 78 (1983).

117.    As stated herein, Plaintiffs have detailed the multiple ways in which the Bank's
loan servicing actions were commercially unreasonable because they violated the provisions of the
UCC.

118.    Accordingly, pursuant to *Savoy*, the deficiency balance of every Class Member
must be presumed to have been extinguished by the sale of his/her vehicle, and unless the
presumption is rebutted, any amounts collected by the Bank from class members in respect of
alleged deficiencies were illegally collected and must be disgorged.

119.    In some cases, the Bank has refinanced one of these previously-extinguished
deficiencies. (*See* refinance offer attached hereto as **Exhibit 17**). Collecting payments on a loan
that refinanced a "debt" that was not owed in the first place is just as improper as collecting
payments directly on the original unlawful debt. As a consequence, any amounts collected by the
Bank from Class Members with respect to refinanced loans or new loans to finance disputed (and
un-owed) deficiency balances were illegally collected and must be disgorged.

25

120.     The UCC contemplates that actual damages for violations of its provisions should be consistent with equitable principles.  Accordingly, damages are not limited to those specified within the four corners of the statute.  *See e.g.* Section 9620 Comment 12: "Remedies available under other law, including conversion, remain available under this Article in appropriate cases;" Section 9625, Comment 3: "…principles of tort law supplement this subsection."  Accordingly, damages should be awarded with an eye towards preventing Defendants from being unjustly enriched and, therefore, other equitable relief such as injunctive relief is sought herein.

## VII.  CLASS ALLEGATIONS

121.     Plaintiffs bring this action on their own behalf and on behalf of the following classes and subclasses of individuals designated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

122.     Plaintiffs propose the "Form 1 NOR Class," defined as: All debtors, obligors, and co- obligors:

(a)     who entered into a retail instalment sales contract in Pennsylvania for the financing of the purchase of a Motor Vehicle primarily used for personal, family or household use and whose retail instalment sales contract was assigned or sold to the Bank; and,

(b)     from whom the Bank, as secured party, repossessed the vehicle or ordered it to be repossessed; and,

(c)     whose vehicle was repossessed in Pennsylvania; and,

(d)     who were sent a Notice of Repossession by the Bank that was identical or substantially similar to Form 1 Notice of Repossession (**Exhibit 2**), at any time on or after September 22, 2011 through the date of class certification.

123.     The Form 1 NOR Class is represented by Plaintiffs Flynn and Daisey.

124.     Plaintiffs propose the "Form 2 NOR Class," defined as: All debtors, obligors, and co-obligors:

     (a)    who entered into a retail instalment sales contract in Pennsylvania for the financing of the purchase of a Motor Vehicle primarily used for personal, family or household use and whose retail instalment sales contract was assigned or sold to the Bank; and,

     (b)    from whom the Bank, as secured party, repossessed the vehicle or ordered it to be repossessed; and,

     (c)    whose vehicle was repossessed in Pennsylvania; and,

     (d)    who were sent a Notice of Repossession by the Bank that was identical or substantially similar to Form 2 Notice of Repossession (**Exhibit 3**), at any time on or after September 22, 2011 through the date of class certification.

125.    The Form 2 NOR Class is represented by Plaintiffs Hosick and Abbott.

126.    Plaintiffs propose the "NOR Alternative Class," defined as: All debtors, obligors, and co-obligors (individually and collectively "Borrower"):

     (a)    who entered into a retail instalment sales contract in Pennsylvania for the financing of the purchase of a Motor Vehicle primarily used for personal, family or household use and whose retail instalment sales contract was assigned or sold to the Bank; and,

     (b)    from whom the Bank, as secured party, repossessed the vehicle or ordered it to be repossessed; and,

     (c)    whose vehicle was repossessed in Pennsylvania; and,

     (d)    who were sent a Notice of Repossession by the Bank at any time on or after September 22, 2011 through the date of class certification;

     (e)    which failed to inform the Borrower of the Personal Property Fee or the Redemption Fee; or,

     (f)    failed to inform the Borrower that the Storage Expense exceeded an amount which the Bank incurred; or,

     (g)    included amounts itemized as an "Expense of Storing the Vehicle" "Storage Expenses" "Expense of preparing/repairing Vehicle for sale" or "Sale preparation expenses" or other charges for amount(s) not incurred by the Bank.

127.    The NOR Alternative Class is represented by all Representative Plaintiffs.

128.    Plaintiffs propose a "Post-Sale Notice Class" defined as: All debtors, obligors, and co-obligors who are members of the Form 1 NOR Class, the Form 2 NOR Class, or the NOR Alternative Class who:

    (a)    were either sent a Post-Sale Notice which included in the total amount due and/or deficiency balance, an expense(s) not incurred by the Bank; or,

    (b)    were not sent a Post-Sale Notice either directly or through his or her counsel.

129.    The Post-Sale Notice Class is represented by Plaintiffs Abbott, Hosick, and Flynn.

130.    Plaintiffs believe that there are thousands of members of these classes. These classes are sufficiently numerous that joinder of all members would be impractical. Fed.R.Civ.P. Rule 23(a)(1) is, therefore, satisfied.

131.    Questions of law which are common to all Plaintiffs and Class Members include but are not limited to the following:

    (a)    Whether each Class Member entered into a RISC in Pennsylvania and had their vehicle repossessed in Pennsylvania;

    (b)    Whether each Class Member's RISC was assigned to the Bank;

    (c)    Whether the subject Notices of Repossession Forms 1 and 2 complied with the UCC;

    (d)    Whether the Post Sales Notice complied with the UCC;

    (e)    What the minimum statutory damages for the Form 1 NOR and Form 2 NOR Classes;

    (f)    What the minimum statutory damages of the Post Sale Class are;

    (g)    Whether it is commercially reasonable for the Bank to have assessed "expenses" to Class Members which it had not incurred;

(h)    Whether the Bank is obligated to disgorge post-redemption payments it received.

132.    Questions of fact which are common to all Plaintiffs and Class Members include but are not limited to the following:

(a)    Whether the Bank repossessed the financed vehicle of each class member;

(b)    Whether, as a matter of policy and practice, the Bank actually incurred an "Expense of preparing/repairing the vehicle for sale" prior to the sending of the Notice of Repossession;

(c)    Whether, as a matter of policy and practice, the Bank placed storage charges on its Notices of Repossession that exceeded the storage expenses that it actually incurred.

133.    Plaintiffs will fairly and adequately represent and protect the interests of the class.

134.    Plaintiffs are represented by counsel that is competent and experienced in both consumer protection law generally and class action litigation, specifically, having filed and certified these types of claims.

135.    The prosecution of several separate actions by the members of the classes would, as a practical matter, create a risk of inconsistent or varying adjudications, leaving these defendants with inconsistent standard for the conduct required of it.  A class action, in contrast, will serve the goal of judicial economy and ensure uniformity of result.

136.    Concomitantly adjudicating individual claims would create the possibility that a single such adjudication would effectively be dispositive of the claims of individuals that are not parties to such adjudication.

137.    The Defendants have acted on grounds generally applicable to the all the members of all the classes, thereby making appropriate injunctive or declaratory relief on behalf of the class if such becomes necessary.

138.    The above-enumerated questions of law and fact common to the classes and the subclasses predominate over any questions affecting only individual members.

139.    A class action is clearly superior to other methods of adjudication for fairly and efficiently adjudicating the similar claims of hundreds of individuals.

140.    Plaintiffs are not aware of any class members being interested in prosecuting separate actions.  To the extent that any such individuals exist, they have the option of excluding themselves from the class.

141.    Plaintiffs are also unaware of any other litigation currently pending that raises the issues being litigated in the present matter.

142.    Neither the size of the class nor the complexity of the issues suggests that there would be any particular problems managing this class action.

## VIII. <u>CLAIMS</u>

### <u>COUNT 1</u>
### (Form 1 NOR Class, Form 2 NOR Class and NOR Alternative Class)

143.    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

144.    The Bank systematically sent Notices of Repossession to Plaintiffs and Class Members which included expenses not actually incurred by the Bank and/or not permitted by statute; failed to notify Plaintiffs and Class Members of fees required to be paid for redemption of their repossessed vehicles, which were not permitted to be assessed by law and/or contract; misrepresented and/or failing to honor Plaintiffs' and Class Members' statutory right to redeem; and provided an inaccurate description of liability of a deficiency balance by misrepresenting the amount required to redeem and other misconduct described above.

145.    The Bank further systematically charged (or permitted the assessment of) undisclosed, improper, un-incurred and/or inflated fees and/or expenses Class Members who

redeemed their vehicles; failed to permit class members to redeem their repossessed vehicle up to the point of sale; and collected additional loan payments and other amounts from class members who had tendered the Redemption Amount as more fully described herein.

146.     These acts violated 13 Pa.C.S.A. §§9614(1)(B) and (3), 9615(a)(1), 9616, and 9623.These acts were also commercially unreasonable in violation of 13 Pa.C.S. §9610(b).

147.     These Defendants also violated 13 Pa. C.S.A. §9610(b) by the following acts and omissions, which individually and collectively constitution commercially unreasonable conduct: retitling repossessed vehicles through false certifications on PennDOT forms; violating the MVSFA; violating the UCC and MVSFA in *pari materia*, violating the Form RISC and other retail installment contracts entered into with Plaintiffs and Class Members; violating their Code of Business Conduct and Ethics; and failing to comply with their statutory obligation of good faith.

## COUNT 2
### (Post-Sale Notice Class)

148.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

149.     At all relevant times, as part of a pattern or consistent with a practice of noncompliance and was not commercially reasonable, the Bank's conduct servicing its vehicle loans, included sending non-compliant notices as described above or failing to send any Post-Sale Notice at all violated13 Pa.C.S.A. §9616.

150.     Accordingly, the Defendants are liable to each member of the Post-Sale Notice Class for statutory damages in the amount of $500, pursuant to 13 Pa.C.S.A.  §9625(e)(5). Further, because the Bank acted commercially unreasonably, any remaining indebtedness of the Post-Sale Notice Class Members is extinguished, pursuant to *Savoy*, *supra*.

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request that this Honorable Court grant the following relief as against both Defendants jointly and severally as follows:

A.    Certify the requested classes and appoint the undersigned as class counsel; and,

B.    Monetary Damages

    1.    Award the greater of actual $\underline{or}$ minimum statutory compensatory damages as provided by 13 Pa. C.S. §9625(b) and (c)(2) to each member of the Form 1 NOR Class, the Form 2 NOR Class and the NOR Alternative Class;

    2.    Award $500.00 plus minimum statutory damages to each member of the Post-Sale Notice Class; and,

C.    Declaratory Relief

    1.    Declare that the practices complained of were not commercially reasonable pursuant to 13 Pa.C.S.A. §9610(b), and violated Sections 9614, 9615, 9616 and 9623; and,

    2.    Declare that the disputed deficiency balances of Plaintiffs and class members are invalid and cannot be collected, as a matter of law; and,

    3.    Declare that any loan by which a Class Member borrowed funds to refinance a disputed deficiency balance is null and void and cannot be collected, as a matter of law;

D.    Injunctive and Equitable Relief

    1.    Impose a constructive trust on all ill-gotten proceeds; order an accounting of all such proceeds, and their expedited return, with interest, by ordering Defendants to disgorge all moneys received from any Class Member as a payment towards a disputed deficiency claim or as a payment towards a loan to the extent that it refinanced a disputed deficiency claim pursuant to 13 Pa. C.S.A. §9625(a);

    2.    Enjoin the collection of any invalid and disputed deficiency balance as permitted by 13 Pa. C.S.A. §9625(a);

    3.    Temporarily and/or permanently enjoin:

        (a) The use of all statutorily non-compliant notices;

(b) The imposition of the unlawful storage;

(c) The imposition of sale preparation/repair fees; and,

(d) The imposition of other undisclosed and/or illegal fees or expenses incident to the sale, repossession, and/or reinstatement of class members' loans and/or the redemption of their repossessed vehicles; and,

4.   Order Defendants to remove the Bank's negative trade line for all class members; and,

5.   Grant such other and further relief as may be deemed just and proper.

Respectfully submitted,
Shenkan Injury Lawyers, LLC

_____
Richard Shenkan
*Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

A copy of this pleading was sent to all counsel of record on May 11, 2018 by E-Mail and First-Class Mail.

Shenkan Injury Lawyers, LLC.

_____
Richard Shenkan