```
                  UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD R. FLYNN, ET AL.,           :
                                   :  Case No.  17-CV-04806WB
                       Plaintiffs, :
                                   :
            vs.                    :  Philadelphia, Pennsylvania
                                   :  October 26, 2018
MANUFACTURERS AND TRADES TRUST     :  10:51 a.m.
COMPANY,                           :
                                   :
                       Defendant.  :
. . . . . . . . . . . . . . . . . .:


    TRANSCRIPT OF HEARING PLAINTIFFS' MOTION TO COMPEL DISCOVERY
             BEFORE THE HONORABLE RICHARD A. LLORET
                 UNITED STATES MAGISTRATE JUDGE
```

<u>APPEARANCES:</u>

```
 For Plaintiffs:              Richard E. Shenkan, Esq.
                              Shenkan Injury Lawyers LLC
                              6550 Lakeshore Street
                              West Bloomfield, MI  48323


 For Defendant:               Scott W. Parker, Esq.
                              Parker Ibrahim & Berg LLP
                              270 Davidson Avenue, 5th Floor
                              Somerset, NJ  08873


 For Defendant:               Fred W. Hoensch, Esq.
                              Parker Ibrahim & Berg LLP
                              1635 Market Street, 11th Floor
                              Philadelphia, PA  19103


 Court Recorder:              Crystal Wardlaw
                              Clerk's Office
                              U.S. District Court


 Transcription Service:       Maukele Transcribers, LLC
                              467 Maukele Place
                              Wailuku, Maui, HI  96793
                              Telephone: (808)244-0776
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES FOR PLAINTIFF:

Richard Kaminski
  (By Mr. Shenkan)                5

Scott Matthews
  (By Mr. Shenkan)               89

Alex Wilshaw
  (By Mr. Shenkan)              113

Ken Fries
  (By Mr. Shenkan)              128


EXHIBITS:                                    Marked

Plaintiffs' Exhibit 1                          50
Plaintiffs' Exhibit 2                          51
Plaintiffs' Exhibit 3                          66
Plaintiffs' Exhibit 4                          72
Plaintiffs' Exhibit 5                         105
Plaintiffs' Exhibit 6                         106
Plaintiffs' Exhibit 7                         141
Plaintiffs' Exhibit 8                         144

```
1    OCTOBER 26, 2018                                    10:51 A.M.

2              (Call to Order of the Court)

3              THE COURT:  Good morning, everyone.  Please be seated.

4              COUNSEL:  Good morning, Your Honor.

5              THE COURT:  We're here on a discovery hearing, a

6    hearing to listen to the argument and also take testimony on a

7    discovery dispute between the parties that's arisen by way of a

8    motion to compel and for sanctions.

9              We're here in the matter of Flynn vs. Manufacturers and

10   Trades Trust Company, 17-CV-04806-WB.  Counsel, would you enter

11   your appearances, please, first for the Plaintiffs and then for

12   the Defense?

13             MR. SHENKAN:  Richard Shenkan on behalf of Plaintiffs,

14   Your Honor.  Good morning.

15             THE COURT:  Mr. Shenkan, good morning.

16             MR. FABIAN:  Good morning, Your Honor.  My name is Rudy

17   Fabian.

18             THE COURT:  Mr. Fabian, welcome.  And for the Defense?

19             MR. PARKER:  Good morning, Your Honor.  Scott Parker

20   from Parker Ibrahim & Berg on behalf of the Defendant, M&T Bank.

21   I'm here with my colleague Fred Hoensch and Marissa Edwards.

22             MS. EDWARDS:  Good morning, Your Honor.

23             MR. HOENSCH:  Good morning, Your Honor.

24             THE COURT:  Good morning to all of you.

25             MR. EDWARDS:  Thank you.
```

1          MR. PARKER:  Thank you.

2          THE COURT:  Welcome.  Yesterday I filed a tentative

3 memorandum or memorandum of my tentative thoughts on disposition

4 in this case.  It is not meant to be binding, but it was meant to

5 bring counsel up to speed on what I'm thinking at this point in

6 time based on having read what's been submitted to me.  I'm glad

7 to structure the hearing in any way that seems productive, but at

8 this point my thought is that I simply allow counsel for

9 Plaintiff as the moving party to go forward with his

10 presentation, put on such evidence as he deems fit.  We'll take

11 argument as needed after the evidence is in.  Mr. Shenkan?

12          MR. SHENKAN:  Your Honor, thank you very much.  I don't

13 have any objection to that.  I would ask that there are two I.T.

14 people from the bank.

15          THE COURT:  Uh-huh.

16          MR. SHENKAN:  I would simply like to begin by

17 questioning Mr. Kaminski, and I would like to sequester Mr.

18 Wilshaw, momentarily, for the duration of his testimony.

19          THE COURT:  We'll grant the motion to sequester.  So,

20 Mr. Wilshire, I believe it is, is that the correct pronunciation?

21          MR. SHENKAN:  Wilshire (phonetic).

22          THE COURT:  Wilshire?

23          UNIDENTIFIED SPEAKER:  Wilshaw, Your Honor.

24          MR. SHENKAN:  Wilshaw, excuse me.

25          THE COURT:  Mr. Wilshaw, please step out of the

1   courtroom.

2          Do you want to call your first witness, Mr. Shenkan?

3          MR. SHENKAN:  I will, Your Honor.  Your Honor, prior to

4   me doing so, I simply wanted to state for the record as a matter

5   of efficiency that I will do my very best to keep the testimony

6   relevant to the motion -- subject motion.  I know I don't want to

7   waive my right in the future in the event that I do need to take

8   a subsequent deposition after I receive additional documents and

9   what have you, but I will do my best to keep things as narrowly

10  focused as possible.

11         THE COURT:  Thank you.  I accept that.

12         MR. SHENKAN:  Mr. Kaminski, please.

13         THE COURT:  Do you want to approach the Deputy and

14  please be sworn?  Crystal, can you swear in the witness.

15     RICHARD KAMINSKI, WITNESS, SWORN

16         THE CLERK:  Please state your full name and spell your

17  last name for the record.

18         THE WITNESS:  Richard Alan (phonetic) Kaminski.  Last

19  name K-A-M-I-N-S-K-I.

20         THE CLERK:  Thank you.

21         THE COURT:  You may proceed, counsel.

22                    DIRECT EXAMINATION

23  BY MR. SHENKAN:

24  Q    Good morning, Mr. Kaminski.

25  A    Good morning.

1    Q    Mr. Kaminski, could you tell us briefly about your

2    educational background.

3    A    Educational background.  I was -- I did my undergraduate at

4    Eleanor Wesleyan University in music and did graduate work at

5    University of Nevada Las Vegas, both in music as well.

6    Q    Okay.  Any post-graduate work?

7    A    I have obtained certifications in e-Discovery in

8    various capacities.  I hold two certifications from LexisNexis

9    for law, as well as three certifications, the Relativity

10   Certified Admin, the Relativity Certified User, and the

11   Relativity Analytics Expert designations.

12   Q    Any other I.T. related qualifications that you have with

13   respect to education or certification?

14   A    Not that I can think of at this time, no.

15   Q    You were certified, just so I understand, you were certified

16   in Relativity?

17   A    Uh-huh.  Yes, that's correct.

18   Q    And you said LexisNexis; what does that mean?

19   A    Law pre-discovery is the program in question.

20   Q    Law pre-discovery?

21   A    Correct.  It's a processing platform.

22   Q    And what were the other certifications?

23   A    Relativity certified administrator, Relativity certified

24   user, and a Relativity analytics expert.

25   Q    Okay.  The Relativity and the LexisNexis, are those the

1    limited numbers of certifications that you have?

2    A     Those are the two platforms in which I hold certifications,

3    yes.

4    Q     Do you have any certifications or qualifications with

5    respect to any court e-Discovery, liaison committees, that sort

6    of thing?

7    A     I'm not certain I understand the question.

8    Q     Have you been part of any discovery committee putting

9    together formats for court systems of any kind?

10   A     Not to my recollection, no.

11   Q     Tell me about your work experience, please.

12   A     I originally entered the discovery industry back in 2005.  I

13   worked in the Bibliographic Coding Department normalizing data,

14   preparing load files.  I also trained --

15            THE COURT:  Where was the Bibliographic Coding

16   Department?

17            THE WITNESS:  In Chicago, Illinois.

18            THE COURT:  What company was it with?

19            THE WITNESS:  Originally On-Site e-Discovery, then

20   acquired by Integreon.

21            THE COURT:  Okay.  Go ahead, counsel.

22            THE WITNESS:  I trained over 150 people during that

23   three year tenure at that position in how to code documents

24   appropriately.  After that I moved into project management with

25   Integreon.

1          THE COURT:  Is that how to -- excuse me -- how to code

2    documents, how to code documents for what purpose?

3          THE WITNESS:  How to capture bibliographic information

4    into specific fields for the purposes of creating searchable

5    databases around those documents.

6          THE COURT:  Very well.  Go ahead.

7          THE WITNESS:  I then moved into project management,

8    which gave me a larger scope of responsibility, slightly less

9    technical in actually operating the systems, but certainly

10   technical in advising how those systems worked and how to best

11   leverage them.

12          I then moved to Trustpoint International where I was a

13   senior project manager.  In that role, project management did

14   have a much more technical role.  I was involved from the

15   inception of the case -- the discovery on the case, from the

16   initial set of data for processing and actually sometimes

17   collecting the data, processing the data, creating the hosted

18   database, making sure that data was indexed, searchable.  You

19   know, it was facilitating the review of the documents and then

20   producing the documents for -- you know, for purposes of e-

21   Discovery productions.

22   BY MR. SHENKAN:

23   Q    When did you work for Trustpoint?

24   A    From April of 2011 through 2014, sometime I believe, late

25   2014.

1   Q    Okay.  And you worked for Integreon then, from 2005 to March

2   of 2011?

3   A    Correct.

4   Q    Okay.

5   A    Okay.

6   Q    Carry on, please.

7   A    Sure.  After my time at Trustpoint I moved to IRIS.  IRIS, I

8   was the area manager for client services overseeing the project

9   management team in, you know, supporting their efforts, as well

10  as providing escalated support to end clients regarding subject

11  matter; basically, acting as a subject matter expert for active

12  clients in my area.  After that --

13  Q    Let me just back up.

14  A    Certainly.

15  Q    This Integreon, what is the nature of that business?

16  A    Integreon, it was a litigation support provider.

17  Q    And what is the purpose of this Trustpoint International?

18  A    The same thing.

19  Q    And IRIS is the same litigation support with e-Discovery?

20  A    It is.

21       THE COURT:  Counsel, I'm not going to bar you from

22  continuing along this line of questioning, but my main interest

23  is in Mr. Kaminski's familiarity with the Defendant's --

24       MR. SHENKAN:  Okay.

25       THE COURT:  -- in-house program and what, if anything,

1   that bears on his ability to provide the necessary expertise for

2   e-Discovery.

3            MR. SHENKAN:  Let me just take another two minutes and

4   just --

5            THE COURT:  Sure.

6            MR. SHENKAN:  -- finish up your education, your work

7   experience.

8            THE WITNESS:  Understood.  After I was at Iris I moved

9   to Inventus.  And that's another litigation support provider

10  where I was the Director of Processing.  I was responsible for

11  preparing raw data and load -- creating load files and searching,

12  filtering that data.  I was responsible for overseeing the team

13  that performed that work.

14  Q    How long did you do that for?

15  A    Just shy of a year and a half.

16  Q    Okay.

17  A    Then I went to McDermott, Will & Emery out of Chicago.  I

18  was a litigation support project manager there working directly

19  with attorneys on --

20  Q    Okay.

21  A    -- e-Discovery matters.  And then most recently with Avalon

22  Document Services out of Buffalo where I'm the Vice-President of

23  Professional Technical Services overseeing all forensics, project

24  management, processing and hosted services.

25  Q    Okay.  So, you've been in the e-Discovery business actually

1   since 2005?

2   A    Correct.

3   Q    Okay.  And how is it that you came to work for this project?

4   A    For this project, I was engaged as the e-Discovery liaison

5   by M&T Bank.

6   Q    Have you done other work with M&T Bank?

7   A    I have.

8   Q    Have you done other e-Discovery work with M&T Bank?

9   A    I have.

10  Q    What was the -- what was the role that you undertook as an

11  e-Discovery liaison?

12          MR. PARKER:  Your Honor, I'm happy to have Mr. Kaminski

13  answer that question.  I would just caution that he not reveal

14  any attorney-client information with respect to any of the

15  projects he's done with respect to M&T --

16          THE COURT:  Very well.

17          MR. PARKER:  -- but I'm okay with him discussing it

18  generally.

19          THE COURT:  We'll proceed and if there's specific

20  objections to specific questions, we'll deal with them as they

21  arise.

22          MR. PARKER:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          THE WITNESS:  Sorry.  Can you --

25  BY MR. SHENKAN:

1    Q    Well, let me -- with this particular case my question is

2    what did you understand your responsibilities to be as an

3    e-Discovery liaison with respect to this particular case?

4    A    I believe it was outlined in an order, but to summarize

5    for -- what my understanding is, is to facilitate the e-Discovery

6    process, to advise on best practices, to gain an understanding of

7    the -- of the systems necessary, to be able to advise on that,

8    that type of -- that type of work.

9    Q    You're referring to the e-Discovery document 6-1?

10             MR. SHENKAN:  May I approach, Your Honor --

11             THE COURT:  Yes.

12             MR. SHENKAN:  -- just very quickly?

13             THE COURT:  And if you have a copy for me, I would

14   appreciate it.

15             MR. PARKER:  I'd like a copy, as well, please.

16             THE COURT:  Thank you.

17   BY MR. SHENKAN:

18   Q    Is this what you're referring to, Mr. Kaminski?

19   A    It is.

20   Q    Okay.  And you're referring particularly to paragraph four?

21   A    Correct.

22   Q    Would you just read to me very quickly what that is?

23   Actually, I don't need you to read it.

24             THE COURT:  No.

25             MR. SHENKAN:  I don't need you to read it.

```
 1              THE COURT:  We don't need it.  I can read it.

 2              MR. PARKER:  Your Honor, also my copy only has every

 3  other page.

 4              THE WITNESS:  Yeah.

 5              MR. PARKER:  I have pages one, three, and five.  I do

 6  not have two and four.

 7              THE COURT:  Well, you can have my copy.

 8              THE WITNESS:  Mine as well.

 9              MR. PARKER:  Your copy also has one, three, and five

10  and not two and four?

11              THE WITNESS:  Mine, as well.

12              THE COURT:  Well, it looks like the one I have has all

13  the pages, even the even numbered pages, and so we can use this

14  as the copy.  You can question the witness from it, and then

15  we'll --

16              MR. SHENKAN:  I will supplement.  I apologize, Your

17  Honor.

18              THE COURT:  Yeah.  That's fine.  I think I can shorten

19  this.  I'm familiar with the terms of the order, so if you want

20  to question the witness about the specifics of the order.

21              MR. SHENKAN:  Very quickly.

22              THE COURT:  Sure.

23  BY MR. SHENKAN:

24  Q    Can you tell me about your familiarity of the M&T systems

25  with respect to the discovery process in this case?  What systems
```

```
 1   were accessed, what systems were used, and tell me about your
 2   familiarity with those systems?
 3   A    Certainly.  There are multiple systems at play.  There's
 4   LOCUS, Shaw, AutoIMS, CACS CAFE, potentially --
 5             THE COURT:  What was the last one, CAPS CAFE?
 6             THE WITNESS:  CACS CAFE.  It's C-A-C-S or CAFE, the
 7   front end of that application.
 8   BY MR. SHENKAN:
 9   Q    What did you say, front end of what?
10   A    The front end of that application.  It's the interface.
11   Q    And it's called C-A-C-S?
12   A    No.  CACS is the -- is the program, CAFE is the collections
13   application front end.
14   Q    Okay.  Go ahead.
15   A    There's On-Demand.  They're using Microsoft Access and
16   SharePoint.  They're using a system called FileNet.
17   Q    On-Demand, SharePoint, FileNet?
18   A    Uh-huh.
19   Q    What was the last one you said?
20   A    That was the last one that I said.
21   Q    Anything else?
22   A    That's the ones that I can remember offhand, but there are
23   likely others.
24   Q    Okay.  Can you tell me very quickly what each of those
25   software programs do; in a general sense, just your familiarity
```

1   first.

2   A    Sure.  The LOCUS -- well, if you could help me out and just

3   let me know which ones you'd like in what order.

4   Q    Start with LOCUS.

5   A    LOCUS.  Okay.  LOCUS is a program that houses information

6   regarding repossession of vehicles and the charges associated

7   with it.

8           THE COURT:  Who designed LOCUS?

9           THE WITNESS:  It's my understanding that that's an

10  internal proprietary system.

11          THE COURT:  Okay.

12  BY MR. SHENKAN:

13  Q    Is it exclusively for repossession related information?

14  A    That's the only capacity in which I understand it, yes.

15  Q    Okay.  Shaw?

16  A    The accounting system.

17          THE COURT:  Who designed that?

18          THE WITNESS:  I'm not certain of that.

19          THE COURT:  Is that off the shelf or internally

20  designed; do you know?

21          THE WITNESS:  I'm not certain.

22          THE COURT:  Okay.

23  BY MR. SHENKAN:

24  Q    AutoIMS?

25  A    AutoIMS is a web-based program that's used between the bank

1   and the -- the repossession agents and resale agents to track the

2   movement of the vehicle during repossession and all the way

3   through the sale.

4           THE COURT:  Is that internally designed or is that off

5   the shelf?

6           THE WITNESS:  No, that's an external web based program.

7           THE COURT:  Okay.

8   BY MR. SHENKAN:

9   Q    C-A-C-S CAFE?

10  A    CACS CAFE, that's another system tracking information about

11  the vehicle, information about the -- the collection efforts that

12  have gone into deficient loans.

13          THE COURT:  Is there some material distinction between

14  the information collected on CACS CAFE and AutoIMS?

15          THE WITNESS:  There is.

16          THE COURT:  What's the difference?

17          THE WITNESS:  The collection effort is done primarily

18  in CACS CAFE, whereas the repossession efforts, and

19  reconditioning, and sale of the vehicles is what AutoIMS handles.

20          THE COURT:  All right.

21  BY MR. SHENKAN:

22  Q    On-Demand?

23  A    On-Demand houses monthly statements.

24          THE COURT:  Again, is that an in-house or off the shelf

25  purchase from a vendor?

```
 1              THE WITNESS:  Yeah, I'm not certain.  I'm sorry, Judge.

 2              THE COURT:  Okay.

 3   BY MR. SHENKAN:

 4   Q    How about SharePoint?

 5   A    Microsoft SharePoint.  That's a Microsoft product.  It's a

 6   document management system, document repository, among other

 7   things, but that's --

 8   Q    Is that what you use for mail merging notice of repossession

 9   of Post-Sale Notices?

10   A    SharePoint?

11   Q    SharePoint.

12   A    No, that would not be.

13   Q    What's used for that?

14   A    To mail merge and generate statements?

15   Q    Mail merge and generate notices of repossession of Post-Sale

16   Notices.  Are you familiar with those terms?

17   A    I am.

18              THE COURT:  And the question is, which software program

19   is used to mail merge, to generate notices of repossession or

20   NORs, or Post-Sale Notices, correct?

21              MR. SHENKAN:  Yes, sir.

22              THE COURT:  Very well.  Go ahead.

23              THE WITNESS:  I don't recall.  I'd have to check my

24   notes on that.

25   BY MR. SHENKAN:
```

1    Q     Do you have your notes?

2    A     I do not.

3    Q     Why didn't you bring your notes?

4          MR. PARKER:  Objection, Your Honor.  This is not

5    appropriate for counsel to be asking that.

6          THE COURT:  Well, why he doesn't bring his notes.  Why

7    don't we ask this question?  Where are your notes?  Are they

8    here?

9          THE WITNESS:  They are not.

10         THE COURT:  Okay.  So, you don't have your notes with

11   you?

12         THE WITNESS:  I do not.

13         THE COURT:  Very well.  You may proceed, counsel.

14   BY MR. SHENKAN:

15   Q     With respect to your notes do you recall a conversation that

16   we had during the discovery conference where you had offered to

17   provide your notes to me?

18   A     I recall having a conversation regarding the notes.  I do

19   not recall offering to -- to supply them.

20   Q     What are your notes about?

21   A     My notes generally cover just my visit at the bank that

22   I -- I actually went to the bank to learn about these systems

23   back in June and took notes.

24         THE COURT:  June of this year?

25         THE WITNESS:  That's correct.

```
 1                THE COURT:  So, you have some notes.  How extensive are

 2    they?

 3                THE WITNESS:  They're fairly barebones, just so that I

 4    can understand --

 5                THE COURT:  I mean are they five pages, 100 pages, some

 6    ballpark.

 7                THE WITNESS:  Oh, two to three pages.

 8                THE COURT:  Two to three pages of notes.  Okay.  I'll

 9    direct that counsel for the Defense review the notes for the

10    potential of any attorney-client privilege but subject to that

11    review that they be turned over at once.

12                MR. PARKER:  Yes, Your Honor.

13    BY MR. SHENKAN:

14    Q    FileNet is the next program.  Thank you.

15    A    FileNet houses retail installment contracts.  More or less

16    anything that's collected at the time the loan is initiated.

17    Q    So, is it limited to the time the loan is initiated only or

18    is it --

19    A    That's the -- the main purpose that I understand it, as it

20    relates to this case.

21    Q    The reason why I ask that, is I have some references and

22    policies that I can show you --

23    A    Uh-huh.

24    Q    -- that say that that is where all of the letters that are

25    sent out are housed.
```

1  A     Okay.

2  Q     Does that comport with your understanding?  When I say

3  letters, I say notice of repossession, Post-Sale Notices, actual

4  copies of those notices are scanned in and housed in FileNet.

5  A     That would make sense to me, yes.

6  Q     So it's not just limited to the inception of the loan --

7  A     No.

8  Q     -- it's all documents that were --

9  A     That would make --

10 Q     -- sent to the -- copies of all letters that are sent to the

11 putative class members would be housed in media form and filed;

12 is that right?

13 A     I couldn't say for certain, but that does make sense to me.

14         THE COURT:  Let me ask why does that make sense to you?

15         THE WITNESS:  It would -- it would make sense in that

16 the information about the loan, the documents about a loan, are

17 housed in that system, so keeping any efforts and correspondence

18 regarding that loan would make sense to also be in that system.

19         THE COURT:  Is there overlap with some other system in

20 terms of loan documentation?

21         THE WITNESS:  There are monthly statements that are On-

22 Demand.

23         THE COURT:  Okay.  So, there would be some overlap with

24 On-Demand.  Particularly, On-Demand would have monthly

25 statements?

1          THE WITNESS:  It's -- yeah, it's likely.

2          THE COURT:  Okay.  Go ahead, counsel.

3    BY MR. SHENKAN:

4    Q    So, if I were to ask you to provide me with all of the

5    notices of repossession or Post-Sale Notices of the entire

6    putative class, would you be able to access those, to the best of

7    your understanding of their systems, in FileNet?

8    A    To the best of my understanding, yes, that makes sense.

9    Q    Have you ever been -- have you ever had a chance to look

10   through FileNet for any client to confirm that, or any customer,

11   a putative class number?

12   A    I'm not certain.  Are you asking me if I have operated that

13   system?

14   Q    Have you operated that system?

15   A    I have not personally operated that system.

16   Q    So, the knowledge that you obtained with respect to the

17   FileNet software has been acquired how?

18   A    During an on-site visit at the bank.

19   Q    And that was one on-site visit in June?

20   A    That was two -- two days.  One visit over two days, yes.

21          THE COURT:  Who did you visit with?

22          THE WITNESS:  I met with five different individuals,

23   Ken Fries, Jennifer Thompson, Randy Surface.

24          THE COURT:  Randy Surface, spelled the ordinary way,

25   Surface?

```
 1                THE WITNESS:  Yes.

 2                THE COURT:  Okay.

 3                THE WITNESS:  Tom Thornton.

 4                THE COURT:  Thornton?

 5                THE WITNESS:  Thornton, I believe, yeah.  Again, I'm

 6    going from memory.

 7                THE COURT:  Okay.

 8                THE WITNESS:  And then Matt Brazinski (phonetic).

 9                THE COURT:  Matt Brazinski.

10                THE WITNESS:  Yeah.

11                THE COURT:  And you met with each of them the two

12    different visits or did you meet with them --

13                THE WITNESS:  No.

14                THE COURT:  -- in different visits?

15                THE WITNESS:  I met with three of them on one day and

16    two on the other.

17                THE COURT:  Which three did you meet on the first day,

18    if it was the first day that you met three people?

19                THE WITNESS:  I believe it was three and then two.  The

20    first day it was Tom, Jennifer, and Randy.

21                THE COURT:  Uh-huh.

22                THE WITNESS:  Then I believe I met with Ken and Matt

23    the following day.

24    BY MR. SHENKAN:

25    Q    How long did you meet with Jessica, Randy -- or Jennifer,
```

```
 1  Randy, and Tom on the first day?
 2  A    All in three hours.
 3  Q    And the second day you met with Ken Fries and Matt
 4  Brazinski?
 5  A    Correct.
 6  Q    And how long did you meet with them?
 7  A    All in probably two hours.
 8          THE COURT:  Were these two successive days or --
 9          THE WITNESS:  They were, yeah.
10          THE COURT:  -- separate?  Okay.
11  BY MR. SHENKAN:
12  Q    Do you recall the date?
13  A    Possibly June 12 and 13, is what sticks out to me.
14  Q    And your notes would reflect your communications with these
15  people during those two days?
16  A    A very high level, but, yes.
17  Q    Now, what did they tell you to do with respect to the
18  discovery that I had propounded?
19  A    I don't understand who -- who is they and --
20  Q    They are these five -- these five people.  You met with
21  someone for five -- you met with them a total of about five
22  hours.  So, I'm just asking what is the substance of that
23  communication with respect to the discovery that I served; have
24  you ever seen the discovery that I served?
25  A    The --
```

```
1   Q    Have you ever seen my discovery, my first set of post

2   removal discovery?  Have you ever actually seen a document?

3   A    The filing?  I have.

4   Q    It wasn't a filing, it was discovery.

5   A    I'm sorry, I'm not sure I understand what you're asking me.

6   If you can show me what you're asking me.

7            THE COURT:  Have you seen what's designated as a set of

8   interrogatories?

9            THE WITNESS:  Yes.

10           THE COURT:  Have you seen a set of request for

11  production of documents?

12           THE WITNESS:  I have, yes.

13           THE COURT:  Okay.  Are those the post removal discovery

14  that counsel is talking about?

15           MR. SHENKAN:  Yes.

16           THE COURT:  Okay.  So, you have seen a set of

17  interrogatories and you have seen a set of requests for

18  production?

19           THE WITNESS:  Yes.  And I have seen responses to those,

20  yes.

21           THE COURT:  Okay.

22  BY MR. SHENKAN:

23  Q    When's the first time that you saw that document?  Was it

24  after -- was it before or after our e-Discovery conferences?

25           THE COURT:  First, when was the e-Discovery conference?
```

 1          THE WITNESS:  There were two.  One, I believe in late

 2   June and one in early July.

 3          THE COURT:  And then let's proceed with the question

 4   counsel posed.

 5          THE WITNESS:  I saw some documents prior to that

 6   conference.  I couldn't -- I don't recall which I saw at which

 7   times.

 8   BY MR. SHENKAN:

 9   Q    I'm asking you about the discovery; the requests for

10   production of documents and interrogatories.

11   A    I understand.

12   Q    Have you had a chance to review those documents before the

13   e-Discovery conferences or subsequent to the e-Discovery

14   conferences that were provided to you for review?

15   A    I don't recall when I actually reviewed that -- that

16   information.  I don't recall.

17          THE COURT:  Do you recall actually reviewing the

18   documents?  Other than just seeing them, did you actually have a

19   chance to read through the interrogatories?

20          THE WITNESS:  That I did, yes.

21          THE COURT:  Did you have a chance to read through the

22   requests for production?

23          THE WITNESS:  I did.

24          THE COURT:  Did you have a chance to read through the

25   responses to the interrogatories?

```
 1                 THE WITNESS:  I did.

 2                 THE COURT:  And how about the requests for production,

 3    did you review the documents and the responses to the requests

 4    for production?

 5                 THE WITNESS:  I believe so, yes.

 6                 THE COURT:  Okay.  Counsel, you may proceed.

 7    BY MR. SHENKAN:

 8    Q    What did you do with respect to the production of documents

 9    that were provided to you?

10    A    Well, there have been multiple sets of production, so I'm

11    not sure which ones -- I had different roles in different sets of

12    these.

13    Q    How many -- well, let's just talk about your roles.  What

14    roles did you play and when, roughly?

15    A    The initial productions were provided prior to me being

16    engaged as e-Discovery liaison.  With respect to anything outside

17    of the email production that was -- that was done I believe in

18    May, I have -- I haven't had any direct involvement in gathering

19    those documents.  I've reviewed them all, but I haven't -- I

20    didn't have any -- any hand in -- in gathering that information.

21    For the email -- specifically the email production --

22    Q    The email production, excuse me for interrupting.  To just

23    clarify for the Judge's sake, you're talking about the 19,000

24    pages that we're all talking about, right?

25    A    Yes.
```

1  Q    The 19,000 page production, were you provided that

2  information on a flash drive or external hard drive in raw data

3  form?

4  A    Oh, the raw data was transferred to us electronically.

5  Q    What did the raw data consist of?

6  A    PST files.  PST files.

7  Q    What is that?

8  A    That is a Microsoft mail container, an Outlook data file.

9  Q    And how many files were there?

10  A    How many files -- how many files were --

11  Q    How many files were transferred to you?

12  A    -- how many individual PSTs or how many mail messages were

13  there?

14  Q    Why don't you provide me with both?  How many PST files were

15  there?

16  A    How many PSTs?  Possibly 20 to 25.

17  Q    And how many email merge files was there?

18  A    I don't know of any mail merge files, but there's --

19  Q    I don't know if that was the term.  You said emails.  How

20  many --

21  A    Actual emails and attachments, approximately 35,000.

22  Q    Well, I'm talking about raw data.  Are you telling me there

23  were emails with -- there were 35,000 emails?  Including

24  attachments, that there were 35,000 of them?

25  A    Uh-huh.

KAMINSKI - DIRECT

```
 1              THE COURT:  And when you are saying -- just so that I'm

 2    clear about your terminology, when you're saying there's 35,000

 3    emails, are you saying that there are 35,000 separate documents

 4    that could be denominated as separate email or 35,000 threads --

 5    email threads?

 6              THE WITNESS:  There's 35 -- 35,000 total documents.

 7              THE COURT:  Okay.

 8              THE WITNESS:  There's approximately 25,000, what I

 9    would call a parent email.

10              THE COURT:  Uh-huh.

11              THE WITNESS:  And then the balance would be the number

12    of attachments to those emails.

13              THE COURT:  Approximately.

14              THE WITNESS:  So --

15              THE COURT:  So, doing the rough math, there's

16    approximately 25,000 parent emails, and there are additional

17    progeny emails or offspring emails that are attached to those

18    parent emails; is that right?

19              THE WITNESS:  No.  Documents attached to the emails.

20              THE COURT:  Documents attached to the emails.  Okay.

21    BY MR. SHENKAN:

22    Q    Now, those documents were -- were some of those documents

23    Excel spreadsheets?

24    A    Yes, they were.

25    Q    Now, I understand that the -- it's common state of the art
```

1  using e-Discovery is to produce Excel spreadsheets in their

2  native format.  Would you agree that that is the industry

3  standard?

4          MR. PARKER:  Your Honor, I object to that as to Mr.

5  Kaminski speaking to the industry standard with respect to native

6  format of Excel documents.  Certainly, if Mr. Kaminski can

7  answer, he can, but --

8          THE COURT:  I'll -- yeah, he can answer the question as

9  to his understanding.

10         THE WITNESS:  Okay.  My understanding is, in general,

11 Excels can and are often produced in their native format with

12 the -- the main reason for not doing so would be the need to

13 apply redactions to the document.

14 BY MR. SHENKAN:

15 Q   What you did in this case, the format that you used -- and

16 I'll ask you about that, but before I do, have you had a chance

17 to read -- you said you read the Judge's order.  When's the first

18 time that you read the Judge's order?

19         THE COURT:  Are you referring to the document number

20 6-1 --

21         MR. SHENKAN:  Yes, Your Honor.

22         THE COURT:  -- from the ECF?

23         MR. SHENKAN:  Yes, Your Honor.

24         THE COURT:  Very well.  That's the order of November

25 1st of 2017.  Go ahead.

1          THE WITNESS:  I'm not certain without understanding the

2     substance of what you're --

3     BY MR. SHENKAN:

4     Q    When's the first time that you saw this Court order?  This

5     e-Discovery Court order that's been marked as 6-1 -- document 6-

6     1?

7     A    I'd have to take a look, and I can probably tell you.

8          THE COURT:  Why don't I give the witness my copy

9     since --

10         MR. SHENKAN:  I've got it right here.

11         THE COURT:  Okay.  Very well.

12         THE WITNESS:  This was one of the first documents I

13    reviewed when I was engaged as liaison.

14    MR. SHENKAN:

15    Q    I'm going to direct your attention to paragraph seven.

16    A    Okay.

17    Q    Would you read the first sentence to yourself and let me

18    know when you're done?

19         MR. PARKER:  And, Your Honor, this is -- this is the

20    version that I don't have.  I was given only pages one, three,

21    and five.

22         MR. SHENKAN:  It was given.

23         MR. PARKER:  Yeah, I know, but I don't have it.

24         MR. SHENKAN:  You don't have the order with you?

25         THE COURT:  Very well.

```
 1              MR. PARKER:  If you're using it as an exhibit, I think
 2   it's appropriate for you to give me what you're handing the
 3   witness as an exhibit.
 4              THE COURT:  Yes, it is.  It would be appropriate.
 5         (Pause)
 6              THE WITNESS:  I'm done.
 7   BY MR. SHENKAN:
 8   Q    Okay.  It says that documents should be -- Excel documents
 9   should be produced in their native format; would you agree with
10   that?
11   A    I do see where it says that, yes.
12   Q    And if you had that understanding before you made the
13   production, why did you make the production not in the Excel
14   native format?
15   A    Because there's no way to apply redactions to a live Excel
16   document without altering the document.
17   Q    When you say altering the documents, what alterations are
18   you talking about?
19   A    You'd need to delete content from the Excel spreadsheet in
20   order to apply a redaction.
21   Q    Okay.  And who told you to do the redactions?
22   A    I didn't apply the redactions.
23   Q    Who did apply the redactions?
24   A    The people reviewing and -- the people reviewing the
25   documents.
```

KAMINSKI - DIRECT

```
 1                THE COURT:  Do you know who those people were?

 2                THE WITNESS:  I believe it was counsel.

 3                THE COURT:  Are you sure?

 4                THE WITNESS:  I'd have to look at the history of the

 5   documents in the system to verify, but I -- I don't recall

 6   creating log-in credentials for anyone else --

 7                THE COURT:  All right.

 8                THE WITNESS:  -- so I would say reasonably sure.

 9                THE COURT:  So, you created log-in credentials for

10   counsel as part of your duties?

11                THE WITNESS:  I did.

12                THE COURT:  All right.  And they alone had the log-in

13   credentials for the documents that were to be produced?

14                THE WITNESS:  Outside of -- they were the only ones

15   outside of me and my team, obviously, as system admins --

16                THE COURT:  Very well.

17                THE WITNESS:  -- yes.

18                THE COURT:  Okay.  Counsel, you may proceed.

19   BY MR. SHENKAN:

20   Q    So, the PST documents that you received, those documents

21   were already redacted; is that right?

22   A    No.

23   Q    Okay.  Can you tell me what documents you received that were

24   redacted?

25   A    In raw form?
```

1    Q     In raw form.

2    A     None.

3    Q     So, I want to just be clear.  Who did the redactions?

4    A     The -- the people --

5    Q     So, that's --

6    A     -- reviewing the document, it would be counsel.

7    Q     Okay.  I see.  I see.  So, you provided counsel with the

8    information, and they then did their own redactions?

9    A     As part of their review, yes.

10   Q     And did you participate in any form in doing the redactions?

11   A     I did not.

12   Q     And one of the things that the e-Discovery liaison, I

13   understand, is to do is to -- let me start over.  Let me ask you,

14   sir.  Did you say at all to anybody, listen, I saw this order --

15   I saw paragraph seven of this order, and it says Excel

16   spreadsheets should not be -- should be provided in native

17   format, is of concern to me?  Did you ever tell that to anybody,

18   express that concern?

19         MR. PARKER:  Objection, Your Honor.  This is getting

20   argumentative.

21         THE COURT:  No, it's a question.  You can answer the

22   question.  Overruled.  The only question, as I understand it, is

23   did you tell anybody, hey, the order says produce Excel in its

24   native format.  Did you have that conversation with anybody?

25         THE WITNESS:  We -- yeah, I did have that conversation

1   with counsel as to the format for production.

2   BY MR. SHENKAN:

3   Q    And why didn't you produce it in native format?

4   A    Because redactions needed to be applied to the document.

5   Q    Okay.  Did you ask if it was Court ordered that permitted

6   redactions?

7   A    I did not.

8   Q    Do you know if there's a Court order that permits

9   redactions?

10  A    I did -- I do not know.

11  Q    Do you know that there was a confidentiality stipulated -- a

12  stipulated confidentiality agreement in this case that was rather

13  detailed, it was eight pages?  I'm going to show that to you.

14  Have you ever seen this?  It's Document Number 22.

15       THE COURT:  You should provide a copy to opposing

16  counsel and to me.

17       MR. SHENKAN:  Certainly.

18       THE COURT:  Thank you.  This is ECF document number 22,

19  not Exhibit 22, just for the record.  And the question, Mr.

20  Kaminski, is whether you read this document previously.

21       THE WITNESS:  I don't recall.

22  BY MR. SHENKAN:

23  Q    Do you know if you've ever been provided with that copy?

24  A    I would have to check the files that I've received.

25  Q    Let's talk about the files that you received; what would

 1   they consist of?  Your notes, obviously.  Five pages of notes.

 2   What other documents that are in your file?

 3   A    Various court documents similar to the ones you handed me.

 4   Q    Do you have that here today, your file?

 5   A    I do not.

 6   Q    Were you involved in any document production, other than

 7   this 19,000 page production that we were referencing through the

 8   Relativity software package?

 9   A    I'm not -- involved in its preparation?

10   Q    Yeah.

11   A    No.

12   Q    And execution.  Were you involved in anything else, other

13   than -- other than that one task, scan in or to work with

14   these -- I'm sorry -- these PST files that were provided to you

15   in raw form --

16   A    Uh-huh.

17   Q    -- the 20 to 25 files --

18   A    Uh-huh.

19   Q    -- that you worked on --

20   A    Uh-huh.

21   Q    -- was there any other project that you worked on with

22   respect to the production of documents?

23   A    There was not.

24        MR. SHENKAN:  I just want to approach.

25   BY MR. SHENKAN:

1   Q    I don't need to give you -- I don't need to mark this into

2   evidence, but I just want to --

3   A    Uh-huh.

4   Q    -- have you look through this.  Is this the kind of

5   redactions to the best of your understanding that were done?

6         THE COURT:  Counsel represented that's the PST

7   documents that counsel has been speaking of?

8         MR. SHENKAN:  I just have them here for demonstrative

9   exhibits --

10        THE COURT:  Sure.

11        MR. SHENKAN:  I'll take them back.

12        THE COURT:  Very well.

13        THE WITNESS:  It looks like a full page redaction.

14  BY MR. SHENKAN:

15  Q    Okay.  So, do you know how many of these pages were actually

16  redacted of those 19,000?

17        MR. PARKER:  Your Honor, I'd like to see this, too, if

18  counsel doesn't mind.

19        THE COURT:  We're not -- you're not going to go all

20  through it.  I'll let you take a look.

21        MR. SHENKAN:  It's just for demonstrative reasons.

22  They're all blank copies.  They're all redacted copies.

23        THE COURT:  I'll take a representation from Mr. Shenkan

24  about what's in those documents.  Mr. Shenkan, why don't you just

25  proffer to the Court what's -- what are those documents that

1    you're using as a demonstrative?

2    BY MR. SHENKAN:

3    Q    Mr. Kaminski, why don't you tell me what they are?

4              THE COURT:  No, counsel, I directed you to tell me and

5    then -- no, counsel --

6              MR. SHENKAN:  I'm representing to the Court that these

7    actually were printed documents from the 19,000 Relativity

8    production of documents that were --

9              THE COURT:  Received by you?

10             MR. SHENKAN:  -- received by me.

11             THE COURT:  Very well.  Okay.

12             MR. SHENKAN:  And I had my paralegal print them out.

13   And these are just -- these are just some of the redacted copies.

14             THE COURT:  Okay.

15             MR. PARKER:  And, Your Honor, I would just add this

16   doesn't include -- you know, the front page cover of these is

17   supposed to include the column headings for the purposes of

18   demonstration that counsel's using this for.  This is really an

19   inaccurate representation of what was actually produced.

20             THE COURT:  Well, understood and subject to the

21   objections as to complete accuracy of the entire production.

22   Counsel's representing that the documents he's holding in his

23   hand and using for demonstrative purposes are at least part of

24   the production that he is questioning about.  So, counsel, you

25   may proceed.

1    BY MR. SHENKAN:

2    Q    Let me ask you -- Mr. Parker raised a good point.  You

3    indicated that some of these documents have some information in

4    Excel --

5    A    Uh-huh.

6    Q    -- is that right?

7    A    Yeah.  I don't believe every page is fully redacted.

8    Q    Well, do you know how many pages actually have data in them

9    of the 19,000 pages --

10   A    I don't know offhand.

11   Q    Well, what's the reason why people don't want to cut up --

12   or, I'm sorry.  Are these TIFF files that you made?

13   A    I believe those were produced in PDF.

14   Q    PDF.  Are you sure that they're PDF, because I --

15   A    Oh, they may be TIFF, as well.  I mean both are image

16   formats.

17   Q    And to the extent that they were TIFFS, and I were to look

18   at them as the recipient --

19   A    Uh-huh.

20   Q    -- I would have to open up every single page separately;

21   isn't that right?

22   A    That would depend primarily on the program being used to

23   view the documents.

24   Q    The program being used is, is I click and -- click the

25   scroll bar on one of the documents I opened it up.  I had to open

1    up each one separately.  The way that it was provided to me by

2    you would require me to open up each one separately; isn't that

3    right?

4    A    Again, it depends on what program you were using to access

5    those documents.

6    Q    What program did you provide to me?  In what form were

7    these -- was this information provided to me?

8    A    TIFFs were provided, so that would be a concordance style

9    load file, pretty much industry standard, along with accompanying

10   data and Opticon files.

11   Q    When you say the industry standard, are you saying industry

12   standard to convert Excel spreadsheets and TIFFS?

13   A    When redactions are necessary, yes, it's very common.

14   Q    Why is it that you can't redact -- why can't you do your

15   filter in Excel and simply erase or block out all of the columns

16   and rows that might not apply to the subject matter that's being

17   sought and provide it to the person in native format?  Why

18   couldn't you do that?

19   A    That would involve -- I do.  That would involve inherently

20   changing the -- you'd have to alter the document.

21   Q    You altered the document here because you cut it up.

22   A    Yes, I converted it to TIFF.

23   Q    Okay.

24   A    But I didn't alter the -- I didn't deliver you something

25   that would represent an Excel file in its -- in its raw original

 1   format.

 2           THE COURT:  Mr. Kaminski, let me ask you a question.

 3           THE WITNESS:  Certainly.

 4           THE COURT:  If you took the Excel and you removed the

 5   offending or other data, the chaff data that wasn't necessary to

 6   produce, you could make a working copy of the existing Excel and

 7   modify the working copy of the Excel and obtain the same result

 8   by redacting in that fashion.  And, obviously, you would have to

 9   produce a document that's clearly denominated as a working copy

10   that's been redacted; is that correct?

11           THE WITNESS:  Absolutely, sir.

12           THE COURT:  You could do that?

13           THE WITNESS:  Absolutely --

14           THE COURT:  Okay.

15           THE WITNESS:  -- you can delete rows and indicate the

16   presence of redactions that way by merging cells.

17           THE COURT:  Okay.  And let me try and cut this to the

18   chase, then.  Counsel, Mr. Shenkan, is production in that fashion

19   superior in your mind in terms of your capacity to search the

20   document to the methodology that was utilized by making TIFF

21   shots, essentially, of each document?

22           MR. SHENKAN:  Certainly.

23           THE COURT:  Very well.  Then I'm going to order that

24   the Excel document in its native format be preserved, but the

25   working copy be prepared and that the redactions that were

 1    previously done by TIFF be done by actually modifying the Excel

 2    working copy and that the working copy be produced to Mr.

 3    Shenkan.  How much time is that going to take, Mr. Kaminski, do

 4    you think?

 5              MR. PARKER:  We're talking tens of thousands of

 6    documents here, Your Honor.

 7              THE COURT:  Yeah.  How much time did it take to produce

 8    the TIFFS?

 9              THE WITNESS:  That production I believe took a couple

10    of days on my end to -- to prepare.

11              THE COURT:  Two days -- two to three days on your end?

12              THE WITNESS:  Sure.

13              THE COURT:  How much time for other employees of the

14    bank or other vendors?  Were there any other persons involved in

15    producing the TIFFS out of the Excel?

16              THE WITNESS:  Oh, that was my team, and I would be

17    involved in that two to three days.

18              THE COURT:  Okay.  How many people involved?

19              THE WITNESS:  Three to four.

20              THE COURT:  Three to four?

21              THE WITNESS:  Three to four people working on it.

22              THE COURT:  Okay.  For two to three days full time?

23              THE WITNESS:  Uh-huh.  Oh, no, not full time.  It's

24    primarily machine time that we're talking about here.

25              THE COURT:  Okay.

KAMINSKI - DIRECT

1          THE WITNESS:  However, I will say that the production

2   of -- of the spreadsheets and the alteration creating the working

3   copy you suggest is a much more manual process --

4          THE COURT:  And that would have to be --

5          THE WITNESS:  -- whereas creating images --

6          THE COURT:  -- the redactions in the Excel working copy

7   would have to be accomplished, as you're describing it, largely

8   by counsel who's doing the redacting; is that correct?

9          THE WITNESS:  Correct, but that's automated.  If

10  I -- let's say I want to redact pages 1 to 1,000, I can -- that's

11  a -- that's a five second task.

12         THE COURT:  Okay.  All right.  I'm going to order that

13  that be accomplished.

14         UNIDENTIFIED SPEAKER:  Uh-huh.

15         THE COURT:  Counsel for the Defense, you can advise me

16  about a timeframe for accomplishing the redactions in an Excel

17  format as opposed to the TIFF format that's been previously

18  utilized, and I'll allow you to supplement and advise me by some

19  sort of letter or otherwise about how much time is going to be

20  necessary to accomplish that, okay?

21         MR. PARKER:  Yes, Your Honor.

22         THE COURT:  Very well.

23  BY MR. SHENKAN:

24  Q    Mr. Kaminski, in the production of -- or the conversion from

25  Excel to this TIFF files, all of the metadata is erased; is it

1  not?

2  A    No.  No, it's not.

3  Q    So, can I look at the Excel spreadsheet metadata through the

4  TIFF files?

5  A    No.

6  Q    Why not?

7  A    Because that's not the Excel, that's the TIFF file.  Those

8  are TIFF files.

9  Q    So, in other words, your conversion also stripped the

10  metadata?

11  A    It did not.

12  Q    It did not.

13  A    That is -- no.

14          THE COURT:  Does the TIFF file -- can the TIFF file

15  disclose the metadata from the Excel file?

16          THE WITNESS:  It cannot.

17          THE COURT:  Okay.  So, once you create a TIFF file, it

18  doesn't reproduce the metadata that's still existing in the Excel

19  file; is that correct?

20          THE WITNESS:  That's correct.

21          THE COURT:  Okay.  So, the -- the metadata does exist

22  somewhere, it exists in the original Excel file?

23          THE WITNESS:  Absolutely.

24          THE COURT:  Would the metadata be preserved in the

25  methodology that we just discussed, which is producing a working

1    copy of the Excel spreadsheets and then redacting those?  Would

2    the metadata still be available for those documents that have

3    survived the redaction process?

4            THE WITNESS:  Not from the working copies.

5            THE COURT:  Uh-huh.

6            THE WITNESS:  It would still be preserved on the

7    original.

8            THE COURT:  Okay.  How would the metadata be produced

9    most logically from the original?

10           THE WITNESS:  If the -- the metadata could be gleaned

11   from the -- it's all fielded information --

12           THE COURT:  Right.

13           THE WITNESS:  -- in the hosted platform, so a CSV, a

14   DAT file, whatever's -- some sort of delimited (phonetic) file.

15           THE COURT:  Okay.  So, it's possible to glean the

16   metadata from the Excel -- the original Excel file and produce

17   that in comprehensible format?

18           THE WITNESS:  Yes.

19           THE COURT:  Is it also possible that the person reading

20   that metadata that has been gleaned from the original Excel is

21   going to be able to relate the metadata to the individual files

22   that are produced in the working Excel?

23           THE WITNESS:  Yes.

24           THE COURT:  Okay.  So, I would direct that that be

25   accomplished.

1              MR. SHENKAN:  May I approach, Your Honor?

2              THE COURT:  Yes.

3              MR. PARKER:  Your Honor, before that -- I mean I would

4    object to that.  There's no requirement the metadata actually be

5    produced in conjunction with any of these electronic discovery.

6    It's required to be preserved, not produced.  Counsel hasn't

7    demonstrated in any way that the production of metadata is

8    required here.

9              MR. SHENKAN:  Well --

10             MR. PARKER:  Let me finish, please.

11             THE COURT:  Go ahead.

12             MR. PARKER:  There's no requirement the metadata be

13   produced.  The order doesn't say that, counsel hasn't

14   demonstrated the need for it, so I would actually object to that

15   -- that particular instruction or at least be given the

16   opportunity to brief it.

17             THE COURT:  And the objection is, as I understand it,

18   is essentially -- is it relevance?

19             MR. PARKER:  Yes.

20             THE COURT:  So, it's discovery relevance.  That that's

21   the standard that I'm asked to apply, is whether the metadata for

22   documents produced is relevant?

23             MR. PARKER:  Yes.  Relevant, and it's unduly

24   burdensome, very costly.  There's no need for it.

25             THE COURT:  To produce the metadata, as opposed to --

```
1                MR. PARKER:  Oh, I'm sorry, Your Honor.

2                THE COURT:  -- to produce the metadata, as opposed to

3     the substance of the documents is additional and burdensome?

4                MR. PARKER:  Yes.

5                THE COURT:  Okay.  I'm not really buying that much, but

6     I'll allow you to explain to me, in some detail, why production

7     of the metadata for individual documents that themselves are

8     relevant to the -- for discovery purposes would be somehow

9     categorically irrelevant themselves.  I'll also allow you to

10    address the burdensomeness issue, in some detail, because just

11    saying it's burdensome or it would involve a lot of work is

12    really insufficient for me to make a burdensomeness --

13               MR. PARKER:  Yes, Your Honor.

14               THE COURT:  -- or disproportionality assessment.  And

15    if you're -- you know, if you're talking about a million hours to

16    do this then, yes, that sounds burdensome.  If you're talking

17    about 29 hours to do it, that doesn't sound too burdensome, but

18    both are burdensome.  I mean both involve additional activity.

19               So, I'll allow you to address those two issues with

20    respect to the metadata, and I'll allow Mr. Shenkan to respond.

21    What kind of timeframe are you going to need to adequately

22    address that?

23               MR. PARKER:  That I think we could address pretty

24    quickly.

25               THE COURT:  So, I'll say within seven days.  And within
```

1    seven days what I'm looking for is for counsel to address the

2    objections as they've been formulated here -- on the basis of the

3    objections that they've been formulated here, which is we're

4    talking about producing the -- and I've already ordered the

5    production of the underlying emails and so forth in Excel format

6    in a working copy, but the specific issue is the metadata for

7    those Excel documents that are being produced in the working

8    copy.  And the issue is how much time, and effort, and expense is

9    it going to take to produce the metadata and also what's its

10   relevance.

11             MR. PARKER:  Yes, Your Honor.  Thank you.

12             THE COURT:  Thank you.

13             MR. SHENKAN:  Your Honor, very quickly.  On my reading

14   and interpretation of paragraph two of Judge Beetlestone's order,

15   she's already addressed this issue for purposes of Excel

16   spreadsheets.

17             THE COURT:  Uh-huh.

18             MR. SHENKAN:  And the Excel spreadsheet, when it's

19   made, has metadata in it.

20             THE COURT:  I understand, counsel, and I understand

21   that metadata in my experience --

22             MR. SHENKAN:  Okay.

23             THE COURT:  -- is usually produced.  I'm going to allow

24   counsel for the bank to tell me why the metadata is not relevant

25   somehow.  If counsel's representing at this point -- I'm not

1   going to get into a long hash here, but if counsel is insisting

2   that somehow, it's not relevant, then we'll have a go at it, but

3   it's not going to be a long go.  We'll get this done.

4   BY MR. SHENKAN:

5   Q    Mr. Kaminski, could you tell me what is involved and what is

6   included in the metadata files that we're talking about?

7   A    That's a -- that's a broad question.  There's any number of

8   information, but I guess simply put, metadata is automated

9   information capture or created at the time a file is created

10  relevant to its creation date, location, formatting, and -- and

11  other properties of the file.

12  Q    So, let's talk about that, the creation date and

13  formatting --

14  A    Uh-huh.

15  Q    -- of the file.

16  A    Uh-huh.

17  Q    All of that right now is in the Excel spreadsheets as raw

18  data, the original?

19  A    Yeah.  Uh-huh, yeah, it is.

20  Q    So, you would actually have to go and remove that metadata

21  from the raw file for it not be provided to me.  Someone would

22  have to do that; is that right?

23  A    I'm not certain I understand what you're asking.

24  Q    Is it an effort -- is it an additional effort to remove the

25  metadata from the Excel spreadsheets?  What effort is involved in

1  removing the metadata from the Excel spreadsheets?

2  A    In metadata scrubbing --

3  Q    Scrubbing.

4  A    -- it's a -- you'd have to have a program to -- to execute

5  that.

6  Q    What program do you use to have access to the metadata

7  scrubbing on the Excel spreadsheets?

8  A    I think the last time -- it's been awhile since I've used a

9  scrubbing program.  There's -- I believe there's one called

10  Metascrubber (phonetic) or something to that effect.

11  Q    What would be the reason to remove metadata from a document?

12  A    The only time I've ever done it is for purposes of -- of

13  production, but again that's been quite some time.

14  Q    Since 2005, and I assuming you've worked on thousands of

15  e-Discovery projects.

16  A    Oh, yeah, certainly.

17  Q    Could you tell me, and tell the Judge, and everybody, how

18  many times have you been asked to actually scrub the metadata

19  from the documents that you produce?

20  A    Just a handful.

21        THE COURT:  Counsel, I want to lay my cards on the

22  table.  I am not looking favorably at the notion of scrubbing the

23  metadata, not at all.  I'm -- I'm somewhat familiar with --

24        MR. SHENKAN:  Okay.

25        THE COURT:  -- with the drill.

1          MR. SHENKAN:  Okay.

2          THE COURT:  And I am highly dubious of the notion that

3   the metadata are somehow exempt from ordinary discovery, but I'm

4   allowing the Defense to say their peace and --

5          MR. SHENKAN:  I want to be as efficient as possible.

6          THE COURT:  I understand.

7          MR. SHENKAN:  And I don't mean to belabor the topic, I

8   really don't.

9          THE COURT:  I understand.  And if you have a few more

10  questions on the subject, I'm fine with that, but I'm just laying

11  my cards out there, so you know that the fact finder is already

12  highly dubious of the notion that we're not going to produce

13  metadata because somehow it is not relevant or expensive.

14  BY MR. SHENKAN:

15  Q    Could you tell me, this relates to the 19,000 page

16  production --

17         THE COURT:  And this is a document that you've just

18  produced, which is three pages, and if counsel could describe it

19  for the record if you're not going to mark it as an exhibit.

20         MR. SHENKAN:  I'd like to mark it as Exhibit 1.

21         THE COURT:  Very well.

22      (Plaintiffs' Exhibit 1 marked for identification)

23         THE COURT:  And what is Exhibit 1?  Just a brief

24  description before we get started.

25         MR. SHENKAN:  A brief description is its load files --

```
 1   part of a load file.
 2              THE COURT:  What's that?
 3              MR. SHENKAN:  It's part of a load file, and it shows
 4   pretty much an inventory of what the 19,000 page files were.
 5              THE COURT:  I see.  Okay.
 6   BY MR. SHENKAN:
 7   Q    That's what my understanding is, but I'll ask you to confirm
 8   my --
 9              THE COURT:  Very well.  And so, the question's directed
10   to Mr. Kaminski at this point.
11              THE WITNESS:  It's the entirety of the load file
12   provided for that deliverable.
13   BY MR. SHENKAN:
14   Q    And how many files is there?
15   A    How many files what?
16   Q    How many files are referenced in this document that's been
17   marked as Plaintiffs' Exhibit 1, and it shows the inventory of
18   the deliverable that we're talking about, this 19,000-page
19   deliverable.
20   A    It appears to be 57.
21   Q    And how many Excel spreadsheets are in there?
22   A    I can't tell from this file.
23   Q    Why not?
24   A    There's no reference to -- since no native files were
25   produced, there's no reference to a native file in this load
```

1    file.

2            THE COURT:  There was no reference to a native Excel

3    file?

4            THE WITNESS:  Correct.

5            THE COURT:  Okay.

6            THE WITNESS:  There's no reference to any native file

7    actually.

8            THE COURT:  Okay.

9            MR. SHENKAN:  May I approach, Your Honor?  I'd like to

10   give these -- I'd like to mark this next exhibit as Plaintiffs'

11   Exhibit 2.

12           THE COURT:  Very well.

13       (Plaintiffs' Exhibit 2 marked for identification)

14   BY MR. SHENKAN:

15   Q    I understand from my e-Discovery liaison that this is called

16   a TAD file, and it also reflects the 19,000 page deliverable.

17   Mr. Kaminski, is this a TAD file?

18   A    No, it is not.  It's an Opticon file.  It's a portion of an

19   Opticon file.

20           THE COURT:  What's an Opticon file?

21   BY MR. SHENKAN:

22   Q    Okay.  What is an Opticon file?

23   A    An Opticon file is an image load file.

24   Q    And what does this show you?

25   A    This shows me the first two -- well, the first document and

1    then the first few pages of the second document.

2              THE COURT:  Of the production of the 19,000 page

3    production --

4              THE WITNESS:  Yes, sir.

5              THE COURT:  -- or are you talking about something else?

6    Okay.  Thank you.

7    BY MR. SHENKAN:

8    Q    So, does the first 1675 -- does that say the first page from

9    1675 to the one file and 1676 to the next, I'm looking over to

10   the right column, is that file then 6,235 pages?

11   A    That second file is, yes.  That's correct.

12   Q    Incidentally, making the TIFF files, doing the conversion

13   from an Excel spreadsheet, I would use eight-and-a-half by eleven

14   paper, but some of these Excel spreadsheets are rather

15   voluminous, and they're much larger than eight-and-a-half by

16   eleven, right?

17   A    They are.

18   Q    So, it's kind of like the information you gave me, I've got

19   a jigsaw puzzle.  I've got to somehow find the other pieces that

20   are put in together and actually put the pieces together to try

21   to make my Excel spreadsheet, right?

22   A    To?

23   Q    To make them align.  I mean they're all cut up.

24             THE COURT:  Are we talking -- and I'm sorry, counsel,

25   but I just want to understand the context of the question.  Are

1  we talking about the 19,000 page, or document, I'm not sure which

2  it is, production that has been the subject of questioning so

3  far?

4          MR. SHENKAN:  Yes.  Yes, Your Honor.  I apologize.

5          THE COURT:  And so, the TIFFS that you received, in

6  many instances, as I understand it from your question, were

7  breaking apart native Excel documents into multiple TIFFS; is

8  that what's going on?  Is that -- so that I'm understanding --

9          MR. SHENKAN:  Yes.

10          THE COURT:  -- the question?  Okay.

11          MR. SHENKAN:  That's the way I understand it.

12          THE COURT:  Let me then -- okay.  I'm sorry, because

13  I'm just trying to understand the context of the question.

14          Go ahead, Mr. Kaminski and respond to that.  Is that

15  the case?

16          THE WITNESS:  It's similar to if you would open the

17  Excel file --

18          THE COURT:  Uh-huh.

19          THE WITNESS:  -- you know, on your computer --

20          THE COURT:  Right.

21          THE WITNESS:  -- and then hit print.

22          THE COURT:  And it's just going to break it up in

23  accordance with however the print is designed to format for the

24  pages that the printer's producing; is that right?

25          THE WITNESS:  The system is configured from a page

1    setup standpoint, yes.

2              THE COURT:  Okay.  All right.

3              THE WITNESS:  Yes, correct.

4              THE COURT:  All right.  I think I understand.

5    BY MR. SHENKAN:

6    Q    Mr. Kaminski, if I were to ask you about how to easily

7    extract the information from, let's say, AutoIMS, do you know if

8    there's an extraction tool?

9    A    Not to my knowledge, not that I've been made aware of.

10   Q    Have you worked with the system, actually worked with the

11   system firsthand?

12   A    Have I --

13   Q    AutoIMS?

14   A    -- physically operated AutoIMS?

15   Q    Yes.

16   A    I have not.

17   Q    So, the systems that we talked about earlier, you haven't

18   physically operated the file that -- you haven't physically

19   operated AutoIMS?  Have you physically operated LOCUS yourself?

20   A    No.

21   Q    Have you physically ever operated Shaw yourself?

22   A    No, I've never operated any bank system myself, as I'm not

23   an employee of the bank, but I did spend multiple hours, as I

24   mentioned, reviewing these systems and learning how they operate,

25   and for purposes of me being able to advise on best practices for

1   production and collection.

2   Q    And that was during these five -- those five hour meetings?

3   A    In addition to other calls that I've had.

4   Q    So did you actually have a demonstration?  Someone, you

5   know, put up AutoIMS and walked you through it?

6   A    Absolutely.

7   Q    Was that helpful to you?

8   A    It absolutely was.

9   Q    Would you agree that that would be helpful for someone like

10  myself to better understand the systems, to actually be able to

11  see them in operation?

12  A    I don't know how you learn, I know it's how I learned.  I

13  couldn't speculate as to how -- whether it would be helpful for

14  you.

15  Q    Let me ask you about -- if I were to ask for an inspection,

16  the opportunity to actually go and just, you know, have someone

17  pull up my own client's information through these systems, how

18  difficult would that be in your eyes to provide that inspection?

19  A    I wouldn't -- I wouldn't be able to tell you.  I don't know.

20  Q    Is there a -- is there a cost involved to having, other than

21  someone operating the system, but if I were to have my e-

22  Discovery liaison, perhaps with your help, do a TeamViewing,

23  would that be something that would be easily provided -- easily

24  able to, with counsel's cooperation, of course, but I'm just

25  asking could this -- could a TeamViewer -- do you know what a

1  TeamViewer is?

2  A     Yes.

3  Q     What is a TeamViewer?

4  A     A remote desktop sharing program.

5  Q     Is that something that I could sit in my office in Michigan

6  and you could sit in Buffalo and walk me through the process of

7  how these systems operate through TeamViewer?

8  A     I mean I could -- I don't know that I would be the best

9  person to do that because, like I said, I don't put hands on

10 these systems.

11 Q     Is that something feasible that could be done?

12 A     I would have to defer to the people who would actually be

13 performing that work.

14 Q     Based upon your understanding, as eDiscovery liaison, is

15 there any reason why that couldn't be done, limited only to my

16 representative Plaintiffs, who I represent?

17 A     Not -- there's no technical limitations that I can -- I can

18 see there.

19        MR. SHENKAN:  Your Honor, I would also ask for just the

20 opportunity to do a remote access, or at least brief that

21 opportunity so at least I can get a familiarity with these

22 systems firsthand, similar to what Mr. Kaminski had obtained

23 himself?

24        THE COURT: Any objections, counsel?

25        MR. PARKER: Yes, Your Honor.  We strongly object to

1    that.  You know, pursuant to -- if Your Honor would like to do a

2    briefing schedule, we're okay with that, but we very strongly

3    object to that, pursuant to Judge Beetlestone's 12/4/17 order

4    governing electronic discovery.  Onsite inspections of electronic

5    media under Federal Rule of Civil Procedures 34(b), shall not be

6    permitted absent exceptional circumstances for good cause and

7    specific need have been demonstrated.

8          We would certainly take the position that that sort of

9    intrusive onsite inspection would fall well outside the scope of

10   either good cause or special circumstances.

11         THE COURT:  I'm inclined to let you brief it under the

12   same briefing schedule.  You can include this issue in your seven

13   day brief.

14         MR. PARKER:  Yes, Your Honor.

15         THE COURT:  I will say that, as couched so far, I don't

16   -- I'm not quite sure I understand why counsel, looking at his

17   own clients -- I assume you're talking about the representative

18   parties only, just to get a sense of how the software works on

19   TeamViewer -- it quite matches the (indiscernible) that I'm

20   hearing about the intrusiveness of the onsite inspection, but I

21   will certainly let you brief that, and I will let Mr. Shenkan

22   respond.

23         On first blush, it sounds awfully reasonable to me, and

24   I'm just -- I'm not saying I can't be convinced, I just want you

25   to know clearly where I'm coming from.  It sounds awfully cost-

1   effective and simple to arrange to me.  There may be case law

2   that I'm not aware of, and I'm perfectly willing to be educated.

3          MR. PARKER:  Yes, Your Honor.

4          THE COURT:  Thank you.

5          MR. PARKER:  I understand that.  I would appreciate

6   that.

7          THE COURT:  Okay.

8   BY MR. SHENKAN:

9   Q    Mr. Kaminski, I would like to ask you how these systems are

10  integrated.  In other words, I'm not an IT guy, so I see that,

11  you know, they -- you know, in AutoIMS they type in certain

12  information and then in LOCUS certain information.  All of that

13  gets filed into something, right?

14  A    There are certain integrations in place between some of the

15  systems, yes.

16  Q    Why don't you tell me about what those integrations are and

17  how they can easily be accessed most efficiently?

18  A    There is a -- there is an update between AutoIMS and LOCUS

19  to sync information at regular intervals, and there's also ties

20  between LOCUSA and Shaw, the accounting system.

21  Q    Anything else that's integrated that you know of?

22          THE COURT:  Counsel --

23          THE WITNESS:  Not that I can recall at this point.

24  Sorry.

25          THE COURT:  Go ahead with your answer, Mr. Kaminski.

 1                    THE WITNESS:  Sorry.  Not that I can recall at this

 2     time.

 3                    THE COURT:  Counsel, I just want to let you know, at

 4     12:45 promptly, I have to depart.  I have to handle a criminal

 5     list, and I have to prepare for the criminal list.  So, I'm going

 6     to break the parties at 12:45 for -- it should take about an

 7     hour-and-a-half, all totaled, so we'll be back an hour-and-a-half

 8     after that.  And forgive me for not doing the math right away in

 9     my head, but we'll figure that out when the time comes.  I just

10     wanted to give your forewarning, we have about 45 more minutes as

11     I see it.

12                    MR. SHENKAN:  Thank you, Your Honor.

13                    THE COURT:  And I do intend to be done with Mr.

14     Kaminski at that point.  We need to move on.  I think there's

15     other witnesses that have travel schedules late in the afternoon.

16                    MR. PARKER:  Yes.  Yes.

17                    THE COURT:  Okay.

18     BY MR. SHENKAN:

19     Q    How is it that I can easily access this information in its

20     integrated fashion?  What is it called?  Is there a document

21     that's called -- let me just back track.  If I ask you to provide

22     me with all of the information on Edward Flynn, who is one of my

23     clients --

24     AS   Uh-huh.

25     Q    -- how is it, in your opinion, based upon your knowledge,

1    that request can easily be provided, if possible?

2    A    Easily being the operative word there, I don't know that

3    there's an easy way.  Each system would have to be searched

4    individually for that person, and then the information rendered

5    from that system would have to be gathered individually.

6    Q    Well, you just indicated that these systems are integrated.

7    A    That the information is integrated, the systems, themselves,

8    have different interfaces and contain different information.  Not

9    every piece of information -- it sounds like you're asking about

10   redundancies, and redundancies and integration are very

11   different.

12   Q    So, if someone at the bank were to ask, I want to get a copy

13   of Mr. Flynn's entire file, everything to do with him --

14   A    Uh-huh.

15   Q    -- what forensically is done to obtain that information, if

16   you know?

17   A    Forensically, there wouldn't be -- collecting from these

18   systems forensically, especially given their proprietary nature,

19   would be fairly complex, but as it pertains to actually gathering

20   information from those systems, you would have to go into each of

21   them individually, run your search and pull it out, as I've

22   mentioned.

23   Q    Do you know how much time it takes at all, if you know?

24   A    From what -- from conversations I've had, it is my

25   understanding that the gathering of an individual person's files

KAMINSKI - DIRECT

1    from all these different systems and ensuring that all

2    information is captured, can take up to -- and this -- I'm sorry,

3    this also excludes email, these systems would be about four hours

4    per person.

5    Q    Four hours per person.  And how is it that you have come to

6    learn that, four hour --

7    A    Based on my discussions onsite at the bank, as well as

8    subsequent discussions with the people who actually gathered the

9    information.

10   Q    And who did you talk to that was involved in gathering the

11   information?

12   A    Well, like I said, I, you know, the five people I met in --

13   Q    Anyone else?

14   A    -- in Buffalo.  Primarily -- primarily those people is my

15   understanding or members of their team, I should clarify.

16   Q    Do you -- what you're providing -- have you actually been --

17   have you ever seen the culling of the information, the pulling

18   and extracting of the information for any one in particular, any

19   customer?  You've indicated that someone shows you how it works?

20   A    Yeah.  I was not present when the information was collected,

21   no.

22   Q    So you don't have firsthand knowledge as to how long it

23   actually takes to get this information?

24        MR. PARKER:  Your Honor, I object to the term firsthand

25   knowledge.  I think that's a legalese term.  I think he can speak

1   to his knowledge and his experience, but to categorize it as

2   firsthand knowledge or otherwise, I think is inappropriate.

3          THE COURT:  It's overruled in light of the fact that

4   it's me that's the fact finder here, and I think we'll do the

5   best we can to make sense of questions and answers.  I think the

6   question is reasonably clear and colloquial perhaps, firsthand

7   knowledge, but sufficient so that I can understand the nature of

8   the answer, and so, I'll overrule the objection.  The witness can

9   go ahead.

10          MR. PARKER:  Yes, Your Honor.

11          THE COURT:  I do have a question, though, and it might

12   help to explain it to me, and that is that as I understand the

13   sum of what you've been saying for the last few minutes about the

14   data, it's not as simple as somebody just sitting on a computer

15   one day and saying give me all the information on Mr. Flynn,

16   typing -- search all information on Mr. Flynn and then you get a

17   production; is that right?

18          THE WITNESS:  Yeah.  Absolutely not.  Yeah, that's --

19          THE COURT:  And effectively, while the data is shared,

20   the various interfaces, the various programs, cut the data up in

21   a bunch of different ways, and each one has to be queried

22   independently in order to ensure that you have all the data on

23   Mr. Flynn.  Is that -- am I getting that right?

24          THE WITNESS:  I would agree, and also state that each

25   of these systems does have information specific to each of them

```
 1   individually.  So --
 2              THE COURT:  Okay.
 3              THE WITNESS:  -- pulling from one doesn't give you
 4   everything from the other.
 5              THE COURT:  All right.  When you say that the systems
 6   are integrated, in what sense are they integrated?  Do they share
 7   some data, but not all data?
 8              THE WITNESS:  Absolutely, that's exactly correct.
 9              THE COURT:  Okay.  All right.  Proceed, counsel.
10   BY MR. SHENKAN:
11   Q    Are there manuals for AutoIMS?
12   A    Not that I have put hands on, no.
13   Q    Have you ever asked?
14   A    I have not.
15   Q    Have you ever asked if there were manuals for any of these
16   systems?
17   A    I have not.  I saw them in operation.
18              MR. SHENKAN:  Your Honor, I would ask, subject to
19   confidentiality agreement, certainly, that if there are any
20   manuals, how to documents with respect to any of the software
21   applications that the bank uses that they be provided.  I would
22   ask for that.
23   BY MR. SHENKAN:
24   Q    And do you remember an eDiscovery conference?  Do you
25   remember that?
```

```
 1  A    I don't recall.

 2             THE COURT:  Counsel?

 3             MR. PARKER:  It hadn't been asked in any formal

 4  document requests, so.

 5             THE COURT:  Well, we're going to cut that short, and

 6  I'm going to direct that operational manuals for the software

 7  that's involved, whether it's AutoIMS or the other software

 8  programs, be provided, if they exist.  I don't know in what

 9  format they might exist.  If it's proprietary software -- well,

10  my experience has been that proprietary software is a much bigger

11  ask than off the shelf on that score, but counsel will do their

12  best, and along with their consultant, to try and respond to that

13  request in a reasonable period of time.

14             And at this juncture, since we're trying to get

15  discovery done, as opposed to continue with the battles, sooner

16  rather than later, how long -- I'm assuming counsel's going to

17  need to get back to me on how long that's going to take.

18             MR. PARKER:  I think I would, Your Honor.

19             THE COURT:  Okay.  On the seven day period, can you get

20  back to me in your filing with an estimate of who's going to have

21  to be consulted and what kind of effort it's going to take to put

22  together a basic operation manual for the various softwares

23  involved?

24             MR. PARKER:  Yes, Your Honor.

25             THE COURT:  Thank you.
```

KAMINSKI - DIRECT

```
 1              MR. SHENKAN:  May I approach, Your Honor?  I would like

 2    to mark this as Plaintiffs' Exhibit -- deposit Exhibit 3, please?

 3              THE COURT:  Yes.  And this is marked Exhibit 5.  Do you

 4    want it to be marked --

 5              MR. SHENKAN:  I'm sorry.  I'm sorry, Exhibit 5.

 6              THE COURT:  And there's another page is marked page --

 7              MR. SHENKAN:  Oh, no, it's Exhibit 3.  I'm sorry.  I

 8    just made copies.

 9              THE COURT:  Of various --

10              MR. SHENKAN:  Excuse me, Your Honor.  These were -- I

11    think that we're on -- where are we on numbers?

12              THE COURT:  We would be on this hearing's Exhibit

13    Number 3.

14              MR. SHENKAN:  Correct.

15              THE COURT:  You want this entire set of documents that

16    have just been handed to me marked Exhibit 3?

17              MR. SHENKAN:  Yes, please.

18              THE COURT:  Very well.

19         (Plaintiffs' Exhibit 3 marked for identification)

20    BY MR. SHENKAN:

21    Q    Do you know what these are, Mr. Kaminski?

22    A    They appear to be templates of notices of repossession.

23    Yeah, notices of repossession and letters.

24    Q    Have you ever seen them before?

25    A    I have.
```

1  Q    Okay.  And are these form documents?  Are these forms?

2  A    They appear to be, yes.

3  Q    How about the last page, bate stamp number 20189?  Is that

4  also a form document?

5  A    20189.

6         THE COURT:  It's also marked Exhibit 11 on the exhibit

7  sticker that's copied on that document, the last page of this.

8         THE WITNESS:  It appears to be, yes.

9  BY MR. SHENKAN:

10 Q    The right-hand side, on the last page of Exhibit 3, which is

11 20189.

12 A    Uh-huh.

13 Q    It has, I want to say merge fields.  Do you see that?

14 A    I do.

15 Q    I have never been provided with a copy, despite my request,

16 of merge fields for the notices of repossession.  Do you know if

17 that document exists?

18 A    I'm sorry, I'm not certain I understand the question.

19 Q    What is this merge field?  What is it -- what is it for,

20 Exhibit 20189?

21 A    I would be making an educated guess.  It appears that this

22 is possibly out of a Microsoft Word or Wordesk (phonetic) format,

23 and that these fields correspond to data that would be inputted

24 and then merged into these fields.

25 Q    So there are merged fields also for the notice of

```
 1   repossession of sales, the NORs, which is the first of the pages
 2   in Exhibit 1?
 3              THE COURT:  Are we referring to the first page, which
 4   is the last five digits, 19976 from the bate stamp?
 5              THE WITNESS:  Yeah, it -- I couldn't say for certain as
 6   the redaction covers that area.
 7   BY MR. SHENKAN:
 8   Q    To the best of your knowledge, these are forms, and they
 9   still mail -- they're mail-merged, right?
10   A    I would -- to the best of my knowledge, and I would assume
11   so, yes.
12              MR. SHENKAN:  So, Your Honor, I would also ask that --
13   I've asked for in discovery, for the templates, as well as the
14   exemplars of both notices of repossession and the Post-Sale
15   Notices that have been used at all -- at any time during the
16   putative class period.
17              THE COURT:  And I think that's been the subject of the
18   written motions; is that -- am I correct?
19              MR. SHENKAN:  Yes, Your Honor.
20              THE COURT:  I think I've addressed it in my expect --
21   or my tentative motion or my tentative opinion, but, counsel, any
22   response to that?
23              MR. PARKER:  Your Honor, that's an easy one.  So, the
24   -- in the request for production exemplars were requested.  So,
25   examples of all three repossession notices and Post-Sale Notices
```

1   for the class period were provided.  Some of those might be what

2   Plaintiffs' counsel is now -- are now calling templates.  To the

3   extent that he wants both templates and exemplars, I have no

4   issue with providing those.

5           THE COURT:  Very well.  Okay.  So, they will be

6   provided, if they have not already been.  Very well, subject to

7   my tentative order, I think we've covered that.  Go ahead,

8   counsel.

9   BY MR. SHENKAN:

10  Q    I would like to talk to you about the storage of documents,

11  retention of documents.  Do you have any knowledge as to them?

12  A    As it pertains to emails, I do have some understanding.  As

13  it pertains to document retention policies on their other

14  repository sites, that, I have no --

15  Q    So if I were to ask you -- show you a policy that says it

16  was created on one date, and then revised on a later date, and

17  the initial policy was not provided, would you have any

18  information with respect to the whereabouts of other policies

19  that have been requested in discovery that have not been

20  provided?

21  A    I would not.

22  Q    Do you have any knowledge of what -- whether or not

23  Plaintiffs have been provided with all of the documents that have

24  been requested in this discovery request, if you know?

25  A    That, I do not.

1          THE COURT:  Which discovery request?

2          MR. SHENKAN:  It would be Plaintiff's first

3  post-sale -- post-removal set of discovery.

4          THE COURT:  And, Mr. Kaminski, if you know the answer,

5  you can provide it.  If you don't know, you can say that.

6          THE WITNESS:  I don't know.

7  BY MR. SHENKAN:

8  Q    There were various objections that were interposed to the

9  first set of post-removal discovery, class discovery.  Some of

10  those objections included a burden, it was too expensive, too

11  difficult, time consuming, what have you.  Are you up to speed or

12  do you have any knowledge to support or refute the bank's

13  objection as to --

14  A    I do not.

15  Q    Were you involved, at all, in the production of the

16  documents that were provided, other than this 19,000 email/Excel

17  delivery -- deliverable discovery?

18  A    In -- I'm sorry, involved in -- can you repeat the initial

19  part of your question?

20  Q    I think I may have asked -- let me try to clarify that.

21  A    Yeah.

22  Q    You were involved with only -- the production of documents

23  was limited only to the 19,000-page production pertaining to the

24  emails and Excel spreadsheets that you converted from Excel to

25  TIFF?

1    A    As it pertains to the preparation of that production, that

2    is the only one that I was involved in.

3    Q    Did you ever search -- were you ever involved in any

4    searching for policies and procedures that were requested by me

5    in that discovery?

6    A    I was not.

7    Q    Do you have any knowledge of how to request or to search the

8    M&T Bank's repositories for policies and procedures, if you know?

9    A    No, I'm -- as -- no, I'm not a bank employee.

10   Q    If you were to -- wanted to contact a bank employee to do a

11   search for policies, procedure manuals, who is it, based upon

12   your experience and your interaction with the bank so far, who

13   would you contact?

14   A    If I was going to contact as part of my role and ask for

15   documents from the bank, I would go through either counsel here

16   or Bill Simon, the counsel for M&T.

17   Q    Was there anyone that you worked with on your -- on this --

18   with these five people, were you provided with any documents to

19   assist you in your eDiscovery liaison capacity, other than the

20   court documents, court orders that you referenced?

21   A    No.

22   Q    If I were to -- I'm going to just show you, and I don't need

23   to mark this as an exhibit right now, but bates stamp number

24   20240.  I'm going to read it to you and just ask you a few

25   questions.

1        Paragraph 8, it says, add storage fees.  The beginning of

2   that paragraph, it says confirm the storage fee one of three

3   ways.

4              THE COURT:  Counsel, may I have a copy of that

5   document?

6              MR. PARKER:  Me, too, please.

7   BY MR. SHENKAN:

8   Q    As he's getting a copy of this, let me just ask you, there's

9   what's called Agent Coverage Fees Excel Spreadsheet.

10             THE COURT:  Why don't we -- why don't we wait so that I

11  can actually follow the question.

12             MR. PARKER:  Thank you, Your Honor.

13             (Pause)

14             MR. SHENKAN:  Your Honor, I would like to mark this as

15  Plaintiffs' Exhibit 6, Your Honor?

16             THE COURT:  I think it's 4 now.

17             MR. SHENKAN:  4.

18             THE COURT:  Don't worry.  Thank you.  It's quite all

19  right.

20        (Plaintiffs' Exhibit 4 marked for identification)

21  BY MR. SHENKAN:

22  Q    Have you ever seen this document before, Mr. Kaminski?

23  A    Yes, I have.

24  Q    Then I refer your attention to page 4 of 7, please.

25  A    Okay.

1   Q    Paragraph A, it says add storage fees, do you see that?

2   A    I do.

3   Q    It says if the account is New York, Pennsylvania, Maryland,

4   you must add storage fees.

5   A    Okay.

6   Q    And then it goes down and says confirm the storage fees one

7   of three ways, and it says consult Agent Coverage Fees Excel

8   Spreadsheet.  Do you see that?

9   A    I do.

10  Q    What is that document, Agent Coverage Fees Excel

11  Spreadsheet?  Do you know?

12  A    I do not.

13        MR. SHENKAN:  Your Honor, I would ask that this

14  document be provided.  It is our understanding that certain

15  storage of repossessed vehicles is one of the subjects that Judge

16  Beetlestone ordered all documents to be provided.

17        We have made efforts to obtain that document and have

18  been rebuffed.  I would ask that Your Honor issue an instruction

19  that the documents be provided for all versions that may be in

20  existence relative for discussing during the class period --

21  putative class period.

22        THE COURT:  Vis-à-vis the representative Plaintiffs?

23        MR. SHENKAN:  No, no.  This -- this is --

24        THE COURT:  Class wide?

25        MR. SHENKAN:  I can -- I can put some additional

1    information in, but this --

2              THE COURT:  Well, first, let me understand that you're

3    asking that the Agent Coverage Fees Excel Spreadsheet be

4    produced.  Presumably, that's a separate document that is

5    consulted by whomever is preparing this form, correct?

6              MR. SHENKAN:  Yes.

7              THE COURT:  Okay.

8              MR. SHENKAN:  It's a document that's consulted, and it

9    has on it all of the various repossessers or auctions and what

10   they are charged for as storage, their redemption fees, their

11   administrative fees, their reinstatement fees, and that's one of

12   the means that a clerk can access the information to insert it --

13   that into that notice to repossess.

14             THE COURT:  So, that's how the clerk manages to confirm

15   storage fees is one of the devises that he or she might use.

16             MR. SHENKAN:  Yes, Your Honor.

17             THE COURT:  Is that your understanding?

18             MR. SHENKAN:  Yes, sir.

19             THE COURT:  And so, you're looking for the -- whatever

20   the document is that's titled Agent Coverage Fees Excel

21   Spreadsheet?

22             MR. SHENKAN:  Yes, sir.

23             THE COURT:  And in any of its, perhaps, manifold

24   iterations during the term of the class period?

25             MR. SHENKAN:  Yes, sir.

1          THE COURT:  Okay.  Let me hear from Defense counsel

2     about it.

3          MR. PARKER:  Your Honor, the objection is simply that

4     it hasn't been asked for before, not in any formal request, and

5     certainly not all iterations of any spreadsheet over the course

6     of the class period.

7          THE COURT:  All right.

8          MR. PARKER:  I couldn't even say if different

9     iterations exist.

10         THE COURT:  All right.  I assume, counsel, that there

11    is such a document called an Agent Coverage Fees Excel

12    Spreadsheet.

13         MR. PARKER:  I believe there is, yes.

14         THE COURT:  And let me ask counsel for Plaintiff, was

15    this the subject of a separate document request or is it covered

16    under one of your document requests?

17         MR. SHENKAN:  It is covered under one of my document

18    requests.  I think it's either 12, 13, or 14, that asks for

19    all -- it's a -- you know, all documents pertaining or relating

20    to storage repossession.  I mean it was a very broad

21    encompassing --

22         THE COURT:  Yeah, yeah.  Well, if that has not been

23    provided, and I'm going to just take a moment and refer -- we'll

24    try and deal with this now -- to 12, 13, or 14.

25         (Pause)

1          MR. HOENSCH:  Your Honor, number 12 asks for all

2    AutoIMS documents that concern the representative payments.

3          THE COURT:  Yes, I'm reading 12 now, and I've read 13.

4          MR. SHENKAN:  Your Honor, 13, I believe, is almost a

5    word for word version of what would was in Judge Beetlestone's

6    January 11th --

7          THE COURT:  Yeah, the question is whether it covers

8    this document.

9          MR. HOENSCH:  We would just say that a document isn't a

10   policy or procedure just because it might be referenced in the

11   policy or procedure.

12         THE COURT:  Well, the question is whether this relates

13   to, in any way, the sending of any notice of repossession and/or

14   Post-Sale Notice.  If the Agent Coverage Fees Excel Spreadsheet

15   is consulted in preparation of either of those documents, then it

16   certainly does.

17         MR. HOENSCH:  Well, I'm sorry, Your Honor, are you

18   looking at 13?

19         THE COURT:  I'm looking at number -- document request

20   number 13.

21         MR. HOENSCH:  Right.  Documents which concern or

22   relate, pertain or discuss M&T's policies, practices and/or

23   procedures.

24         THE COURT:  And/or the sending of any notice of

25   repossession and/or Post-Sale Notice.  So, in your reading, this

1  is not covered because it's not a policy or procedure?

2          MR. HOENSCH:  Correct.  It was asking for policies and

3  procedures.

4          THE COURT:  It certainly looks like a procedure.  This

5  is a procedure that your employees are -- by this form that I'm

6  looking at in front of me, page -- bates stamp number, the last

7  three digits, 984 of Plaintiffs' Exhibit 4 --

8          MR. HOENSCH:  Yes, that is the procedure, yeah.

9          THE COURT:  -- this is a -- this is a procedure that

10  that employees are designated to follow, correct?

11          MR. HOENSCH:  The procedure designated on 984, yes.

12          THE COURT:  Well, that's one of the bank's procedures.

13          MR. HOENSCH:  Correct.  The Agent Coverage Spreadsheet

14  wasn't a procedure.

15          THE COURT:  Yeah.  Well --

16          MR. HOENSCH:  It's simply a spreadsheet that they

17  consult for names of --

18          THE COURT:  Well, it's all documents which concern,

19  relate, pertain or discuss.  I think that's broad enough to cover

20  a document that an employee is procedurally directed to look at

21  as part of a procedure.  I think that's covered, and I think it

22  needs to be produced.

23          MR. HOENSCH:  Okay.

24          THE COURT:  Very well.

25          MR. HOENSCH:  We can certainly do that, Your Honor.

1           THE COURT:  Very well.  Counsel, you may proceed.

2   BY MR. SHENKAN:

3   Q    If I could direct your attention --

4           MR. SHENKAN:  Thank you.

5   BY MR. SHENKAN:

6   Q    If I could direct your attention to the first page of the

7   repossession --

8   A    Uh-huh.

9   Q    -- policy, please.

10  A    Sure.

11  Q    Do you see where it says purpose used, rent?

12  A    Yes.

13  Q    It indicates State laws, regulations that are subject to

14  change must be agreed to.  Do you know if there is a document

15  related to State laws in effect, if you know?

16  A    I don't know.

17  Q    If I could also direct your attention on page 91, bate

18  stamp.  It says -- there's a big white-out in this, in the

19  picture.  Do you see that?  Do you know if that was -- if that

20  was part of the policy or if that was actually whited out for

21  discovery, if you know?

22  A    I can't say for certain since I didn't prepare this

23  screenshot, but it does not appear that way based on my

24  understanding and knowledge of LOCUS.

25          THE COURT:  That is to say this appears to be --

```
 1                THE WITNESS:  Genuine and unaltered.

 2                THE COURT:  -- a genuine picture of the --

 3                THE WITNESS:  Correct.  That is --

 4                THE COURT:  -- screenshot rather than a post-screenshot

 5     redaction.

 6                THE WITNESS:  -- that is accurate.

 7                THE COURT:  Okay.

 8                THE WITNESS:  And the reason I make that assumption is

 9     that I understand in LOCUS, you have columns.  Column-width

10     cannot be altered in a table.

11                THE COURT:  Uh-huh.

12                THE WITNESS:  So, there's no way to expand those out.

13     It's simply -- it looks as though -- and it looks -- it also

14     looks as though, if you look in the upper righthand corner of the

15     screenshot, you will see that this is a maximized screen, so as

16     to facilitate a full-page screenshot rather than a selected

17     screenshot.

18                MR. SHENKAN:  Okay.  Thank you.

19     BY MR. SHENKAN:

20     Q    Let me bring your attention back to bates 984, which is page

21     4.

22     A    Yes.  Yes.

23     Q    Paragraph 8, section B, number 2.

24     A    Uh-huh.

25     Q    Roman number two.
```

1   A      Uh-huh.

2   Q      It looks like -- it says redemption specialist notes.  Do

3   you know what that is?

4   A      I would only be able to infer from context, but, no, I don't

5   know.

6          MR. SHENKAN:  Your Honor, I would also request that

7   since it was part of the policy, that any -- to the extent that

8   there are policies or procedures, or worksheets, or instructions,

9   that follow the nomenclature of redemption specialist notes, I

10  would ask that that also be provided.

11         THE COURT:  And it will be directed on to the same

12  logic.

13         MR. SHENKAN:  As the Agent Coverage Fees Excel

14  Spreadsheet?

15         THE COURT:  Yes.

16         MR. SHENKAN:  Yes, Your Honor.

17         MR. HOENSCH:  And Your Honor?

18         THE COURT:  Yes.

19         MR. HOENSCH:  It's our understanding that these

20  redemption specialist notes that he's referring to are

21  simply -- it's a box of notes listed in the LOCUS system, sort of

22  screen logs on the bottom righthand corner of the first page.  We

23  can certainly confirm that, but they may not be separate

24  documents.

25         THE COURT:  Very well.  Well, counsel can certainly, in

1    responding to this, to the extent that it becomes either there's

2    no documents or the documents have already been produced in some

3    fashion, you can direct attention to the Bates stamp number or

4    the document load that has already produced those documents.

5              (Pause)

6              THE COURT:  And counsel, we have about nine more

7    minutes.

8              MR. SHENKAN:  I thought I was waiting to -- was that

9    issue resolved Your Honor, that last --

10             THE COURT:  Yes.  I directed that there be production

11   of the redemption specialist notes.  Obviously, if counsel, upon

12   examination, determines that they've already been produced in

13   some other production, he can direct attention to that other

14   production and affirm.  As I have indicated as a general matter,

15   that that's it, they don't have any more, or they've already

16   produced them and direct the bates stamp number.

17             MR. SHENKAN:  Thank you.

18   BY MR. SHENKAN:

19   Q    Mr. Kaminski, Are you familiar with the quality of review

20   forms?  Do you know what that is?

21   A    I do not.

22   Q    Mr. Kaminski, do you know M&T's Bank's policies with respect

23   to the assessment of storage fees?

24   A    I do not.

25   Q    On any putative class member?

1   A    I do not.

2   Q    Do you know, -- do you have any knowledge with respect to

3   how to access who was actually charged storage fees in the

4   putative class?

5   A    I do not.

6   Q    Do you have any knowledge as to whether or not, as a matter

7   of policy and practice, the storage fees are inserted into the

8   fields in the notice of repossessions that are subject to this

9   litigation, if you know?

10  A    I would have to review -- you're asking if storage fees are

11  somehow itemized in the notices of repossession?

12  Q    If you know.

13  A    It appears as though they are from the document you

14  provided.

15          THE COURT:  Which document are you referring to, sir?

16          THE WITNESS:  Bates stamp 19977.  It was part of, I

17  believe, Exhibit 3, page 2.

18          THE COURT:  Okay.

19          THE WITNESS:  Expense of storing the vehicle is listed

20  as the fifth charge down in the bottom section.

21          THE COURT:  I see.

22  BY MR. SHENKAN:

23  Q    Do you know if that expense of storing the vehicle actually

24  was incurred or expected to be incurred by the letter that was

25  generated?

```
 1   A    I can't speak to what charges were or were not incurred by
 2   the bank.
 3   Q    Do you know how it would be determined whether those charges
 4   -- storage charges, were incurred by the bank?  What search --
 5   based upon your understanding, what search would be done to find
 6   out?
 7             MR. PARKER:  Your Honor, I would object to this line of
 8   questioning.
 9             THE COURT: Yes.
10             MR. PARKER:  This is going well beyond --
11             THE COURT:  I'm going to -- I'm going to sustain the
12   objection, and here's my suggestion as we're drawing close to the
13   time that I have to depart.  It sounds as if -- and I had hoped
14   to clarify in my own mind, but it sounds as if counsel for
15   Plaintiff, and correct me if I'm wrong, is seeking a deeper
16   understanding of the document storage and accessing realities at
17   the bank.
18             And it's obvious to me that Mr. Kaminski, while quite
19   expert at his role, is not the person with -- who's going to have
20   primary knowledge of how documents are stored, kept, and so forth
21   at the bank.  That someone would be somebody else, and the rest
22   of our hearing today is going to be directed at finding out who
23   that someone else might be.  And for the purpose of setting up a
24   30(b) -- a preliminary 30(b)6 deposition of that person or
25   persons who is best qualified, in the general sense, to talk with
```

1   personal knowledge about how documents are stored at the bank,

2   where documents are, what documents are accessible through what

3   programs.

4            That being the case, counsel can, on both sides

5   perhaps, use the lunchbreak, hopefully, to think about how that's

6   going to happen.  I'm not going to presume to define the terms of

7   the 30(b)6 notice, but I am going to say that it's my

8   determination that somebody other than Mr. Kaminski is obviously

9   the person who should be asked those questions.

10           Mr. Kaminski would certainly be subject to a deposition

11  at some point in time, if necessary, for specific issues that

12  related to the scope of his employment, but by and large, much of

13  the questioning today has indicated to me that Mr. Kaminski is

14  not the person who would be best suited to talk about the bank's

15  software, and what it's capable of, and what it does house, and

16  how to access documents, and so forth.

17           So, I think we can conclude here.  I'll give counsel

18  the opportunity to address that issue at the time we come back,

19  and then we'll proceed with taking testimony today and try and

20  conclude today's hearing at a reasonable hour.  All right?

21           MR. SHENKAN:  Thank you.

22           THE COURT:  Thank you, both.

23           MR. PARKER:  Thank you, Your Honor.

24           MR. SHENKAN:  Thank you, Your Honor.

25           THE COURT:  You may step down.  We're adjourned for --

```
 1                 THE WITNESS:  Thank you.

 2                 THE COURT:  -- let's see --

 3                 (Off the record)

 4                 THE COURT:  Please be back by 2:15 and take a few

 5     minutes to discuss the potential shortening of the afternoon, if

 6     it's possible, but I'm scheduled to be here, so I'm ready to go.

 7     If we need to go to 5, that's what we'll do.  Okay.

 8                 MR. PARKER:  Your Honor --

 9                 THE COURT:  Yes.

10                 MR. PARKER:  -- can Mr. Kaminski be excused for the day

11     if we have no cross for him?

12                 THE COURT:  I have -- I have no reason why he can't be.

13     I think I'm done.  Thank you, Mr. Kaminski for your service here.

14                 THE WITNESS:  Thank you, sir.

15                 MR. SHENKAN:  Thank you, Mr. Kaminski.

16         (Recess at 12:42 p.m.; reconvening at 2:35 p.m.)

17                 THE CLERK:  All rise.

18                 THE COURT:  Please be seated.  Thank you.  We're

19     reconvening our hearing in the matter of Flynn v. Manufacturers

20     and Trades Trust Company.

21                 Let me suggest to counsel before we get started with

22     evidence, I've had a few minutes to think about how we proceed

23     this afternoon.  It seems to me that in a significant measure, I

24     have resolved the disputes, the pending discovery disputes in my

25     tentative thoughts, expressed them in memorandum of yesterday.
```

1              I believe that the remaining witnesses are here for the

2    purpose of trying to get through the thicket of concerns that

3    Plaintiff had about a eDiscovery liaison.  As far as the

4    substance of the disputes, if the evidence is going to go to the

5    particulars on either side of my dispositions as expressed in my

6    tentative memorandum, or tentative -- my memorandum of tentative

7    resolutions, let's get to that and let me understand explicitly

8    what the witness is talking about and why the witness is being

9    produced.

10             But if the purpose of some of the witnesses is to

11   continue to, as it were, debate the issue of whether Mr.

12   Kaminski's expertise suffices to explain some of the bank's

13   processes, I think we resolved that.  So, I don't think I need to

14   hear further evidence from any of the qualified or potentially

15   qualified people at the bank.  The bank is going to have to

16   converse with counsel to arrange a 30(b)(6) deposition, and we're

17   going to try and get to the bottom of some of the concerns about

18   process.

19             So, that leaves me asking counsel what's the plan for

20   this afternoon in light of that?  Mr. Shenkan.

21             MR. SHENKAN:  May it please the Court?  Your Honor, I

22   have Plaintiffs' eDiscovery liaison, Scott Matthews, who came in

23   from Michigan.

24             THE COURT:  Yes.

25             MR. SHENKAN:  I would like -- respectfully, my

1   suggestion would be to put him on very quickly so that -- he has

2   a very unique perspective.  He participated in both eDiscovery

3   conferences.

4           THE COURT:  No, I'm agreeable to his testimony.

5           MR. SHENKAN:  Okay.

6           THE COURT:  I understand.  Okay.

7           MR. SHENKAN:  Mr. Wilshaw's testimony is going to

8   really find out what the -- what subject he knows, and how to

9   access and store the information, and how it can be quickly

10  retrieved.  It might not be long, but I would like to at least

11  have him -- his qualifications better understood, what his

12  involvement is, and, you know, I don't want take time to --

13          THE COURT:  Right.

14          MR. SHENKAN:  -- depose him.  That might be relatively

15  quickly.

16          Mr. Fries is also here -- Fries.  You know, I think

17  that some of the information that he knows will determine, you

18  know, for example, where are the storage receipts for all these

19  storage vehicles, all the billables that were burdensome to

20  produce, why is it so burdensome.  I think Wilshaw might know

21  that as well, but I, in no way, want to belabor any of these

22  topics.  I would like to catch a flight earlier --

23          THE COURT:  Yeah.

24          MR. SHENKAN:  -- you know, today as well.  So, I'm --

25          THE COURT:  Okay.

1              MR. PARKER:  -- trying to -- over the course of the

2    last hour or so I tried to ramp it up.

3              THE COURT:  Okay.

4              MR. SHENKAN:  So --

5              THE COURT:  Well, I'm glad of that.  I think I may -- I

6    may cut short the testimony if I think that I've heard enough and

7    so --

8              MR. SHENKAN:  Absolutely.

9              THE COURT:  -- but I want to give counsel the

10   opportunity to at least make a record on some of the issues in

11   the interest for shortening debates that may take place outside

12   the court on, you know, who's going to testify about what.

13             The second thing, then let me turn to Defense counsel.

14   Any witnesses the Defense counsel wishes to put on today on any

15   of the issues that are sort of pending and they're still pending?

16   I don't know if there's any record that needs to be made to

17   bolster the Defense argument and contradiction, or to help me

18   change my decisions on my tentative decisions.  So, I'm glad to

19   hear from the Defense if they have witnesses as well.

20             MR. PARKER:  No, Your Honor.  We're not planning to put

21   any witnesses on.

22             THE COURT:  Very well.  Okay.  Well, then let's get

23   started with Mr. Matthews, and my understanding is that Mr.

24   Matthews may have some pertinent information on some of the

25   document issues that have bedeviled the case.  So, go ahead.

1          MR. FABIAN:  Your Honor, before we start, I have to

2     leave probably before we're done.  I have -- because I'm

3     observant, I have to be back by the time my status starts.  So, I

4     will stay as long as I can, with your permission, and then try to

5     quietly exit.  I just wanted you to know ahead of time.

6          THE COURT:  Well, so long as Plaintiff has counsel here

7     at the table, I'm fine with that.  Thank you, sir.

8          THE CLERK:  Raise your right hand, please.

9        JOHN SCOTT MATTHEWS, PLAINTIFFS' WITNESS, SWORN

10         THE CLERK:  Please state your first name and spell your

11    last name for the record.

12         THE WITNESS:  My name is John Scott Matthews,

13    S-C-O-T-T.

14                        DIRECT EXAMINATION

15    BY MR. SHENKAN:

16    Q    Mr. Matthews, would you tell everyone here in the courtroom

17    a little bit about your educational background and your work

18    experience, please?

19    A    I have a B.A. in Economics and Japanese studies.  I have an

20    M.B.A. from Columbia University in Finance.  Since 1989, I've

21    been working professionally, 15 years since '89.  I was employed

22    at Chrysler Corporation and Subsidiaries Incorp, including its

23    financial subsidiary, Chrysler Financial Corp.

24         Since 2004, when I created Spectrum, I've been doing

25    nothing but computer forensics, electronic discovery, and

 1   computer security related service, providing those services.

 2   Q    Approximately how many eDiscovery projects have you had

 3   since 2004?

 4            THE COURT:  I'm going to say I've actually reviewed Mr.

 5   Matthews CV --

 6            MR. SHENKAN:  Okay.  We'll move on.

 7            THE COURT:  -- and we can move on.

 8   BY MR. SHENKAN:

 9   Q    Mr. Matthews, you signed the (indiscernible) discovery

10   confidentiality order?

11   A    Yes.

12   Q    Was there anything in that order, in your opinion, that is

13   unusual with respect to the redactions that Defense counsel has

14   made to date?

15   A    In my experience, when there's a confidentiality agreement,

16   the documents that are -- that would have a search hit, would be

17   produced.

18   Q    Without redaction?

19   A    Without redaction.

20            MR. SHENKAN:  Just for the Court's attention, there is

21   nothing in here, Your Honor, with respect to redactions.

22            THE COURT:  Very well.

23            MR. SHENKAN:  And that's in Document 22.

24            THE COURT:  Noted.

25   BY MR. SHENKAN:

1    Q    I would like to refer your attention to the previous

2    exhibits that I provided to Mr. Kaminski with respect to both

3    files.

4    A    Yes.

5    Q    Could you tell me what those are briefly?

6          THE COURT:  Is this Government's (sic) -- or rather,

7    Plaintiffs' Exhibit 1 or Plaintiffs' Exhibit 2?

8          MR. SHENKAN:  Let's talk about Plaintiffs' Exhibit 1

9    first.

10          THE COURT:  Yes.

11          THE WITNESS:  This illustrates the 57 documents that

12    were produced in text and TIFF format, and the -- what we don't

13    see in its totality is the page count that's associated with that

14    -- the page count.  Well, you actually do see the page count.

15    You see the dock I.D., M&T with a number, the final number being

16    19,549 on page 3, and the first number -- I'm sorry for reversing

17    order here.  And the first number on page 1 being 1675?

18          THE COURT:  Yes.

19          THE WITNESS:  So, it's a straightforward effort to do

20    the file count, the TIFF file count.  So, what's notable for me

21    is of that production in TIFFS, approximately 90 percent is

22    evidenced by the printouts that you brought to the court, were

23    just blacked out.

24    BY MR. SHENKAN:

25    Q    These redactions?

1    A    That's correct.  Let me just say that in all my years of

2    doing this, when I received the zip file that had this production

3    set, until the second conference, which occurred on July 3rd, I

4    had no idea that it was an email production.  When you look at

5    that first set of documents, it is just inscrutable as to what

6    was being produced.  The load file had no information regarding

7    any of the metadata, whether something as simple as an Excel file

8    for email messages.

9         It's common, very common to have the subject, from, to,

10   CC, BCC, the sent date, the attachment count, the attachment

11   names, so the person on the other receiving side understands what

12   they're looking at.  That is the purpose of model orders such as

13   the one that the Judge originally entered in this case, is to

14   facilitate the exchange of information so the parties can make

15   their arguments based on the data that's provided.

16   Q    What do you glean from these 57 files?

17        THE COURT:  With respect to Exhibit 1?

18        MR. SHENKAN:  With respect to Exhibit 1.

19        THE WITNESS:  One of the takeaways that I believe is

20   relevant here is the -- one of the themes that we're hearing is

21   the burdensome nature of the discovery for this project.  So,

22   what has been produced is these 57 documents because there's 57

23   text files.  Some number of these are Excel files.  How long

24   would it take to review those Excel files?  Are there ten Excel

25   files, are there eight?  If we had that information, we would be

1    able to share an understanding of that.

2              So, it's not just an academic exercise that I would

3    love to know if this was an Excel file, a Word document, or

4    whatever it was.  It cuts to everything of any case, is what am I

5    looking at.

6    Q    Talk to me about the standard that you have seen over the

7    last -- you've been doing this since 2004, right?

8    A    Yes.

9    Q    Okay.  Since then, what have you seen with respect to having

10   Excel documents cut up into TIFF files like this particular

11   instance?

12   A    Perhaps early on, when there's some mistakes or people just

13   aren't clear on the importance of producing something in an Excel

14   file format, or natively, which is why the model order

15   specifically calls out Excel files and Access database files by

16   way of example, looking at those -- and the Judge made a spot on

17   point -- how can you make heads or tails of these pages of black

18   documentation that was natively an Excel file?  Delete those

19   rows, state to the parties why that was deleted, which is what I

20   saw, one of the purposes of the discovery liaisons.

21             You say opposing discovery liaison, we have this Excel

22   file, there's thousands of rows that need to be deleted.  We can

23   provide you the deleted version of that, where all those rows are

24   gone and say, hey, there used to be 5,000 rows, now they're down

25   to ten because those are the only responsive ones.  That, I

1   believe, is some of the collaborative activities that the Judge

2   envisioned when she provided that model order.

3            And in my experience in Federal Court, and working on

4   the Litigation Technology Committee as a Co-Chair in the Eastern

5   District in Michigan, that's one of the things that the judges

6   really find critically important in terms of moving forward so

7   you don't engage in what, again, the adverb would be whatever,

8   but in the continuum of production, this production is on the

9   extreme side of --

10           THE COURT:  Unhelpful?

11           THE WITNESS:  -- unhelpful, yes.  That's a good word.

12   BY MR. SHENKAN:

13   Q    Let me ask you, just from perspective, you said that you

14   have been involved in since 2004, hundreds and hundreds of

15   eDiscovery issues?

16   A    Yes.

17   Q    Can you give us, in that continuum, what context would this

18   be as far as if -- would you say that this -- in your opinion and

19   your observations, is this discovery abuse, in your opinion?

20   A    Given the fact that it's 2018, and all the Zubulake rulings

21   came out in the mid-2000's with all the issues with eDiscovery

22   abuses, this is -- I'll continue with the Judge's wording, very

23   unhelpful.

24   Q    And based upon all -- would this be one of the most extreme

25   discovery abuse instances that you've seen?

1   A    Given its current date, that it was done in 2018,

2   absolutely.

3   Q    In your opinion, what would have been the most efficient

4   manner to do this?  I know you've said about -- if you want to

5   just redact certain columns or rows, but let me ask you, talk to

6   me about the burden involved in the production set of 57 files,

7   knowing that we have four clients.  Can you give the Judge a

8   little bit of perspective as to what you believe, if there was

9   any burden, what it was and how much time would be involved to

10  provide this in the proper manner?

11  A    Again, to echo one of the points that the Judge referenced

12  with Mr. Kaminski during Mr. Kaminski's testimony, there's two

13  types of burdens.  There's the ones that yes, it's going to take

14  29 hours, and, of course, that's an opportunity cost to the

15  organization where they could be doing other things, as opposed

16  to answering litigation related questions, but there's an

17  efficient way to do that, and then there are inefficient ways to

18  do that, and there are ways to claim that things are inefficient

19  to do that.

20          If you're not speaking to the correct parties in the

21  organization, which is the 30(b)(6) steps that the Judge has

22  ordered, you don't know that the John Smith who works down in,

23  you know, Department X, can pull this stuff out of Access, can

24  generate the Excel files, and can get you the information you

25  need in an hour.  There are people in these organizations that

1    know how to get to the information that is needed to generate

2    anything.

3            This is a bank, this is not -- this is a modern bank.

4    They have systems that cull this information.  If there's one

5    thing a bank has, from, you know, auditing purposes, reporting

6    purposes at the state and federal level, it's the ability to

7    access information and generate reports to give auditors and the

8    other regulators the information they need.

9            This is a variation on a theme.  They have the -- I

10   can't imagine that they would not have the expertise to query the

11   systems, generate those special queries, type out -- select this

12   information from this table, from this database, and give me the

13   dump of what that -- are in those systems.

14   Q    Well, Attorney Parker has indicated that the production is

15   extended to four -- approximately 4,000 people would be four-

16   million pages.  In your opinion, do you think that that's

17   accurate?

18   A    Let me put it this way, there are two general buckets of

19   information that I think are at play.  The second productions

20   that the Defendants made, the 19,000 documents was an email

21   production.  I think that would be of generally lesser importance

22   in terms of what Plaintiffs' counsel had requested.  The real

23   data that's going to drive to determine the merits of this case

24   are going to come out of these systems, LOCUS and Shaw.  Shaw is

25   their accounting system.  I'm incredulous that LOCUS and Shaw

1   don't communicate sufficiently to generate general ledger

2   information.  All the things that a bank needs to do to generate

3   its profit and loss statements, it's cash flow statements.  Those

4   are its prime directive as an entity.

5   Q    How much time -- can you -- based upon what you see in

6   Exhibit 1 and Exhibit 2, do you have any idea of a range of time

7   it would take for a competent person to provide a search --

8   conduct a search and provide the information in the fashion that

9   you're talking about?

10  A    It would be -- it would be days.

11  Q    And that's for approximately 4,000 people?

12  A    Yes.

13  Q    What we don't have is an understanding of here's the data

14  dump out of the database files in order to understand how tough

15  it is, or here are the gaps of information.  We have the balance

16  out, we had the loan inception date, we had the payment history,

17  you know, they were good up through a certain day.  Here's the

18  total amount that was paid down in principal, here's the total

19  amount that was paid down in interest.  We would have all that

20  information and go, well, gee whiz, that's great and that gets us

21  80 percent of the way, but here's the other 20 percent that we

22  don't know about, and that's why, you know, poor Mr. Kaminski, he

23  doesn't have that subject matter expertise.  It would take

24  somebody who is in the weeds in this detail in the bank.

25  Q    Do have you any -- based upon your knowledge in the

1   industry, and based upon what you heard with Mr. Kaminski, do you

2   have any knowledge as to how long would it take to query these 57

3   documents for just four people, four people -- four Plaintiffs?

4   Approximately, a range?

5   A    So, the beauty of litigation databases like Relativity and

6   that's one of the platforms that -- litigation review platforms

7   that his company provides, and I understand from his testimony

8   that is what they used, you load the documents, in this case

9   email messages and their attachments into Relativity, and then

10  whoever is driving the show, so to speak, using the keyboard,

11  they enter search terms.

12          In this case, it would be, I would assume, the four

13  Plaintiffs' names and variations of them, perhaps it's their VIN

14  number, perhaps it's their account number, you present that

15  information into your search string, into Relativity, and because

16  Relativity, and because Relativity has all the magic behind the

17  scenes, it immediately presents you with the results.

18      Then it's up to counsel to determine is any of this

19  privileged, is this privileged communication.  It's

20  straightforward.  You put in the email domain of outside counsel.

21  You would put any other privileged entities in your search string

22  and you immediately, boom, dump that out and that's used to

23  generate your privilege log.  The other documents that are

24  produced, boom, those are the responsive documents.  And then

25  produce them pursuant to the order.

1  Q    I asked you about the time frame.  Would you say four hours,

2  eight hours?

3  A    The first of that would be a day, but then the review on,

4  that's going to be driven by the number of attorneys who are

5  reviewing it, that sort of thing.

6          THE COURT:  The first part being loading the documents

7  to begin with into Relativity, and then generating searches?  Is

8  that what you're saying is a day?

9          THE WITNESS:  No more than a day, yes.

10          THE COURT:  Okay.

11          THE WITNESS:  And that would assume -- I'm guessing

12  this is anywhere from five to ten gig of email.

13          THE COURT:  Uh-huh.

14          THE WITNESS:  Thirty-five thousand messages to search

15  and process is not -- unless you're talking about design --

16  drawing files, CAD files that are email attachments that are

17  multiple meg, this is going to go very quickly.

18          THE COURT:  Uh-huh.

19  BY MR. SHENKAN:

20  Q    Let's talk about cost.  I understand -- I understand, you

21  can correct me if I'm wrong, that cost is about $100 a gig to do

22  this e-Discovery?

23  A    I'd say 100 to 200 a gig to -- once you're done processing

24  and hosting.

25  Q    And then how many gigs was this?

1  A    We don't know.  I would estimate somewhere between 5 and 10.

2  Q    So, the cost of putting this into Relativity and having the

3  host on the platform and doing searches is approximately $1,000?

4  It should be in your opinion?

5  A    A thousand to two thousand dollars, not counting some

6  professional -- some private management fees, some of consultancy

7  fees that the vendor would provide, and certainly excluding

8  review time, whatever's needed, from opposing counsel.

9  Q    Talk to me about metadata very quickly.  Metadata with

10  respect to this particular 19,000 page deliverable, please.

11  A    Well, certainly, there is no metadata included in here.

12  There is some metadata that can be culled.  When you looked at

13  the text documents, there's some email message bodies.  And so,

14  you see the header, and from that, you can -- and as Mr. Kaminski

15  was saying this morning, old school, when it was only

16  photocopies, the poor people -- the paralegals would have to go

17  in and read the document, and then type in the metadata into the

18  litigation database.  It was all manual.  And that's what we

19  would, essentially, be forced to do.

20        All this metadata is in Relativity.  It's there.  The

21  subject to all that stuff is populated when Relativity does its

22  processing.  There's no reason, other than to make things

23  difficult, to not include that or raise the question.  That's the

24  purpose of these liaisons and the reason for these amount of

25  orders.  Hey, how would you like this produced?  If there's a

 1   reason why it's unreasonable, now is the time to do it rather

 2   than just lobbying this dump of black TIFFs to the poor client on

 3   the other side.

 4   Q    Okay.  Talk to me a little bit about Exhibit 2.  What is

 5   Exhibit 2?  What is that?

 6   A    So, Exhibit 2 simply tells you -- it gives you indices of

 7   the page count per a particular file.  So, that first file has

 8   6,234 pages of TIFFs associated with it, because it goes from

 9   page 1 to one less than what you see on the next line.  So, I

10   would not be surprised if those 6,000 -- at least a large, large

11   percentage of those 6,200 plus files are included in that deck of

12   black printout because, as I recall, there's just a header.

13   There's a column header that is on page 1, which had account

14   number and last name, first name, and then it's just black.

15   Q    Now, I mentioned the word jigsaw puzzle before, and you

16   heard that in my conversation.  Can you tell the judge what you

17   mean by jigsaw puzzles with respect to this 19,000 page --

18   A    Well, I believe anybody who's worked with Excel understands

19   that unless you have a very small Excel file, one sheet, because

20   you could have multiple sheets in an Excel file and if you put

21   print on a let's say a 16 to 20 tab Excel file, you're going to

22   have a nightmare of print -- printout.  And you're not going to

23   be able to tell, you know, your -- what's what by looking at

24   that.

25        The point in producing it natively is so that you can see

1  exactly, oh, here are the 20 columns, here are the rows, here are

2  the items in there.  And it's just-- it's the difference between

3  having something practical and common sense, versus unhelpful.

4  Q    Now, you and I talked, and I remember calling you and asking

5  you how to print one of the images, because I couldn't print what

6  I saw, which was a little bit of a row from the Excel

7  spreadsheet.  And you told me to use PowerPoint.  I had to cut it

8  out and then put it back.  Can you tell the judge why it is that

9  I had to do all of these machinations to get even some of the

10 information from the TIFF file?

11 A    When you -- OCR, for example, we'll talk about.  I think

12 it's one of the first two documents where the first page is

13 column headers only that are an image.  And then what the

14 Kaminski organization -- I don't recall the name of the company

15 for whom he works -- when they were tasked, they OCR'd those

16 TIFFs.  My experience is you do text extraction on the documents

17 first.  That forms your text file, and then you have the TIFF

18 version of it that you can quickly -- the text version is to

19 facilitate searching.  That's what Relativity indexes.  When we

20 talk index, that's the keys to the kingdom for searching.  And

21 that's why those text files are so important.

22      To pull the -- to extract the text in an Excel file makes it

23 all searchable.  When all you have are the -- when you OCR, which

24 is Optical Character Recognition, that's converting an image to

25 text, you compromise -- you run the risk of compromising the

1   integrity of the text that was originally in that document rather

2   than when you just extract it originally, it's all there.  You

3   know it's good to go.

4              THE COURT:  So, in short, when you OCR the TIFF file,

5   you get a lot of garble oftentimes.

6              THE WITNESS:  You can unless it's a really clean image.

7              THE COURT:  You can unless it's a particularly good --

8              THE WITNESS:  That's correct, Your Honor.  Which is why

9   the standard is you do text extraction --

10             THE COURT:  Do text first.

11             THE WITNESS:  Correct.

12  BY MR. SHENKAN:

13  Q    I made a suggestion to the judge, and he's going to have us

14  brief this TeamViewer concept.  Can you speak about your opinions

15  with respect to the efficiency of that, please?

16  A    I think at this stage in the case, I think it's important

17  for both the e-Discovery liaisons to have confidence into what is

18  actually being presented as being, oh, here's how we're going to

19  generate the discovery for you.  We've gotten this, which is all

20  email, which came out during the second discovery conference.

21  The TeamViewer concept will facilitate both the e-Discovery

22  liaisons to understand the fields in play, how all this data's

23  being mapped into LOCUS and Shaw, how Shaw maybe speaks back to

24  -- to LOCUS, and it's just going to give clarity to all the

25  parties and to the data that's going to be produced.  And it

1  should expedite and facilitate the whole process.

2  Q    I'm going to show you very quickly -- have you had a chance

3  to look at the privilege log, the most recent privilege log?

4  A    I did.

5  Q    Okay.  Can you tell me what your impressions have been with

6  respect to that privilege log?

7  A    I think it's very plain to observe.  The -- in the cases

8  that I support, one of the byproducts, as I described earlier, is

9  that those privileged communications get put off to the side and

10  then my counsel will go ahead and review them and -- and provide

11 some brief explanation as to why they are privileged.

12       In this case, there was one explanation that was copied

13 through thousands, and thousands, and thousands of rows of

14 privileged documents.  I -- I personally have not seen that

15 methodology employed.

16 Q    So, you've worked on hundreds and hundreds of cases in e-

17 Discovery, and you've never seen this kind of a privilege log

18 provided?

19 A    Not one where you just have the same -- I -- I don't

20 understand that, but that's --

21 Q    And you're saying that it lacks sufficient description

22 compared to what you've been accustomed to seeing in the

23 industry?

24 A    Yes.

25            MR. PARKER:  Your Honor, I'm going to object to this.

MATTHEWS - DIRECT

 1   This is going to the substance of the legal requirements of a

 2   privilege log.  This is beyond the scope of this particular

 3   individual.

 4         THE COURT:  I'll overrule.  Counsel for Plaintiff,

 5   though, I would like a copy of the privilege log that you're

 6   referring to marked as an exhibit here today.  Thank you.  We'll

 7   mark that as Plaintiff's Exhibit No. 5.

 8        (Plaintiffs' Exhibit 5 marked for identification)

 9   BY MR. SHENKAN:

10   Q    Also, with respect -- very quickly, with respect to

11   privilege, have you seen for the e-Discovery that you've done

12   since 2004, in the hundreds of cases, where if it's an Excel

13   spreadsheet that may have privileged information, the headers are

14   not even produced.  What's your impression on that?

15   A    I don't understand why an Excel file would be -- itself it

16   would be part of a privileged communication, but I believe that -

17   - I just don't understand that methodology.

18   Q    Is there any reason from what you've seen in this case why

19   the headers of any Excel spreadsheet would be protected by

20   privilege from what you've seen here?

21   A    I -- I wouldn't understand that.

22   Q    You need to tell --

23   A    The answer would be no.

24   Q    Is there anything else, in the interest of time, that you

25   have observed in this particular -- oh, I'm sorry.  Excuse me one

```
 1    minute.

 2              MR. SHENKAN:  May I approach, Your Honor?

 3              THE COURT:  Yes.

 4              MR. SHENKAN:  I'm trying to hustle.

 5    BY MR. SHENKAN:

 6    Q    Could you take a moment and look at this next exhibit, which

 7    is 7, right?

 8              THE COURT:  Yes, Plaintiffs' Exhibit No. 6.

 9              THE WITNESS:  Yes.  It's labeled as Repo tab.

10    BY MR. SHENKAN:

11    Q    It is.

12    A    And it -- I believe it says LOCUS in the header as well in

13    the top left corner.

14    Q    Yeah.

15    A    And --

16    Q    Go ahead.

17    A    And it appears to be -- it almost looks like an Excel icon

18    in the top left, but that may be the -- the LOCUS icon.

19    Q    What are these fields for?

20    A    So --

21    Q    What happens when someone inputs these fields in templates

22    such as this?

23    A    So, why all the policies and procedures are so critical in

24    this case, they provide us insight into the -- the sources of

25    data and the types of data that can be extracted.  In some cases,
```

 1   these forms, which are the front end of a database most commonly,

 2   whether it's up in Cloud, in a web --

 3              THE COURT:  And when --

 4              THE WITNESS:  -- website --

 5              THE COURT:  And when you say the front end of a

 6   database, that's a term of art, what do you mean by that?

 7              THE WITNESS:  Front end --

 8              THE COURT:  Yeah.

 9              THE WITNESS:  -- the GUI, the graphic user interface.

10   So, when you by way of --

11              THE COURT:  Translate that into easier terms for a

12   layperson to understand.  The graphic person [sic] interface,

13   that's what the user's looking at, at the keyboard when he's

14   using the software?

15              THE WITNESS:  Correct.  So, in this particular example,

16   this form is -- has labels.  Like if you look in the expenses

17   section --

18              THE COURT:  You're referring to the exhibit that was

19   marked No. 6?

20              THE WITNESS:  Yes, Your Honor.

21              THE COURT:  Yes.  Go ahead.

22              THE WITNESS:  So, in that expenses section, you see

23   type with an asterisk, and then the agent, and auction, inventory

24   date.  All that information would be in a database --

25              THE COURT:  Uh-huh.

1          THE WITNESS:  -- by way of example.  And if you just

2    had that database, it would be -- you might not see column

3    headers.  You would not see any rows.  You would just see a bunch

4    of cells with data and there would be no way for the poor user

5    who's trying to enter the data or view the data --

6          THE COURT:  Uh-huh.

7          THE WITNESS:  -- to understand what's going on.  The --

8    the purpose of a form like this, the front end or the graphic

9    user interface, is to facilitate a user's either review of that

10   data or the input of that data.

11         THE COURT:  All right.

12         THE WITNESS:  So, in this case, it could be both.

13   There could be some pretty populated information that's already

14   in the database and then as one of these particular cases comes

15   up, they have to enter different auction information and

16   expenses.  If it's not pre-populated or if it's coming from a

17   separate system that's not integrated, they would have another

18   window open, perhaps.

19         THE COURT:  Uh-huh.

20         THE WITNESS:  And then they'd go, oh, look, there's

21   that information.  Now, I got to type that into here, which is

22   why there's those myriad of processes and procedures, which are

23   very helpful, I -- I -- I can only imagine, to running the

24   business.  But the point is it gives you insight into the types

25   of data and the field names that are in play and available for

 1  querying to generate information that's relevant in reporting --

 2  reporting is what we're talking about -- that's relevant and

 3  germane to this matter.

 4  BY MR. SHENKAN:

 5  Q    So, you work for Chrysler?

 6  A    Yes.

 7  Q    Okay.  So, let's just talk about what you observed from your

 8  career and experience in e-Discovery as well as these kinds of

 9  templates.  Does -- after the front end once, it's inputted by

10  the user, does it go to a system that is easily -- not easily,

11  but can you access it through a database of some sort?

12  A    Yes.  And there's -- you write queries, which is just a way

13  to interrogate the database to give you the information that

14  you're seeking.

15  Q    So, if I were to ask you -- and I know you don't know it

16  -- if I were to ask how long would it take to query, based upon

17  your knowledge, to query how many people have deficiencies who've

18  had cars repossessed, would that be, in your opinion, in your

19  estimation, a difficult query for a bank of this nature?

20  A    If you ask the correct person, I do not think so.  There are

21  going to be what I call the subject matter experts.  They might

22  be a database administrator, they might have database

23  administrator experience.  They know how to generate SQL queries,

24  which is the term of art for running those interrogatories, those

25  questions against the database, and dump out the report.

1      The challenge or the -- the thing that needs to be

2  understood is who is that person, who is that John or Jane Smith,

3  however many there are, who operate these systems, who maintain

4  these systems and have the ability to do that in a -- in a swift

5  and competent manner.

6  Q   Let me talk very quickly --

7          THE COURT:  When you say SQL queries, tell me what

8  you're describing.

9          THE WITNESS:  SQL is another term of art.

10         THE COURT:  Uh-huh.

11         THE WITNESS:  It's S-Q-L which is --

12         THE COURT:  Yes.

13         THE WITNESS:  -- structured query language.

14         THE COURT:  Uh-huh.

15         THE WITNESS:  It's a separate lexicon to extract

16  information from a database.  So, by way of example, you have a

17  database with two tables.  You would structure the -- the query

18  language would talk to the two tables.  It would look for links

19  between the two tables.  And then you would generate -- you would

20  tell the -- via the SQL query the data that you want to extract.

21  I want this field, I want this field, and this field pulled out

22  of the database -- out of these tables on the database.

23         THE COURT:  And different databases have different

24  grammars, or devices, or means of expressing queries.  They have

25  different languages, so to speak; is that correct, or do they all

1   share commonalities at this point in the evolution of database

2   technology?

3            THE WITNESS:  The latter, Your Honor.  Most have

4   migrated and -- and consolidated themselves to one or two SQL --

5   they're small grammatical issue or --

6            THE COURT:  Yeah.

7            THE WITNESS:  -- differentials between some.

8            THE COURT:  Okay.  Go ahead, counsel.

9   BY MR. SHENKAN:

10  Q    Very quickly, can you tell me about -- there are a variety

11  of policies where the bank says that they no longer have these

12  documents.  Previous iterations of policies have been lost,

13  discarded, or are no longer available.  What has been your

14  understanding of these sorts of institutions with respect to

15  backups?

16  A    Certainly, there's going to be regulatory requirements for

17  maintaining Legacy information.  I believe it's at least seven

18  years for some of the types of information.  Other parts of it

19  are -- would be defined in the -- in the data in basically your

20  backup -- your document retention and destruction policy.  What

21  is your document detection -- retention and deletion policy?  And

22  then from that, you can understand, well, they didn't have an

23  obligation to and that's part of their standard policy and

24  procedure.  So, as long as not subject to a regulatory

25  requirement, it would be driven by their retention and

 1   destruction policy for that type of data.

 2           MR. SHENKAN:  Your Honor, no acknowledgement -- I have

 3   not formally requested the destruction and retention policies in

 4   my request for production of documents.  As a matter of

 5   efficiency, and in light of Mr. Scott's testimony and Mr.

 6   Kaminski's testimony, I would ask that the Court at least

 7   consider compelling them to produce all retention policies and

 8   destruction policies, which had any application or was

 9   implemented at all during the last period.

10           THE COURT:  I'm going to permit counsel to construct --

11   I think what we need to do first is sort through the flotsam and

12   jetsam that we have currently pending.  And to the extent that

13   there are new requests that they need to be formulated, do so in

14   writing rather than trying to do it on the fly here in the

15   hearing at this point.  You can certainly refer back to the

16   hearing transcript as additional explanation for the basis for

17   the request.  If you feel it necessary to do so.

18           MR. SHENKAN:  Thank you, Your Honor.

19   BY MR. SHENKAN:

20   Q    Mr. Scott, as a matter of efficiency, is there anything else

21   that you and I had discussed that you wanted to inform the judge?

22   A    No, counsel.

23           MR. SHENKAN:  Thank you.  Thank you, Mr. Scott.

24           THE COURT:  Very well.  Cross-examination?

25           MR. PARKER:  No.  Thank you, Your Honor.

1          THE COURT:  Very well.  You may step down, sir.  Thank

2    you.  You're excised.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Call your next witness.

5          MR. SHENKAN:  Mr. Wilshaw.

6          THE COURT:  Very well, Mr. Wilshaw

7          THE CLERK:  Please raise your right hand.

8        ALEX WILSHAW, WITNESS, SWORN

9          THE CLERK:  Please state your full name and spell your

10   last name for the record.

11         THE WITNESS:  My first name is Alex, last name Wilshaw,

12   W-I-L-S-H-A-W.

13         THE CLERK:  Thank you.

14                    DIRECT EXAMINATION

15   BY MR. SHENKAN:

16   Q    Mr. Wilshaw, good afternoon.  What is it that you do for the

17   bank?

18   A    I am a digital forensics investigator for M&T.

19   Q    What does that mean?

20   A    Essentially, my job is to institute legal holds at the

21   request of the Legal Department generally over -- I'm sorry,

22   counsel, are you able to hear me?

23   Q    Yeah, I didn't hear what you said.

24   A    Okay.  Let me -- let me start over, if I may.  Essentially,

25   my job is to institute legal holds for our Legal Department.

1    Generally, those are email-based holds.  On occasion, they will

2    also request us to gather and preserve other types of evidence as

3    well that may be electronic.  Also, as part of my job, I perform

4    digital forensic examinations.  Generally, it doesn't happen for

5    legal, but I do perform that and other contacts for the

6    organization.

7    Q    Who is it that you report to?

8    A    My manager's name is Naomi Foote.

9    Q    And what does she do in the organization?

10   A    Her title is digital forensics manager and physical security

11   operations manager.  She essentially has a hybrid role to where

12   she manages the team of which I'm a part of and she also manages

13   a physical security operations group that she recently took on.

14   Q    And how many people are in the digital forensics team?

15   A    One manager, that is Ms. Foote, and it is myself and one

16   other colleague who are on the team.

17   Q    And what's his name?

18   A    Whose name?

19   Q    The other colleague.

20   A    Tyler Verrall.

21   Q    A-R-R-E-L?

22   A    V-E-R-R-A-L-L.

23   Q    How long have you had that position?

24   A    I've been doing this for over about two years.  The title

25   has changed in that time.  I began with M&T in September of 2016,

1  where this type of function was part of my -- my duties.  In July

2  of 2017 or so, the title and function changed into a different

3  division.  That's when it became digital forensics investigator.

4  Q    And what is it that you did with respect to anything in this

5  case?

6  A    With respect to email searches, I would have supported my

7  colleagues that were performing the searches, provide any

8  guidance, helping them look over queries.  With this case as

9  well, I did work with Mr. Kaminski to instruct him on, you know,

10  the nuances of the email system and the email archive.

11  Q    What did you tell him to do?

12  A    I beg your pardon.

13  Q    What did you tell Mr. Kaminski to do?

14  A    I didn't give Mr. Kaminski any orders.  My role with Mr.

15  Kaminski was informing him on how the process worked.  And with

16  that, essentially how we collected the mail up until the point we

17  delivered the mail to Amazon -- or Avalon, excuse me.

18  Q    And who helped -- who performed the queries -- the other

19  queries?

20          THE COURT:  What queries, sir?

21  BY MR. SHENKAN:

22  Q    You communicated that you created queries or emails.  Did I

23  mishear that?

24          THE COURT:  In connection with the discovery in this

25  case?  Is that your testimony, sir, that you created queries with

1   respect to the discovery produced in this case?

2           THE WITNESS:  I helped construct the queries with

3   respect to the email queries.  So, with the email system, I would

4   have assisted my colleagues in that.

5   BY MR. SHENKAN:

6   Q    When you say your colleagues, you're talking about who?

7   You're talking about Tyler and Naomi?

8   A    Yes.

9   Q    Now, those queries, do you have a record of them, what they

10  are?

11  A    They would be in the -- in the email archive platform, yes.

12  And they also would be captured in the request sent to us by

13  Legal.

14  Q    What's that query called?  How would you reference that

15  query if I were to ask you to go back to the bank and get that?

16  A    The software doesn't have a real special name for the query,

17  which I -- I think is your question.  Forgive me if I'm

18  misunderstanding.  Essentially, it's just a query that we tell

19  the system who we're trying to run the search against, what's the

20  time frame, and any other parameters that would have been handed

21  down to us from Legal.

22  Q    Okay.  Do you know what the parameters were?  Can you tell

23  us what the query is that you ran with respect to this case?

24  A    I don't recall offhand, sir.

25  Q    Do you have a time frame that you ran the queries?

1    A    I don't recall offhand, sir.

2    Q    Do you know how many queries you ran?

3    A    There were multiple, but I can't remember how many

4    specifically.

5    Q    Were there -- was there one for each of the four -- of the

6    Plaintiffs?

7    A    I can't recall.  I'm sorry.

8    Q    If I were to ask you to provide all of the information that

9    pertained to the queries or the work that you did on this

10   project, would you be able to reconstruct that and provide

11   documents relating to that?

12   A    We may be able to provide queries with respect to how much

13   work any one of us at any given time.  I don't think I would be

14   able to produce that.

15            MR. SHENKAN:  Your Honor, I'd also like to ask for a

16   copy of whatever queries they used.  Would you like me to put

17   that in writing?

18            THE COURT:  Yes, please.  Yeah.

19   BY MR. SHENKAN:

20   Q    And you said that you're not able to determine how much time

21   you spent on the project relating to this case?

22   A    I could not, no.

23   Q    Why not?

24   A    I don't have those kind of analytics to track.

25   Q    So, if I were to ask you to give an estimate of how much

1   money the bank had spent on production of the 19,000 page

2   production, would you have any idea how that can be reconstructed

3   by the bank?

4   A    I -- I do not.

5   Q    Who would know that?

6   A    Honestly, I'm not sure.

7   Q    Can that be reconstructed?

8   A    I wouldn't know.

9   Q    Do you have time records?

10  A    No.

11  Q    Do you have calendars where you write down what you did on a

12  particular day?

13  A    I do not.

14  Q    Do you keep your information on any sort of electronic

15  platform that tracks your time?

16  A    I don't have time tracking software, no.

17  Q    So, as you know, one of the objections that the bank has

18  interposed in writing to these discovery requests is that it's

19  burdensome.  Are you aware of that?

20  A    I've heard a bit on call with counsel, but specifics of that

21  argument, I do not know.

22  Q    Do you know how -- how would the bank -- are you familiar

23  with the various systems the bank uses?

24  A    I've heard about some of them in connection with this case.

25  Familiarity is another story.

1  Q    Why don't you tell me what you are familiar with?  Are you

2  familiar with LOCUS?

3  A    I am not.

4  Q    Are you familiar with AutoIMS?

5  A    I am not.

6  Q    Are you familiar with the systems that would be used to

7  generate notices of repossession letters or Post-Sale Notice

8  letters?

9  A    I'm not familiar with that.

10 Q    Are you familiar with the storage of retail installment

11 contracts or letters, perhaps, in FileNet?

12 A    I'm not familiar with that.

13 Q    Do you know anything about FileNet?

14 A    I know that the bank uses FileNet in places, but that's

15 about the extent of my knowledge.

16 Q    Have you ever used it?

17 A    I have not.

18 Q    I understand you were the chief contact or the primary

19 contact for Mr. Kaminski, is that accurate, with respect to this

20 assignment?

21 A    With respect to email and this assignment, yes.

22 Q    And have you reviewed his bills that might help refresh your

23 memory of how much time you spent on the project or he spent on

24 the project?

25 A    I have not.  I've never seen those bills.

1   Q    Do you know how many emails were provided with respect to

2   this 19,000 page deliverable?

3   A    I have no idea.

4   Q    Mr. Scott Matthews indicated that it would be pretty easy to

5   go through an Excel spreadsheet and if redactions were proper, to

6   simply highlight the areas of the information that you wouldn't

7   want to provide and just wipe that out or delete those cells.

8   Would you agree with Mr. Matthews with respect to his testimony

9   in that respect?

10  A    Respectfully, I can't comment on it either way because I

11  don't deal in redaction with my job.  And, truly, my only

12  involvement with this area has been with email.  I don't believe

13  I dealt with any flat files like an Excel file or any of the

14  other documentation that you've been provided.

15  Q    So, if I were to ask you how many emails you looked at with

16  respect to this query, you don't know right now?

17  A    We don't perform reviews.  We would essentially hand that

18  mail off to our legal partner or, in this case, it would have

19  been Avalon to work with further.

20  Q    So, you don't even review it.  What does that mean?

21  A    Meaning I don't go through those emails one by one and

22  determine if there's some kind of privilege associated with that,

23  that's relevant to us.  My role in this and my team's role would

24  have been to pull that mail together and hand it off to an

25  appropriate party for the next steps in the process.

1          THE COURT:  Mr. Wilshaw, let me ask you a few questions

2    then.  Your job is essentially to go to the email as it stands as

3    it's used at the bank, make queries, and pull the documents and

4    provide them to the next step in the process, correct?

5          THE WITNESS:  With respect to the email workflow, we

6    gather that mail, and we will assist in the production of it.

7          THE COURT:  Okay.

8          THE WITNESS:  But that production is very raw.  So,

9    forgive me, stop me if I'm --

10         THE COURT:  Yeah.

11         THE WITNESS:  -- going too far, but when I discuss the

12   word production, I truly mean that we're instructing the email

13   platform to take the mail that we were instructed to gather and

14   put that in a container.

15         THE COURT:  Uh-huh.

16         THE WITNESS:  And there's no edits to the content at

17   that point.  If there's privileged information, whether it's

18   attorney-client privilege or --

19         THE COURT:  Yeah.

20         THE WITNESS:  -- what have you, that's all in that

21   file.

22         THE COURT:  Okay.

23         THE WITNESS:  And then we hand it off to another party

24   that does whatever they need to do with it.

25         THE COURT:  Container, so to speak, a design feature of

```
 1   the email software or is it a separate file or software that you

 2   use to make the collection?

 3          THE WITNESS:  Our email archive software provides that

 4   functionality.

 5          THE COURT:  Okay.

 6          THE WITNESS:  It puts it in a format called a PFC

 7   container, which is a Microsoft format.

 8          THE COURT:  Uh-huh.  How many days did it take you to

 9   make the various queries, and fill the container, and pass it

10   along to the next step in the process?

11          THE WITNESS:  Building individual queries isn't the

12   part that takes a lot of time, although we do have to break it up

13   just because if we put too much of a request and too complex of a

14   request in a simple query, the system tends to break down,

15   struggle, et cetera.

16          THE COURT:  Uh-huh.

17          THE WITNESS:  So, there is some kind of trial and error

18   with respect to how much can we get it into one query.  But as

19   far as actually collecting the mail and producing it, I don't

20   recall how long it would have taken in this case.  But, truly,

21   the more custodians internal to the organization that were

22   looking at, how broad the time frames are, how complex any

23   keywords or approximately how many operators use, things of that

24   nature, the more of those that are put in there and the broader

25   those things end up being increase the time it takes to produce
```

1   and collect that mail.

2           THE COURT:  In this case at some point, you did produce

3   a collection of raw -- pretty raw data, emails in PST format for

4   further review by counsel or whoever was going to do the review;

5   is that correct?

6           THE WITNESS:  We would have handed it on to Avalon,

7   yes.

8           THE COURT:  All right.  Did it take a matter of weeks

9   to complete that task that you were given, or did it take a

10  matter of days?

11          THE WITNESS:  Honestly, I don't recall.

12          THE COURT:  Did it take months?

13          THE WITNESS:  I don't believe it took months, but,

14  again, it was so long ago that I can't recall with specificity.

15          THE COURT:  All right.  Counsel, you may proceed.

16  BY MR. SHENKAN:

17  Q   Mr. Wilshaw, how many gigabytes were provided to Avalon and

18  Mr. Kaminski?

19  A   I don't recall the file size.

20  Q   Do you think it was more or less than ten?

21  A   I really can't speculate on that.  I really don't recall.

22  Q   Do you think it was more or less than a hundred gigabytes?

23  A   I really don't recall.

24  Q   How about a thousand gigabytes?  Was it a thousand

25  gigabytes?

1   A    I really don't recall.

2   Q    So, if I were to ask you if it was a million gigabytes, you

3   wouldn't know?

4           MR. PARKER:  Objection.  This is argumentative.

5           THE COURT:  Well, it's not argumentative.  It's just

6   another question, but we're going to stop at a million.  We're

7   not going to go ten million.  So, you can answer the question.

8           THE WITNESS:  I can safely say that we have not had a

9   production or submission in the millions of range.

10  BY MR. SHENKAN:

11  Q    Let's talk about what the bank's policies and procedures are

12  with respect to document retention very quickly.  Are you

13  familiar with the document retention protocol for the bank?

14  A    I am not.

15  Q    Are you familiar with the instruction protocol?

16  A    I am not.

17  Q    Are you familiar with the backup solutions that the bank

18  uses for products that the bank uses to back up their database?

19  A    I am not.

20  Q    Then who would be?

21  A    Honestly, I'm not sure.  It would likely be someone within

22  our technology division, but I don't even know where to start

23  with the contact on that.

24  Q    Who's in charge of your technology division who might know

25  that information?

1   A    Honestly, I'm not sure.  You would have to work through

2   counsel to figure who that point would be.

3   Q    I'm asking you, do you know?

4   A    Respectfully, counsel, I don't have the answer for you.

5   Q    If I were to ask you to let me know about how expenses are

6   tracked --

7            THE COURT:  What expenses, counsel?

8   BY MR. SHENKAN:

9   Q    Expenses are tracked for storage expenses or expenses

10  relative to a repossessed vehicle, would you know how that's

11  done?

12  A    I would not.

13  Q    Do you know who would know?

14  A    I do not.

15  Q    Do you know who, in your opinion, would be the best or most

16  knowledgeable person to talk about the subject of the systems

17  that the bank uses?

18  A    I really am not sure.  Again, I come back to it would

19  probably be a technology point of contact you'd be looking for.

20  Where that start of that search would be to find that person, I

21  couldn't tell you.

22  Q    Mr. Matthews talked about the presentation of Excel

23  spreadsheets in TIFF files.  Do you have any familiarity with

24  that process?

25  A    I do not.

1          THE COURT:  All right, counsel.  I think that --

2          MR. SHENKAN:  Okay.

3          THE COURT:  -- I'm going to direct that if there's any

4    further questioning that it be directed towards things that Mr.

5    Wilshaw does know.

6    BY MR. SHENKAN:

7    Q    Did you tell me everything that you did with respect to the

8    assignment that you had regarding this particular case?

9    A    I have.

10          THE COURT:  Very well.

11          MR. SHENKAN:  Thank you very much.

12          THE COURT:  Is there any cross-examination?

13          MR. PARKER:  No, Your Honor.

14          THE COURT:  Okay.  You may step down, sir.  Thank you.

15    You're excused.

16          MR. SHENKAN:  Thank you, sir.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  Next witness.

19          MR. SHENKAN:  The next witness is Mr. Fries.

20          MR. PARKER:  Your Honor, is Mr. Wilshire free to leave?

21    I don't know if he's going to or not, but --

22          THE COURT:  Yes.

23          MR. PARKER:  Okay.

24          THE COURT:  Mr. Wilshaw is free to leave.

25          MR. PARKER:  Thank you very much.

```
 1                 THE COURT:  Thank you.

 2                 THE CLERK:  Please raise your right hand.

 3        KENNETH STEVEN FRIES, WITNESS, SWORN

 4                 THE CLERK:  Please state your full name and spell your

 5   last name for the record.

 6                 THE WITNESS:   Kenneth Steven Fries, F-R-I-E-S.

 7                          DIRECT EXAMINATION

 8   BY MR. SHENKAN:

 9   Q    Mr. Fries, good afternoon.

10   A    Good afternoon.

11   Q    What is it that you do for the bank?  What's your position?

12   A    Currently, I am a process improvement manager.  I'm a Vice-

13   President of the bank and Process Improvement Manager.

14   Q    What does that mean, process improvement manager?

15   A    So right now, I'm in -- in charge of process efficiencies,

16   removing waste at the bank, improving -- just improving processes

17   all across consumer asset management.

18   Q    In this litigation, in Rule 26(a) disclosures, you're the

19   only person that's been designated to have any information with

20   respect to the subjects in this case.  Are you aware of that?

21   A    Yes.

22   Q    Is that accurate?  Is that an accurate representation, in

23   your opinion?

24   A    Yes.

25   Q    You indicated that the class size from the initial complaint
```

1   that was filed in 2017 was approximately 4,000 people?

2   A     Just short of 4,000, yeah.

3   Q     And what did you do to identify those people?  When I say

4   what did you do, who did you call, who did you contact, how did

5   the process happen?  Could you just tell me a little bit about

6   that process?

7   A     Sure.  I was instructed of the date range that this case

8   surrounded.  And I was instructed through Legal that -- of the

9   parameters.  For instance, the, you know, repossessions in the --

10  for Pennsylvania accounts.  And what I really did was I just

11  contacted our analytics team, gave them those parameters, and

12  advised them I needed certain information such as account

13  numbers.  I needed their, I believe, origination date, the -- the

14  state that the contract was in, although they would -- yeah,

15  they -- I advised them that they needed to be Pennsylvania.  Some

16  financial information that was in our Shaw system.

17      And I really just sent the request over to analytics.  They

18  developed a report and in a -- in a spreadsheet format.  And that

19  was passed on to legal counsel.

20  Q     Those account numbers, are there any names associated with

21  that or is it just account numbers?

22  A     There are.  There are names.

23  Q     So, if I were to ask you to provide a copy of that

24  spreadsheet and redact the column of the people's names, how

25  difficult would that be for the bank to do?

1   A     It would be relatively easy.

2   Q     Who in your analytics team did you speak to?

3   A     Mr. Randy Surface.

4   Q     What is his position at the bank?

5   A     He's the man -- he's a manager of the Analytics Department.

6   I don't recall his exact title, but I do know that he's the

7   manager.

8   Q     Do you know how many deficiency balances there are for the

9   putative class?  Have you done that research?

10          MR. PARKER:  Your Honor, I would object.  This is going

11  well beyond the scope of what's the subject of this evidentiary

12  hearing.

13          THE COURT:  It is.  It's sustained.

14          MR. PARKER:  Thank you.

15          THE COURT:  We're not doing substantive discovery.

16  We're trying to wade through document requests and interrogatory

17  requests and determine whether they're burdensome or whether

18  they're relevant and to make rulings on the objections.

19          MR. SHENKAN:  The only reason why I asked, Your Honor,

20  is because the providing of the deficiencies there was a

21  burdensome objection.  It was one of my requests.

22          THE COURT:  Very well.  I'll permit short questioning

23  about the process of obtaining deficiency balances.

24  BY MR. SHENKAN:

25  Q     Have you obtained any information with respect to deficiency

1  balances for the putative class?

2  A    I believe there's a column on that report that lists what

3  the remaining balance on the account is.

4  Q    And does it also have a column for bankruptcy people, if you

5  were to file for bankruptcy?

6  A    It does.  It does.

7  Q    Are there accounts in there for the finance charges to

8  figure out statutory damages?

9  A    I believe it does.

10         MR. PARKER:  Your Honor, I also object on the grounds

11  that this is calling for -- this is delving into claims of work

12  product.  This is inappropriate.

13         THE COURT:  Well, I'm going to overrule this.  At this

14  point, counsel, I've got to tell you there's been resistance at

15  every step of the way, it appears, from the bank to providing

16  simple information in a lawsuit.  Right now, I'm interested in

17  hearing about this because it bears on the potential for

18  sanctions as well.

19         MR. PARKER:  Yes, Your Honor.

20         THE COURT:  As to how easy this is to provide, and this

21  information has not -- as far as I can determine been provided.

22  It's been the subject of a hailstorm of objections.  And I think

23  it's time to sit down.  I'm going to allow this questioning to go

24  on.  We'll sort through the privilege issues after it comes up,

25  and if there are legitimate privilege claims or work product

1   claims, we'll sort them out.

2          MR. PARKER:  Yes, Your Honor.

3          THE COURT:  I've got to hear them anyway and determine

4   whether it's privileged or work product.  So, at this point,

5   we're going to go forward.

6          MR. PARKER:  Yes, Your Honor.

7          THE COURT:  And if this record needs to be sealed

8   because there's some privileged matter or some work product, then

9   we're going to deal with it.

10         MR. PARKER:  Understood.

11         THE COURT:  So, the questioning's going to go forward.

12  Go ahead.

13  BY MR. SHENKAN:

14  Q    Just to clarify, the minimum statutory damages information

15  was also in this report; is that right?

16  A    I believe so.  If -- if I understand what you're asking,

17  there was a finance charge column.

18  Q    And there was also the amount financed column as well?

19  A    I believe so.  I would have to look at the document to be

20  sure, but, yes.

21  Q    How about the amount that's been paid on a deficiency -- a

22  purported deficiency balance since the car had been repossessed?

23  Is that also on there?

24  A    I don't believe that's on there.  No.

25  Q    Would that be a simple analytic to figure out for Randy

1    Surface or any of the other folks in the analytics team?

2    A    I'm not an expert at it.  I -- I think it can be taken care

3    of in -- in a query.  Yes, I would think so.

4    Q    There are three classes -- putative classes.  Are you

5    familiar with those three classes?

6    A    I would need to be reminded of those classes.

7    Q    Have you read the lawsuit?

8    A    I have.  And I understand it's important, but it's --

9    it's -- it's been a while.  I'm no longer in that position, so

10   it's my -- my priorities are elsewhere at this point, but I

11   have -- I have read the material.

12   Q    I'm sorry.  You're no longer in what position?

13   A    When this all started, I was in a -- I was a manager of

14   special services.  So, I was the manager of the bankruptcy

15   department, probate department, legal liaison department.  I've

16   had previous experience in collections default and managing the

17   repossession remarketing department as well.

18   Q    Who is that person now that took your place?

19   A    My specific just pertaining to bankruptcies, legal, and

20   probate is Jason Davis.

21   Q    Who's in charge of the analytics department?  Is that Randy

22   Surface?  He's the manager?

23   A    He's the manager, correct.  There's -- he -- he has a

24   manager as well, and he has a manager as well.

25   Q    Who is Randy Surface's manager?

1   A     Joseph Hassett, H-A-S-S-E-T-T.

2   Q     And very quickly, his manager -- Joseph Hassett's manager?

3   A     Chris Lightcap, L-I-G-H-T-C-A-P.

4   Q     Now, if I want to ask about, you know, how these systems

5   work and how they actually integrate all of this, you know,

6   information, who, in your opinion, would be the best person to

7   ask that of?

8   A     From the user perspective, if you're looking for one person,

9   I would recommend myself.  From a technical perspective, each one

10  of those systems has a technical owner department.  They would be

11  the ones to contact.  I don't have particular names for each one

12  of those systems as their technical owner.  That would have to be

13  further researched.

14  Q     Further researched.  So, if I asked you who's in charge of

15  the LOCUS system, you have no idea?

16  A     That's incorrect.  CISPA is the department that is the

17  technical owner of the LOCUS system.  They -- they developed it.

18  Q     What is CISPA?

19  A     It's an acronym, C-I -- C-I-S-P-A.  I -- I don't know what

20  it refers to.

21  Q     Is there someone who's in charge of the LOCUS system?

22  A     CISPA is the department that built it and manages it.

23  Q     And who's in charge of CISPA?

24  A     Robert Denman, last I knew, D-E-N-M-A-N.

25  Q     Any other systems that you know the manager of?

1   A     So -- so, Shaw is a -- is not a homegrown system.  Shaw

2   would have its own owners, but we -- our technology department is

3   the best department to give detailed description on the operation

4   of Shaw.

5   Q     And you don't know who's in charge of the technology

6   department?

7   A     I would say Tina Nowicki, N-O-W-I-C-K-I.

8   Q     So, if I were to find out and ask how all of the information

9   for each of these systems works in the store, would I then have

10  to have each person in each of these teams that purportedly own

11  the know-how come and provide testimony in your opinion?

12  A     If it's anything about a user perspective, yes, you would

13  want to talk to each one of the technical owners.

14        MR. SHENKAN:  Your Honor, there's seven systems.  Do I

15  ask --

16        THE COURT:  You'll reduce it to a written request.

17        MR. SHENKAN:  Yes, I will.

18  BY MR. SHENKAN:

19  Q     Let me ask you, are you -- your involvement in this

20  particular case, have you been involved in the production of

21  documents and responses to our inquiries?

22  A     Yes.

23  Q     Are you familiar with the objections that have been

24  interposed to the discovery that I served?

25  A     In general, yes.

1    Q    Are you familiar with the burdensome objections?

2    A    Yes.

3              MR. SHENKAN:  Your Honor, I don't want to duplicate

4    efforts.  Can I --

5              THE COURT:  Go ahead and ask him what's the basis of

6    the burdensomeness and the general.  You can ask him specific

7    questions.

8    BY MR. SHENKAN:

9    Q    Can you tell me about the basis of the burdensome objections

10   in general?

11   A    Are you asking me to kind of explain what your -- what

12   your -- your argument is?

13             THE COURT:  No.  The burdensome objections are voiced

14   by the bank.

15             THE WITNESS:  Okay.  Yeah.

16             THE COURT:  So, the question is what's the burden of

17   the production.  You can give us some illustrative --

18             THE WITNESS:  Okay.

19             THE COURT:  -- examples, perhaps.

20             THE WITNESS:  Okay.  So, based on the research that

21   we've conducted so far, for the Plaintiffs involved, it involved

22   a very manual process of gathering all of the information that

23   was requested of us in reference to taking screenshots of each

24   and every bit of information that is pertaining to these

25   Plaintiffs from all of these systems.  And I believe based on

1   that and the time it took to do all of that, I believe that's the

2   basis for the --

3              THE COURT:  Uh-huh.

4              THE WITNESS:  -- for the objection.

5   BY MR. SHENKAN:

6   Q    So, it's the screenshots for all of the systems --

7   A    Uh-huh.

8   Q    -- for all of the four Plaintiffs?

9   A    Uh-huh.

10  Q    That's the burdensome objection?

11  A    Yeah.  In addition to creating -- going into the On-Demand

12  system, printing up all the statements, going through the

13  collection history, which can be -- which can be rather

14  burdensome --

15  Q    How --

16  A    -- the printing of those, yeah.

17  Q    How burdensome is it for you to print out a statement of

18  history for a client?

19  A    Well, it -- it can be burdensome by the time you print up --

20  and I -- I don't have the exact amount of pages that some of

21  these Plaintiffs have in collection histories, but you have

22  to -- when it's archived out of the CACS system, you have to --

23  you have to put it into Word.  Otherwise, you're going to find it

24  on a mainframe -- like a mainframe-type -- it's going to be

25  visually mainframe, and you're going to -- and you're never going

1   to be able to read it.  There's no way to -- you can take a print

2   screen, but then there's other fields on the side.  So, you have

3   to actually combine it and put it into a Word doc.  So, there's

4   some combining you have to do for these systems that are not --

5   it's not generally user-friendly when you're trying to retrieve

6   that.

7              THE COURT:  Who made the decision to produce the

8   information by screenshots instead of by native format by

9   electronically producing the data?

10             THE WITNESS:  I -- I don't recall who made the final

11  decision.  We were asked to provide the information --

12             THE COURT:  Uh-huh.

13             THE WITNESS:  -- for the collection history.  And we

14  put it all into Word.  So that's the only way we could --

15             THE COURT:  Did Plaintiff demand, as part of his

16  production, that you do screenshots as opposed to producing

17  electronically or was that a decision that was made by somebody

18  in the bank or bank's counsel?

19             THE WITNESS:  I don't -- I don't recall that there was

20  an actual decision made.

21             THE COURT:  Somebody made a decision at some point to

22  produce the information requested by taking screenshots.

23             THE WITNESS:  Uh-huh.

24             THE COURT:  I'm just looking for where that decision

25  came from.

 1                THE WITNESS:  Well, in the -- the CACS, if it's in the

 2   CACS system currently today, that's the only way you can do it.

 3   And if it's in -- if it's in archive CACS, it would be a

 4   screenshot as well.  The only decision that was really made was

 5   to put it into a readable format so that everybody could look at

 6   it and not be confused and put it in Word.  So, those would be

 7   the CACS history notes that were --

 8                THE COURT:  Who owns the CACS system?

 9                THE WITNESS:  So CACS is, I believe, CGI.  I believe

10   they're the vendor.

11                THE COURT:  What is CGI?  I mean so it's an outside

12   vendor?

13                THE WITNESS:  Yeah.  Yeah.

14                THE COURT:  How long has the bank been using CACS?

15                THE WITNESS:  Oh, before I got there in 2001.

16                THE COURT:  And who at the bank is the primary

17   custodian of the CACS system, if you will?

18                THE WITNESS:  So, we have a CACS technical team.

19                THE COURT:  Uh-huh.

20                THE WITNESS:  They would be probably -- if you wanted

21   to know the ins and outs of CACS, you'd want to talk to them.

22                THE COURT:  Okay.

23   BY MR. SHENKAN:

24   Q    Is that the only system that the bank uses other than

25   AutoIMS that is vendor-provided, it's not homegrown, if you know?

1  A    So, if you're asking for another system that's not

2  homegrown, there's Columbia Ultimate.

3  Q    What is that?

4  A    That is the recovery collection system.  So, once an account

5  goes into charge-off, it is -- any collection activity is housed

6  in that system.

7  Q    How much time did it take to generate the initial report

8  that you spoke of that has the person's name, the account number,

9  the finance charge, whether they filed for bankruptcy, and the

10  rest of the information?  Would it take a day?

11  A    No.  I believe it took about -- I'd have to consult with

12  Randy Surface, but I would guess about a week to build it and

13  then get the report back.

14  Q    And have you provided me -- do you know if the bank's

15  provided me with that information in the form of an Excel

16  spreadsheet with the columns, so I can see what the column is of

17  the spreadsheet that you didn't know if it's been provided?

18  A    To you?

19  Q    To me.

20  A    I don't know if it's been provided.  It's been provided to

21  our legal counsel.

22         MR. SHENKAN:  Did you want me to ask -- to also put

23  that in writing, Your Honor?

24         THE COURT:  Yeah.  Any additional request.  I don't

25  want to have counsel for the Defense attempting to track back

1   through a transcript.  It's brutal, and unnecessarily confusing.

2   So, you can reduce it to writing.

3   BY MR. SHENKAN:

4   Q    What's that document called, sir?

5            THE COURT:  The spreadsheet that you're talking about?

6   BY MR. SHENKAN:

7   Q    Yeah.  What's that spreadsheet called?

8   A    I --

9   Q    Is it a spreadsheet?

10           THE COURT:  Well, first, does it have some name that's

11  widely used?

12           THE WITNESS:  Well, it would -- it would have some name

13  saved into --

14           THE COURT:  A file name?

15           THE WITNESS:  -- a file, right.

16           THE COURT:  Okay.

17           THE WITNESS:  Yeah.  I don't recall --

18           THE COURT:  You don't --

19           THE WITNESS:  -- the exact name.  I -- I -- I don't

20  know.

21  BY MR. SHENKAN:

22  Q    If I called it the slim spreadsheet that's referred in here,

23  is that adequate for you to --

24  A    It's adequate for me.

25  Q    What other spreadsheets have you done, has the bank done

1   with respect to determining how and in what fashion to respond to

2   discovery?

3   A    I believe that's -- I believe that's it.

4   Q    I'm going to ask you -- you can tell -- do you know if I

5   made some discovery requests, the responses of which have not yet

6   been provided by the bank?

7   A    I don't know of any, no.

8            MR. SHENKAN:  May I approach, Your Honor?

9            THE COURT:  Yes.  Thank you.  This is Exhibit No. 7 for

10   Plaintiff.

11       (Plaintiffs' Exhibit 7 marked for identification)

12   BY MR. SHENKAN:

13   Q    I'm going to refer your attention to the second page of

14   Exhibit 7, bates stamp number 446.  And this is just for your

15   edification, what I've done is, is I went through the various

16   policies that had been provided, and I've identified what's been

17   provided and what I think remains outstanding.  Have you seen

18   this document before, sir?

19   A    Yes, I believe I've seen this document before.

20   Q    Do you know if -- I know that the bank provided just two

21   days ago 66 additional pages of policies.  Are you aware of that?

22   A    Yes.

23   Q    Why did they wait so long to provide those policies?

24   A    So, with a lot of these procedures, they were housed in the

25   business units themselves.  So, it's very difficult to try and

1    track these down.  I know this is a discovery case, so each and

2    every day we are still working to accommodate all requests made

3    by you.  And as soon as we get the information, we are providing

4    it to you.

5            THE COURT:  Sir, are these policies -- and excuse me,

6    counsel, for interrupting, but --

7            THE WITNESS:  Uh-huh.

8            THE COURT:  -- are these policies typically had on

9    electronically -- retained electronically or are they actual

10   physical policies that somebody has to go and open and copy?

11           THE WITNESS:  So, typically, prior to us having a

12   SharePoint site for these procedures --

13           THE COURT:    Uh-huh.

14           THE WITNESS:  -- they would be in, usually, Word

15   format --

16           THE COURT:  Okay.

17           THE WITNESS:  -- and saved onto a shared drive

18   somewhere --

19           THE COURT:  Okay.

20           THE WITNESS:  -- in the bank.

21           THE COURT:  So, these policies that are reflected in

22   the first page of Exhibit 7, are they drawn from a computer bank

23   somewhere, some type of computer program and then printed out?

24           THE WITNESS:  No.  So, these particular ones look like

25   they would be included in -- like the bold print there, there

     1   would be some sort of version in SharePoint.

     2            THE COURT:  And SharePoint is what?

     3            THE WITNESS:  It's -- it's like a Microsoft -- I don't

     4   know if it's an application, but it's a Microsoft-based --

     5   Microsoft Office-base product.

     6            THE COURT:  If you sit at your desk at your office at

     7   the bank, can you access the SharePoint and these documents on

     8   the SharePoint?

     9            THE WITNESS:  I can access the documents in SharePoint,

    10   correct.  If they are uploaded in --

    11            THE COURT:  Are these documents --

    12            THE WITNESS:  -- if they were uploaded to SharePoint, I

    13   would be able to view them, the one caveat being if there was a

    14   procedure that was deemed archived --

    15            THE COURT:  I see.

    16            THE WITNESS:  -- that would not be -- I would not be

    17   able to get that.  That would -- I would have to go out to grab

    18   that from the manager of that SharePoint site.

    19            THE COURT:  Sitting here, can you tell which of these

    20   12 policies listed on the first page of Exhibit 7 were, in fact,

    21   on SharePoint or were archived such that you have to go retrieve

    22   them by a different means?

    23            THE WITNESS:  Yeah.  I would have to go through them

    24   because they're -- they're referencing earlier versions.

    25            THE COURT:  I see.

```
 1              THE WITNESS:  So, I wouldn't know if those earlier

 2    versions were put on SharePoint in the first place.

 3              THE COURT:  Okay.  All right.  Counsel, I think I've

 4    heard enough from the witness in terms of my projections about --

 5    as far as I can see, but I'm certainly willing to allow you to

 6    continue if you have an important -- a different subject matter

 7    to talk to the witness about, but I think we need to wrap it up

 8    because I want to touch base on the privilege issue as well.

 9              MR. SHENKAN:  Your Honor, I'll do my best to --

10              THE COURT:  All right.

11              MR. SHENKAN:  -- to wrap it up.  If you can give me

12    just a little bit more time to ask a couple of critical

13    questions.

14              THE COURT:  Okay.

15              MR. SHENKAN:  Thank you, Your Honor.

16              THE COURT:  Well, as an old Virginia judge used to say

17    to us when we were trying cases in front of him, he's like, well,

18    I suggest you ask your most important questions first because the

19    time is drawing to a close.  This is Exhibit No. 8

20              MR. SHENKAN:  Yes.

21         (Plaintiffs' Exhibit 8 marked for identification)

22    BY MR. SHENKAN:

23    Q    Do you know what that is, sir, Exhibit No. 8?

24    A    Yeah.  It looks like a screenshot from LOCUS.

25    Q    Okay.  And I'm looking at the fees, repo fees.  Is this --
```

1   does this list all of the fees that any putative class member

2   would have -- I'm sorry.  Does this list all of the fees, which

3   would have been paid by the bank relating to any putative class

4   members relating to this case?  Would this tab provide that

5   information?

6   A    I can't say it was paid by the bank, but it looks to

7   encompass most of the fees that I am -- I recognize.

8   Q    Where else would the fees or expenses be housed?  What

9   system or template would that be in besides this particular

10  template which is in Exhibit 8?

11  A    So, they should all be in the LOCUS.  They should all be in

12  LOCUS.  So, this is fees coming out of AutoIMS.  So, I -- I can't

13  think of another system that would have any additional fees.

14  Q    Okay.  The expenses that the bank has incurred, where are

15  they housed, in LOCUS?

16  A    Correct.

17  Q    And with respect to other expenses that are housed in

18  AutoIMS, can you tell me what the differential is?  Why the

19  difference?

20  A    So AutoIMS will -- the fees will carry over into LOCUS

21  through a feed from AutoIMS.  The classification of fees is a

22  little bit different than the classification of fees in LOCUS.

23  So, yes, the total should remain the same.  You might see a

24  breakdown, like -- I'm trying to think of a particular -- like

25  the $20 other fee might be included in LOCUS as a all

1   encompassing repo fee.  So, the classification might be a little

2   bit different when it populates a LOCUS field.  There's another

3   field for fees, so -- but the fees -- the fees are in LOCUS.

4   Q    So, I'm looking -- tell me about the storage fees.

5   A    Okay.

6   Q    The storage expenses.  When the bank sends out a notice of

7   repossession --

8   A    Uh-huh.

9   Q    -- as you know, the notice say -- it says, typically, 25 to

10  $35 dollars a day.

11  A    Uh-huh.

12  Q    Are you familiar with that?

13  A    Uh-huh.

14  Q    Has the bank incurred any of those fees at the time they

15  send out the notice?

16  A    The bank has incurred no fees for storage.

17  Q    Why is it that the bank then places those nomenclatures as

18  expenses on the notice of repossession if the bank had not

19  incurred any of those fees, if you know?

20  A    Well, the storage fees is a customer expense.

21          THE COURT:  I think we're going to stop the

22  questioning, insofar as it's dealing with what sounds like truly

23  substantive --

24          MR. SHENKAN:  Okay.

25          THE COURT:  -- questions that pertain to the

1  litigation.  My purpose here is to try and determine about what

2  discovery should be had and what should be avoided, and that's

3  not going to help me to know why the bank did or did not include

4  storage fees or how they were calculated.  That really doesn't,

5  maybe go to the heart of the substance of the case, but it

6  doesn't help me much in terms of discovery dispute.

7          So, we're going to --

8  BY MR. SHENKAN:

9  Q    How about accounting records, if any, with respect to this

10  repair sale -- repair fee?  Are there any records of that?

11  A    You're referring to the recondition fee or the $200 fee?

12  Q    Yes.

13  A    Okay.

14  Q    Are there any records of those expenses?

15  A    There would be.

16          THE COURT:  I think what we'll do is this, Mr. Shenkan.

17  I'm going to stop the questioning.  I'm certainly going to permit

18  you to notice the deposition of Mr. Fries for a later time, at

19  the convenience of bank counsel, and so forth, on some of this

20  subject matter, but we're going to stop for today with Mr. Fries.

21  Is there any cross-examination from the bank?

22          MR. PARKER:  No, Your Honor.

23          THE COURT:  Very well.  Mr. Fries, you may be excused.

24          THE WITNESS:  Thank you.

25          THE COURT:  Thank you.

1          MR. SHENKAN:  Thank you.

2          THE COURT:  I want to direct the parties' attention to

3     the privilege log dispute.  My take on this is that I have the

4     most recent privilege log in hand; is that correct?

5          MR. HOENSCH:  Yes, Your Honor.

6          THE COURT:  And it will also be produced to me

7     electronically, so that I can work through it electronically, as

8     well as by hand.  Okay.  It's been filed, document 110-2, ECF; is

9     that correct, counsel for the Defense?  The privilege log, is

10    this the most recent iteration of the privilege log?

11         MR. HOENSCH:  I am not sure that we have filed a

12    privilege log with anything.

13         THE COURT:  Well, this says that document 110-2 is the

14    Plaintiffs' Exhibit number 5.  What I think is probably best to

15    do is this.  Defense counsel will provide me with your most up-

16    to-date privilege log, so that we're all working from the same

17    page.  Also, provide counsel for Plaintiff with the same thing.

18    It may have already been provided and there's no changes, but I

19    just want to make sure that I've got the most up-to-date log.

20    There's no sense in me looking at a historical document that's

21    not up-to-date.

22         So, that will be provided within seven days.  I trust

23    that since the log has already been prepared that, in reality,

24    this will not be an involved process for counsel.  Provide that

25    to me in copy -- hard copy form, as well as in electronic form.

1          And I have the parties' pros and cons on the privilege

2    log and the documents that underly the privilege log.  Is that

3    the lovely set of boxes that I see in front of counsel there?

4          MR. HOENSCH:  That is most of it, Your Honor.

5          THE COURT:  Okay.

6          MR. HOENSCH:  If I could talk about the privilege log

7    for just one second?

8          THE COURT:  Yes.

9          MR. HOENSCH:  The bottom four boxes are all of the

10   Excel spreadsheets that are listed in the privilege log.

11         THE COURT:  Right.

12         MR. HOENSCH:  The top box is the other documents that

13   are listed on the privilege log.

14         THE COURT:  Now, speaking of --

15         MR. HOENSCH:  And just --

16         THE COURT:  Go ahead.

17         MR. HOENSCH:  I'm sorry, just --

18         THE COURT:  No, no, go ahead and make a record.

19         MR. HOENSCH:  -- just to briefly explain --

20         THE COURT:  Yeah, absolutely.

21         MR. HOENSCH:  -- how the privilege log works.  So, if

22   you look at the file extension column --

23         THE COURT:  What is that?

24         MR. HOENSCH:  -- if that is blank, then that means --

25         THE COURT:  I'm looking at columns across that --

1            MR. HOENSCH:  On --

2            THE COURT:  -- and there's a third -- or, one, two,

3  three, four, fifth column across says --

4            MR. HOENSCH:  Fifth column.

5            THE COURT:  -- file extension that's blank; is that

6  right?

7            MR. HOENSCH:  That's right.  So, if it's blank that's

8  an email.

9            THE COURT:  I see.

10            MR. HOENSCH:  And then the documents under that blank

11  email -- so, look at the second blank down.  That was an email.

12            THE COURT:  Uh-huh.

13            MR. HOENSCH:  And then the PDF and the two Excel

14  spreadsheets underneath of --

15            THE COURT:  Uh-huh.

16            MR. HOENSCH:  -- that were the attachments to that

17  email.

18            THE COURT:  I see.  How simple or difficult is it going

19  to be for me to wade into some boxes and relate them to this

20  document?

21            MR. HOENSCH:  So, the first column contains the

22  Relativity I.D. --

23            THE COURT:  Uh-huh.

24            MR. HOENSCH:  -- for each of these.  For all of the

25  non-spreadsheet documents --

1              THE COURT:  Uh-huh.

2              MR. HOENSCH:  -- that Relativity I.D. is printed across

3    the bottom of each of those documents.  For the spreadsheets, the

4    Relativity I.D. has been -- there's a label on each spreadsheet,

5    either a post-it note or an actual label on the actual printed

6    spreadsheet in the box.

7              THE COURT:  Okay.

8              MR. HOENSCH:  This is with the exception of the first

9    eight or so -- one, two, three, four -- with the exception of the

10   first ten spreadsheets.  Those spreadsheets were related to a

11   prior litigation and those were simply too big to print.

12             So, unfortunately, what we did for those, we stitched

13   together the first page of what that spreadsheet would be.  I

14   think they spread from column A through column -- you know, 50

15   some columns by 51,000 rows.

16             THE COURT:  Uh-huh.

17             MR. HOENSCH:  To print those it would have been

18   approximately 10,000 pages --

19             THE COURT:  Uh-huh.

20             MR. HOENSCH:  -- each.  So, to avoid printing 100,000

21   pages, we printed out the beginning section --

22             THE COURT:  Uh-huh.

23             MR. HOENSCH:  -- of each page, of each one, and

24   stitched them together so Your Honor could get the information --

25   you know, get a flavor of the information --

1          THE COURT:  Uh-huh.

2          MR. HOENSCH:  -- that was contained in those

3     spreadsheets along with on the label it says how many pages that

4     spreadsheet actually would have been had we printed it out in

5     that format.

6          THE COURT:  All right.  My -- what I intend to do is to

7     select no more than two items from each page -- I see there's 48

8     pages of privilege log -- randomly, as an effort to sample and to

9     give the parties a ruling on the limited sample.  That sampling

10    may reveal that the work is still too overwhelming for a sole

11    practitioner, which is me, with two law clerks who are busy full-

12    time writing opinions.  And so, we'll see how that goes.

13         I encourage the parties to continue discussions about

14    the privilege log because that may take a while for me to work

15    through even a sample of the items that I'm looking at right now,

16    but I will work through it, and I will give you rulings on those

17    items that have been selected.  And at that point, I would

18    suggest, based on that ruling, that the parties can make

19    extrapolations about what the rulings would be on other documents

20    of similar nature.

21         Now, if counsel wants to confer about some selection

22    process from my random sampling of privilege items to take a look

23    at first and suggest a better or more -- a sampling process that

24    is more likely to succeed in giving counsel the guidance that it

25    will need to extrapolate from my sampled rulings, they can do

1   that.  I welcome that.  If they come up with suggestions, please

2   communicate that to me.  I'm, obviously, not going to do this

3   tomorrow.

4            MR. SHENKAN:  Your Honor, might I --

5            THE COURT:  Mr. Shenkan.

6            MR. SHENKAN:  -- might I propose, Your Honor,

7   respectfully, that the Flynn spreadsheet that Mr. Fries

8   referenced, at least be highlighted for Your Honor's use and

9   perhaps that could be one of the first documents that could be

10  reviewed by the Court.

11           THE COURT:  Is the Flynn -- the so-called Flynn

12  spreadsheet that Mr. Fries referred to, is that one of the

13  documents that's contained in the boxes that I'm looking at?

14           MR. HOENSCH:  So, Your Honor, there were many, many,

15  many spreadsheets created in connection with this action, all at

16  the direction of either outside or inside counsel.

17           MR. SHENKAN:  Spreadsheets.

18           MR. HOENSCH:  All those of spreadsheets -- you know,

19  there's various forms with different raw data or polished data,

20  initial sets, subsequent sets.  It was a work in progress over

21  the course of several months.

22           So, the bottom four boxes, essentially, are all

23  separate versions of the bank's exposure analysis and settlement

24  analysis for this case.  So, it's not one particular spreadsheet.

25  It's four boxes, approximately ten -- almost 10,500 pages of

1   spreadsheets, all different iterations, different forms,

2   different information, some not even related to this case, some

3   related to a prior case.  There's no one form, which is the

4   bank's ongoing exposure analysis with respect to this case,

5   again, done all at the direction of either --

6            THE COURT:  Is --

7            MR. HOENSCH:  -- outside counsel or inside counsel.

8            THE COURT:  -- is that which Mr. Fries testified to

9   still in existence?

10            MR. HOENSCH:  I think what Mr. Fries --

11            THE COURT:  His initial production from analytics?

12            MR. HOENSCH:  I don't know that you would be able to

13   parse out from --

14            THE COURT:  Well, I wasn't --

15            MR. HOENSCH:  -- the spreadsheets, which one would

16   actually --

17            THE COURT:  -- I wasn't suggesting that I would be

18   doing the parsing.

19            MR. HOENSCH:  I'm not sure if we would be able to parse

20   out exactly which one --

21            THE COURT:  Okay.

22            MR. HOENSCH:  -- would be the first one.  We can try to

23   look through dates of potential emails, but, again, there were so

24   many different iterations of the document, some of them are, of

25   course, preliminary, some are very more over expansive than just

1   this case, than just the state, and the time period involved.

2   It's --

3          THE COURT:  Well, I suggest that Defense counsel point

4   me to the one most likely to give you a comprehensive idea of my

5   thoughts on privilege, and I'll give you that opportunity.

6          MR. HOENSCH:  Yes, Your Honor.

7          THE COURT:  All right.

8          MR. SHENKAN:  Your Honor, would it be -- would it be

9   helpful or -- you know, I had asked for just the columns to be

10  provided in my letter to you.  I don't know that that would --

11  that's privileged to just have the columns -- you know, finance

12  charge, you know, account number, you know, --

13         THE COURT:  Do you mean the column labels?

14         MR. SHENKAN:  Just the column labels be provided, not

15  the information therein, but just the content of the labels.  I

16  would like to review that.  And to the extent that it can be

17  provided in a -- with a number at the bottom of what the

18  privilege log is, I would like to provide Your Honor with what I

19  think would be most productive to review as opposed to going

20  through, you know, four boxes of 10,000 pages, which --

21         THE COURT:  Well, I'm always glad to hear about more

22  efficient devices to get to the heart of the matter.  I will be

23  glad to direct that Defense counsel provide at least the column

24  labels.  I don't -- it's hard for me to imagine that that is

25  subject to a serious objection that disclosure of those column

1  labels, as opposed to the data within, is going to compromise

2  either attorney-client privilege or work product doctrine, but

3  let me turn to Defense counsel and find out if their impressions,

4  immediately, are that that is either possible, physically, to

5  give me some notion of what the spreadsheets would reveal if the

6  data were fully occupied.

7          MR. PARKER:  And because there are so many

8  spreadsheets --

9          THE COURT:  Uh-huh.

10          MR. PARKER:  -- the headings are different.

11          THE COURT:  The headings are different.  Okay.

12          MR. PARKER:  So, it would involve parsing out the

13  headings of each individual spreadsheet.  Some are the same, some

14  are very different.  It's not all one spreadsheet.

15          THE COURT:  Well, I think that I'm going to slog

16  through some documents, and I'll do the best I can.  And probably

17  once I delve into the documents, I'll have a better idea of

18  precisely what will help me get to the point of the matter and

19  will do that.  I think that at this point, not having looked at

20  the documents at all, I'm not positioned, ideally, to be more

21  efficient than that, based on what I'm hearing.

22          So, that's it as far as I can see for the privilege

23  documents.  As far as any sanctions motion, I am postponing and

24  will take that under advisement.  And at such time as we get some

25  cures together, and we have some disposition on the substance of

1   the discovery disputes, then we can take up the sanctions issue

2   and determine whether sanctions are appropriate or not.

3           I think that concludes this matter.  Is there anything

4   either counsel wishes to add?

5           MR. PARKER:  Your Honor, just very, very minor

6   points --

7           THE COURT:  Yes.

8           MR. PARKER:  -- with respect to the memorandum, and I

9   don't know if you want to go through them now or if you want us

10  to provide written correspondence.  Just really, sort of

11  really --

12          THE COURT:  This is the memorandum we directed that you

13  provide?

14          MR. PARKER:  Yes, Your Honor.  That's correct.

15          THE COURT:  Yes, go ahead.

16          MR. PARKER:  So, with respect to your decision -- I'm

17  sorry?

18          MS. EDWARDS:  In regards to the tentative order, not

19  the --

20          MR. PARKER:  Yeah, the tentative order, Your Honor,

21  that you issued --

22          THE COURT:  Yes.

23          MR. PARKER:  -- yesterday, right?

24          THE COURT:  Yes.

25          MR. PARKER:  Okay.  I'm sorry, if I --

1            THE COURT:  No, go ahead.

2            MR. PARKER:  -- didn't make that clear.

3            THE COURT:  My memorandum, not the one that I'm

4  expecting from you?

5            MR. PARKER:  Yes, Your Honor.

6            THE COURT:  I called it a memorandum, because it wasn't

7  really an order.  Go ahead.

8            MR. PARKER:  Understood.  So, with respect to

9  interrogatory number 2, Your Honor's memorandum indicated that

10 Plaintiff has asked for an account of all the deficiencies for

11 all the class members, but that is not what the interrogatory

12 actually indicates.  The interrogatory number 2 indicates that

13 it's the request was to "Please state the aggregate sum of all

14 deficiencies you claim are due and owing as a result of the date

15 of answering this discovery request for a certain class."

16           So, we're just -- we're looking for some clarification,

17 but really it should be -- the order we would suggest should

18 match the actual interrogatory.  And there is a difference

19 between the two.

20           THE COURT:  Very well.

21           MR. PARKER:  Yes.

22           THE COURT:  I will amend it.

23           MR. PARKER:  Thank you, Your Honor.  With respect to

24 interrogatories number 7 and number 8, we had noted that Your

25 Honor had, in certain circumstances, permitted the Defendant to

1   either supply an -- answer under oath, or by following the

2   procedure outlined in Federal Rule of Civil Procedure 33(d).

3        We would just ask that with respect to the responses

4   for interrogatory number 7 and number 8, if Your Honor could

5   possibly add that similar language for those two particular

6   interrogatories, because we do think that those interrogatories

7   are conducive to a thirty-three-three -- 33(d) disclosure where

8   they're identified by bates range.

9        THE COURT:  I will amend.

10       MR. PARKER:  Thank you, Your Honor.  With respect to

11  production of document -- request for production number 7, this

12  was -- this is one of the very few where we're actually, I

13  suppose, requesting a reconsideration of it, mostly not doing

14  that.  Any complaints filed by you -- this is document request

15  number 7 -- any complaints filed, and any other lawsuit or

16  administrative action in any state relating to any aspect of your

17  policy, practice, or procedure, et cetera, et cetera.

18       The request, as phrased, doesn't limit this to policies

19  and procedures for Pennsylvania borrowers, nor does the request

20  limit to policies and procedures that were actually in effect

21  during the class period.

22       So, we would ask, to the extent that Your Honor is

23  willing to reconsider that particular ruling -- I'm sorry?

24       THE COURT:  I will.

25       MR. PARKER:  Oh, this is a different definition too.

1          THE COURT:  I'll reconsider.

2          MR. PARKER:  Thank you, Your Honor.

3          THE COURT:  I'll advise.

4          MR. PARKER:  And my colleagues have just pointed out

5    too that interrogatory number 8, the way it's described in Your

6    Honor's memorandum is different from the actual interrogatory and

7    that could make a difference from a substantive perspective as

8    well.

9          THE COURT:  What is the actual language in

10   interrogatory number 8?  I did not purport to, verbatim, include

11   the language, but to the extent that my effort at summary has led

12   to some ambivalence or ambiguity, I'm willing to correct it.

13         MR. PARKER:  No, we --

14         THE COURT:  What is the --

15         MR. PARKER:  -- we appreciate that, Your Honor.  We

16   just --

17         THE COURT:  What is it?

18         MR. PARKER:  -- wanted to make sure that there wasn't

19   any -- so, interrogatory number 8 says:  "Please state the

20   aggregate sum of the expense of storing the vehicle listed in the

21   notice of repossession for all putative class member."  And the

22   actual interrogatory is for -- I'm sorry.  Your description says:

23   "The aggregate amount Defendant actually paid for storing the

24   vehicles, which is different from the aggregate sum listed on the

25   notice of repossession.

1          THE COURT:  Very well.

2          MR. PARKER:  That's actually very different.

3          MR. SHENKAN:  I think that was the second -- I think

4    that was 8.

5          MR. PARKER:  Yes, that was 8.  That's exactly right.

6          MR. SHENKAN:  Right.  So, one was billed and the other

7    one was actually paid.  So, the -- I --

8          THE COURT:  Well, number 7 is for actually paid for all

9    third-parties for storage expenses.  What we'll do is this.

10   Defense, you can propose amended language that would probably be

11   more efficient, and more precise, and allow Plaintiffs' counsel

12   to see, in writing, the language that you're proposing for

13   amendment of the tentative order.

14         MR. PARKER:  Yes, Your Honor.

15         THE COURT:  And you can do that for all your requests.

16   You can go ahead and verbally explain them now, but what I want

17   to do is have you follow-up in writing, so we're all clear on

18   what you're suggesting.

19         MR. PARKER:  Yes, Your Honor.  Absolutely.

20         THE COURT:  Okay.

21         MR. PARKER:  And the last one to make was with respect

22   to -- and we will include this in the correspondence.  The class

23   sample list.  You had indicated it would be filed under seal, and

24   our understanding was that if we -- that the better way to go

25   would be an in camera review as to actually filing it on the

```
1   docket under seal.

2            THE COURT:  That's fine.  You can do it under -- in

3   camera.

4            MR. PARKER:  Thank you, Your Honor.

5            THE COURT:  Yeah.

6            MR. PARKER:  And then Judge Beetlestone had previously

7   indicated with respect to that list that we were going to use

8   account numbers rather than names.

9            THE COURT:  Very well.

10           MR. PARKER:  Thank you.  The very last point --

11           THE COURT:  Uh-huh.

12           MR. PARKER:  -- and I promise I'm done.  Your Honor, in

13  the memorandum, had indicated that the deadline for the burden

14  submission, and I believe that statistician submission was

15  November 23rd.  That is the day after Thanksgiving.  So --

16           THE COURT:  Oh, heavens.

17           MR. PARKER:  -- do we get one more week?

18           THE COURT:  Yes, I'm glad to give one more week.  And

19  you'll note that in your written request --

20           MR. PARKER:  Yes, Your Honor.

21           THE COURT:  -- so that we have it all in one place.

22           MR. PARKER:  That's all I've got.

23           THE COURT:  Okay.

24           MR. PARKER:  Thank you very much.

25           THE COURT:  Mr. Shenkan.
```

1          MR. SHENKAN:  Your Honor, if it makes sense I would

2     suggest, Your Honor, where the -- since the sampling in your pre-

3     tentative was reduced from 20 to 10, simply to wait for the

4     production of the initial discovery, and I would like to be able

5     to consult with Defense counsel with respect to the TeamViewer

6     idea, and then hold that simply in abeyance right now as far as

7     the numbers, because I just think it's most efficient as opposed

8     to just picking a number.  It might be less.

9          THE COURT:  Yeah.  So, what you're saying is -- explain

10    it to me.  Maybe because it's 4:30, and I've got a, you know,

11    chocolate deficiency or something, but I'm not quite sure where

12    that said it.

13         MR. SHENKAN:  All that I'm -- all that I'm asking, Your

14    Honor, is to withdraw from your order with respect to the

15    sampling number right now to -- they're going to brief the

16    TeamViewer idea -- the concept.  I would like to be able to have

17    Stark weigh in, because to the extent that we might --

18         THE COURT:  Okay.

19         MR. SHENKAN:  -- be able to narrow this even more than

20    that, you know --

21         THE COURT:  So, are you suggesting -- right now, are we

22    really talking about staging briefing in such a way that the

23    sampling decision gets put off a little bit --

24         MR. SHENKAN:  Yes, Your Honor.

25         THE COURT:  -- and we talk about some of the issues

1   that talked today --

2            MR. SHENKAN:  That's all I want to do, is just put it

3   off.

4            THE COURT:  Does the Defense -- I can't imagine the

5   Defense would be objecting to that, but I'll hear from the

6   Defense.

7            MR. PARKER:  Your Honor, if you're imagining that we

8   can't object to it --

9            THE COURT:  Uh-huh.

10           MR. PARKER:  -- then I suspect that we should not be

11  objecting --

12           THE COURT:  Well, no, no.  As I conceive of counsel's

13  comment, it is that let's square away follow-up briefing from

14  this hearing first before I start imposing what is a fairly

15  demanding response period for getting together, you know, what

16  the sampling size is going to be.  And I'm okay with that.  I

17  just want to make sure that I'm not mistaking the pros and cons

18  of this.  And if Defense counsel has any comment on that, it

19  would seem to me that that does make some sense is to try and

20  square away some of the issues here before we launch into what

21  the sample size is going to be and so forth.

22           MR. PARKER:  Yeah, that could make some sense.

23  Honestly, Your Honor, we would probably like just a little bit of

24  time to consider that possibility.

25           THE COURT:  Okay.  Well, then why don't you do that in

1    terms of comment -- you can provide me with -- I'll treat that as

2    sort of another amendment to my tentative order.  And if you can

3    provide comments, and then that will give Mr. Shenkan an

4    opportunity to respond to your comments and proposed changes.

5            Mr. Shenkan, you can do the same by letter.  I don't --

6    I welcome the suggestion, but I think it's probably better -- I'm

7    not adverse to making quick pitch softball decisions from the

8    bench on major issues, but I think it's probably beneficial for

9    all concerned to have a few days to think it through, put it down

10   in writing, and tell me how the memorandum -- my memorandum

11   should be amended.

12           MR. PARKER:  Yes, sir.

13           MR. SHENKAN:  Your Honor, can he have seven days to

14   submit whatever he wants to do to change the order or amend the

15   order, and I'll have seven days just to give you my responses?

16           THE COURT:  That's fine.  Let me question though, I

17   have also directed substantive responses, not just sort of how

18   the order should be amended.  So, substantive responses, and I

19   said seven days during the hearing.  Now, that may be a little --

20   if you want seven days to give me comments on the tentative

21   order, that's fine, and an additional seven days to get your

22   substantive responses together based on this that's fine.

23           MR. PARKER:  That would be extremely helpful, Your

24   Honor.

25           THE COURT:  It would help me to sort of get the picture

1    of where we're headed a little bit straighter, and I think that's

2    reasonable.  That takes us out seven days for the comments.  Mr.

3    Shenkan, you'll have an additional seven days to do any kind of

4    rebuttal comments.  And at the same time, counsel for the Defense

5    will be working on the substantive responses that we've indicated

6    through today.

7              MR. PARKER:  Yes, Your Honor.

8              THE COURT:  Okay.

9              MR. SHENKAN:  Your Honor, I only have just, I think,

10   four issues that I would just like to put on the record very

11   quickly --

12             THE COURT:  Very well.

13             MR. SHENKAN:  -- and then follow-up with a letter.  To

14   the extent that there's total deficiencies, I agree with Defense

15   counsel that I would like to get an aggregate, but to the extent

16   that it's easy to provide me with the number of people that have

17   filed for bankruptcy that have a zero deficiency, if that

18   information is readily available, I would like to have that as

19   part of the deficiency issues.

20             Seven and 8, I agree with Defense counsel we just have

21   to clarify, but I don't want to have -- I think that it would be

22   absolutely cumbersome for me to be given those documents when

23   they know exactly how much money they have billed and how much

24   money they obtained through the storage.

25             So, I would like them to provide you with a reason why

1  they want to give me documents, you know, perhaps in a letter,

2  knowing that that information could be readily culled from their

3  database.

4          Your Honor, you had indicated in number 10, that the

5  process used to determine the class size, and you denied my

6  request for that.  Simply as a matter of clarification, I only

7  want to know how it was determined from their metrics unit, what

8  they did.  You know, what queries did they do.  What the process

9  was --

10         THE COURT:  Uh-huh.

11         MR. SHENKAN:  -- because I think it will glean a lot of

12  relevant data for additional information for the case.

13         8 and 9 -- discovery request 8 and 9, Your Honor

14  granted that request, thank you, but I also would like to get the

15  templates for both --

16         THE COURT:  Uh-huh.

17         MR. SHENKAN:  -- not just the exemplars.  And, number

18  14, the request for production, I would like it not to be limited

19  to just the -- you said concerning repo.  I have a bunch of

20  issues with storage and transportation, and what have you.  I

21  simply wanted to make sure that it's granted with, you know, of

22  my request.

23         Other than that, Your Honor, thank you.  I think all

24  parties appreciates your indulgence today, Your Honor, and your

25  patience.

1          MR. PARKER:  I would certainly agree with that, Your

2     Honor.

3          THE COURT:  Well, you're welcome.  And I thank counsel

4     for patiently going through the documents as well as the

5     information on a case that is going to take me some time to get

6     up to speed on.

7          Let me suggest then to summarize what my understanding

8     of a deadline -- an appropriate deadline schedule would be, so

9     that everybody is clear.  The only thing that I'll issue is

10    probably Monday, a short scheduling order based on responses that

11    we discussed right now.  I'm going to make sure that counsel has

12    the opportunity to put in writing what their comments are in

13    terms of how the order should be amended -- the final order.

14         So, I think that's the first thing we need to get to.

15    I'll say seven days for both sides to supply their initial

16    comments.  If there's any responses or having viewed the other

17    side's seven day proposal for amendments to the order, there may

18    be responses necessary and counsel will do those in four business

19    days thereafter, so that we have that done and completed, and I

20    have a picture of what you want the amended order to look like.

21         The second part of the briefing schedule then will

22    ensure that the Defense has 14 days from today to provide me with

23    the substance of the various objections and comments during the

24    course of this hearing that it had.  And the Plaintiff will have

25    seven days, thereafter, and that will be 21st day, for response

 1   to the substance.

 2           We will defer and postpone -- and this should be part

 3   of your commentary on the changes to the order, but my

 4   understanding is now that I'm going to defer or postpone full

 5   gear on the sampling issues that I've identified in my order

 6   pending some straightening out of what this order should look

 7   like.  So, I'm going to wait on that, and then impose whatever

 8   deadlines at a future date.

 9           Does that make sense as we're sitting here right now at

10   4:30 on a Friday afternoon?

11           MR. SHENKAN:  Yeah.

12           MR. PARKER:  Yes, Your Honor.

13           THE COURT:  Okay.  If there's --

14           MR. SHENKAN:  It makes a lot of sense.

15           THE COURT:  -- and if there's any commentary about

16   jockeying dates or anything, I'm not -- these are not -- they're

17   orders, but I understand also that we're coming up on the holiday

18   season, so if counsel wants to say can we -- you know, if 14 days

19   happens to be on Thanksgiving or 21 days, I'm not stuck on it.

20   It could be the day after or the Monday following Thanksgiving.

21   Is that clear?

22           MR. SHENKAN:  Yeah, I understand.

23           MR. PARKER:  Yes.

24           MR. SHENKAN:  Thank you very much, Your Honor.

25           THE COURT:  Okay.  Is there anything further that we

1    should do before we adjourn?

2          MR. PARKER:  I don't believe so, Your Honor.

3          THE COURT:  Nothing from the Defense.  Anything from

4    Plaintiff?  That long pause tells me that it can't be critical.

5          MR. SHENKAN:  Thank you very much, Your Honor.

6          THE COURT:  Very well.  We're adjourned.  Thank you,

7    counsel.

8          MR. PARKER:  Thank you.

9        (Proceedings concluded at 4:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: November 6, 2018

Jessica B. Cahill, CER/CET-708