IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD R. FLYNN, GENE DAISEY, DOUGLAS J. ABBOTT, and CATHERINE HOSICK, individually and on behalf of all others similarly situated, | ) ) ) ) | CIVIL ACTION |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | No. 2:17-CV-04806-WB |
| v. | ) ) | |
| MANUFACTURERS AND TRADERS TRUST COMPANY a/k/a M&T BANK, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM DISCUSSING SUBSTANTIVE
OBJECTIONS TO TENTATIVE RULINGS
ARTICULATED IN OCTOBER 25, 2018 MEMORANDUM**

Plaintiffs, by and through their undersigned counsel, file their Memorandum

Discussing Substantive Objections to Tentative Rulings Articulated in October 25, 2018

Memorandum, stating as follows:

## I.      PRELIMINARY STATEMENT

Plaintiffs disagree that it was the Court's intention to limit the pleadings that were

filed by the parties on November 2, 2018 to two issues, as the Bank claims.  The Court's

scheduling Order of October 29, 2018 (Dckt. No. 123) merely states: "The parties must file

any proposed language changes to my tentative rulings articulated in the memorandum dated

October 25, 2018 (Doc. Nos. 120) by **November 2, 2018**." (emphasis in original).  The Bank

is correct that Plaintiffs did not limit their proposed changes to "inconsistencies" and instead,

suggested a number of language changes that constituted changes to the tentative rulings.  As

they reasonably explained in their Response to the Bank's Proposed Changes (Dckt No. 127),

"Plaintiffs believe that the purpose of the Court's request for language changes was to facilitate

1

the incorporation into its Memorandum of what was learned during the hearing. " (*Id.* at 8). Accordingly, the Court should reject the Bank's objection to any of Plaintiffs' changes that amount to substantive changes.

## II.     ARGUMENT

### A. The Court Should Adopt Plaintiffs' Language Change Suggestions Concerning the Sampling Protocol

The Bank's current position (understandably) seems to be to want us all to pretend that the October 26, 2018 hearing never took place.  Relevant evidence was taken at the hearing, but the Bank does not want it reflected in the final version of the Court's Memorandum.  The Court's tentative ruling of October 25, 2018 set a November 23, 2018 deadline for the Bank to submit evidence of burdensomeness, apparently believing that final deadline makes it meaningless that they wholly failed to do so, the tentative ruling was just that—tentative.  The tentative ruling included the provision for the November 23 submission of evidence.  As set forth *supra*, it appeared clear to Plaintiffs that the results of the October 26, 2018 hearing were going to be incorporated into a revised version of the tentative ruling. If that were not the case, there would have been little purpose in having the hearing.  It behooved both parties to have presented evidence to support their respective positions on the various issues.  Plaintiffs did that.  The Bank either wouldn't or couldn't.  It should not be granted a mulligan.

If the Court finds that it heard sufficient evidence during the hearing to adopt some or all of Plaintiffs' proposed changes, the Bank will have suffered no injustice.  The Bank cannot escape the substantial deficiencies in its discovery responses revealed at the hearing by now arguing that Plaintiffs cannot make suggested changes to this Court's pre-hearing

tentative rulings.

The Bank particularly bemoans its mistreatment regarding the spreadsheets:

> Indeed, it would have been much easier and less time consuming to delete the irrelevant rows at the outset rather than redacting. M&T, however, has no doubt that if it had taken it upon itself to doctor this document without the express permission of this Court (and in contravention of Plaintiffs' demand for the full spreadsheet), that it would almost undoubtedly faced an application for sanctions by Plaintiffs.

Response at 4.

The Bank apparently never even considered the possibility of contacting Plaintiffs to confer with the production of Excel spreadsheets to discuss any redaction concerns or purported "difficulties" it was facing to fully respond to this discovery before producing 19,000, mostly all blacked-out .tif image files. The Bank's reason was simple – to manufacture evidence to the support its untenable objection that the previously agreed-to figure of a 20% sampling was "unduly burdensome."

Doing so might have facilitated the Bank's responding in a way that was workable for it and yet provided some, if not all of the information sought by Plaintiffs. However, the Bank really didn't want to provide *any* information to Plaintiffs. It was happier to try to pull a "fast one" – to attempt to pull the wool over Plaintiffs' counsel's eyes to devise an excuse—even one as contrived as here— that the production set was onerous.

Plaintiff's counsel submits the contemporaneously filed affidavit confirming that no one ever attempted to confer with him prior to the avalanche of the 19,000 page production. As such, the Plaintiff's statement that it had conferred and that "numerous" requests for spreadsheets were made with knowledge that the Bank would produce such is patently false. Plaintiff's counsel is willing to submit to a deposition, if necessary, to

confirm such and hope that the Banks' counsel will similarly be willing to do so. See Affidavit of Richard Shenkan, **Exhibit 1**.

As a direct result of the Bank's counsel's efforts to derail an efficient production of information in the discovery process, Plaintiffs' counsel has been forced to spend an inordinate amount of time and money to expose this discovery abuse. In Stott Matthews' (Plaintiffs e-discovery liaison's) affidavit, Mr. Matthews details the method the Bank has taken to violate the Court's E-Discovery order, to devise the "unduly burdensome" objections, and the considerable time and effort which he has expended to expose this discovery abuse. **Exhibit 2**. [1]

Mr. Matthew's affidavit contains much crucial information to the present issues before the Court, including the production of the 19,000 blank pages in lieu of producing Excel spreadsheets in their native format at the direction of M&T's counsel, the native format of class members' data; the lack of qualifications of the Bank's e-discovery liaison; the weaknesses of the Bank's burdensomeness objections; and the potential for a forensic investigation of the Bank's archives for the "missing" policies.

**B.   The Evidence Adduced at the Hearing Fully Justifies Plaintiffs' Suggested Language Changes Regarding Individual Discovery Disputes**

It is true that on October 25, 2018, the Court made a tentative ruling that "full class-wide discovery at this time would be overly burdensome and disproportionate to the issues and monetary amounts involved in this case." (*Id.* at ¶12).  In making this preliminary ruling which would effectively undo Judge Beetlestone's earlier ruling regarding bifurcation (Doc.

---

[1] Plaintiff's counsel requests that, in addition to the discovery sanctions previously requested, that his firm be paid for fees and costs associated the Motion to Compel Discovery and Impose Sanctions.

4

91), the Court undoubtedly relied upon and gave credence to the material representations made in the Bank's Brief in Opposition to Plaintiffs' Motion to Compel as such related to its "unduly burdensome" objection as relating to the Sample.

However, after the Court conducted an evidentiary hearing at which the Bank really did not provide ***one scintilla of evidence*** to support its systematic burdensome objections, it is Plaintiffs' hope that the Court now appreciates that the Bank's objections have been persuasively disproven. (*See*, *generally*, Plaintiffs Suggested Language Changes to Proposed Order (Dckt. No. 125)). The testimony revealed a calculated, outrageous discovery abuse designed to mislead Plaintiffs' counsel and this Court. Thus, contrary to the Bank's contention, the evidence from the hearing dramatically illuminates the Bank's discovery transgressions.

Accordingly, Plaintiffs submit that it is completely appropriate for the Court to revise its provisional ruling about the proposed burden of class discovery in a way that is consistent with Plaintiffs' proposed language changes and would reinstate the Court's prior ruling (Doc. 91).

Furthermore, the Court will likely want to revisit its tentative ruling concerning disproportionality of Plaintiffs' discovery to the monetary amounts imposed. With the limited information that the Bank has provided to Plaintiffs to date, they have been able to calculate that the average statutory damages for the four named Plaintiffs is $5,957.29. By extrapolating this amount to the 3,946 members of the classes, the statutory damages at issue

in this case can be shown to be on the order of $23.5 million.[2]  Plaintiffs submit that the burden on the Bank of responding to class-wide discovery is not disproportionate to the monetary amounts involved in this case. This conclusion is advanced particularly in light of the October 26, 2018 testimony at the hearing and Judge Beetlestones' First Amended Scheduling Order (Doc. 91) stating that "Fact Discovery (Not Bifurcated)."

The Bank, not surprisingly, objects to any characterization of the evidence from the hearing being included in the final version of the Court's Memorandum.  But it goes on to argue that such evidence is superfluous because it does not in any way alter the Bank's obligations under the discovery requests.  This is wrong.

If the Court's final order requires the Bank to respond to class-wide discovery because the evidence at the hearing showed it would endure little burden in doing so, the Bank will have an obligation to respond to such discovery that it would not have had in the absence of the evidence from the hearing. Thus, contrary to the Bank's contention, the evidence from the hearing dramatically alters the Bank's discovery obligations as it has not maintained its burden to establish, with evidence, that any of its "unduly burdensome" objections have any merit.

### a.  Interrogatory No. 2

The Bank objects to only the last line of Plaintiffs' proposed additional language: "For completeness purposes, the Defendant shall also state, according to the Bank's latest records, how many class members in each class had any deficiency balance discharged in

---

[2] However, a year ago, Kenneth Fries executed an affidavit claiming that the minimum statutory damages for the class was purportedly $40,420,945.59. (Doc. 1-5, p. 3) Thereafter, Mr. Fries submitted a revised affidavit modifying the statutory damages to $37,013,998.24 (Doc 13-2, p. 4).

bankruptcy." The basis for the objection:

> [B]ecause Plaintiffs have not requested the number of deficiencies M&T has marked as discharged in their systems – but rather, how many class members had deficiencies discharged in a bankruptcy proceeding generally – providing an accurate answer to this question would require M&T to not only confirm whether a bankruptcy had been filed for every class member, but also review the docket to determine what type of bankruptcy was filed, whether a discharge was entered, it if it was, whether M&T was sent notice of the bankruptcy proceeding such that any discharge would be effective against claims of M&T. <u>Obtaining this information would therefore be unduly burdensome and disproportionate.</u> (Emphasis added)

Thus, because the Bank argues that Plaintiffs asked how many class members had been discharged, rather than how many members the Bank's records reflect had been discharged, answering the Interrogatory would be unduly burdensome, and the Court should not, therefore include such language in its revised Memorandum. Unfortunately, this is the kind of semantic gamesmanship that has left the discovery in this case dead in the water for months. The Bank could certainly have answered the interrogatory based on *its* records, and made that clear as part of its answer. It could have contacted Plaintiffs to discuss how to handle the problem it perceived. It did neither, it simply refused to answer the interrogatory at all.

Mr. Fries testified that – as he recalled - the Flynn Spreadsheets, indeed, contained information as to which putative class member filed for bankruptcy. This data point is readily ascertainable. Indeed, to moot Defendants' objection as to the issue that it relates to a matter not having yet requested in formal discovery, Plaintiffs propounded a separate discovery request seeking the production of this information in its Second Set of Post-Removal Discovery. (Document Request 18, p. 5).

One final observation about Defendant's bad-faith discovery response is in order. In its haste to quibble with the language that Plaintiffs sought to add to the tentative ruling, the Bank seems to have neglected to actually read Plaintiffs' suggested language in Plaintiffs' Suggested Language Changes to Proposed Order (Dckt. 125). The Bank states "Plaintiffs have not requested the number of deficiencies M&T has marked as discharged in their systems – but rather, how many class members had deficiencies discharged in a bankruptcy proceeding generally". This is untrue. Plaintiffs' suggested language is "… Defendant shall also state, ***according to the Bank's latest records***, how many class members in each class had any deficiency balance discharged in bankruptcy." (emphasis added). Thus, the contrived argument crafted by the Bank is invalid for the most basic of reasons. It objects to something other than the language that Plaintiffs actually proposed.

### b. Interrogatory No. 5

The most significant aspect of the October 26 hearing was that it exposed the Bank's discovery ploy – to not disclose either the highly relevant information consisting of the aggregate statutory damages for the entire class, that is sought in this interrogatory or the ease with which this information can be accessed. The Bank does this by disingenuously claiming that the information is somehow shielded by the work product doctrine or is unduly burdensome to compile (claimed in the Bank's written objection to the discovery). However, the Court rejected this contention during the hearing.

Q: Have you obtained any information with respect to deficiency balances for the putative class?

A: I believe there's a column on that report that lists what the remaining balances on the account is.

8

Q: And does it also have a column for bankruptcy people, if you were to file for bankruptcy?

A: It does. It does.

Q: Are there accounts in there for the finance charges to figure out statutory damages?

A: I believe it does.

MR. PARKER: Your Honor, I also object on the grounds that this is calling for – this is delving into claims of work product. This is inappropriate.

THE COURT: Well, I'm going to overrule this. At this point, counsel, I've got to tell you there's been resistance at every step of the way, it appears, from the bank to providing simple information in a lawsuit. Right now, I'm interested in hearing about this because it bears on the potential for sanctions as well.

MR. PARKER: Yes, Your Honor.

THE COURT: As to how easy this is to provide, and this information has not – far as I can determine been provided.  It's been the subject of a hailstorm of objections. And I think it's time to sit down. I'm going to allow this questioning to go on. We'll sort through the privilege issues after it comes up, and if there are legitimate privilege claims or work product claims, we'll sort them out.

MR. PARKER: Yes, Your Honor. …

Q: Just to clarify, the minimum statutory damages information was also in this report; is that right?

A: I believe so.  If – if I understand what you're asking, there was a finance charge column.

Q: And there was also the amount financed column as well?

A: I believe so. I would have to look at the document to be sure, but, yes.

Q: How about the amount that's been paid on a deficiency – a purported deficiency balance since the car had been repossessed? Is that also on there?

A: I don't believe that's on there. No.

9

Q:  Would that be a simple analytic to figure out for Randy Surface or any
of the other folks in the analytics team?

A:  I'm not an expert at it. I – I think it can be taken care of in – in a query.
Yes, I would think so.

A year ago, Kenneth Fries executed an affidavit claiming that the minimum statutory damages for the class was purportedly $40,420,945.59. (Dckt.. 1-5, p. 3) Thereafter, Mr. Fries submitted a revised affidavit modifying the statutory damages to $37,013,998.24 (Dckt. 13-2, p. 4). The Bank's computer queries generated a year ago yielded this information in the Flynn Spreadsheet(s). Not surprisingly, the Bank jumped to the task to obtain this information to assist it to defend a Motion for Remand. However, when asked to provide the *very same statutory damage information* in response to a properly propounded discovery request, the Bank claimed that "the request is impermissibly vague, ambiguous, overbroad, unduly burdensome, and premature. Subject to the foregoing specific objections, and the general objections, M & T states that it is not required to calculate Plaintiff's alleged damages."

The Bank's work product argument is untenable for two reasons. First, Interrogatory No. 5 seeks a *single quantity*—the amount of minimum statutory damages—for each of three classes; the Court's tentative ruling was: "Plaintiff asks for a calculation of minimum statutory damages. ...Defendant shall supply an unequivocal answer under oath...;" Plaintiffs suggested additional text stating "the Bank has already performed *this calculation*, it is hardly 'unduly burdensome,' as it contends to provide this *information* or update it." (emphasis added). Accordingly, it is clear that Plaintiffs and the Court are talking about *three individual totals.*

The Bank, on the other hand, claims that "it is clear that the documents requested by

10

Plaintiffs are protected by the work product privilege." This is an interrogatory, not a document request. It only asks for three *numbers*, not documents. Realizing that attempting to assert the work product doctrine as to 3 numbers was facially indefensible, the Bank started arguing about documents that Plaintiffs had not requested. The only reason Plaintiffs were forced to delve into the spreadsheets in the first place was to refute the Bank's bad faith burden objection. Indeed, discovery regarding a declaration made on remand is discoverable so the information presented therein (which happens to be an answer to some of the discovery requests) is similarly discoverable. *Institute of Pennsylvania Hospital v. Travelers Insurance Company*, 817 F. Supp. 24 (E.D. Pa. 1993)(when disputed issues of fact exist and motion for remand cannot be decided based upon material then before the court, court may properly defer its rulings until such time as an evidentiary hearing or discovery on those issues has been taken).

The second reason why the Bank's work product argument is untenable is equally as compelling. The deficiency balance, finance charge and amount financed for each class member constitute factual data which is not protected by the work product doctrine simply because an attorney may have requested the generation of this spreadsheet(s).

Aggregations of non-protected information are not protected by the work-product doctrine because they incorporate the lawyer's thoughts "in, at best, an indirect and diluted manner." *Vanguard Sav. & Loan Ass'n v. Banks*, 1995 WL 555871, at *2 (E.D. Pa. Sept. 18, 1995), citing to *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401–02 (8th Cir.), *cert. denied*, 484 U.S. 917 (1987). *Also see Pettyjohn v. Goodyear Tire and Rubber Company*, Civ. A. No. 91-2681, 1992 WL 94895 at *8, n. 4 (E.D. Pa. April 20, 1992) ("the facts underlying plaintiff's claims are not work product and must be produced.") Thus, even if Plaintiffs had asked the Bank to produce every single cell of these spreadsheets, the work

product doctrine would not be an impediment.

The Bank's counsel outright misleads the Court, yet again, by arguing: "(in fact, they [Plaintiffs] readily admit that they can obtain their damages using non-privileged documents and simple math)…...Plaintiffs admit that the information can be readily obtained from other (non-privileged) sources." (Response, p. 8, 10). First and foremost, Defendant fails to cite the purported source of this admission or how such a calculation can be done without the loan documents. Plaintiffs have never admitted that they can do so "using non-privileged documents."

Secondly, Plaintiffs _**cannot**_ calculate the minimum statutory damages without having a copy of the class members' retail installment contracts (which the Defendant has refused to provide for the putative classes) Plaintiffs' need for these contracts is abundantly clear in the statute (13 Pa. C.S.A. 9625(c)(2)) and has been made abundantly clear in their Second Amended Complaint, par. 108-110.  Defendant itself creates yet another reason why Plaintiffs require these documents.

### *Rule 33(d) is Inapplicable*

Even if the Bank were prepared to produce the retail instalment contracts, something that it has heretofore been unwilling to do, the Bank would still be obligated to answer Interrogatory No. 5.  The Bank argues at page 8:

> Plaintiffs are simply asking this Court to provide them with data that M&T created at the instruction of outside counsel, in order to facilitate settlement negotiations, because it *is more convenient for them*. This is simply not the standard for production of privilege documents.

The Bank has packed a lot of misinformation into this little bit of text.

First, M&T did not "create" the data, as it claims.  The data exists independent of

12

the Bank's efforts to organize it. This is the fundamental misapprehension that underlies the Bank's aggressive and improper assertion of the work product doctrine.

Second, the Bank is incorrect in contending that convenience is not the standard here. Rule 33(d) would only allow the Bank to produce the retail installment contracts (even if it decided to do so) in lieu of providing the statutory damage totals sought in Interrogatory 5 "if the burden of deriving or ascertaining the answer will be substantially the same for either party." The Bank will be hard-pressed to convince the Court that the burden on the Bank of turning over 3 numbers that already exist at the bottom of its spreadsheets is the same as Plaintiffs' burden in pulling 2 numbers from each of 4,000 installment contracts that the Bank produced to them, computing the individual statutory damages and adding the resulting 4,000 damages amounts. This sort of ordeal will require, undoubtably, the Bank undertaking yet another timely and expensive (and wholly unnecessary) redaction process prior to the production.

### *Settlement Discussions*

The third piece of propaganda in the above-quoted excerpt from the Bank's response is its reference to settlement negotiations. Given the Bank's staunch refusal to even consider the topic of a class settlement, it is extremely disingenuous of the Bank to repeatedly mention settlement negotiations (7 times) as a way of ingratiating itself to the Court. While Plaintiffs are willing to discuss a class-wide settlement of this case at any time, they certainly cannot do so without having this most basic information and a willing Defendant to engage the settlement process. Plaintiffs have extended multiple overtures to attempt to mediate this case and will continue to do so, however, to date, the Bank has

13

expressed no inclination to engage the settlement process on a class-wide basis.

If the Court concludes that these spreadsheets are not protected by a privilege, then Plaintiffs request that a copy of the Flynn spreadsheets, in native format, ***with only the Excel spreadsheet "headings" intact*** be produced. This information is highly relevant as it will assist Plaintiffs to better understand the computer system's capacity to generate relevant information and provide evidence to support Plaintiff's Motion for Sanctions. Additional critical information regarding the Flynn Spreadsheet(s) has been suggested by Stott Matthews in his affidavit which Plaintiffs respectfully request the Court to order.

### c.  Interrogatory No. 7

As explained with respect to Interrogatory No. 5, the Bank's claim that it is entitled to respond to this Interrogatory through the use of Rule 33(d) is misplaced.  The storage amounts sought in this Interrogatory have already been input into the Bank's computer system, as evidenced by the "EXPSTORVEH" variable of the Fiscal Field (*See*, M&T000997-998 ("Confidential"), attached to Plaintiff's Second Set of Post-Removal Discovery 9 and 10. These are database fields, as Stott Matthews describes in his affidavit, which can easily be queried to determine the amounts sought. Thus, the Bank cannot possibly satisfy the "burden will be substantially the same" requirement of Rule 33(d). The corporate deposition and document requests suggested by Stott Matthews in his affidavit should help to resolve this issue.

### d.  Interrogatory No. 10

The Bank's position concerning Interrogatory No. 10 provides a window into its discovery strategy. When the Bank interposes a vagueness objection, it is often not because

14

it is really unable to respond because it cannot understand what the request is seeking. Instead, the Bank uses such objection, whether or not well-founded, as an excuse to not answer the discovery at all. (*See. e.g.* discussion of Interrogatory No. 2, *supra*). Here, it opposes Plaintiffs' modification of an admittedly unclear interrogatory, to make it understandable, because it would rather have an interrogatory that is vague and consequently doesn't have to be answered at all, instead of a clearer interrogatory that it would have to answer.

  e.  **Request No. 6**

For the reasons set forth above in Section II(A), *supra*, Plaintiffs' proposed language changes as to this Court's ruling on Request No. 6 should be adopted by the Court.

  f.  **Request No. 7**

M & T wants to limit this request to "complaints filed against M & T regarding those policies practices, and procedures that were in effect for **the class members** during the class period." Response, p. 12. This request is much too limiting. The request should definitely remain as originally drafted. To illustrate how the Bank wants to unduly curtail this request, Plaintiffs submit the following, reasonable hypothetical fact pattern:

> Department of Banking of State X investigated, conducted discovery of, held a hearing about and ultimately cited Lender A, because Lender A charged borrowers (who are residents of State X) the bogus "prepare/repair" fee under the ruse of an "expense" or continued to collect instalment payments from those borrowers, even after they redeemed their vehicles. (Daisey's fact pattern).

Under the Bank's proposed language, this citation would not be disclosed because, the citation only concerns State X residents and therefore, does not affect "the class members" in this case. But, the relevance of this information is abundantly clear and critical

to Plaintiffs' claim because any such citations relate to the same or similar policy, practice, or procedure which was "in effect during the class period" and, accordingly, bears on the determination of whether or not the Bank's conduct at issue here is "commercially reasonable" or in violation to 13 Pa. C.S.A. 9610. (*See*, Second Amended Complaint, Paragraphs 143-147.) Because the UCC is substantively uniform across all the states, information from other states regarding the Bank's conduct is relevant.

### g. Request No. 11

Plaintiffs understand that the Bank believes that there is no insurance that covers the claims asserted against it in this action. However, Plaintiffs should not be constrained to live with that conclusion, which was reached either by the Bank and/or by its insurers, without having the ability to make an independent review. Therefore, if there is even a prospect of coverage, Plaintiffs would like the documents that support the "no coverage" conclusion, including denials of coverage, reservations of rights and all other correspondence between the Bank and any of its insurers concerning the Bank's potential liability in this case. Further, two additional attorneys from a new firm have entered their appearances to represent the Bank in this case. This raises the question of whether one of the Bank's insurers has paid for or required additional counsel in this case. It is more than unusual for a Bank to employ two law firms, six lawyers of whom have entered their appearance, if there is not an additional source of revenue such as an insurer. Respectfully, the time the Bank has taken to debate this issue can be resolved with a verified response, under oath, answering both sections "a" and "b" of this document request.

16

### h.   Document Request 12 (Production of the 12 Policies)

On January 11 of this year, the Court adopted the parties *stipulated* case management order which expressly ordered the production of the very policies and procedures which the Bank has not yet produced. In that order, Judge Beetlestone required the production of the following documents within 30 days, February 11, 2018 (9 months ago!):

> Defendant's policies and/or procedures in effect at any time during the six-year period prior to the filing of the initial Complaint with respect to repossession, sale, storage, transportation, repair, reconditioning, retitling, and/or redemption of a repossessed vehicle, and/or the reinstatement of any loan related to a repossessed vehicle; and/or the sending of statutory repossession and/or post-sale notices.

Far from producing these documents within 30 days, the most recent 66 pages of these documents were produced as late as October 24, 2018. Of course, Plaintiffs have been given no comfort at all that they have now truly received all responsive documents that the Bank has. The Bank's explanation for this extraordinary delay is that the policies are "housed in the business units themselves" which purportedly are "difficult to track down." Transcript, p. 141-2. Notwithstanding having already taken advantage of the Court's patience with this protracted document production the Bank has *still* failed to include 12 prior iterations of specific policies which the Bank had already provided to Plaintiffs in more recent iterations. References to these policies are listed in hearing Exhibit 7 – documents marked as "confidential," attached as Exhibit 1 to Plaintiff's Second Set of Post-Removal Discovery.

Plaintiff's counsel called this deficiency to the Bank's counsel's attention

17

immediately in multiple letters, telephone communication, and in-person at the courthouse. The Bank's counsel explained that such information was no longer in the Bank's possession.

Desiring a verification as to this fact, Plaintiffs served Document Request No. 12 which modelled the language in the January 11, 2018 Court order. By verified response dated August 10, 2018 and executed by Mr. Fries, the Bank stated:

> M&T states that it has already produced the documents in its possession relating to Representative Plaintiffs. Should M&T in the future locate any relevant information or requested information now in existence but not yet located, M&T will so advise counsel for Plaintiffs and make such documents available for inspection…

As seen below, this verified representation was not true because, on the witness stand, Mr. Fries **admitted** that the Bank, indeed, has these documents which are either retrievable from the Bank's Sharepoint program (accessible from Mr. Fries' computer at his desk) or from the Bank's archives. Transcript, p 141-44.

Moreover, the Court should know that the Bank's failure to produce these "other versions" is not an isolated, inadvertent misstep. Rather, it is a consistent, deliberate effort to withhold this information. For example, on the first page of the Bank's letter to the Court dated September 10, 2018, the Bank stated:

**M & T HAS FULLY RESPONDED TO PLAINTIFFS' REQUEST FOR PRODUCTION** [capitalized, bold, underlined in original].

"No matter how many times Plaintiffs ask, M & T cannot produce what it does not possess—nor is it obligated to do so under the Federal Rules of Civil Procedure. …

Later, at page 4 of that letter, the Bank wrote:

**1.  Earlier and later versions of Policies and Procedures – 6(a)-(m)**

18

M & T has already produced all versions of the requested policies and procedures that are in its possession. To the Extent that produced policies and procedures reference prior or subsequent iterations of the documents which have not been produced, M & T is not in possession of those versions. M&T cannot produce documents that it does not have.

Now that the Bank's vice president has testified that these "other versions" reside within the Bank's archives, the Bank should be ordered to promptly produce them.

### i.   Request No. 13

The Bank complains that Plaintiffs' proposed language changes consist of only the addition of Plaintiffs' characterization of the hearing evidence, claiming that such portrayal of the evidence is "irrelevant and unnecessary." Obviously, if the Court has a different understanding of the evidence, it will not utilize Plaintiffs'. Notably, however, the Bank has provided the Court no alternative interpretation of the evidence to consider.

Moreover, it is not uncommon for a court to explain a particular ruling with a brief citation to the factual basis for the ruling. Thus, while such citation is, technically, unnecessary, it is far from irrelevant.

The Bank also objects that it should have 30 days from the date Plaintiffs' second set of discovery was served, not 14 days from the entry of the "revised tentative ruling," as proposed in Plaintiffs suggested language change, to produce these documents because. It is peculiar that the Bank would be quibbling about a few days, given that these documents should have been produced 9 months ago, 30 days after Judge Beetlstone's January 11, 2018 Order.

Finally, Plaintiffs have no objection to the Bank taking 30 days to respond, without objection, under oath, by fully producing the documents ordered to be produced at the

hearing and the policies and procedures (Request 13). Defendants' request for an opportunity to "respond" to the pending discovery claiming that such is "inappropriate for the production of these documents" in the Court's order regarding the pending motion is simply inviting another motion to compel discovery which can easily be avoided.

### j.   Request No. 14

Again, Plaintiffs have no objection to the Bank taking 30 days to respond to the discovery that was recently served.   The Bank is correct that Plaintiffs' original version of this document request did not contain a request for contract ending dates.   Regrettably, that addition has been necessitated by the Bank's evasive, incomplete, misleading and untimely discovery responses to date. To moot the Defendant's objection that "the information was not asked in discovery," Plaintiff's Second Set of Post-Removal Discovery clearly seeks this information. (Interrogatory 4, p. 8). Plaintiffs request that the Bank fully respond, under oath, within 30 days.

Even though the term of a contract might straddle the start date for the class period, it would still fall within the "in effect at any time after September 22, 2011..." language of the original document request.   Nevertheless, based on the Bank's conduct to date, it is fairly predictable that any such contract would not be produced by the Bank under the original language of the document request.   Thus, this additional language is simply an attempt to limit the Bank's ability to evade the discovery.

Defendants' request for an opportunity to "respond" to the pending discovery claiming that such is "inappropriate for the production of these documents" in the Court's order regarding the pending motion is simply inviting another motion to compel discovery

which can easily be avoided.

### k.  Request No. 17

It is no small irony that, on the one hand, the Bank believes that it is inappropriate to submit documents for *in camera* privilege review on a blanket basis, while on the other hand, it asserted privilege on a blanket basis, providing discovery responses in which it asserted that it "objects to the Discovery Requests to the extent that they call for testimony or the production of documents protected by the attorney-client privilege, the attorney work-product doctrine and/or any other applicable privilege," and then incorporated that objection (along with all the other General Objections) into *every one of its discovery responses*. The Bank's general objection that all of the requests ask for privileged information is enough to create a reasonable belief that a review would reveal privilege exceptions, or the absence of any privilege whatsoever.

The fact that it has violated several orders weigh heavily in favor either of waiver of the attorney-client privilege and/or for the in-camera inspection.

(a) The Bank's failure to produce the materials relating to Plaintiff's documents and the policies and procedures in the Court's 1/11/18 order;

(b) The Banks failure to designate an e-discovery liaison with the necessary qualifications as mandated by the Draft Order Governing Electronic Discovery (Dckt. 6-1 at 3);

(c) The Bank's failure to comply with the mandatory format for the production of Excel spreadsheets as set forth in the 12/04/17 order;

(d) The Bank's failure to abide by the Confidentiality Stipulated Order of 1/26/18 by overtly redacting information in the discovery process without any request to modify such order;

(e) and the Bank's outright manufacturing of an "unduly burdensome" objection with the bogus 19,000 page production and its remarkable (fraudulent) claim

21

that a "4 million" page production would be necessary for the Sample. –
All of these contemptuous acts support the waiver of the attorney-client privilege or, at a minimum, the in-camera inspection of the privileged documents **and the imposition of sanctions.**

### C. The Court Should Adopt Plaintiffs' Language Change Suggestions Concerning the Privilege Log

Once again, the Bank objects to Plaintiffs' proposed language changes because they constitute "a substantive ruling on the very issues currently pending before the Court." (Defendant's Response to Plaintiff's Changes at 14). The Bank urges the Court to reject such language out of hand because the Court should not allow Plaintiffs to draft their own substantive rulings. Plaintiffs respectfully submit, however, that it is a fairly common practice for a court to invite the parties to draft proposed findings of fact and conclusions of law after a trial or hearing. Thus, there is obviously nothing inherently improper in Plaintiffs suggesting the language for a substantive ruling. Further, the Court requested that the parties propose changes to its Order, which contained many substantive rulings, thus Plaintiffs believe is within the scope of the Court's Order for Plaintiffs to propose these changes.

As a court would do with post-trial proposed findings and conclusions, this Court can pick and choose which of Plaintiffs' suggested post-hearing changes it wants to adopt in whole or in part. If the Court has completed its review of the privilege log and documents provided to it as requested at the end of the hearing, it would be in an even better position to undertake that process.

Plaintiffs believe that the language that they have proposed is completely justified

22

by what transpired at the hearing and by this Court's request for proposed changes. Plaintiffs' counsel means no disrespect to Your Honor by submitting such proposed rulings and requests the Court's indulgence to review and consider same.

### D. The Court Should Adopt Plaintiffs' Language Change Suggestions Concerning the Imposition of Sanctions

The Bank yet again remarks that Plaintiffs' proposed language change is inconsistent with the Court's tentative ruling and constitutes an "improper substantive ruling." Plaintiff's rejoinder remains the same, as well: the Bank should be surprised neither by a proposed revised ruling that differs from the tentative ruling nor by a proposed revised ruling, issued after an evidentiary hearing, that is substantive and based on the events of the hearing.

In the remainder of the Bank's response, the Bank contends that it cannot be sanctioned for its hailstorm of prematurity and burden objections, because the first time that the Court ruled that they were improper was in the tentative ruling, and the Bank cannot be sanctioned for failing to comply with an order entered subsequent to the conduct at issue. However, in taking this position, the Bank largely misses the point. Plaintiffs are not, at least at this time, seeking sanctions for the Bank's blizzard of boilerplate objections. Instead, they are seeking sanctions for a number of the Bank's discovery abuses that do not depend on the entry of a subsequent Order.

The most obvious of these is the Bank's deceptive conduct in producing 57 documents in the form of 19,000 disassociated individual .tif file, 90% of which are blacked-out, the remainder of which have very little content and none of which have any metadata.

23

This conduct is so fundamentally antithetical to the principles underlying discovery under the Federal Rule 1 calling for a speedy and inexpensive resolution and the discovery rules that the Bank's assertion, addressed to its abusive use of boilerplate objections—that it should *now* be given an opportunity to comply, simply has no place.

The Bank's position that the sanctions provision of Rule 37(b) "first requires M&T to have violated an Order Compelling Discovery," (Response at 15), does the Bank no good in this case. See preceding section.  Moreover,that is because producing 19,000 black-out .tif file ***did*** violate a Court Order.  The Court's December 4, 2017 Order Governing Electronic Discovery (Dckt. No. 17) specifically provided "files that are not easily converted to image format, such as Excel and Access Files, should be produced in native format."  Based on this conduct, alone, the Court would be entirely justified in deciding to impose sanctions now, while deferring the determination of the nature and extent of the sanctions.

Were that not enough, there is more.  In its August 10, 2018 discovery responses,[3] in a September 10, 2-018 letter to the Court[4] and in its October 1, 2018 Brief in Opposition to Plaintiffs' Motion to Compel (Dckt No. 110),[5] the Bank made some variation of the following assertion:

> M & T has already produced all versions of the requested policies and procedures that are in its possession. To the Extent that produced policies and procedures reference prior or subsequent iterations of the documents which have not been produced, M & T is not in possession of those versions. M&T cannot produce documents that it does not have.

---

[3] Response to Request No. 13, at page 16.  Mr. Fries certified the correctness of these discovery responses.
[4] At Page 1. This letter was signed by the Bank's counsel, Mr. Parker.
[5] At Page 20. This Brief was signed by the Bank's counsel, Mr. Parker.

24

However, the Bank's vice president, Kenneth Fries testified during the hearing that these "other versions" of the policies and procedures had, in fact, been archived by the Bank's. (Transcript at 141-44).   Based on this testimony, it is clear that the foregoing assertion, is false.

Of interest is the fact that it was Mr. Fries that certified the discovery responses which contained the contention that the Bank was not in possession of the "other versions." This, of course contradicted Mr. Fries sworn testimony at the hearing.[6]

The Bank's *presently* sanctionable conduct also includes its now demonstrably false assertion the providing responses to Plaintiffs' request for the class-wide sum of deficiency balances and statutory damages would be unduly burdensome.   The Bank was in possession

---

[6] While Mr. Fries testimony at the hearing was under oath, his certification of the discovery responses merely evasively stated:

> The factual information contained in the responses is true and correct to the best of my knowledge, information and belief, and the records and information still in existence and presently recollected.  I reserve the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein, or that more accurate information is available.

An evasive certification such as this would not, normally, be noteworthy, but Mr. Fries had previously signed two different Declarations in this case (Dckt. Nos. 1-5 and 13-2) in which he made the proper affirmation:

> Pursuant to 28 U.S.C. § 1756, I declare under penalty of perjury that the foregoing is true."   Perhaps the Bank can explain why it downgraded the certification language so dramatically.

It is for this reason alone that all discovery responses from the Bank should be made under oath.

25

of the answers to these interrogatories before they were ever posed!  Just to be clear, this is not the unthinking, repetitive interposition of a boilerplate objection as to which the Bank argues it should still be given a chance to get it right.  Rather, this is a knowing and deliberately false objection, asserted for the specific purpose of depriving Plaintiffs of critical discovery information to which they were unquestionably entitled.

Fed.R.Civ.P. 26(g) provides:

> (1) …. every discovery request, response, or objection must be signed by at least one attorney of record….. By signing, an attorney … certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry: ………..
>
> (B) with respect to a discovery request, response, or objection, it is:………
>
> (ii) not interposed for any *improper purpose*, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(emphasis added.)

Rule 26(g) goes on to state: "(3) *Sanction for Improper Certification.* If a certification violates this rule without substantial justification, the court, on *motion or on its own,* **must** impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." (italics added, boldface added).  Accordingly, the comfort that Bank appears to take in its conclusion that it cannot be sanctioned under Rule 37 until after it has an opportunity to remove its boilerplate objections is grossly misplaced.  It can be sanctioned right now for its conduct up to the present.

And there is yet more.  On January 1, 2018, the Court entered an Order that stated:

> 5.     Within 30 days of the filing of Plaintiffs' Amended Complaint or the filing of Plaintiffs' response to Defendant's Motion to Dismiss, Defendant will produce:

26

(i)     Defendant's policies and/or procedures in effect at any time during the six-year period prior to the filing of the initial Complaint with respect to repossession, sale, storage, transportation, repair, reconditioning, retitling, and/or redemption of a repossessed vehicle, and/or the reinstatement of any loan related to a repossessed vehicle; and/or the sending of statutory repossession and/or post-sale notices; and

(ii)    Defendant's contracts/agreements in effect at any time during the six-year period prior to the filing of the initial Complaint with autoIMS, any auction houses, any repossession companies, and any other entities relating to any service rendered with respect to repossession, sale, storage, transportation, repair, reconditioning , retitling, and/or redemption of a repossessed vehicle, and/or the reinstatement of any loan related to a repossessed vehicle.

Plaintiffs file their Amended Complaint on February 2, 2018, which meant that all of the documents described above were to be produced by March 5, 2018. As of October 24, 2018, over 33 weeks overdue, the Bank was still producing documents pursuant to the foregoing Order, and indeed, according to Mr. Fries, many of the policy documents have yet to be produced. Therefore, assuming, *arguendo*, that the Bank is correct that it can only be sanctioned if it violates a specific Order, it has violated the aforesaid order and is currently subject to sanctions.

If the Court acts as Plaintiffs have suggested in their proposed language changes and looks at the Bank's "conduct as a whole," it can only conclude that the Bank can be held to be subject to sanctions right now, and determination of the extent and character of the sanctions can be deferred.

### E. The Court Should Adopt Plaintiffs' Language Change Suggestions Concerning New Document Production

Plaintiffs have no objection to the Bank taking 30 days to produce the requested

27

documents and verify, under oath, that it has fully complied with the discovery request. However, any suggestion that the Bank's obligation to produce these documents arose for the first time when Plaintiffs proposed to add this list of documents to the tentative ruling must be rejected.

Many of these documents are well within the purview of Judge Beetlestone's January 11, 2018 Order and their production is extremely overdue.   Even more egregious, in particular, is that the Bank has not produced the fifth item on the list, the Agent Coverage Fees Excel Spreadsheets, as reference on M&T000984.   That document was discussed at the October 26, 2018 hearing (*See* transcript at 72-77) and, *from the bench, the Court ordered that it be produced* (*Id.* at 77).   That was three weeks ago.   The Bank continues to flout even this court's most recent directive. The Bank now has the gall to claim that it has 30 days from the date the Second Set of Post-Removal Discovery to produce this document.

Plaintiffs attempted to reduce the requests to writing shortly after the hearing as a matter of efficiency, not to afford the Defendant with additional time to respond, but rather to memorialize the requests made at the hearing as best Plaintiff's counsel could recall without having the benefit of a transcript to review at the time the requests were made.

### F. The Court Should Adopt Plaintiffs' Language Change Suggestions Regarding the Re-Designation of the Bank's Discovery Liaison

The Bank concedes that Mr. Kaminski may not be "the proper individual for a 30(b)(6) deposition on the technical capabilities of M&T's internal systems," but nevertheless contends that "he certainly demonstrated that he was qualified to serve as an e-discovery liaison, generally, and facilitate the production of documents." (Response at 17).   Plaintiffs concur with the Bank's first proposition and vehemently disagree with the

28

second.

The first court-required qualification to be an e-discovery liaison is to be "familiar with the party's electronic systems and capabilities in order to explain these systems and answer relevant questions" (Dckt. 6-1 at 3). Regarding this requirement, the Court found the following facts:

> "Mr. Kaminski…is not the person with – who's going to have primary knowledge of how documents are stored, kept, and so forth at the bank." (Transcript at 83)

> Mr. Kaminski does not have "personal knowledge about how documents are stored at the Bank, where documents are, what documents are accessible through what programs." (*Id.* at 84).

> Mr. Kaminski is not the person who would be best suited to talk about the bank's software, and what it's capable of, and what it does house, and how to access documents, and so forth." (*Id.*).

Another requirement set by the Court for being an e-discovery liaison is that he/she be "responsible for organizing the party's e-discovery efforts to insure consistency, and thoroughness and, generally, to facilitate the e-discovery process." (Dckt. 6-1 at 3). Mr. Kaminski did not even have broad *involvement* in the Bank's e-discovery efforts, much less being *responsible* for organizing the Bank's e-discovery efforts. His participation was limited to the production of the 19,000 blacked-out pages and his only contribution there, was to convert 57 documents into 19,000 disassociated .tif files. (Transcript at 31-35).

The Bank seems to believe that if it produces one or more competent 30(b)(6) deponents, it is absolved of the duty to designate a qualified e-discovery liaison. Plaintiffs respectfully submit that the Bank is mistaken. The person(s) who are most familiar with the Bank's systems are the individuals who Kenneth Fries testified to as the "technical owners" of the systems. Plaintiffs' counsel would like to take a corporate deposition following the

suggestions made by Stott Matthews, as described in his affidavit.

### G. The Court Should Adopt Plaintiffs' Language Change Suggestions Concerning Remote Access to M&T's Systems.

The Bank appears to have acquiesced to the notion that the Court will probably allow Plaintiffs to participate in a remote access session concerning the Bank's systems. It strenuously objects, however, to Plaintiffs' suggestion that such session be handled as if it were also a 30(b)(6) deposition. Its resistance to the ideas of transcribing and videotaping the session is reminiscent of its belligerent opposition to Plaintiff's suggestion that that the telephonic e-discovery-conferences be recorded. Had that been done, Plaintiff could have demonstrated Mr. Kaminski's incompetence without the need for a live evidentiary hearing. Similarly, transcribing and videotaping the remote access session will create evidence that can efficiently and quickly resolve future disputes about the Bank's capabilities of finding and producing requested data and will provide the Court, if necessary, with a record to review to resolve any further discovery disputes expeditiously.

### Plaintiffs' Proposed Changes Regarding the Timeline for Responses should be Accepted

Plaintiffs would like to comment on the Bank's explanation that it needs enough time to conduct the extensive search necessary to locate all the responsive documents. Perhaps the Court will wonder why that search didn't begin 10 months ago, when Judge Beetlestone entered her January 11, 2018 Order. The answer to that question can be found in the example that the Bank provides to show the ostensive difficulty it faces in finding these documents: "(for example, obtaining policies or procedures that have been archived and are therefore not readily available on the system)." It wasn't until the right after the

hearing that the Bank started looking in the archives for these documents, because that is when it was caught concealing their whereabouts.

Plaintiffs want to obtain all information as expeditiously as possible and move for class certification, particularly in light of the Bank's suggestion that it is filing suit against class members for deficiencies – a discovery request it also is attempting to delay answering.

Most all of the information sought in the discovery is not in any way dependent upon a sampling. In other words, class wide discovery and a sampling for complete files are two distinct issues which are mutually exclusive. The statutory damages or aggregate amount of storage fees billed or paid; or the number of class members who the Bank shows as having filed for bankruptcy protection have absolutely no relationship to the Sampling.

Plaintiffs contend that the production of the operation manuals of the Bank's computer systems and obtaining other discovery via a preliminary corporate deposition as discussed in Stott Matthews affidavit should be had before the Court makes any amendment to Judge Beetlestone's First Amended Scheduling Order calling for no bifurcation of class and merits discovery or the Court's stipulated scheduling order compelling a 20% sampling. Again, Plaintiffs simply request leave to obtain some of this additional information to supplement the record before the Court determines the feasibility regarding the scope and size and "undue burdensome" issues of the Sampling

**III.   The Bank's Additional Suggested Language Should be Rejected**

The Bank asks the Court to add language to its tentative ruling that would relieve the Bank of having to respond to four document requests (Nos. 7, 18, 22 and 23) and two interrogatories (Nos. 2 and 3) from Plaintiffs' Second Set of Post-Removal Class Discovery

at this time.  It argues that document requests 7 and 23 run afoul of the work product doctrine and that request 18 and 22 are for "full class-wide discovery" which is not permitted at this time.   It also argues that Interrogatory No. 5 is related to evidence of undue burdensome and answering it should be postponed pursuant to the tentative order.  The Bank asks the Court to excuse it of having to respond to these requests "until such time that the issues underlying the same have been addressed by Order of this Court."[7]

Defendant is incorrect on all counts. First, requests 18, 22, and interrogatories 2 and 3 are not impermissible "full class-wide discovery requests". Request 18 asks for the number of putative class members in each class for whom the Bank has issued a 1099-C for cancellation of a deficiency.  Request 22 asks whether the Bank has "charged off" any accounts of plaintiffs or class members prior to the filing of the initial complaint, and if so whether the storage expense or preparation expenses was included in the charge-off amount. Interrogatory 2 asks for the aggregate sum of the "Expense of preparing/repairing the Vehicle for sale" listed in the notices of repossession for the class members in each class; and Interrogatory 3 asks for the aggregate amount the Bank actually paid third parties for the aforesaid aggregate sum of listed repair expenses.

The Court may recall that Mr. Fries testified that the Bank does not pay for storage expenses, but the customers do. Why then wouldn't the Bank simply answer the request seeing the amount it billed the class and the amount it paid for the storage expenses begs

---

[7] Plaintiffs have already explained why the work product doctrine does not shield the Bank from having to produce spreadsheets – because the work product doctrine does not protect against underlying facts.  They have also explained why the Bank's no-class-discovery argument is untenable — with the Bank's claim of undue burden having been shown to be a lie, there is no reason to delay class-wide discovery.   Plaintiffs will not repeat those arguments here.

the answer: delay. The same applies to the Bank's expense of "repair/prepare" (Interrogatories 2 and 3; Second Set) – it likely never incurs any expense to any third party. The Bank should expeditiously answer these sorts of direct and clear interrogatories rather than claim, an unsubstantiated basis, undue burden.

None of these asks for individual information for class members, only aggregate numbers. Whether deficiencies have been discharged is relevant to potential damages in this action, as deficiencies may be extinguished pursuant to the UCC. Whether the Bank was charging off unincurred expenses goes to whether the Bank was including unincurred expenses as expenses in its financial books, and goes to Plaintiffs' commercial unreasonableness claim. And the interrogatories asking for the comparison of the aggregate expenses listed on the notices with what the Bank actually paid for those expenses is not an attempt to seek out information about class members, but to determine whether the Bank actually incurred the expenses listed on the notice.

As for Requests 7 and 23, as Plaintiffs have explained above, the spreadsheets are not protected by the work product doctrine.

The Court has already received sufficient legal argument from the parties and sufficient factual information from the hearing to decide these two issues, along with the other outstanding discovery issues, at this time. Plaintiffs submit that instead of adding language that merely kicks the can down the road as the Bank urges, the Court should make changes to the tentative ruling that actually makes the resulting order the one that "addresses the issues underlying the various discovery disputes."

Defendant further asserts that Plaintiffs' Interrogatory No. 5 requests that M&T provide information and documents substantiating any undue burden objections, and that this "tracks" this Court's request in paragraph 9 of the tentative order to be included in the subsequent briefing by the parties, thus Defendant's response to Interrogatory No. 5 should be similarly delayed. This is absurd, because Interrogatory No. 5 is not comparable to paragraph 9.  It is abundantly clear on the face of paragraph 9 that the Court is discussing the circumstances of Defendant's claims of undue burden regarding the sampling, while Interrogatory No. 5 is *not limited* to claims of undue burden regarding the sampling but rather requests evidence supporting undue burden objections made by Defendant to "any of the discovery requests" in the first or second set of post-removal discovery.

Thus, Defendant should not be granted a reprieve from answering any of these discovery requests.

Date: 11/16/18

SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan

## CERTIFICATE OF SERVICE

I do hereby certify that I caused a true and correct copy of this Memorandum was served via ECF to all counsel of record.

Date: 11/16/18

SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD R. FLYNN, et al,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 17-cv-04806-WB** |
| | : | |
| **MANUFACTURERS AND TRADES TRUST COMPANY** | : | |
| | : | |
| **Defendant.** | : | |

## DECLARATION OF J. STOTT MATTHEWS
## PLAINTIFFS' E-DISCOVERY LIAISON

AND NOW COMES, J. Stott Matthews, an adult individual, affirms as follows:

1. I am an owner and Managing Partner of Spectrum Computer Forensics & Risk Management, LLC ("Spectrum"). Spectrum provides computer-forensic, electronic-discovery and computer-security-related services. For nine years, I have held the Encase Certified Examiner certification, EnCE, one of the globally recognized computer-forensic certifications. For six years, I held the Certified Information Systems Security Professional, CISSP, a globally recognized computer-security certification.

2. I also presently serve as a Co-Chair of the Litigation Technology Group for the United States District Court for the Eastern District of Michigan.

3. A copy of my CV is attached as **Exhibit 1**, and I attest to the accuracy of the representations within it.

4. To date, my services have included, among others, a review of two sets of electronic production made by the Defendant dated on or around May 11, 2018, including (i) a PDF-based production of Defendant's files (Bates 920 - 1,674), the "PDF Production Set", and (ii) "FLYNN001.zip" containing approximately 18,050 files (Bates 1,675 - 19,667) in Concordance database, load-file format, the "TIF Production Set" or "19,000 Page Production."

5. As Plaintiffs' E-Discovery Liaison, I participated, along with Richard Shenkan, in two telephonic e-discovery conferences with representatives of the Defendant on June 21, 2018 and July 2, 2018 and have reviewed an assortment of pleadings and other discovery to become familiar with the pending discovery dispute. I also attended and testified at an evidentiary hearing conducted by the Court on October 26, 2018.

1

**EXHIBIT**

tabbies® 1

6. The following are my opinion on several topics in light of the testimony from the 10/26/18 hearing and issues involving the pending discovery dispute.

**<u>Defendant's 19,000 Page Production</u>**

7. The Court's December 1, 2017 Order Governing Electronic Discovery requires that Excel spreadsheets be produced in native format.

8. The 19,000 Page Production was transmitted to Plaintiffs' counsel on or about May 11, 2018.

9. At the first electronic discovery conference on June 21, 2018, I asked questions about the Bank's computer systems, its functionality, and some of the discovery responses.

10. Both Richard Shenkan and I were not aware of the content of the 19,000 Page Production until the second electronic discovery conference on July 2, 2018. At that time, Mr. Kaminski, the Defendant's e-discovery liaison, informed Richard Shenkan and me that this 19,000 Page Production was comprised of e-mails and Excel spreadsheets.

11. When I asked Mr. Kaminski why he did not provide the Excel spreadsheets in their native format which would ensure that the meta data was intact instead of converting them to a .tif image file format, Mr. Kaminski responded that he just did what he was told to do by M & T's counsel.

12. From my examination of the 19,000-Page Production file and after hearing Mr. Kaminski and Mr. Wilshaw, the Bank's Digital Forensics Investigator, testify at the October 26, 2018 hearing, this is what I discovered:

(1) Mr. Wilshaw testified that he provided Mr. Kaminski with pst files (e-mail medium to transmit e-mail files) containing the results of search terms and date filter parameters (the query of yet has not been provided). In this production set, Defendant's counsel produced some number of Excel spreadsheets and e-mails, totaling 57 documents in all. It is unclear how many Excel files were provided, due to the manner in which they were produced (including, at a minimum, no file name or file extension in the load files, among other common pieces of metadata);

(2) Mr. Kaminski's firm converted all of these 57 documents to approximately 19,000 .tif files; and

(3) Defendants' counsel then fully redacted approximately 90% of these files, delivering completely blacked-out .tif image files in their production set.

13. As a result of converting the Excel spreadsheets to .tif image files:

(1) The tabular format of the Excel spreadsheets became unaligned and distorted, much like a cut-up jigsaw puzzle without any instructions for its re-assembly;

2

(2) Each Excel file which, ordinarily can be readily opened with just a double click of a mouse, required the double click of the mouse for each of its pieces comprising part of the file. In other words, in an instance where only 57 double-mouse clicks should access these files, such was required for the 19,000 pages, separately. Even with the use of a litigation database platform like Relativity or Concordance, the content of this production and its manner of presentation was subpar (no meta data, no disclosure of its content, inordinate redactions, etc.) from an e-discovery industry norm and of very little value, if any.

(3) And, as mentioned above, no metadata, not even the file's name, extension, let alone the file's Author, Last Printed date, path, and date-related metadata, was provided in the load file, let alone its parent email's metadata (e.g. Subject, From, To, CC, BCC, Sent Date/Time, Attachment Count, and Attachment Name). It is for this very reason that neither Plaintiff's counsel, nor myself with the decade-plus experience, understood that these 19,000 pages represented an email production set, until informed of such during the second e-discovery conference call.

14. One effect of this tactic was to artificially inflate the time and cost of the production to attempt to substantiate a similarly artificial "unduly burdensome" objection. This is a tactic that represents a form of discovery abuse which I have not seen in more than 10 years and which runs counter to the Court's 12/04/17 (Doc. 17) and 1/26/18 (Doc. 22) Orders.

15. The Bank could have easily produced the Excel spreadsheets in their native format to ensure the integrity of their features and simply redact the cells or columns of data relating to un-involved customers. It acknowledged this at the hearing. This would take only hours to perform and could readily work to redact many tens-of-thousands of records in an Excel file. Alternatively, anonymizing the Excel data by using customer numbers would enable all the data to be produced in under an hour, as columns are simply deleted to achieve this goal.

16. Succinctly stated, the time necessary to assemble the correct query to cull through these Excel files and to separate the relevant person's files from the non-relevant ones for the four Representative Plaintiffs should have taken a few hours, *at most*. Then, once this query(s) is assembled and run, the data can be produced for 4,000 class member's accounts/names in under a day's time, *at most*.

17. The unfortunate result of not producing the Excel files natively is that Plaintiffs' counsel was forced to spend significant, unnecessary resources to expose this - what I believe to be -- abusive discovery tactic to advance their claim and to attempt to enforce the clear e-discovery mandate of the Court's 12/04/17 (Doc. 17) and 1/26/18 (Doc. 22) orders as they relate to the format Excel spreadsheets must be provided in and the lack of any provision for any redactions.

**Native Format of Plaintiff's and Class Member's Data**

18. A relational database is made up of several components, of which the table is most significant. The database table is where all the data in a database is stored.

19. The structure of a database consists of one or more tables. Each table is made up of rows and columns. If you think of a table as a grid, the columns go from left to right across the grid and each entry of data is listed down as a row.

20. The information that is input into the Bank's computers through the portals/forms which were produced as the screen shots are present in one or more database systems. The information is ascribed a name which is called a database "field." Examples of some of the Bank's database fields are as follows:

Bates Stamp 997-998

"EXPSTORVEH" for "Storage Fees" and "EXPPRE/REP" for "Expense of preparing the vehicle for sale" in the "Title" fields in Bates Stamp 997 and 998. (Exhibit 9 – 10 of Plaintiffs' Second Set of Post-Removal Class Discovery which is not attached as it is marked "Confidential")

Bates Stamp 20189

<<Payoff_Prior_To_Sales>> for "Payoff prior to Auction Date;
<<Auction_Proceeds>> for "Auction Proceeds"
<<Obligations_after_proceeds>> for "Obligation after proceeds"
<<Auction_Expenses>> for "Auction Expense"
<<Repo_Expenses>> for "Repossession Expenses"
<<Credits>>  for "Credits"
<<Total_Amt_Dues>> for "Total Amount Due / Deficiency"

**Exhibit 2**.

21. Based on my analysis to date, the information which is in native format for each class member is stored in the one or more of the Bank's software systems in these database fields which can be readily accessible with the use of a query.

22. I understand that the Court issued orders on 1/11/18 and 4/13/18 relating to the mandatory production of all documents, including all electronically stored information, for all of the Representative Plaintiffs. To the best of my knowledge, the Bank has yet to produce any of the *database field headings and corresponding information* for each of the Representative Plaintiffs in each of the Bank's database systems or third-party database systems.

23. The production of this information should help the Court, Plaintiffs' counsel, and me to better understand what and how information is stored in each system and, accordingly, what information can be easily searched by the Bank's database systems for each class member. Having this information should considerably reduce the time and cost involved in the discovery

process and better enable the parties and the Court to better understand the Bank's database systems and the "unduly burdensome" objections presented by the Bank.

*Document Request*: Therefore, it would be helpful if the Bank would provide: (a) the data field headings and corresponding information in each database for each of the representative plaintiffs; and, (b) a list of all database fields, identifying the database and tables to which each field corresponds, for each of the Bank's computer systems.

## Defendant's Unqualified E-Discovery Liaison

24. When I asked Mr. Kaminski, Defendant's present E-Discovery Liaison, about this information, he was not knowledgeable about any of the details regarding even the most basic database matters of the Bank – as he was similarly not sufficiently knowledgeable about the Bank's computer systems, having never operated any of the systems himself. Based on his testimony at the 10/26/18 hearing and my discussions with Mr. Kaminski, he does not satisfy the requirements of the Court's Draft Order Governing Electronic Discovery setting forth the requirements of an e-discovery liaison.

## The "Flynn Spreadsheet(s)"

25. In my opinion, the disclosure of the Flynn Sheet(s) referenced at the 10/26/18 hearing is extremely important because it established that the Bank's "unduly burdensomeness" objection was not credible. I say this because the Bank had (and easily can generate an update to) the very information sought in Plaintiff's First Set of Post Removal Discovery seeking, by way of illustration, the "finance charge" and "amount financed" to calculate the aggregate amount of statutory minimum damages (Interrogatory 5) and the aggregate deficiency balances (Interrogatory 2).

*Document Request*:  From my perspective, the critical information regarding the Flynn Spreadsheet(s) referenced at the 10/26/18 hearing which I would like to obtain are as follows: (a) all documents identifying the queries which were run to generate these spreadsheets; (b) the names of the databases in which the queries were run; (c) the names of the tables within those databases; (d) the name of the person who was responsible for running the query(s); and, (e) the information regarding the named Plaintiffs in the spreadsheet(s). Assuming that I can obtain this information, I can work with a Bank representative (preferably the person who ran the query(s) that generated the Flynn Spreadsheet(s)) to run a query(s) to obtain the information sought in the discovery.

## Corporate Deposition with Remote Access Session

26. I would be able to assist Plaintiff's counsel to take a corporate deposition to better understand, among other things, how the Bank's computer systems generally work and the most efficient means to search and to retrieve the information sought in the discovery which remains outstanding and to which the Bank has asserted an "unduly burdensome" objection relating to the sampling and several other discovery requests.

27. At the deposition, I suggest that the Bank have a computer which has full access the Bank's systems accessible to enable the deponent(s) to answer questions posed to him/her by having the capability to use a visual of the Bank's systems. Of course, the Bank's computer systems would be accessed <u>solely</u> by the deponent or another Bank representative and the information in the deposition could be marked "Confidential" to allay any anticipated objection by the Bank that its systems to maintain its business information is a trade-secret.

28. I suggest that the deposition and the computer monitor both be videotaped so that there can be a contemporaneous record of each. After the deposition, the videos then can be easily merged to show each visual with a split-screen to ensure a reliable record.

29. Because I reside in Michigan and the Bank is located in Buffalo, New York, it makes most economical sense for me to attend the deposition via a remote access session (though I am certainly willing to travel to Buffalo, NY if necessary). Undoubtably, the Bank uses a remote access application for its employees to use, and I am fine using the Bank's preferred remote-access system and will confer with the Bank's representative to coordinate these provisions.

*Document request*: In preparation for this deposition, as a matter of efficiency, I would like to be provided with all of the operation manuals for each of the computer systems used at the Bank during the class period and be put in touch with someone with whom I can discuss a remote access connection.

### 12 Policies Stored in Sharepoint or Archive Back-up

30. I understand that the Court issued an order on 1/11/18 requiring the Bank to produce policies and procedures at issue in this lawsuit. To that end, I also understand that there are 12 earlier iterations to the already-provided policies which remained outstanding and which Plaintiffs' counsel requested at the hearing which are set forth in Exhibit 1 of Plaintiffs' Second Set of Post-Removal Discovery (Exhibit 7 of the hearing transcript).

31. Because of the Bank's Response and Objections to Plaintiff's First Set of Post-Removal Discovery, I initially thought that the Bank simply did not have these documents anymore, because it stated:

> M&T states that it has already produced <u>all</u> such responsive documents in its possession pursuant to its obligations under the [1/1/18] Initial Scheduling Order. (Emphasis added)

32. Mr. Fries' testimony at the 10/26/18 hearing seems to establish, however, that these policies and procedures are, indeed, stored either in the Bank's Sharepoint application, in a back-up archive system, or similar system.

33. Now, the Bank's counsel appears to be requesting 30 days from the entry of an order to locate the "policies or procedures that have been archived and are therefore not readily available on the system." Bank's Opposition to Plaintiffs' "Suggested Language Changes to Proposed Order" (Doc. 126, p. 19).

34. While it is possible that prior versions of the policies and procedures will be provided by the Defendants, I can conduct a forensic search for this information, if such becomes necessary. In this connection, the Bank would need to produce a mirror image of each device, drive, and server on which such policies and procedures were previously located (already requested in Document Request 24 of Plaintiff's Second Set of Post Removal Discovery). I would confer with the Bank's representative to select a neutral third-party forensic expert to coordinate the search and to establish a mutually agreed-to protocol to conduct the queries to locate this information or confirm that it no longer is in existence.

*Document Request*: The term "absolute path" or "full path" refers to the complete details needed to locate a file or folder, starting from the root element and ending with the complete list of directories and subdirectories. In preparation for this forensic search, I need to obtain documents which show the "absolute path" or "full path" of where these policies and procedures were previously located. In light of Kenneth Fries' testimony, I need the "absolute path" or "full path" of the Sharepoint application and all archive back-up systems at the Bank. If the archive system is cloud-based, then I need the name of the system, at a minimum, at this juncture and will supplement this document request.

### My Bill for my Time Unnecessarily Expended to Expose Defendant's Frivolous Undue Burdensome Objections to Date

35. In connection with my work as an e-discovery liaison, I have spent a total over 29 hours. My hourly rate is $210 for analysis, review and reporting and $500 for expert services, rates which I ordinarily charge other clients for similar work. The total amount due for my services to date is $9,679.

36. Of the amount due, I attribute only roughly 5 hours (my preparation time and the time spent at the first e-discovery conference) resulting in $1,050 to be reasonably needed to begin to become familiar with the Bank's systems and to review the Bank's discovery responses.

37. The balance of my time has been devoted to unwinding the Defendant's remarkable claim that the 19,000 Page Production was legitimate and compliant with the Court's 12/04/17 (Doc. 17) order.

I affirm the above content is accurate and state these opinions within a reasonable degree of professional certainty subject to 18 US.C §1621.

J. Stott Matthews

# *Digital Discovery and Computer Forensics*
## J. Stott Matthews

866-977-9779
E-Mail: jstott.matthews@spectrumforensics.com
www.spectrumforensics.com

## SPECTRUM COMPUTER FORENSICS AND RISK MANAGEMENT LLC

- Provide digital-discovery, computer-forensic, and computer-security-related services.

- Digital-discovery and computer-forensic services offered:
  - ✓ Identification of electronic devices and storage media relevant to a case, such as servers; computers; USB storage devices; iOS, Android and other types of cell phones; CDs/DVDs; and other types of digital media.
  - ✓ Bit-stream imaging of hard drives, storage and email servers, and other digital media and the preservation of electronic media.
  - ✓ Preservation and collection of Cloud-based data.
  - ✓ Extraction of data, computer files, including email stores, from live systems.
  - ✓ Keyword searching to identify case-critical data, as well as proprietary and privileged information.
  - ✓ Analysis of operating-system and other software-application logging.
  - ✓ Review and analysis of software code, including VB and C# (.Net platform).
  - ✓ Determination of the origin, history, and authenticity of electronic documents.
  - ✓ Examination of deleted files, electronic-file meta data, and other digital artifacts on computers and related electronic devices.
  - ✓ Creation of load files for litigation database applications, including Concordance, among others.
  - ✓ Provide a Web-enabled, scalable and secure, litigation database for all matters, including those of a multi-client, multi-geographic location nature.
  - ✓ Restoration of e-mail and the search for case-critical information within.
  - ✓ Support the creation of interrogatories, deposition questions, and related steps in the litigation process.
  - ✓ Expert witness and deposition services.

- Services offered to clients range from law firms to corporations. Prior engagements have spanned multi-million dollar civil suits and the support of criminal cases.

## CERTIFICATIONS

- State Licensed Professional Investigator (Michigan)

- Encase Certified Examiner (EnCE) - Nine Years (Computer-forensics certification)

- Certified Information Systems Security Professional (CISSP®) - Six Years (Computer-security certification)

*We handle the technology, so you can practice the law.*

EXHIBIT
tabbies®
1

## EXPERT WITNESS

- 20th Circuit Court for the County of Ottawa, State of Michigan (Expert Testimony – April '18 2nd)

- 20th Circuit Court for the County of Ottawa, State of Michigan (Expert Testimony – April '18 1st)

- American Arbitration Association (Expert Testimony – September '17)

- United States District Court for the Western District of North Carolina (Expert Testimony – July '17)

- Circuit Court for the County of Washtenaw, State of Michigan (Expert Deposition Testimony – June '17)

- United States District Court for the Eastern District of Michigan (Expert Testimony – December '16; Expert referenced in Federal Court Opinion).

- Circuit Court for the County of Oakland, State of Michigan (Expert Deposition Testimony – September '15)

- Circuit Court for the County of Wayne, State of Michigan / Jury trial (Expert Testimony – March '15)

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – December '14)

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – November '14)

- United States District Court for the Eastern District of Michigan (Expert Testimony – October '14)

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – October '13)

- Circuit Court for the County of Macomb, State of Michigan (Expert Testimony – October '13)

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – May '13)

- United States District Court for the Eastern District of Michigan (Expert Testimony – March '13; Expert referenced in Federal Court Opinion)

- 20th Circuit Court for the County of Ottawa, State of Michigan (Expert Testimony – January '13)

- 20th Circuit Court for the County of Ottawa, State of Michigan (Expert Deposition Testimony – January '13)

- Circuit Court for the County of Oakland, State of Michigan (Expert Deposition Testimony – March '12)

- Superior Court for the County of Hall, State of Georgia (Expert Testimony – December '11)

- Trial Court for the County of Washtenaw, State of Michigan (Expert Testimony – May '11)

*We handle the technology, so you can practice the law.*

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – December '10)

- Circuit Court for the County of Emmet, State of Michigan (Expert Testimony – October '09)

- Circuit Court for the County of Kalamazoo, State of Michigan (Expert Testimony – September '08)

- Circuit Court for the County of Oakland, State of Michigan (Expert Testimony – August '08)

- Circuit Court for the County of Genesee, State of Michigan (Expert Deposition Testimony – December '07)

- United States District Court for the Eastern District of Michigan Southern Division (Expert Deposition Testimony - August '07)

- United States District Court for the Eastern District of Michigan Southern Division (Expert Referenced in Federal Court Opinion – December '06)

- Third Circuit Court for the County of Wayne, State of Michigan (Expert Testimony – November '06)

- Third Circuit Court for the County of Wayne, State of Michigan (Expert Deposition Testimony – November '06)

- United States District Court for the Eastern District of Michigan Southern Division (Expert Testimony – September '06)

- Berrien County Trial Court, State of Michigan (Expert Deposition Testimony – July '06)

- Berrien County Trial Court, State of Michigan (Expert Deposition Testimony – March '06)

- Sixth Circuit Court for the County of Oakland, State of Michigan (Expert Deposition Testimony – August '05)

## PROFESSIONAL TRAINING

- 32 hours "NT File System and Artifacts", Date: May 22 – 25, 2007; Sterling, VA.

- 40 hours of "Microsoft-based Network Forensics", Date: August 22 – August 26, 2005; Falls Church, VA.

- 32 hours of "Network Intrusion Investigations", Date: November 30 – December 3, 2004; Pasadena, CA.

- 40 hours of "Incident Response, Forensic Analysis and Discovery", Date: July 19 – 23, 2004; Sterling, VA.

*We handle the technology, so you can practice the law.*

## LECTURES AND APPEARANCES

- April 19, 2018; DRI (Defense Research Institute) - Business Litigation Program; Co-Presenter: "Employee Theft of Trade Secret or Confidential Information", Denver, CO.

- November 10, 2017; MDTC 2017 Winter Meeting; Co-Presenter: "Technology in Today's Practice of Law", Novi, MI.

- June 9, 2017 ICLE / State Bar of Michigan — Upper Michigan Legal Institute - Presenter: "Technology Security and Privacy", Mackinac, MI.

- November 23, 2016; ICLE – Co-Presenter: "Tech Competence, Confidentiality, and Cyber Ethics for Lawyers and Law Firms", Plymouth, MI.

- February 10, 2015; Panelist: Panelist - Federal Bar Association - Co-Chair of Litigation Technology Committee; Update and Survey Results - E-Discovery Model Order, Detroit, MI.

- January 14, 2014; Panelist - Federal Bar Association - Co-Chair of Litigation Technology Committee; Topic - E-Discovery Model Order, Detroit, MI.

- July 19, 2011; Co-Presenter: Best Practices in Computer Forensics; Association of Legal Support Professionals (ALSP), Eastern Chapter of Michigan, Troy, MI.

- April 15, 2010; The Federal Bar Association - Eastern District of Michigan Chapter; Panelist (including one Federal Judge); "Social Media and Its Impact on Litigation: From Discovery Through Trial" at Wayne State University Law School, Detroit, MI.

- March 19, 2008; Speaker: "Internal Threats & Implications of New PII Legislation", ISACA (Information Systems Audit and Control Association) Monthly Meeting, Detroit Chapter, Dearborn, MI.

- November 30, 2007; Co-Presenter: 'Hot Issues in Privacy Law' – 'Computer Forensics: What Are You Really Sharing?', The Institute of Continuing Legal Education, Ann Arbor, MI.

- May 4, 2007; Co-Presenter: 'The Revised Federal Rules of Civil Procedure: The Changes, Best Practices and Risks', Michigan State Bar – Annual Legal Assistants Day of Education, Frankenmuth, MI.

- September 14, 2006; Guest Lecturer: High Tech Crimes Class - Washtenaw Community College, Ann Arbor, MI.

- October 6, 2005; "Digital Detroit" Panelist at 2005 Detroit IT Security Summit: 'Securing Our Infrastructure: Practical Means to Safe Business Practices', Novi, MI.

- July 5, 2005; Washtenaw County Family Court, Presentation: 'Digital Discovery and Computer Forensics – Current Status and Family Law', Ann Arbor, MI.

- April 28, 2005; Washtenaw County Bar Association, Presentation: 'Computer Forensics,

*We handle the technology, so you can practice the law.*

Electronic Discover and their Benefits to Building your Case – It's not Just for Big Cases, Anymore', Ann Arbor, MI.

## PRIOR PROFESSIONAL EXPERIENCE

- Among 15 years of professional experience, as member of the executive team, served as Director of Business Development and Finance in the high-tech joint venture between DaimlerChrysler, Ford and GM, and as Vice President - Controller of Chrysler Corporation's Japanese subsidiary.

## EDUCATION

- M.B.A., Finance, Columbia University Graduate School of Business

- B.A., Economics and East Asian Studies, Bucknell University

## OTHER

- Honorably discharged veteran of the United States military.

*We handle the technology, so you can practice the law.*

«Todays_Date»

«Letter_Name»
«Letter_Address»
«Letter_City», «Letter_Sate» «Letter_Zip»

RE:    Name:  «Borrowers_Name»
        Account #: «Account_»
        Collateral: «Year» «Make»  «Model»

Dear «Letter_Name»:

Please be advised that your repossessed collateral was sold at a private auction on «Sold_Date». Here is a description of how we applied the proceeds from sale to the account balance and calculated the deficiency of «Total_Amt_Due»(the amount you owe us) that remains after the sale:

| | |
|---|---|
| Payoff prior to Auction Date: | «Payoff_Prior_To_Sale» |
| Less: Auction Proceeds: | «Auction_Proceeds» |
| Equals: Obligation after proceeds | «Obligations_after_proceeds» |
| Plus: Auction Expense: | «Auction_Expense» |
| Plus: Repossession Expense: | «Repo_Expense» |
| Less: Credits | «Credits» |
| Equals: Total Amount Due/ Deficiency | «Total_Amt_Due» |

Future debits, credits, charges, interest and expenses, if any, may affect the amount of the deficiency. Please contact me immediately to make arrangements for payment of the remaining amount due.

If you have filed for relief under the United States Bankruptcy Code, please understand that this notice is given to you for informational purposes only to provide you with an accounting of the sale and is not an attempt to collect a debt or any deficiency after the sale.

However, if you have not filed for bankruptcy or you are not entitled to protection under the Bankruptcy Code, this is an attempt to collect a debt and any information obtained will be used for that purpose.

If you want additional information about this transaction, you may contact us at 1-800-724-8644 or write to us at M&T Bank, Attention: Remarketing Support, PO Box 2187, Buffalo, NY 14240. The office hours associated with our phone number 1-800-724-8644 are Monday through Thursday 8:00 am – 9:00 pm, EST and Friday 8:00 am – 5:00 pm EST.

Sincerely,

«Work_Out_Specialist»
Workout Specialist



EXHIBIT
2
tabbies

M&T020189

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD R. FLYNN, et al,          :          CIVIL ACTION
                                 :
          Plaintiffs,            :
                                 :
                                 :
          v.                     :          No. 17-cv-04806-WB
                                 :
MANUFACTURERS AND TRADES         :
TRUST COMPANY                    :
                                 :
          Defendant.             :

## <u>DECLARATION OF RICHARD SHENKAN</u>

AND NOW COMES, Richard Shenkan, an adult individual, affirms as follows:

1.  I am counsel of record for Plaintiffs in the above captioned matter.

2.  In the Defendants; Opposition to it states on page 4-5 as follows:

    > It is undisputed that this spreadsheet contains the personal financial information of tens of thousands of unrelated M & T customers that have never consented to having their personal information provided to Plaintiffs. Regardless of whether or not the confidentiality order specifically provides for redactions, Plaintiffs are simply not entitled to this information and M & T cannot just hand over sensitive personal financial information on unrelated customers. Counsel for M & T informed Plaintiffs' of this fact on numerous occasions, yet counsel continued to demand the production of the full spreadsheet. The only way that M & T was able to produce the full spreadsheet (as requested) without disclosing the personal identifying information on the unrelated individuals was to perform redactions. Indeed, it would have been much easier and less time consuming to delete the irrelevant rows at the outset rather than redacting. M & T, however, has no doubt that if it had taken it upon itself to doctor this document without the express permission of this Court (and in contravention of Plaintiffs' demand for the full spreadsheet), that it would almost undoubtably faced (sic.) an application for sanctions by Plaintiffs.

3.  The representations made in the above paragraph are patently false.

4.  At no time prior to the production of the 19,000 Page Production on or about May 11, 2018, did I have anyone contact me to discuss this production, the contents of this production

1



(i.e., that it would include any Excel spreadsheets), the format of the production (converted Excel spreadsheets to single file .tif image files), or M & T's intent to undertake redactions to spreadsheets.

5.   I was not made aware of that the 19,000 contained e-mails and Excel spreadsheets and how and why the redactions were made until the second e-discovery conference on July 2, 2018.

6.   My firm has been forced to expend considerable time and financial outlay as a result of M & T's efforts to engage in a "discovery abuse" as the term is used by Stott Matthews, whose affidavit is filed contemporaneously herewith.

I affirm the foregoing pursuant to 18 U.S.C. §1621.

SHENKAN INJURY LAWYERS, LLC.

_____
Richard Shenkan