IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD R. FLYNN, GENE DAISEY, DOUGLAS J. ABBOTT, and CATHERINE HOSICK, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>MANUFACTURERS AND TRADERS TRUST COMPANY a/k/a M&T BANK,<br><br>        Defendant. | CIVIL ACTION<br><br>CLASS ACTION<br><br>No. 2:17-CV-04806-WB |

## PLAINTIFFS' RESPONSIVE MEMORANDUM DISCUSSING SUBSTANTIVE OBJECTIONS TO TENTATIVE RULINGS ARTICULATED IN OCTOBER 25, 2018 MEMORANDUM

AND NOW COMES Plaintiffs, by and through their undersigned counsel, file their Responsive Memorandum Discussing Substantive Objections to Tentative Rulings Articulated in October 25, 2018 Memorandum, stating as follows:

### I.    INTRODUCTION

In its most recent Brief, the Bank complains because Plaintiffs had not served a formal discovery request for the remote access session as referenced at the October 26, 2018 hearing. Specifically, the Bank contends: "Plaintiffs should be required to comply with the Rules and serve a document request that identifies exactly what they are seeking, so that M&T can provide a formal response, including objections, in accordance with the Rules."

The Bank seems to forget how we got here. Plaintiffs served only 13 interrogatories and 17 document requests that, with one or two exceptions, clearly identified exactly what Plaintiffs were seeking. The requested remote access session is needed because the Bank has repeatedly stonewalled and misled both Plaintiff and the Court in its responses to those requests.

1

As has been laid out in detail in prior filings, the Bank belatedly responded with a hailstorm of Objections, including its 13 boilerplate "General Objections" and at least three additional objections to every discovery request, including approximately 12 "unduly burdensome" objections. The Bank then manufactured a burdensome objection as relating to the Sample, claiming that 19,0000 pages of mostly redacted documents needed to be provided for just the named Plaintiffs and 4 Million pages of documents for a 20% Sample.

At the Court's evidentiary hearing, Mr. Fries, the Bank's Vice President who verified its discovery responses to Plaintiff's First Set of Post-Removal Discovery, testified that there were two (2) matters which resulted in the Bank having interposed the unduly burdensome objections: (1) printing screen shots of the computer systems for accounts; and, (2) generating and printing monthly statements. Hearing Transcript p. 135-136. Critically noteworthy is the fact that Mr. Fries *never* claimed that the 19,000 page production (comprised of converting Excel spreadsheets to .tif files and the attendant redaction process) resulted in any burden to the Bank whatsoever. Why? Because when placed under oath, Mr. Fries likely recognized the risks associated with advancing any justification for this contrived process, and he did not want to perjure himself.

Lest we not forget, the Bank similarly claimed that it would be unduly burdensome to provide simple calculations as to aggregate deficiency balances and statutory damages for the putative classes. (Interrogatories 2 and 5 of Plaintiff's First Set of Post-Removal Discovery). At the 10/26/18 evidentiary hearing, however, over counsel's work product objection, Mr. Fries testified to having reviewed a spreadsheet (the "Flynn Spreadsheets") which contained the very information the Bank claims was too burdensome to produce, namely the statutory damages and aggregate deficiency information of putative class members.  The Bank, however, failed to disclose this highly relevant, responsive information claiming improperly claiming the work

2

product doctrine at the hearing.

The Bank also disingenuously claimed that twelve critical policies and procedures were no longer in its possession, and subsequently Mr. Fries debunked his own verification by explaining, at the Court hearing, that such policies are, indeed, accessible either in a Sharepoint program or in archive, but that, to date, they haven't been located despite Mr. Fries testifying that "—if they were uploaded to SharePoint, I would be able to view them, the one caveat being if there was a procedure that was deemed archived....That would—I would have to go out to grab that from the manager of that SharePoint site." (Hearing Transcript at 143).

In addition to the above, the Bank appointed an extremely unqualified and unknowledgeable e-discovery liaison and failed to produce court-ordered discovery. The Bank has shown that it cannot be trusted on its claims regarding what information it can access and produce, the format in which that information can be produced, and the level of difficulty of accessing that information electronically. Because of this, remote access to the Bank's computers are necessary to determine what information the Bank can access, the most efficient means to do so, and to ensure that all of the requested documents are being produced.

Having brought this result upon itself, the Bank should not be heard to complain about it. Plaintiffs should be provided the opportunity to explore the validity of the Bank's assertions of burden, of inability to find documents that are in its archives, etc.[1] Almost comically, the Bank musters the audacity to write that Plaintiffs don't need much more than certain vendor agreements and certain policies and procedures—ironically, the very categories of documents as to which the Bank has exhibited its most aggressive intransigence.

---

[1] The Court should reject the Bank's clever attempt to characterize the set of documents that Plaintiffs need to prove their claims as including "specific documents relevant to each Plaintiff." Part of what Plaintiffs have to prove is numerosity, typicality, and commonality, showings they cannot make with discovery that is limited to the named Plaintiffs.

The Bank also contends that there are less intrusive ways for Plaintiffs to obtain the discovery they are seeking: "there is simply no need for Plaintiffs to be allowed such invasive access to M&T's proprietary systems, when they can acquire the same information in other, less intrusive ways. Plaintiffs' response comes in two words: "We tried." [2]

## II.    ARGUMENT

### A. BY MISCITING A FEDERAL STATUTE AND OFFERING AN ALTERNATIVE "NEW" PRODUCTION, THE BANK ATTEMPTS TO ELUDE THE COURT'S ORDER TO BRIEF WHY THE META DATA AND EXCEL SPREADSHEETS COMPRISING THE 19,000 PAGE PRODUCTION SHOULD NOT BE PRODUCED

At the 10/26/18 evidentiary hearing, the Court ordered the Bank to submit a brief within 7 days to explain why the production of the Excel spreadsheets, with the meta data intact, comprising the "19,000 page production" was both: (1) irrelevant; and (2) unduly burdensome. (Transcript, p. 46) The Bank failed to file this brief thereby waiving any such objections. Also, at the hearing the Court ordered the Bank to provide a timeframe for the production of a working copy of the Excel spreadsheets, with meta data intact, redacting only the rows of customers unrelated to the Plaintiffs' case. (Transcript, p. 41-42). To date, the Defendant has provided no time frame for this production either. Instead, the Bank does another "dodge-and-weave," offering to run a "new" spreadsheet though only for the representative Plaintiffs, leaving the meta data issues and the content of to be determined by the Bank. The problem with this solution is multi-fold.

**First**, the format of the production does not comply with the Court's 12/4/17 Order requiring all meta data and the spreadsheets to be intact. Notwithstanding the foregoing, Plaintiffs' counsel has no objection to redacting the cells of the personally identifiable information of non-plaintiffs, nothing more. Notably, the Court already ordered the production of this information not once, but

---

[2] Importantly, Plaintiff's counsel recently sent a letter to all of the Bank's counsel attempting to resolve and/or clarify many discovery related issues and inviting a class-wide mediation. **Exhibit 1**. The Bank has not provided the professional courtesy of a response, further underscoring its "scorched earth" strategy.

twice in its 1/11/18 and 4/13/18 ("Defendants shall provide Plaintiffs with all documents referenced in this Court's January 11, 2018 Scheduling Order, including electronically stored information, for all Plaintiffs, including Douglas Abbott, by April 27, 2018.") orders.

**Second**, the proposal references that the meta data relating to other customers be deleted; however, the meta data should not be disturbed in any way. Furthermore, meta data does not relate to a "customer" but is source data identifying files. Among the information of the meta data is the folder/path location of the information – information which will help Plaintiffs' counsel better understand how to retrieve relevant information. The proposed production permits the alteration of the critical meta data from the original spreadsheets which is not permitted by the Court's 12/4/17 order.

**Third**, the proposed production would obviate Plaintiffs' counsels' ability to tally columns (e.g., the "finance charge" "amount financed" to determine the minimum statutory damages (as sought in Interrogatory 5) and the alleged deficiency amounts (as sought in Interrogatory 2);

**Fourth**, the Bank's proposal is unclear. In its brief at page 6, the Bank references "10 lines" but there are only four named Plaintiffs. This lack of clarity injects the prospect for the Bank to continue to manipulate the data in some fashion.

**Fifth**, the proposal coyly offers to produce spreadsheets which "*either* contain column headings *or* relate solely to the named Plaintiffs." (Brief, p. 6). However, ***both*** the column headings ***and*** all information relating to the named Plaintiffs is required to be produced.

**Sixth**, the proposal seeks to eliminate the Bank's need to produce a detailed log of exactly what the 19,000 pages consists of and to provide corresponding Bates Stamp to the .tif production. For example, one of the .tif files might be 3,000 pages, but its Excel spreadsheet might only be 20

pages. This information will be incredibly beneficial for the Court to understand the length of efforts which the Bank went to manufacture the burdensome objection.

Evidentiary support for these deficiencies is provided by Stott Matthews, Plaintiff's E-Discovery Liaison, who has opined that the proposed production is improper. *See,* **Exhibit 2** which is incorporated herein.

In order to resolve this conflict, Plaintiffs ask that the Court compel the Bank to state, under oath, exactly what the contents of the "19,000 page production" consists of, particularly how many spreadsheets, e-mails, the size of each, and a brief description of each) in a log and to provide a Bates Stamp of each file. Plaintiffs then would ask that the Bank produce all e-mails and spreadsheets, in their native Excel format, with all *original* meta data intact, redacting *only* the cells of the rows which have any personally identifiable information (names, addresses, phone numbers, and social security numbers), providing separate Bates Stamp for each so that a corresponding reference to the .tif file production can be understood. Indeed, the Court previously *ordered* the production of this very information in its 12/4/17, 1/11/18, and 4/30/18 orders and in the format requested (excluding the redactions for PII of non-Plaintiffs). Certainly, after having wasted almost a year since the initial 1/18/18 order was entered, the Bank should be able to comply with this simple production almost immediately.

## Bank Improperly Cited the Gramm-Leach-Bliley Act

The Bank's effort to convince the Court that the Gramm-Leach-Bliley Act ("GLB") required it to produce blacked-out .tif files, epitomizes its continuing mendacity.  It quotes the policy statement provision of the GLB, which speaks, generally, about a financial institution's duty to protect the personal information of its customers. It quotes a Third Circuit case that contains a general discussion of the GLB's ban on disclosing such personal information to unaffiliated third

6

parties.  It even cites a couple of state court cases that don't have anything to do with GLB.  From all of this, it concludes that "[t]he disclosure of personal information to [Plaintiffs] is prohibited, regardless of whether they are then required to keep it confidential." (Brief at 5).

What the Bank neglects to mention is the common countervailing consideration of a financial institution's duty to provide information during discovery.  *Costantino v. City of Atlantic City*, 152 F.Supp.3d 311, 328 (D.N.J. 2015)("a party must devote reasonable resources to respond to legitimate discovery requests").  It also fails to mention that GLB, *itself*, has a provision that embodies Congress's careful balancing of these potentially competing interests.  In a subsection entitled "General exceptions," 15 U.S.C.A. § 6802 provides:

> Subsections (a) [which contains the actual limitation on disclosure of personal information] and (b) shall not prohibit the disclosure of nonpublic personal information--
>
> \*     \*     \*     \*     \*     \*     \*
>
> **(8)** to comply with Federal, State, or local laws, rules, and other applicable legal requirements; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

15 U.S.C.A. §6802(e)(8).

Not only does the Bank ignore the foregoing statutory provisions, it also carefully disregards the case law interpreting Section 6802(e)(8) that is *diametrically opposed* to the Bank's conclusion that "[t]he disclosure of personal information to [Plaintiffs] is prohibited, regardless of whether they are then required to keep it confidential." (Brief at 5).  In *Marks v. Global Mortgage Group, Inc.*, 218 F.R.D. 492, 496 (S.D. W. Va. 2003), the court stated: "The court **FINDS** that 15 U.S.C. § 6802(e)(8) permits a financial institution to disclose the non-public personal financial information of its customers to comply with a discovery request."

The *Marks* court then went on to explain its ruling:

> The phrase "to respond to judicial process" is syntactically separate and from the phrase "to respond to ... government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law." *See* § 6802(e)(8). Thus, the "judicial process" exception is independent from, and in addition to, the exception permitting disclosure to comply with a government regulatory investigation. Furthermore, the legislative history indicates that the House Bill, which added the privacy protections to the GLBA, envisaged an independent judicial process exception. *See* H.R. 74, 106th Cong. 93, 108–09, 124 (1999)(discussing a judicial process exception without reference to "government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law"). When a party must disclose information pursuant to a discovery request, the party is responding to judicial process. Thus, under the judicial process exception, the defendant may disclose its customers' nonpublic personal information in response to the plaintiffs' discovery request.

*Id.*

In *Lehman Brothers Holdings, Inc. v. Equity Resources, Inc.* No. 2:09-CV-735 (W.D. Pa. July 27, 2009), the District Court for the Western District of Pennsylvania cited *Marks* approvingly and specifically refuted the Bank's claim that under GLB, "[t]he disclosure of personal information to [Plaintiffs] is prohibited, *regardless of whether they are then required to keep it confidential.*" (emphasis added).

> A protective order is appropriate in this case to protect information likely to be exchanged between the Parties that the law recognizes warrant protection from public dissemination. *Under the Gramm–Leach–Bliley Act, every financial institution "has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).* **Consequently, courts recognize the need to fashion protective orders which will protect borrowers' nonpublic personal information.** See, e.g., Marks v. Global Mortgage Group, Inc. 218 F.R.D. 492, 497 (S.D.W.Va. 2003).

*Id.* at *1 (emphasis added).

As the Bank would have to concede, its counsel negotiated the terms of a ***stipulated*** confidentiality order. (Doc. 22). Indeed, well before the deadline for the Bank to have produced

responsive documents to the pending discovery and the Court's initial scheduling order (1/11/18 Order; Doc. 21), the Bank had in place the adequate protections to comply with GLB. Thus, it certainly cannot use GLB as an excuse for its blacked-out .tif production. In fact, in choosing to handle the production in that manner, the Bank actually violated the Draft Order Governing Electronic Discovery (Doc. 6-1) and the Order Governing Electronic Discovery (Dckt 17) which both specifically *require* that Excel spreadsheets be produced in native format. The Bank chose not to mention those Orders in its Brief, either.

Thus, when the Bank states "[t]he only way that M&T could comply with Plaintiffs' request, while simultaneously protecting (as it must) its customers' personal data from disclosure, was to produce the documents in PDF or TIFF format and redact the personal data of all consumers, other than the named Plaintiffs," (Brief at 5) it is, to be kind, telling yet another untruth.

The best evidence of this is that the spreadsheets that the Bank has now, finally agreed to produce, do exactly what the Bank said could not be done without redacted .tif files. Furthermore, the testimony of its e-discovery liaison that it is impossible to redact certain cells in an Excel spreadsheet is not only wrong, it is irrelevant because there was no need to redact the Excel spreadsheets in light of the pending confidentiality order.[3]

Nevertheless, the Bank persists with its misleading argument that "it had no choice if it was going to avoid doctoring the contents of the documents." (Brief at 5). The Bank seems to believe that by referring to the production of Excel spreadsheets with cells relating to any personally identifiable information redacted, but including all metadata, as "doctored," it can convince the Court to simply close its eyes to the true facts.

---

[3] Kenneth Fries testified that it would be "relatively easy" for the Bank to simply redact a column containing class member names from a native-format spreadsheet. (Hearing Transcript at p.128-29.)

To "doctor" means "to alter deceptively." *Merriam Webster's Collegiate Dictionary*, 11th Ed. 2003 at 368. Plaintiffs submit that producing Excel spreadsheets in native format, with PII of non-Plaintiffs removed, with metadata intact, in compliance with GLB and disclosing in advance to Plaintiffs and the Court what it planned to do, would not have been "doctoring." The same cannot be said for what the Bank actually did, however.

The Bank secretly converted 57 documents, including Excel spreadsheets, into 19,000 pages of completely disassociated worthless single file, .tif documents, with no metadata, with 90% black-outed pages, without informing either Plaintiffs or the Court in advance and without obtaining leave from the Court to deviate from the explicit directives of the 12/4/17, 1/11/18, and 4/13/18 orders.[4] Then, only after executing such a useless production, the Bank attempts to mislead Plaintiffs and this Court that:

> [T]he following facts are not in dispute: There are approximately 3,946 potential members of the classes, 20% of which is 789 individuals. M&T's production relating solely to the four named plaintiffs yielded almost 19,000 pages (about 4,750 pages per plaintiff). By extrapolation, the same production for 789 more customers would yield just under four million pages of documents...

(Dckt No. 110 at 16-17). (*See also,* Bank's 10/15/18 letter to Judge Lloret, p. 2). Now ***that*** is doctoring.

The Bank now double-downs on its discovery abuse by advancing a rationalization to produce 19,000 blacked-out pieces of paper:

> Now that this Court has ordered M&T to produce new spreadsheets containing only the personal data of the representative Plaintiffs, M&T is protected from any document tampering allegation. M&T is therefore able to withdraw its objection to producing these new properly truncated spreadsheets in their native Excel format with metadata intact...

---

[4] The Bank claims that it informed Plaintiffs' counsel that it was going to convert Excel spreadsheets to mostly blacked-out single file .tif images ***before*** the production is a falsehood. (*See,* Dckt No. 126 at 4). (*See* Declaration of Richard Shenkan (Dckt No. 136).

(Brief at 6). Despite its superficial appeal, however, this crafty argument is wrong. The Bank was previously protected from "document tampering allegations" by: 1) the entry of a Confidentiality Order to satisfy GLB; and 2) the Order Governing Electronic Discovery (Doc. 17), which specifically commanded the Bank to produce Excel Spreadsheets in native format.

Ironically, however, there is nothing to protect the Bank from the consequences of the document-tampering it actually committed when it deceptively converted the Excel spreadsheets to .tif files, for the purpose of fabricating a "4-million-page" undue burdensome argument. The Bank is not producing any actual spreadsheets now because it is, for the first time "protected," as it claims. Rather, it would be producing them now because *it got caught*. And, for this, the multi-billion dollar Bank should suffer considerable sanctions.

### A.     EVEN THE BANK'S CURRENT PROFESSED WILLINGNESS TO PRODUCE RELEVANT SYSTEM MANUALS IS A TRICK

During the hearing, the Court was quite clear that: [W]e're going to cut that short, and I'm going to direct that operational manuals for the software that's involved, whether it's AutoIMS or the other software programs, be provided, if they exist." (Hearing Transcipt at p. 65).

Attempting to manipulate the Court's use of the phrase "*software that's involved*," the Bank in its Brief, misleadingly states: "M&T's witnesses testified that information relevant to Plaintiff's discovery requests are housed in the following nine M & T systems: (1) Locus; (2) Shaw; (3) AutoIMS; (4) CACS; (5) CAFÉ; (6) On-Demand; (7) Sharepoint; (8) FileNet; and (9) Columbia Ultimate." (Dckt No. 135 at 6). The Bank wants the Court to draw the unjustified inference that the "information are [sic] housed in *only* the following nine M&T systems." The Bank even disingenuously cites the Hearing Transcript (14:3-17; and 139: 1-2) in support.

Yet, this is NOT what the witnesses stated.

Richard Kaminski, the Bank's E-Discovery Liaison, who identified 8 of these 9 systems, could not recall at the October 26 hearing whether the systems that he named constituted *all* of the software applications that the Bank utilized. ("**That's the ones that I can remember offhand, but *there are likely others*.**" (Hearing Transcript, p. 14)). So, the Bank's representation that its witness provided a comprehensive list of systems is flatly wrong. Notwithstanding this equivocal testimony, the Bank continues to engage in wordsmithery[5] to shield from production the documents related to other relevant systems.

It goes so far as to state:

> While nine of those systems were discussed at the Evidentiary Hearing, the remaining seven have never even been discussed in relation to this lawsuit, much less have had their capabilities questioned. Specifically, *the following systems have never been discussed* or disputed in this lawsuit, and therefore Plaintiffs are not entitled to manuals on their operation: (1) Forms; (2) TPX; (3) Hogan; (4) AFS; (5) CLS; (6) Aspire (incorrectly identified by Plaintiffs as "Aspite"); and (7) Vintek.

*Id.* at 8 (Emphasis added).

This statement can also be added to the list of a demonstrably false representations. References to the need for the very software applications which the Bank claimed are not relevant are listed as required to be accessed in the very repossession related policies which it produced in discovery.

| **Computer System Referenced** | **Policies by Bates Numbers of Referencing Document** |
| --- | --- |
| ***Forms*** | M&T000975, M&T000981, M&T001524, 000981 |

---

[5] "Specifically, the following systems have never been discussed *or disputed* in this lawsuit.....the *majority* of these newly requested systems are not only wholly unrelated to the instant lawsuit..." Brief, p. 8 (Emphasis added).

*The Forms system is used to generate the form Notice of Repossession and Post Sale Notice forms.*

**_TPX (Shaw)_** [6]                    M&T000969, M&T000975

*The Shaw system is used for the accounting matters and at issue to matters such as the amount of expenses/fees assessed and the calculation of the redemption amounts.*

**_Aspire_**                    M&T000969, M&T000975

*The Bank's E-Discovery Liaison has failed to describe what this system is used for; however, it is listed as a relevant system for the repossession policies produced.*

**_Vintek_**                    M&T001424, M&T 00443, M&T0000988

*The Vintek system is used to facilitate the transfer of titles of the repossessed vehicles.*

These Bates Stamp Documents are set forth in Exhibit 7 of the transcript of the 10/26/18 evidentiary hearing and Exhibit 1 of Plaintiff's Second Set of Post-Removal Discovery (submitted via overnight mail to the Court). References in these repossession-related policies to the computer software in question is next to the heading "*Systems Needed.*" As a matter of efficiency, a complete copy of Plaintiff's Second Post-Removal Discovery will be filed under seal, in light of the Bank's designation of the "confidential" designation of its exhibits.

Furthermore, the Bank's statement at page 8 of the Bank's Brief that the "Forms" or "Vintek" software programs have "never even been discussed in relation to this lawsuit.......," is misleading at best because it implies that they are not involved in any way with the information of class members. This fact is also simply not true.

---

[6] The Bank routinely references the "Shaw" and "TPX" software as "TPX (Shaw)." This nomenclature suggests that they are synonymous. It, therefore, misleading for the Bank to claim, as it is doing in its brief, that the "TPX" system is not relevant and dissimilar to the Shaw software if they are the same.

Also, at page 8 of its Brief, the Bank explains why it believes that the "CLS" and "AFS" computer systems are not relevant. If the Bank states, under oath, that these software applications were not used, in any fashion, in connection with either: (a) the loans of the named Plaintiffs or putative class members including the assessment of any expenses, fees, or charges after their vehicles were repossessed or the reinstatement of any such loan; or, (b) the repossession, reconditioning, storage, transportation, repair, retitling, redemption, or sale of their repossessed vehicles or the preparation of the repossessed vehicle for sale, then such will satisfy its discovery obligation to respond to Document Request #2 of Plaintiffs' Second Set of Post Removal Discovery and (Plaintiffs's counsel presumes) the Court's directive at the hearing. Plaintiffs stand ready to have a meet-and-confer regarding this and any other discovery matters. *See*, **Exhibit 1**.

As stated above, however, all other computer systems, should be produced as the Bank's own repossession-related policies establish that they are clearly relevant as they are used to implement such policies.

**B.   DUE TO THE BANK'S EGREGIOUSLY INAPPROPRIATE BEHAVIOR: (1) TO CONCEAL CRITICAL INFORMATION FROM PLAINTIFFS; (2) TO MISREPRESENT MATERIAL FACTS AND LAW TO THE COURT AND PLAINTIFFS; (3) TO INTERPOSE FRIVOLOUS OBJECTIONS AND MANUFACTURE EVIDENCE TO SUPPORT SUCH OBJECTIONS; (4) TO SYSTEMICALLY DISREGARD COURT ORDERS (INCLUDING APPOINTING AN UNQUALIFIED E-DISCOVERY LIAISON), THE COURT IS JUSTIFIED TO PERMIT PLAINTIFFS TO DEPOSE THE BANK WITH THE AID TO INSPECT ITS COMPUTER SYSTEM.**

**1.   The Bank's Position that it Has Never Received a Discovery Request for the Information Being Sought by Plaintiffs is Absurd**

The Bank first contends that Plaintiffs have never made a formal request for the material whose existence they hope to confirm with an inspection of the Bank's computers, and that Plaintiffs should, therefore, be denied such inspection. Inexplicably ignoring the ten pages of discussion found at pages 9-19 of its own Brief (Dckt No. 135), the Bank contends that it "has not

had an opportunity to formally object to such a request" (Brief at 9).  Plaintiffs urge the Court to reject this contrived argument.

The Bank claims that Plaintiffs never served any formal discovery requests under Rule 34 and that Plaintiffs must be required to do that so that the Bank has an opportunity to respond.  The Bank fails to explain why the 13 interrogatories and 17 document requests in Plaintiffs' First Set of Post-Removal Discovery that was served on June 12, 2018 don't count as such formal document requests.  It is only because the Bank refused to fully and honestly respond to these document requests (not because it didn't understand what was being requested) that it now faces the prospect of Plaintiffs being allowed to access its computer systems in order to determine exactly how deficient the Bank's responses really were and how best to retrieve the very information which it sought by way of discovery, much of which the Court ordered to have been produced in connection with its 1/11/18 and 4/13/18 orders.

The Bank similarly appointed an E-Discovery Liaison had no first-hand familiarity with or knowledge of the systems needed to retrieve any of the information sought in or provided in discovery.

### 2. The Bank's Discovery Obstinacy, Even Without More, Is Sufficient to Justify Allowing Plaintiffs Access to Its Computer Systems

Notwithstanding: 1) the exposure of its gambit with the 19,000-page .tif-file production; 2) its allegedly inadvertent failure to check its archives for policies and procedures that Plaintiffs had properly requested in discovery; or 3) its phony claim that fully responding to Interrogatories 2 and 5 was unduly burdensome when it had the answers in hand, using the work product doctrine to shield the disclosure of such answers; the Bank wrongly claims that it has not improperly withheld any information from Plaintiffs.  It also contends that Plaintiffs request to inspect the Bank's computer system fails to satisfy Judge Beetlestone's Order Governing Electronic

Discovery (Dckt 17) which provides that on-site inspection of electronic media is not permitted *absent exceptional circumstances where good cause has been shown and specific need has been demonstrated*.

In short, Plaintiffs respectfully submit that the Bank's evasive conduct in discovery and the resulting inability of Plaintiffs to discover relevant information easily satisfies Judge Beetlestone's requirement for good cause. As far as the Bank's complaint that access to the Bank's computer systems is "the most intrusive way to obtain the information that [Plaintiffs] seek." (Brief at 10) and that there are less intrusive ways to obtain the information sought by Plaintiffs,[7] the Bank seems to forget that Plaintiffs pursued these less-intrusive measures first, and only when met with the Bank's obduracy did they request access to the Bank's computer system.[8] Moreover, despite being liberally sprinkled with "invasive" and "intrusive," the Bank's Brief fails to explain what it takes to be "invasive" or "intrusive," or why Plaintiffs' remote access would be "invasive" and intrusive," and makes no effort at all to point to any evidence that might support such undefined allegations.

Similarly, the Bank argues that under Rule 34 "the responding party can choose to produce documents rather than submit to an inspection." (Brief at 13). However, the Bank already had its opportunity to produce documents in lieu of an inspection of its computer system, and its resulting production was an abject failure. Now it wants to pretend that its previous response never happened and that it should get another chance to produce what it should have produced in the first

---

[7] Notwithstanding its claim that it "cannot even determine the propriety and feasibility of Plaintiffs' actual request," (Brief at 12), the Bank seems to have a sufficiently good idea of what Plaintiffs are seeking to argue that there are less intrusive way for Plaintiffs to obtain it.

[8] The most obvious and most direct mechanism for facilitating Plaintiffs' receipt of the requested information would be for the Bank to drop its assertion of privilege and simply provide Plaintiffs the information they have already requested.

instance – before the Court's day-long evidentiary hearing and before Plaintiffs' counsel spent hundreds of hours and tens of thousands of dollars to expose the Bank's systemic discovery abuses. Of course, the Bank has cited no support for its entitlement to a mulligan.

The Bank takes comfort in the Advisory Committee Note to the 2006 amendment of Rule 34 which states, in part, that "[t]he addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system." Yet again, the Bank misleads this Court. Had it quoted the remainder of the sentence of this Advisory Committee comment, the Bank would probably be less encouraged by it. The entire sentence reads: "The addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system, *although such access might be justified in some circumstances*." (emphasis added). The case at bar certainly represents one of those circumstances.

The Bank concedes that access to a party's information systems should be permitted in truly exceptional cases—those in which the relevant information is on the system and has been improperly withheld. (Brief at 13-14). Both of these characteristics are clearly satisfied here. Cases exhibiting these two characteristics are not nearly as rare as the Bank would have the Court believe. *See, Areizaga v. ADW Corporation*, 2016 WL 9526396 at *3 (N.D. Tex Aug. 1 2016), ("courts have permitted restrained and orderly computer forensic examinations where the moving party has demonstrated that its opponent has defaulted in its discovery obligations by unwillingness or failure to produce relevant information by more conventional means)(*citing White v. Graceland College Center etc.*, 2009 WL 722056, at *7 and cases cited at n. 17 (D. Kan. Mar. 18, 2009)); *See also*, *White v. Graceland College Center for Professional Development & Lifelong Learning*, 2009

WL 722056, at *7 (D. Kan March 18, 2009) ("Apart from compelling production and inspection of computer hard drives and forensic imaging where trade secrets and electronic evidence are involved, courts have also compelled production based upon discrepancies or inconsistencies in a response to a discovery request or the responding party's unwillingness or failure to produce relevant information."); *Koosharem Corp. v. Spec Personnel, LLC,* Civ. A. No. 6:08–583–HFF– WMC, 2008 WL 4458864, at *2 (D. S.C. Sept. 29, 2008) (allowing forensic analysis on defendants' computers based upon failure to produce documents and due to the relevance of electronic information stored on the computers); *Ferron v. Search Cactus, L.L. C.,* No. 2:06–CV– 327, 2008 WL 1902499, at *2 (S.D. Ohio April 28, 2008) (allowing plaintiff's forensic computer expert to mirror image plaintiff's computer systems' hard drives based upon plaintiff's failure to place sufficient litigation hold and failure to otherwise produce the relevant information); *P.J. ex rel. Jensen v. Utah,* 247 F.R.D. 664, 672 (D. Utah 2007) (allowing defendants limited access to the relevant documents on the plaintiffs' crashed hard drive and computer because the plaintiffs provided only relevant research documents that they saved or printed); *Orrell v. Motorcarparts of Am., Inc.,* No. Civ. 3:06CV418–R, 2007 WL 4287750, at *7 (W.D. N.C., Dec. 5, 2007) (allowing the employer defendant to conduct forensic examination of the plaintiffs' home computer where plaintiffs had wiped the hard drive of her work-issued laptop computer and had testified that she forwarded email to her home computer); *Ameriwood Indus., Inc. v. Liberman,* No. 4:06CV524– DJS, 2006 WL 3825291 (E.D.Mo. Dec.27, 2006), as amended, 2007 WL 685623 (E.D. Mo. Feb. 23, 2007) (allowing independent expert to obtain and search a mirror image of defendants' computer equipment upon plaintiff presenting evidence suggesting that defendants failed to produce responsive email); *Matthews v. Baumhaft,* Case No. 06–11618, 2008 WL 2224126, at *2, 2008 U.S. Dist. LEXIS 42396, at *5 (E.D. Mich. May 29, 2008) (allowing direct access upon a

showing of responding party's discovery misconduct); *Ferron v. Search Cactus, L.L.C.,* Case No. 2:06–CV–327, 2008 WL 1902499, at *2, 2008 U.S. Dist. LEXIS 34599, at *8 (S.D. Ohio Apr. 28, 2008) (allowing direct access where responding party "failed to fulfill his 'duty to preserve information because of pending or reasonably anticipated litigation' ") (quoting FED.R.CIV.P. 37 notes of the advisory committee to the 2006 amendments); *Simon Property Group,* 194 F.R.D. at 640-41 (allowing imaging on a finding of "troubling discrepancies" in the opponent's document production); *Playboy Enter., Inc. v. Welles,* 60 F.Supp.2d 1050 (S.D.Cal.1999) (allowing imaging on a finding of systematic deletion of relevant e-mails after litigation had commenced); *NOLA Spice,* 2013 WL 3974535, at *3 ( "Instead, courts have permitted restrained and orderly computer forensic examinations where the moving party has demonstrated that its opponent has defaulted in its discovery obligations by unwillingness or failure to produce relevant information by more conventional means." (*citing White v. Graceland College Center*).

Although authored by a state intermediate appellate court in Ohio, *Bennett v. Martin,* 928 N.E.2d 763 (Oh. App. 2009) could have been written for the present case.[9]  The plaintiff was a former employee that sued his ex-employer on a number of theories.  The trial court ordered the defendant employer to produce forensic copies of computer hard drives. The employer appealed, and the employee moved to dismiss the appeal.  In affirming the order to produce the forensic copies of the hard drives, the Court of Appeals explained.

> [Plaintiff] has demonstrated that defendants repeatedly represented that they had disclosed all responsive documents when, in fact, they had not. As the magistrate

---

[9] "The Ohio Rules of Civil Procedure are modelled [sic] after the Federal Rules of Civil Procedure, which were adopted in 1938 and have been amended several times." *Stammco L.L.C. v. United Telephone Company of America*, 994 N.E.2d 408, 413 (Oh. 2013). In particular, the 1970 Staff Notes to Rules 34 and 37 state that those Rules are based on their federal counterparts. Federal law interpreting a federal rule is persuasive authority in interpreting a similar Ohio rule. *Stammco* at 413. Plaintiffs urge this Court to apply the converse in the present case.

found, such obfuscation displays a willful disregard of the discovery rules and the trial court's orders. Moreover, defendants' last-minute discovery of certain responsive documents indicates that when not outright defying the trial court's orders, defendants adopted a lackadaisical and dilatory approach to providing discovery. Given this background of noncompliance, we cannot conclude that the trial court abused its discretion in ordering defendants to produce forensic copies of the hard drives of [Defendant's] CEO, CFO, and COO.

*Id.* at 774.

The similarities between *Bennett* and the case at bar are striking.

In arguing to the contrary, defendants first contend that the trial court's order impermissibly allows [Plaintiff] to discover vast amounts of irrelevant information that cannot possibly relate to [Plaintiff's] age-discrimination, retaliation, and breach-of-contract claims. ***While defendants may be correct, they fail to appreciate that their own intransigence in the course of discovery justifies the scope of the trial court's order.***

*Id.* (emphasis added).

Additionally, the following excerpt from *Bennett* is highly relevant to the issue of sanctions

for the Bank's conduct in violating this Court's Orders regarding electronic discovery.

On [Plaintiff's] Civ.R. 37(B) motion for sanctions, the question before the trial court was no longer the propriety of the document requests, but instead whether defendants had violated two court orders. Once the trial court ascertained that defendants had, in fact, contravened its orders, it could impose any just order to sanction defendants' conduct. Civ.R. 37(B); *Billman v. Hirth* (1996), 115 Ohio App.3d 615, 620, 685 N.E.2d 1287, quoting *Laubscher v. Branthoover* (1991), 68 Ohio App.3d 375, 381, 588 N.E.2d 290. (" 'Civ.R. 37 authorizes the court to make "just" orders in response to violations of the discovery rules or court orders' "). ***Here, defendants proved themselves untrustworthy to produce documents in compliance with the court orders. To ensure obedience with its orders, the trial court ordered forensic imaging, which prevents defendants from withholding any information.***

*Id.* at 775 (emphasis added).

Recognizing the Bank's gamesmanship during the discovery process, this Court should

employ the same reasoning as did the *Bennett* court, to allow Plaintiffs remote access to the

Bank's computer systems to prevent it from withholding any information. With the Court's

instruction, the parties can confer among themselves to assemble a mutually agreeable protocol

for the inspection and will submit a joint (or separate) recommendation in short order (i.e., 14

days) upon request by the Court.

### 3. Even Having Had Many of its Discovery Abuses Revealed at the Hearing, the Bank Continues to Flaunt the Court's Directives

In case there could be any remaining question about the deliberativeness of the Bank's

discovery-related conduct, it is dispelled by the fact that over a month after the hearing was held,

the Bank has still not produced the following items which, during the course of the hearing, the

Court had directed it to provide.

### a. <u>Documents Ordered to be Produced to Plaintiffs' Counsel</u>

1) The computer systems operations manuals "for the software that's involved" as described in Hearing Transcript, p. 64-65 ("I'm going to direct that operations manuals for the software that's involved, whether it's AutoIMS or the other software programs, be provided, if they exist."). Hearing Transcript, 65:5-8.

2) The spreadsheet(s) which the Bank referenced on page 6 of its Brief (Doc.135);

3) The Agent Coverage Fees Excel Spreadsheet described in Hearing Transcript, p. 72-77 ("I think that's covered, and I think it needs to be produced.");

4) The Redemption Specialist Notes as described in Hearing Transcript, p. 80-81 (or, if no additional documents exist, to refer to Bates Stamp numbers for all documents relating to the named plaintiffs);

5) Templates and exemplars of all Notices of Repossession and Post-Sale Notices promised to be provided by Bank's Counsel (Hearing Transcript, p. 69); and,

6) A "working copy(s)" of the Excel documents in their native format, with meta data intact, and that the redactions previously having been done by .tiff be done by modifying the Excel working copy as described in the Hearing Transcript 40-45;

Regarding a "working copy(s)" of the Excel spreadsheets, please see Section A pages 4-6

above.

Plaintiffs ask that the Court compel the production of the *original* Flynn spreadsheet(s), in native format, which were referenced at the hearing. Plaintiffs have no objection if the Bank were to redact the rows of cells which have personally identifiable information (name, address, phone number, social security number, etc.) other than the Representative Plaintiffs' personally identifiable information. This limited redaction will allow Plaintiffs' counsel to compute the totals of the columns and possibly answer several of the outstanding interrogatories (including Interrogatory 5 seeking aggregate statutory damages and Interrogatory 2 seeking the aggregate deficiency amounts).

Even though many of the documents discussed at the hearing were ordered to be produced, pursuant to the Court's direction, Plaintiffs included them in Plaintiffs' Second Set of Post-Removal Discovery as a matter of efficiency. ("[T]o the extent that there are new requests that they need to be formulated, do so in writing." (Transcript, p. 112, *See also*, p. 139-140.) Plaintiffs propounded the second set of discovery, in part, to comply with this directive – not, as the Defendant contends, to delay the production of any documents already ordered to be produced at the 10/26/18 hearing nor to afford the Bank with another opportunity to re-litigate the Court's rulings compelling the production of certain documents that were made during the hearing.

**b.**     <u>**Documents Ordered to be Produced to Court**</u>

An up-to-date privilege log was ordered by Court to have been provided. (Transcript, p. 148). While the Defendant sent the Court a copy of the latest privilege log, it was not an "up-to-date" privilege log, as it failed to include any information after April 25, 2018 (Revised Privilege Log at 48 of 48). *See, Medeva Pharma Suisse v. Roxane Laboratories, Inc.,* Civil Action No. 07-5165, 2011 WL 310697 (E.D. Pa. 2011)(requiring post-complaint privilege log).

Furthermore, the Court issued an order on October 24, 2018 requiring "[t]hat Defendant will bring to the hearing on October 26, 2018 all of the documents referenced in its privilege log in the format requested in Plaintiff's letter of October 16, 2018. However, when asked whether all of the privileged documents were in the boxes brought to the Court, the Bank's counsel responded: "*That is most of it*, Your Honor" (Hearing Transcript at 149)(emphasis added).

It is, therefore, unclear whether or not the Bank complied with the Court's October 24, 2018 directive. Accordingly, there remains uncertainty about the following:

  (1) whether *all* of the documents referenced in the First Revised Privilege Log have already been provided to the Court;

  (2) if not, when any remaining outstanding documents will be provided to the Court;

  (3) whether the Bank will produce an "updated" privilege log (for documents after April 25, 2018); and, if so,

  (4) when the Second Revised Privilege Log will be provided.

Plaintiff's counsel respectfully requests that the Court compel the Bank and its counsel to state, under oath, that it has produced for in camera inspection all documents referenced in the First Revised Privilege Log and to compel it to produce its current post-complaint privilege log pursuant to *Medeva, supra*.

## CONCLUSION

In conclusion, Plaintiffs requests that the Court provide the relief sought in its Motion to Compel and Impose Sanctions, at the evidentiary hearing, and as requested in its post-hearing memoranda, including:

  (a) To overrule all objections and compel full and complete responses, affirming compliance under oath;

  (b) To compel the production of the Flynn Spreadsheets and all spreadsheets of the 19,000 document production, in their native Excel format, permitting only the

redaction of cells of the non-plaintiff's personally identifiable information;

(c) To compel the production of an updated privilege log;

(d) To compel the production of a bates stamp and log of the files/documents comprising the 19,000 production;

(e) To compel the Bank to submit to an inspection of any computer software used in any fashion with respect to any Representative Plaintiff or putative class members;

(f) To compel the production of all operation manuals for any computer software used in any fashion with respect to any Representative Plaintiff or putative class members of the relevant computer systems;

(g) To compel the Bank to produce all documents sought in Section 3a. above;

(h) To compel the Bank to provide a Bates Stamp log of all supplemental production of the 19,000 batch so that Plaintiffs and the Court can easily compare what was produced in the 19,000 production and its corresponding supplement, in native format;

(i) To assess the Bank to pay all fees and costs of Plaintiffs' counsel relating to its Motion to Compel Discovery and Impose Sanctions, including the corporate deposition/inspection; and,

(j) To impose an appropriate sanctions for the Bank's egregious, contemptuous conduct.

Respectfully submitted,
SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I do hereby certify that I caused a true and correct copy of this pleading was sent to all counsel for Defendant as all subscribe to the ECF.

SHENKAN INJURY LAWYERS, LLC.

Date: 11/30/18

Richard Shenkan



SHENKAN
INJURY LAWYERS

6550 Lakeshore St., West Bloomfield, MI 48323
Phone: (800) 601-0808 • Fax: (888) 769-1774
rshenkan@shenkanlaw.com

November 26, 2018

**Via Fax and E-Mail**

Alfred W. Putnam, Jr., Esq.          Scott Parker, Esq.
Michael P. Daly, Esq.                Jim Berg, Esq.
Drinker Biddle & Reath, LLP.         Fred Hoensch, Esq.
One Logan Square                     Marissa Edwards, Esq.
Suite 2000                           PIB Law
Philadelphia, PA  19103              270 Davison Ave.
                                     Somerset, NJ 08873

RE:   *Flynn, et al. v. M & T Bank,* No. 17-4806.

Dear Counsel:

After reviewing the Bank's most recently filed memorandum (Doc.135)(hereafter "Brief"), I am writing to obtain clarification and to address several issues.

### A. Documents Ordered at Court Hearing to be Produced to Plaintiffs' Counsel

To date, while the hearing has occurred more than thirty (30) days ago, Plaintiffs have yet to receive the documents which the Court ordered to be produced:

1) The computer systems operations manuals "for the software that's involved" as described in Hearing Transcript, p. 64-65 ("I'm going to direct that operations manuals for the software that's involved, whether it's AutoIMS or the other software programs, be provided, if they exist."). Hearing Transcript, 65:5-8.

2) The spreadsheet(s) which the Bank referenced on page 6 of its Brief (Doc.135);

3) The Agent Coverage Fees Excel Spreadsheet described in Hearing Transcript, p. 72-77 ("I think that's covered, and I think it needs to be produced.");

4) The Redemption Specialist Notes as described in Hearing Transcript, p. 80-81 (or, if no additional documents exist, to refer to Bates Stamp numbers for all documents relating to the named plaintiffs);

5) Templates and exemplars of all Notices of Repossession and Post-Sale Notices promised to be provided by Bank's Counsel (Hearing Transcript, p. 69); and,

1

**EXHIBIT**

*tabbies*    **1**

6) A "working copy(s)" of the Excel documents in their native format, with meta data intact, and that the redactions previously having been done by .tiff be done by modifying the Excel working copy as described in the Hearing Transcript 40-45;

### B. Privilege Log Issues

Separately, the revised privilege log which the Bank recently sent to the Court did not include any information after April 25, 2018. Please advise whether the Bank will update the privilege log. *See, Medeva Pharma Suisse v. Roxane Laboratories, Inc.,* Civil Action No. 07-5165 (FLW), 2011 WL 310697 (E.D. Pa. 2011)(requiring post-complaint privilege log). Also, when asked whether all of the privileged documents were in the boxes brought to the Court, Mr. Hoensch responded: "***That is most of it,*** Your Honor" (Hearing Transcript at 149)(emphasis added). Please also advise whether the Bank making efforts to provide the remaining materials to the Court which were referenced in the 48-page privilege log.

### C. Flynn Spreadsheets

Regarding the Flynn Spreadsheets, Judge Lloret asked that the Bank brief the issue as to whether the meta data should be disclosed. Rather than briefing this issue, the Bank advanced an alternative – to generate "new" spreadsheets. The approach, however, disregards the Court's briefing mandate regarding the relevancy issue of the meta data and the production of the original Flynn Spreadsheets. Is the Bank unwilling to brief the meta data issue or produce the original Flynn Spreadsheets keeping intact its meta data, redacting only the personally identifiable information of putative class members other than that of the Representative Plaintiffs? Please advise. Also, please let me know when to expect these newly run spreadsheets.

### D. Unduly Burdensome Objections

I ask that you clarify whether the Bank is maintaining its "General Objections" and the 12 "unduly burdensome" objections set forth below.

- Interrogatory 2 seeking aggregate sum of deficiencies;

- Interrogatory 3 seeking identification of dockets of auto loan deficiency actions filed by the Bank against Class Members;

- Interrogatory 5 seeking aggregate sum of statutory damages for each putative class;

- Interrogatory 7 seeking aggregate amount Bank paid third parties for STORAGE EXPENSES for each putative class;

- Interrogatory 8 seeking aggregate amount Bank listed in the NOTICES OF REPOSSESSION for STORAGE EXPENSES for each putative class;
- Document Request 6 calling for a SAMPLE;

2

- Document Request 7 calling for the production of complaints in lawsuits filed against the Bank regarding the topics challenged in this lawsuit;

- Document 10 regarding insurance-related information;

- Documents 12 seeking all documents, including electronically stored information, regarding the Representative Plaintiffs, almost word-for-word of the Court's 1/11/18 and 4/13/18 order calling for this information to be produced;

- Document 13 seeking all policies, procedures, and practices at issue during the class period. Please also state whether the Bank has located and will be producing the 12 policies and procedures (Exhibit 7 of the Hearing and Exhibit 1 of Plaintiffs' Second Set of Post-Removal Discovery);

- Document Request 14 seeking contracts/agreements with venders relating to AutoIMS, any auction, any repossessor, or any other entity concerning or relating to any goods or service(s) rendered with respect to the repossession, sale, storage, transportation, repair, reconditioning, retitling, redemption, preparation for sale, and/or the sale of a repossessed vehicle, and/or the reinstatement of any loan relating to a repossessed vehicle; and,

- Document Request 17 requests copies of documents which YOU referenced or relied upon in YOUR answers to the above interrogatories.

Also, with respect to the 19,000 page production, you stated on Page 4 of the Bank's Opposition (Doc. 126)[1] that counsel for M&T purportedly informed me on numerous occasions that the Bank had no choice but to produce .tif documents rather than spreadsheets in their native format.  Please advise: (1) who; (2) when; and (3) in what manner I was purportedly informed about the Bank's plan to convert the Excel spreadsheets to .tif images and then engage in the redaction of most of these documents before the production. Please also provide all facts regarding this alleged discussion or exchange. Please explain why the Bank did not move the Court for special dispensation of its obligations to produce Excel spreadsheets in their native format pursuant to the Court's 12/04/17 Order.

### E.  Sample

Regarding the "unduly burdensome" objection relating to the Sample, the Bank's contention is presently that, if the Bank were to follow the same procedure (conversion of Excel to .tif images plus redactions), it would need to produce "4 million" pages of documents.

---

[1] *See also,* Defendant's M & T's Opposition to Plaintiffs' Suggested Language Changes to Proposed Order, p. 4 and Bank's Opposition to Plaintiffs' Motion for Compel Discovery as well as in the Bank's letter to Judge Lloret dated 10/15/18, p. 2 where remarkable "4 Million Page" rationale advanced.

3

When asked about the basis of the unduly burdensome objection at the 10/26/18 hearing, however, Mr. Fries stated that the objections were limited to making screen shot images and reproducing the monthly statements. In light of the testimony elicited at the hearing and the Bank's concession that the information can be presented more easily, please advise whether the Bank is abandoning this "4 Million Page" reason as a basis for its "unduly burdensome" objection and, accordingly, whether it is withdrawing all of its objections.

Please know that Plaintiffs do not seek the reproduction of any of the monthly statements of any of the putative class members' relating to the Sample.

Please also advise whether there is a means to produce some or all of the putative class member's information in native format without the need for taking screen shots.

**F. Second Set of Class Discovery**

Lastly, regarding Plaintiffs' Second Set of Post-Removal Discovery, Plaintiffs are certainly willing to consider amending the discovery requests, if necessary, to avert objections. In this connection, I am willing to set-up a meet-and-confer anytime this week so let me know. At present, discovery responses are due on Wednesday, December 5, 2018.

**G. Mediation**

Plaintiffs remain willing to mediate this matter on a class wide basis. Plaintiffs are willing to share the costs equally to engage a private mediator, if requested. Please advise if the Bank has reconsidered its position.

I would appreciate receiving a response to the items raised in this letter no later than COB Wednesday, November 28 in light of my briefing obligation due this Friday, November 30. Thank you for your immediate attention to this matter.

Sincerely,
SHENKAN INJURY LAWYERS, LLC.

Richard Shenkan
*Attorney for Plaintiffs*

11/26/2018 MON 13:36   FAX   ☑001

```
**************************
*** FAX MULTI TX REPORT ***
**************************


JOB NO.              2365
PGS.                 4


TX/RX INCOMPLETE     -----
TRANSACTION OK       12159882757
                     19083336230
ERROR                -----
```



6550 Lakeshore St., West Bloomfield, MI 48323
Phone: (800) 601-0808 • Fax: (888) 769-1774
rshenkan@shenkanlaw.com

November 26, 2018

**Via Fax and E-Mail**

Alfred W. Putnam, Jr., Esq.          Scott Parker, Esq.
Michael P. Daly, Esq.                Jim Berg, Esq.
Drinker Biddle & Reath, LLP.         Fred Hoensch, Esq.
One Logan Square                     Marissa Edwards, Esq.
Suite 2000                           PIB Law
Philadelphia, PA  19103              270 Davison Ave.
                                     Somerset, NJ 08873

RE:   *Flynn, et al. v. M & T Bank,* No. 17-4806.

Dear Counsel:

      After reviewing the Bank's most recently filed memorandum (Doc.135)(hereafter "Brief"), I am writing to obtain clarification and to address several issues.

### A. Documents Ordered at Court Hearing to be Produced to Plaintiffs' Counsel

      To date, while the hearing has occurred more than thirty (30) days ago, Plaintiffs have yet to receive the documents which the Court ordered to be produced:

  1) The computer systems operations manuals "for the software that's involved" as described in Hearing Transcript, p. 64-65 ("I'm going to direct that operations manuals for the software that's involved, whether it's AutoIMS or the other software programs, be provided, if they exist."). Hearing Transcript, 65:5-8.

  2) The spreadsheet(s) which the Bank referenced on page 6 of its Brief (Doc.135);

  3) The Agent Coverage Fees Excel Spreadsheet described in Hearing Transcript, p.



**Phone:** 866-977-9779
**Web:** www.spectrumforensics.com

Richard Shenkan
Shenkan Injury Lawyers, LLC.
6550 Lakeshore St.
West Bloomfield, MI 48323

November 30, 2018

Re: <u>**DEF Memo Clarifying Objections Made During 10.26.19 Evidentiary Hearing 11.19.18**</u>

In my review of the document "<u>**DEF Memo Clarifying Objections Made During 10.26.19 Evidentiary Hearing 11.19.18**</u>" (the "Memo"), I identified two sets of language that I believe lacks necessary precision and both of these appear on Page 6.

The first set of language appears in the first complete paragraph (the second paragraph, if you include the paragraph continued from the prior page). It is as follows:

"M&T is therefore able to withdraw its objection to producing these new properly truncated spreadsheets in their native Excel format with metadata intact, and is in the process of preparing those documents for production."

Metadata, in the context of e-discovery, includes properties within (internal metadata) and external to the document in question. There is internal metadata for different types of documents; in terms of an Excel file this would include, among others, the "Author", "Created", "Last Modified", "Last Printed", "Company", and "Last Modified By". In terms of external metadata, this includes, but is not limited to, the user from whose computer the file originated, the four file-system dates of the Excel file as it resided on M&T's systems, its name, and its folder/path location. Importantly, the metadata of the original Excel file should be provided, as the revised-and-truncated version would have different results than the original.

I also am concerned with language that appears in the next paragraph on Page 6 of this Memo and it is as follows:

"For example, one spreadsheet (Bates No. M&T008200) contains 23,308 lines of data and 15 columns of data. At the Court's instruction, M&T's counsel will delete 23,298 lines of data relating to other customers (including metadata relating to those customers), and produce a revised Excel file consisting of 10 lines, with 15 columns, all of which either contain column headings or relate solely to the named plaintiff(s)."

First, the use of the word "lines" adds some level of ambiguity to terms associated with Excel files and used elsewhere in this Memo. I believe the term "lines" refers to "rows". Also, it is unclear why ten (10) rows of data would be produced for the four Representative Plaintiffs. Only if the column headers consume 6 rows in the Excel file does this make sense. This ultimately will be revealed upon the production of this Excel file, but it is concerning that four parties' data and a column header would consume 10 rows of an Excel file.

Secondly, to the extent this Excel file, Bates No. M&T008200, contains data responsive to any of the class members, the natively produced Excel file should include those as well. Any cells in the Excel file containing an individual's PII (personally identifiable information), such as their name, address, phone, SSN, etc. should be deleted. This eliminates any potential breach of such data. Even with 24,000 rows of data, deleting such data would take a matter of minutes; that is the elegance of

**EXHIBIT**

tabbies

2



Phone: 866-977-9779
Web: www.spectrumforensics.com

working natively in Excel. And, performing a quality check to confirm this, similarly, should require a very limited amount of time.

Defendant also should produce **all** the data for the four-named Plaintiffs and present in the original Excel file, including all PII data, data currently resident in the unmodified version of the Excel file, including column headers. This then will provide both the Plaintiff and the Court visibility into the nature of the data that will have been deleted from the original version of the Excel file.

One final topic is a more macro-related one and relates to the second production set of 19,000 TIF pages, representing 57 documents. I believe it would be consistent with what was discussed at the evidentiary hearing for the metadata of the 57 documents to be produced. This metadata already will be resident in the litigation database hosted by Defendant's discovery vendor, due to its production from an Outlook mailbox file. Downloading this information is a common activity in cases like this. This will evidence (i) the large gaps consumed by the all-black TIFs of the Excel-file attachments, creating the artificial inflation of the 19,000 page document production and (ii) the inefficiency of using this methodology. This, then, too will provide context for what has been produced to date, including the Excel file discussed above, Bates No. M&T008200.

Lastly, the Bank claims that remote access to its computer systems is unnecessary and intrusive. However, the Bank has placed itself in a position where it needs to plainly show where the potentially relevant data is stored and how it can be retrieved for reporting. I have made considerable efforts to discuss, with the Bank's counsel and its (present) E-Discovery Liaison, how the Bank's relevant computer systems/software applications operate, both (i) to learn how the relevant information is stored and can be retrieved and (ii) to better understand its objections to the pending discovery requests. To date, these efforts have been met in an "unhelpful" manner, at best, especially given the Defendant's presence in an industry where reporting, even at a granular level, is part-and-parcel to its normal, everyday operations.

I remain available to discuss these or any other technical matters with M&T Bank representatives and/or the Court. I also remain willing to participate in a meet-and-confer regarding any discovery-related matters.

I state these opinions within a reasonable degree of professional certainty.

Yours truly,

J. Stott Matthews