IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD R. FLYNN, GENE DAISEY, DOUGLAS J. ABBOTT, and CATHERINE HOSICK, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>MANUFACTURERS AND TRADERS TRUST COMPANY a/k/a M&T BANK,<br><br>　　　　Defendant. | CIVIL ACTION<br><br>CLASS ACTION<br><br>No. 2:17-CV-04806-WB |

## DECLARATION OF PLAINTIFFS' E-DISCOVERY LIAISON STOTT MATTHEWS

To the Clerk:

This Declaration of Plaintiff's E-Discovery Liaison Stott Matthews is filed in support of Plaintiff's Motion for Sanctions (ECF 216), Motion for Leave to Amend Complaint (ECF 211), and the pending discovery disputes.

　　　　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　SHENKAN INJURY LAWYERS, LLC.
　　　　　　　　　　　　　　　　_/s/ Richard Shenkan_
　　　　　　　　　　　　　　　　Richard Shenkan
　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this motion was sent to all counsel of record on October 23, 2020 via the Court's electronic court filing (ECF) system.

　　　　　　　　　　　　　　　　SHENKAN INJURY LAWYERS, LLC.
　　　　　　　　　　　　　　　　_/s/ Richard Shenkan_
　　　　　　　　　　　　　　　　Richard Shenkan
　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD R. FLYNN, GENE DAISEY, DOUGLAS J. ABBOTT, and CATHERINE HOSICK, individually and on behalf of all others similarly situated, | CIVIL ACTION |
| Plaintiffs, | CLASS ACTION |
| v. | No. 2:17-CV-04806-WB |
| MANUFACTURERS AND TRADERS TRUST COMPANY a/k/a M&T BANK, | |
| Defendant. | |

## DECLARATION OF PLAINTIFFS'
## E-DISCOVERY LIAISON, STOTT MATTHEWS

I, Stott Matthews, declare and state as follows:

### Introduction

1. I serve as Plaintiffs' e-discovery liaison in the above captioned matter. I am competent to testify as to the matters contained in this Declaration if called upon to do so.

2. On July 15, 2020, I participated in the Court-ordered, telephonic e-discovery conference. This conference was adjourned due to the schedule of Mr. Frederick Surface, Defendant's newly appointed e-discovery liaison.

3. Mr. Surface has been involved with certain of the Bank's discovery responses and he has demonstrated an in-depth understanding of many of the Bank's systems. However, Mr. Surface was not able to answer several key questions about the Bank's systems for which he did not have subject matter expertise. I understand that that the Bank is not willing to produce anyone else to speak about the computer systems in question, and that it is offering to re-submit Mr. Surface as

1

their e-discovery liaison again (at the continuation of the e-discovery conference), even though he admitted he could not answer certain questions.

4. I write to provide my professional observations and conclusions, based on critical, newly revealed facts from the conference that call into question the Bank's burdensome objection regarding a 20% class sample (roughly 1,000 files), let alone a full class-wide production of only approximately 5,000 files.

5. Critical points impacting essentially all aspects of Plaintiff's requested production are: (1) that the Bank is in the business of managing significant amounts of client data; and, (2) that it must do so in an industry with significant regulatory requirements in terms of the management and reporting of that data.

## The Bank's Representations Regarding E-discovery are not Accurate

6. Several new and very crucial pieces of information were gained from Mr. Surface's responses to questions raised during the July 15th e-discovery conference. Several of these responses relate to the extraction of data from most of the systems of relevance to the claims of this matter.

7. Admissions made by Mr. Surface at the recent (though incomplete) e-discovery conference, as well as the Bank's production of database information, reveal that arguments advanced by the Bank regarding the alleged burdensomeness of producing all of the putative class members' Electronically-Stored-Information ("ESI") are not based in fact, including:

   a. The purported need to take screen shots of information, which the Bank represented to the Court and Plaintiffs' counsel was necessary (no screen-shots need to be provided);

   > *Note*: Exemplars of "screen shots" which the Bank produced in discovery are attached as **Exhibit 1**. Several of these screen-shots illustrate how the information is distorted because the scroll bar cannot show all of the data in one image. Providing the database of information with column-header

> labels in Excel or another flat-file format would have avoided this "problem" created by the Bank.

b. The claim that there would be an inordinate amount of money and manual time needed to redact personally identifiable information (PII) from putative class member's ESI that is stored in database format (database information for the entire class can be readily computer queried and produced in Excel spreadsheet compatible format, with all PII pre-redacted via query).

8. The Bank made the following extreme and contrived claim in its Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Discovery and Impose Sanctions, filed on 10/1/18:

> Despite Plaintiffs' apparent disbelief, the following facts are not in dispute: There are approximately 3,946 potential members of the classes, 20% of which is 789 individuals. M&T's production relating solely to the four named plaintiffs yielded almost 19,000 pages (about 4,750 pages per plaintiff). By extrapolation, the same production for 789 more customers would yield just under **four million pages of documents**, which would undoubtedly take **thousands of hours** of internal bank employee and outside counsel time to produce as each class member must be searched for manually.[12] (Emphasis added).
>
> Footnote 12. Indeed, as Plaintiffs are aware, some of M&T's databases do not have the ability to generate reports or other "outputs" for their documents and, as such, **M&T has had to manually screen-shot each screen in the databases for each named Plaintiff**.

*Def. Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Discovery and Impose Sanctions, ECF 110, p. 16-17 and fn 12.*

9. This claim was repeated in the Bank's 9/10/18 letter to Magistrate Judge Lloret:

> [A]s M&T previously explained in its July 13, 2018 letter to Judge Beetlestone, the 20% sampling initially proposed in the scheduling order is simply not feasible.
>
> Approximately 3,946 members of the putative classes have been identified, 20% of which is 789 individuals. Plaintiffs have requested the following for each of those 789 individuals:
>
>> All documents, including electronically stored information and autoIMS documents, that in any way refer, relate to, or discuss any of the putative class members or their repossessed vehicles, and all communications with any entity that provided goods or services in connection with the repossession, storage, transportation, repair, reconditioning, retitling, and/or sale (including sale preparation) of the putative class member'(s) repossessed vehicles.

3

> M&T's production of the documents relating solely to the four named plaintiffs using the broad parameters of the paragraph above has yielded approximately 19,000 pages of mostly irrelevant documents (approximately 4,750 pages per plaintiff). The same production for 789 additional customers would yield approximately *four million pages* of documents, which would take thousands of hours of internal bank employee and outside counsel time to produce.

See, 9/10/18 letter to Magistrate Judge Lloret, p. 2.

10.  These representations are not accurate for several reasons listed below as well as those set forth in my Supplemental Report, (attached hereto as **Exhibit 2**, ECF 153-1).

### Bank's Conversion of Excel Data to Tiff Format
### Misrepresented that Class wide Discovery would be Burdensome

11.  First (for purposes of background), as I have opined in my Supplemental Affidavit, *supra.*, the 4-Million-page extrapolation was a manufactured and contrived figure, due to the Bank failing to provide Excel spreadsheets in their native format. Instead, the Bank produced 48 Excel sheets as 17,993 separate TIFF files. The Bank then redacted all information except for that relating to the named Plaintiffs, resulting in mostly black pages. This is one of the most egregious discovery abuses I have witnessed in over fifteen years of work dealing with electronic discovery.

12.  Judge Lloret compelled production of the spreadsheets in their native format, limited to the cells relating to the Representative Plaintiffs. I reviewed the Bank's file production and authored a supplemental affidavit which detailed exactly how the Bank performed this discovery abuse. *Id.* Among the details include as follows:

> On May 11, 2018, **the Defendant produced 17,993 separate TIF image pages** ("TIF Production"). This production, as we only later learned, related to email of some as yet unknown number and named custodians. On December 5, 2018, pursuant to Court Order, Defendant then produced 24 Excel-compatible files (the "Excel Files" in their native format, ones previously produced as TIFs, though excluding certain metadata (hereafter "Excel Production"). **The Excel Production comprised 99.4% of the total pages/files produced from the TIF Production. This Excel Production set could be easily printed on 48 pages.** It contains content pertaining to Douglas Abbott and Catherine Hosick, but not the other two Representative Plaintiffs.
> …

4

> The Bank originally produced this [1" x 6"] file [depicted in report] as **6,325-pages of single file TIF images** in the TIF Production. … The Excel file's data relates to one named Plaintiff, Catherine Hosick, and could have easily been presented in the 2-column x 13-row table shown below. **This is one Excel page for 6,325 TIF pages** (**1:6,325 Page Ratio**).

*Id.*, p. 1-2; Emphasis added.

13. Other graphics in my report detail how a 3-page Excel spreadsheet was converted to 2,015 pages by the Bank, and how the Bank converted another 3-page Excel spreadsheet to 2,180 pages. *Id.,* p. 3-5.

<b>Bank's Failure to Provide Database Information in<br>Native Form and Unnecessary Use of "Screen-shots"</b>

14. The Bank took screenshots of various systems' screens and then manually redacted the PII of the named Plaintiffs, claiming (wrongly) that it could only produce the data in screen-shot format. ECF 110, p. 17, n 12 (cited in ¶8 above). This has been born out to simply not be true. The database information underlying the user interface could have been readily produced with select, query-based extractions of the databases' information in a flat-file format such as CSV (comma separated values).

15. After the Bank made this representation, the Bank produced most (or perhaps all) of the database information in Excel for the named Plaintiffs on March 18, 2019, a feat which the Bank and its counsel previously claimed was not possible. "**M&T has had to manually screen-shot each screen in the databases for each named Plaintiff**." *supra.*, p. 3, ¶8. This production clearly illustrates how it did not need to spend the time and resources to produce these screen-shots. I submit that the time and money associated with this "screen-shot" production was simply

yet another effort to manufacture a burdensome objection regarding the production of information to inflate the efforts ostensibly needed for a sample.[1]

16. There is no need to produce screen-shots of putative class members' data, as such system-based information can be provided in flat-file format (CSV, etc). I am available to work with the Bank's IT and business staff to review any queries needed to pull the data for the putative class members – a task which should easily be performed with minimal staff, time, and resources.

**"Auto" Exclusion via of Personally Identifiable Information via System Query/Search**

17. It is my understanding that the Stipulated Discovery Confidentiality Order (ECF 22) protects against disclosure of PII, and therefore, the Bank is not required to redact same. The Bank, however, manually redacted PII unnecessarily.

18. The Bank claimed that this "redaction" process and the ostensible need to print-out screen shots of databases, when applied to the Representative Plaintiffs, would render the production unduly burdensome and sought to reduce the sample size of the number of files from 20% to 10%.

19. This representation is inconsistent with the Defendants' E-Discovery Liaison's statements during the July 15, 2020, telephonic e-discovery conference, at which he confirmed that the Bank has the capability to exclude PII during the data-extraction process, using tailored queries. This means that the Bank can produce the database information of *all* putative class members without PII – all by query.

---

[1] There is a question whether all of the information was provided relating to the subject expenses and the charge-off related data. The most efficient means to ascertain this is if I have the opportunity to observe the Bank's computer systems to track the relevant data from its sources to the reporting and GL (general ledger/accounting) systems. Plaintiff's counsel has requested the aid of a remote access view to the Bank's computer system, subject to the Court's Confidentialit Order (ECF 22). I understand the Bank has summarily denied this reasonable request.

20. It is important to note that this is not surprising. The Bank's business requires the "slicing and dicing", so to speak, of its clients' data for a myriad of customer-related and regulatory/reporting requirements, and the type of very modest data-extraction requested by Plaintiffs should be nothing but commonplace and easy to implement. This is particularly true given the fact, as I understand, that all roughly 5,000 class members have already been identified.

### Bank's Failure to Provide ESI of Named Plaintiffs in Conformity with Prior Orders

21. The Court's 1/11/18 Order, ¶6, calls for the production of:

> [A]ll documents, including electronically stored information and AutoIMS documents, that in any way refer, relate to, or discuss any of the putative class members or their repossessed vehicles, and all communications with any entity that provided goods or services in connection with the repossession, storage, transportation, repair, reconditioning, retitling, and/or sale (including sale preparation) of the putative class member'(s) repossessed vehicles.

22. This demand is also reiterated in the Court's 4/13/18 Order, ¶2 as follows:

> Defendants shall provide Plaintiffs with all documents referenced in this Court's January 11, 2018 Scheduling Order, including all electronically stored information, for all Plaintiffs, including Douglas Abbott by April 27, 2018.

23. By letter dated May 14, 2018, the Bank's counsel affirmatively represented to Judge Beetlestone that: "By May 11, 2018, M&T fully complied with the document production required by the Court's April 13 Order." **Exhibit 3**.

24. This representation to the Court also was not accurate.

25. By letter dated September 11, 2020, the Bank's counsel stated:

> M&T's next supplemental document production predominantly consists of approximately 1,100 spreadsheets wherein one or more of the named plaintiffs' data appears - similar in form to spreadsheets previously produced by M&T - along with data associated with other M&T accounts/customers which has been deleted rather than redacted (as you previously requested). The supplemental

7

production will also include the corresponding emails to which those spreadsheets were attached.

26. I reviewed many of the Excel files produced by Defendants containing data for the named Plaintiffs. Document-level metadata places their creation in the years 2013 to 2017 range, with similar years for their Printed dates. It is my understanding that the Bank has provided no explanation for this delayed 1,100 Excel-file production of September 11, 2020.

### Client-Data production – Class Wide Data Export without Sampling

27. Another critical outcome of the July 15, 2020 e-discovery conference was the clarification of the ostensible need for sampling due to its burdensome nature. Specifically, according to the Bank, a minimal sampling of client data is all that should be required because production of all the clients' data in the class, with all PII excised, (purportedly) would be too burdensome. This does not comport with how data can be efficiently extracted from database and similar systems like those at the Bank.

28. Based on my professional experience, the computer time for running such a query for the entire class of only (approximately) 5,000 people versus only 500-1,000, for a financial institution with the sophistication and size of M&T Bank is *de minimis*.

29. I expect that the time to write and implement the query and then report on its results, for either size, would be less than two days, though this is a topic I would like to further discuss with the Bank's E-Discovery Liaison, as the Bank claims that it needs to provide such information on a "rolling basis," and to have time for a "quality review" examination process. No explanation for, or detail on, this need to produce the discovery on a "rolling basis" or the basis and criterium for a "quality review" has been sufficiently provided. Based on my understanding of what is involved for the production of database information (e.g., Locus) with, auto-redaction of PII, and

the batch-print/export of FileNet documents, a rolling production is not needed, as this information and/or files can be processed and produced in a matter of days.

30. The most time-consuming process is identifying the class members, which allegedly already has been performed, though may need to be updated. The time needed to determine the clients to be assigned to the sample is more arduous and complex to prevent any skew in the results (and subsequently expensive) than simply running the query on the entire set of 5,000 class members. Moreover, providing all database information would moot the issues of a statistically reliable sample and stratification which has resulted in considerable debate.

31. As already noted, it is extremely important to appreciate that M&T Bank is in the business of inputting, maintaining, processing, and reporting its clients' data and this includes the approximately 5,000 customers in the class. Given the very small number of clients in play, the processing and exporting of the entire class's electronic records should truly be a relatively trivial matter for the systems in play for this billion-dollar, publicly traded, multi-state bank.

### Client-Data production – Retail Installment Sales Contracts and Disclosure Notices Scanned into FileNet

32. One of the categories of information for which Mr. Surface lacked knowledge related to the Bank's files stored in a system called FileNet. Based on my reading of documents produced by the Bank, FileNet is the system used by the Bank to store what is commonly called "unstructured" data or what can be called 'loose files'. In this case, this would include electronic versions of documents received or sent by the Bank, including scanned versions of documents that were originally paper and subsequently scanned.

33. Regarding these FileNet files, Mr. Surface could not confirm that these files were organized by account number, though this method was noted in the system user guide for FileNet. (M&T039739, M&T039752). I understand that the Bank's counsel has confirmed that it can batch

print (and this would include batch print to PDF file, if not already in that format) the critical documents (the subject disclosure notices including the Notices of Repossession and Post-Sale Notices, and Retail Installment Sales Contracts ["RISC"]) for all class members, except some retail installment sales contracts from 2009 and prior.

34. I further understand that because the template letters of all statutory disclosure notices purportedly have been provided, along with the exemplar RISCs identified in discovery (sample RISC attached as **Exhibit 4**), an alternative to batch printing is to have the critical information on these documents (i.e., the "Finance Charge" and the "Amount Financed" on each RISC for each putative class member), information that already is almost certainly in the Bank's queriable systems, be provided by way of an affidavit, as sum totals, to determine minimum statutory damages pursuant to 13 Pa. C.S. §9625(c)(2). This damage information has already been retrieved and set forth in a spreadsheet (the "Flynn Spreadsheet") that the Defendant claims is protected by work-product; however, such shows that this data can be readily calculated for the putative class.

## The Continuation of the E-Discovery Conference

35. At the resumed e-discovery conference or hearing, I would like to learn the following information:

   a. The practicability and time-frame (search methodology, specific source of the relevant data, format of files, PII auto-redaction capability) for the Defendant's compliance with the Court's Order dated 1/11/18[2] regarding the production of certain information (and detailed below) from either selected or all of the putative class members' files.

---

[2] The 1/11/18 Order calls for the production of:

> [A]ll documents, including AutoIMS / Auto Auction Services Corp. documents, that in any way refer, relate to, or discuss a potential class member(s)' and/or their repossessed vehicle(s), including all electronically stored information], all communications with any entity that provided goods or services in connection with the repossession, storage, transportation, repair, reconditioning, and/or sale of a potential class member's repossessed vehicle; and/or the reinstatement of any loan related to a repossessed vehicle.

> ***Plaintiffs seek focused, targeted and highly relevant data which can be readily identified and produced***. In this regard, Plaintiffs would like to reduce the scope of the court-ordered production described in the 1/11/18 order for the selected sample to include limited ESI of all putative class members in a flat-file format (i.e., Excel compatible), limited to readily retrievable database information, for a truncated class period from September 22, 2011 through May 13, 2019, inclusive, with all PII auto-redacted. These results should likely be obtained via a computer query and batch print/export production within a two (2) day process.
>
> This process would exclude all e-mails and miscellaneous spreadsheets. (As already noted, the e-mail production performed by the Bank at the outset of this litigation which resulted in 19,000 pages of essentially all-black (redacted) TIFF production, was unnecessary and consumed significant time and resources for both Parties.)

b. Why the information contemplated in "a.", above, would need to be provided on a "rolling basis" with a "quality review" examination process as claimed by the Bank, the time-frame needed, and the amount of data anticipated by the Bank to be provided, and on what periodic basis (weekly, etc.). This subject would include a discussion about the criteria and staffing the Bank expects to employ relating to its anticipated "quality review" process and the need to have such a procedure, and the time needed to prepare and run a query for 500 or 1,000 class member's loans versus the entire class of approximately 5,000.

c. How the following expenses/charges are populated in the Notices of Repossessions (sample template showing datapoints – **Exhibit 5**) and Post-Sale Notices (sample template showing datapoints – **Exhibit 6**) from September 22, 2011 through May 13, 2019, inclusive, and how these data points are input in and can be retrieved from the various databases and the Bank's general ledger: (a) "collection charges;" (b) "expense of repossessing the Vehicle;" (c) "expense of storing the Vehicle;" (d) "storage Expenses;" (e) "Expense of preparing/repairing the Vehicle for sale;" (f) "sale preparation expenses;" and, (g) "Other expenses: (Specify)."

d. How the challenged disclosure notices and RISCs are stored and how they can be batch exported or printed to PDF file, the variables involved in this process, and whether the Bank has already retrieved this information for the putative class members (i.e., when it provided the RISC templates and exemplars in connection with discovery answers provided to date).

e. The most efficient means to retrieve data from the Bank relating to the following subjects, limited to the time period from September 22, 2011 through May 13, 2019, inclusive:

   i. the identification of all repossessors and auto auctions (hereafter "Third Parties") who repossessed and/or sold putative class members' vehicles;

11

  ii. the fees/expenses these Third Parties assessed (or, with the Bank's permission were permitted to assess) to putative class members and/or the Bank for any of the following services: (a) the redemption of a repossessed vehicle; (b) the reinstatement of a borrowers' loan after repossession; (c) the retrieval of personal property left in a repossessed vehicle by a borrower or his/her agent; (d) any administrative services; and/or (e) for the storage of a repossessed vehicle (collectively "Services");

  iii. the Bank's payment to, or collection for, Third Parties regarding the "fees" or "expenses" in connection with these Services; and,

  iv. the finance charge amount of a putative class member (required to calculate statutory minimum damages pursuant to 13 Pa. C.S. 9625(c)(2))

f. Whether the Bank will provide the underlying schema for the database information it provided in discovery, so that we can better understand what each database heading/field relates to and, if not, why not.

g. Information about the "Rapids" database, a system M&T used for repossessions prior to Locus, whether it contains information related to the named plaintiffs or putative class members, the data points in the database by field name, and the process for extracting relevant data from Rapids.

h. Regarding the Bank's databases, particularly the Locus, Shaw, and Columbia Ultimate database systems, and AutoIMS software, I would like to know the following:

  1. As stated in Randy Surface's Declaration "…some of the (expense) data in Locus…is imported directly from AutoIMS and therefore reflects the categorization given to the data by AutoIMS and not M&T." (Doc. 167-2, p. 7, ¶ 12). A discussion as to how the AutoIMS expenses are mapped into the Bank's systems, and particularly whether the notes and other means to record expenses, fees, and redemption/reinstatement information is exported into the databases such that it can be readily queried and extracted is warranted. I also would like an explanation of how the components of the "Total Repo Expenses" in Locus are derived and whether and how the data points for the "charge-offs" are populated in each of the databases, and the criteria used in each of the databases to calculate the charge-off amounts.

  2. A full explanation (the Bank's previous explanations have been contradictory) as to why the Excel spreadsheet for the Columbia Ultimate database (M&T 047010) produced for the named plaintiffs has data fields labeled "EXPSTORVEH" and "EXPPRE/REP" that are blank. The Bank has claimed that data is input into Columbia Ultimate database only when an account is charged off prior to the notice being drafted, and the plaintiffs' accounts were not charged off when this occurred. However, this

       contradicts the Bank's prior explanation that this data is input if the account was charged off after the date of repossession. Additionally, other information is inputted into the Columbia Ultimate database after the repossession date and after the date the notice is drafted, so it is unclear why the data fields "EXPSTORVEH" and "EXPPRE/REP" would only be entered if the account was charged off prior to those dates.

   i. Where the drafts of all of the missing policies and procedures that allegedly which were "saved over" may be stored and can be retrieved and whether a forensic review of the Bank's computer system (as requested in Plaintiff's discovery request) would be the most practical way to retrieve them.

   j. What has been done, and what is currently being done, by the Bank to identify and produce the above information and any other relevant ESI that may exist relating to the named Plaintiffs and putative class members.

   k. In connection with the above, the time period when the Bank queried the databases for the named Plaintiffs' information, what queries were used, whether any results were not produced, and documentation of the queries.

   l. What has been done, and what is currently being done, by the Bank to identify and produce other relevant ESI that may exist relating to the issues involved in this case, including but not limited to internal emails between Bank employees, and emails between Bank employees and Third-Parties, regarding storage of repossessed vehicles and fees for same, prepare/repair expenses, personal property fees, administrative fees and other relevant fees that were charged to the Bank's customers or listed in the subject statutory Notices.

36. Based on the Bank's prior misrepresentations and less than forthcoming answers, the best option would be for the Bank to demonstrate, by remote computer-access, at a resumed e-discovery conference, its computer systems and how it can pull relevant data from its databases. I suggest that the conference be recorded and marked "confidential," pursuant to the Court's Confidentiality Order (ECF 22).

## Conclusion

37. My arguments and conclusions regarding the clients' data in the classes have been consistent since the beginning of my participation in this matter. The Bank's business and regulatory requirements necessitated its adoption and use of systems, long ago, to efficiently input, maintain, process and report on the data within them. After the October 2018 evidentiary hearing

with Judge Lloret, at the July 2020 e-discovery conference call, we learned for the first-time of the Bank's capability to produce database information via query that excluded PII information; this revelation further underscores the Bank's meritless position regarding burdensomeness. Rather, the key ESI elements are available via the efficient extraction and production of data from the Bank's systems using queries, batch files, and similar, system-based solutions readily available to the Bank. This efficient option is clearly something the Bank has not pursued absent the motions and related filings made to the Court.

38. The information for the entire class can be readily provided in flat-file (CSV, Excel friendly) format, with the PII excluded in a processing-based manner. The cost and time to generate this information for the full class is quite likely less than that needed to run the analytics etc. needed to identify a robust and representative subset (i.e. the sample) of the class data. Moreover, apart from actually being less burdensome to produce, a full dataset would provide reliability and ensure that all of the damage information is provided. I would not be surprised to learn that the Bank already has all this information in detail, so it could determine the potential materiality of this case, potentially necessitating its disclosure in its financials.

39. Loose documents/files, in the unstructured data in FileNet, similarly should be able to be produced via batch production. As with the vast majority of relevant data in this matter, a system-based means of identifying and producing this information should be available.

40. In my opinion, (i) the Bank's failure to be forthright regarding its abilities to electronically and efficiently produce relevant ESI for the approximately 5,000 class members (and to do so relatively quickly), and (ii) its manner of producing ESI (including the 19,000 page fiasco (which could have been produced in 48 Excel sheets/tabs) and unnecessarily taking screen shots) and (iii) providing same on a rolling basis of the named Plaintiffs despite court orders to

have provided such information two years ago have both independently and collectively caused considerable obstruction and delay in the discovery process.

41.  I am available to discuss any of these observations and conclusions with the Court. I state these opinions within a reasonable degree of professional certainty. I reserve the right to amend this report as additional information becomes available.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10-23-2020

J. Stott Matthews