IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD R. FLYNN, GENE DAISEY, | ) | |
| DOUGLAS J. ABBOTT, PERCY CHAPMAN, | ) | CIVIL ACTION |
| and JANENE CHAPMAN, individually and on | ) | |
| behalf of all others similarly situated | ) | CLASS ACTION |
| | ) | |
| Plaintiffs, | ) | Case No. 2:17-cv-04806-WB |
| | ) | |
| v. | ) | |
| | ) | |
| MANUFACTURERS AND TRADERS | ) | |
| TRUST COMPANY a/k/a M&T BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS'
<u>AMENDED MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

I.  FACTUAL BACKGROUND AND PLAINTIFFS' CLAIMS…………………………………..1

   A.  M&T Sent Notices of Repossession to Plaintiffs and Thousands of
      Putative Class Members that were Based on Standard, Form Templates -
      All of which Contain the Spurious "Prepare/Repair" Expense……………………………1

   B.  Plaintiffs' Claims………………………………………………………………………….3

        1.  Uniform Fictional $200 Prepare/Repair Expense in Every NOR…………………..3

        2.  Unincurred and/or Inflated Storage Expenses in Every NOR……………………...9

        3.  Impermissible and Undisclosed Fees to Borrowers that Redeemed
            or Reinstated………………………………………………………………………...13

II.  DAMAGES………………………………………………………………………………...14

III. THE CLASSES SHOULD BE CERTIFIED……………………………………………16

   A.  Burden for Certification………………………………………………………………16

   B.  Form Notice Class Actions……………………………………………………………16

   C.  Requirements of FRCP 23……………………………………………………………18

        1.  The Class is Sufficiently Numerous that Joinder is Impossible…………………19

        2.  There are Questions of Law and Fact Common to the Class……………………19

        3.  The Class Representatives' Claims are Typical of the Class Claims……………21

        4.  The Named Plaintiffs are Adequate Class Representatives……………………...22

        5.  Predominance, Superiority, Fairness, Efficiency, & Manageability……………24

        6.  The Classes are Readily Ascertainable…………………………………………27

IV.  CONCLUSION…………………………………………………………………………...30

## TABLE OF AUTHORITIES

### Cases

*Antonik, et al v. First National Community Bank, et al.*
    13-CV-4438 (Lackawanna County 2013)……………………………………………17

*Baby Neal for and by Kanter v. Casey*
    43 F.3d 48 (3rd Cir. 1994)………………………………………………………..19

*Beck v. Maximus, Inc.*
    457 F.3d 291 (3d Cir. 2006)…………………………………………………………16

*Bonett v. Educ. Debt Servs., Inc.*
    2003 WL 21658267 (E.D. Pa., 2003)……………………………………………20, 26

*Bordeaux v. LTD Fin. Servs., L.P.*
    2017 WL 6619226 (D.N.J. 2017)……………………………………………………22

*Brennan v. Community Bank*
    13-CV-02939 (M.D. Pa. 2016)……………………………………………………...17

*Byrd v. Aaron's Inc.*
    784 F.3d 154 (3d Cir. 2015)………………………………………………………27

*Califano v. Yamasaki,*
    442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)…………………………………16

*Carrera v. Bayer Corp.*
    727 F.3d 300 (3d Cir. 2013)………………………………………………………27

*Chakejian v. Equifax Info. Servs. LLC*
    256 F.R.D. 492 (E.D. Pa. 2009)……………………………………………………14

*Cliett v. City of Phila.*
    1985 WL 3181 (E.D. Pa. 1985)……………………………………………………..26

*Cooley, et al. v. FNB, et al.*
    03-CV-10010 (Lawrence County 2003)……………………………………………17

*Cosgrove v. Citizens Auto Finance, Inc*
    2011 WL 3740809 (E.D. Pa. 2011)……………………………………………7, 8, 17

*Cruz v. Citadel*
    200501167 (Phila Co., 2020)………………………………………………………17

*Dudo v. Capital One Finance N.A.,*
    296-2020-CD (CCP Jefferson County, 2020)………………………………………...7

*General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*
    55 F.3d 768 (3rd Cir. 1995)………………………………………………………22

*Good v. Nationwide Credit, Inc.*
    314 F.R.D. 141 (E.D. Pa. 2016)……………………………………………………17

*Haggerty v. Citadel Fed. Credit Union*
    11-cv-11003725 (Philadelphia County 2011)………………………………………17

*Hartt v. Flagship Credit Corp.*
    10-CV-0822 (E.D. Pa. 2010)………………………………………………………17

*Hayes v. Wal-Mart Stores, Inc.*
    725 F.3d 349 (3d Cir. 2013)……………………………………………………....27
*In re Hydrogen Peroxide Antitrust Litig.*
    552 F.3d 305 (3d Cir. 2008), as amended (Jan. 16, 2009)……………………………16
*Indus. Valley Bank and Trust Co. v. Nash*
    349 Pa.Super. 27, 502 A.2d 1254 (Pa.Super.Ct.1985)…………………………….7, 8
*Jackson v. Southeastern Pa. Trans. Authority*
    260 F.R.D. 168 (E.D. Pa. 2009)………………………………………………….19
*Jordan v. Commonwealth Fin. Sys., Inc.*
    237 F.R.D. 132 (E.D. Pa. 2006)………………………………………………...17
*Keele v. Wexler*
    149 F.3d 589 (7th Cir.1998)…………………………………………………....20
*Langer v. Capital One Auto Finance*
    2:16-cv-06130-HB and ECF 109 (E.D. Pa., 2019)………………………………....17, 25
*Marcus v. BMW of North America, LLC*
    687 F.3d 583 (3d. Cir 2012)……………………………………………………16, 27
*Maszgay, et al., v. First Commonwealth Bank*
    15-CV-686 (Jefferson County 2018)………………………………………………17
*McCall v. Drive Fin. Services, L.P.*
    236 F.R.D. 246 (E.D. Pa. 2006)…………………………………………………17
*McCall v. Drive Financial Services, L.P.*
    00005 (Phil. CCP. January Term 2006)…………………………………………7
*Nat'l Football League Players Concussion Injury Litig.*
    821 F.3d 410 (3d Cir. 2016)……………………………………………………21
*New Directions Treatment Servs. v. City of Reading*
    490 F.3d 293, 313 (3d Cir. 2007)…………………………………………………22
*Orloff v. Syndicated Office Systems, Inc.*
    2004 WL 870691 (E.D. Pa., 2004)……………………………………………16, 20
*Phillips Petroleum Co. v. Shutts*
    472 U.S. 797 (1985)……………………………………………………………....24
*Piper v. Portnoff Law Associates*
    215 F.R.D. 495 (E.D. Pa. 2003)…………………………………………………20
*In re Processed Egg Prod. Antitrust Litig.*
    312 F.R.D. 171 (E.D. Pa. 2015)…………………………………………………27
*In re Ins. Brokerage Antitrust Litigation*
    579 F.3d 241 (3rd Cir. 2009)……………………………………………………24
*Rodriguez v. Nat'l City Bank*
    726 F.3d 372 (3d Cir. 2013)……………………………………………………17, 20
*Ryan v. Tidewater Finance Co.,*
    03529-2017 (Phil. CCP, 2018)…………………………………………………7
*Saunders v. Berks Credit & Collections, Inc.*

2002 WL 1497374 (E.D. Pa., 2002)……………………………………………………20
*Savoy v. Beneficial Consumer Disc. Co.*
    503 Pa. 74, 468 A.2d 465………………………………………………………..15, 16
*Simonson v. American Heritage Fed. Credit Union*
    No. 11003762 (Philadelphia County 2011)……………………………………17
*Spry v. Police & Fire Fed. Credit Union*
    11-cv-110900007 (Philadelphia County 2011)…………………………………17
*Stewart v. Abraham*
    275 F.3d 220 (3rd Cir. 2001)…………………………………………………19
*Szczubelek v. Cendant Mortgage Corp.*
    215 F.R.D. 107, 119 (D.N.J.2003)………………………………………………22
*Vista Healthplan, Inc. v. Cephalon, Inc.*
    2015 WL 3623005 (E.D. Pa., 2015)……………………………………………27
*Zawislak v. Beneficial Savings Bank*
    11-cv-110303622 (Philadelphia County 2011)…………………………………17

## <u>Statutes</u>

1 Pa.C.S. §1932(a)……………………………………………………………....8

1 Pa.C.S. §1932(b)……………………………………………………………...8

12 Pa.C.S. §6254(c)(2)……………………………………………………....passim

12 Pa.C.S. §6256…………………………………………………………………14

12 Pa.C.S. §6256(2)………………………………………………………...6, 13, 14

13 Pa.C.S. §1103(b)………………………………………………………………15

13 Pa.C.S. §1201(b)(20)……………………………………………………...8, 13

13 Pa.C.S. §1304……………………………………………………………...8, 13

13 Pa.C.S. §9102…………………………………………………………………28

13 Pa.C.S.A. §9611…………………………………………………………………14

13 Pa.C.S §9611(b)………………………………………………………….passim

13 Pa.C.S. §9610(b)………………………………………………………….passim

13 Pa.C.S. §9614………………………………………………………5, 6 11, 14

13 Pa.S.C.A. §9614(3)…………………………………………………………5

13 Pa.C.S. §9615(a)(1)……………………………………………………….passim

13 Pa.C.S. §9623(b)………………………………………………………….passim

13 Pa.C.S. §9623(b)(2)……………………………………………………….14

13 Pa.C.S. §9625……………………………………………………………passim

13 Pa.C.S. §9625(a)………………………………………………………..15, 16

13 Pa.C.S. §9625(c)(2)……………………………………………………15, 22

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**AMENDED MOTION FOR CLASS CERTIFICATION**

## I. FACTUAL BACKGROUND AND PLAINTIFFS' CLAIMS

### A. M&T sent Notices of Repossession to Plaintiffs and Thousands of Putative Class Members that were Based on Standard, Form Templates – All of which Contain the Spurious "Prepare/Repair" Expense

During the amended class period of September 23, 2011 through May 13, 2019 ("Class Period"), inclusive, M&T sent standardized form Notices of Repossession ("NORs") to the Representative Plaintiffs and Class Members alike which *all* included the challenged "Prepare/Repair" fee. Each NOR provided an itemized lists of amounts required to redeem their repossessed vehicle (i.e., to pay the entire amount due), or to reinstate their loan (i.e., to bring loan current). The NORs sent by M&T to the Plaintiffs and putative class members were based on five (5) templates used by M&T during the Class Period.[1] **Exhibit 8**[2], M&T047066-069 ("NOR Template 1"), 047074-075 ("NOR Template 2"), 047076-079 ("NOR Template 3"), M&T047080-085 (NOR Template 4"), and 047092-094 ("NOR Template 5")(irrelevant Templates excluded).

The Representative Plaintiffs' NORs (**Exhibit 20**) are consistent with and based on one of these NOR Templates. Flynn and Daisey's NORS (defined in the SAC as "Form 1 NOR") are substantially similar to those NOR Templates 1, 2, or 3. Using Daisey's NOR as an example, the "Redemption" section of the Form 1 NOR states, in pertinent part:

> "You can get this Vehicle back at any time before we sell it by paying us the full amount you owe (not just the past due payments), **including our expenses**. To redeem the Vehicle you must pay the total redemption amount set forth below to .

---

[1] As shown in the template exhibits below, these were blank templates with database field names for each amount, thus they were form documents with the personal information for each recipient merged into the letter.

[2] Exhibits are in a contemporaneously filed Appendix, which contains the exhibits for both this Brief and Plaintiffs' Counsel's Declaration.

. . at any time prior to the sale of the Vehicle (which may occur at any time after 15
days from the date of this notice):

| | |
|---|---|
| Past Due Payments: | $750.68 |
| Accrued cate charges: | $ 61.60 |
| Collection charges: | $   0.00 |
| Expense of repossessing the Vehicle | $  85.00 |
| Expense of Storing the Vehicle | $  175.00 (5 days at $35.00 per day) |
| Expense of preparing/repairing the Vehicle for sale | $  200.00 |
| Other expenses:  (Specify) | $     0.00 |
| **Total redemption amount**: | $1,572.28 |

[Emphasis added].

Abbott and Chapmans (formerly Hosick)' NORS (defined in the SAC as "Form 2 NOR")
are substantially similar to those NOR Templates 4 and 5. (**Exhibit 8**). Using Abbott as an
example, NOR Templates 4 and 5 contain a separate and distinct "redemption" and "reinstatement"
of loan" options – both options of which include the "Prepare/Repair" Fee. Abbott's NOR
contains, *inter alia*, a section titled: "Getting the Vehicle Back for Less" which states:

To reinstate the Contract and get the vehicle back for less than the full amount you
owe, you must pay the total reinstatement amount set forth below to . . . at any time
before the sale of the Vehicle (which sale may occur at any time after 15 days from
the date of this notice):

| | |
|---|---|
| Past Due Payments: | $   655.32 |
| Accrued late charges | $    40.28 |
| Collection charges: | $     0.00 |
| Expense of repossessing the Vehicle | $   195.00 |
| Expense of storing the Vehicle | $  75.00 (3 days at $25.00 per day) |
| Expense of preparing/repairing the Vehicle for sale | $   200.00 |
| Other expenses: (specify) n/a | $     0.00 |
| Total Reinstatement Amount: | $1,165.60 |

The NOR Templates 4 and 5 contain a further provision titled "Right to Redeem" which
states "You also have the right to get the Vehicle back at any time before we sell it by paying us
the full amount you owe (not just the past due payments) including our expenses ('redeem')",
[Emphasis added] followed by an itemization of the amount required to redeem, including specific

line items for "Storage expenses" in the amount of $75 (based on the per diem rate stated in the reinstatement itemization above), and "Sale preparation expenses" in the amount of $200.00. *Id.*

Even though the NOR Templates 1-5 have minor differences, these are inconsequential, as the Templates all contain the same defect: the inclusion of a spurious "prepare/repair" fee which principally forms the basis of Amended Classes 1 and 2. [3]

## B. Plaintiffs' Claims

### 1. <u>Uniform Fictional $200 Prepare/Repair Expense in Every NOR</u>

In every NOR sent to Plaintiffs and putative class members, M&T uniformly listed a completely fictitious, unincurred $200 amount as an "Expense of preparing/repairing the Vehicle for sale" or "sale preparation expenses" ("Prepare/Repair Expense"). M&T has admitted that it does not list the actual amount incurred, as of the date of the date the NOR was sent, for preparing/repairing the vehicle for sale, and instead lists a <u>uniform</u> $200 amount. M&T has admitted that this was a (uniform) "estimate" or "placeholder" for some possible future contingent expense which might be incurred if the borrower redeems or reinstates his loan. (See **Exhibit 10**, M&T's Amended Response to Interrog. No. 13 of Plaintiffs First Set of Post-Removal Discovery; See also, **Exhibit 11,** 30(b)(6) dep., pp. 47-48, 111-112, 188-189, 192-194, 213-214). Kenneth Fries, Vice President and Process Improvement Manager at M&T, explained the importance of the NOR conveying accurate, unambiguous information, but acknowledged that that the $200 Prepare/Repair Expense is not a representation of any actual fee incurred by the Bank; that the NORs in question did not specify that the $200 Prepare/Repair Expense was a "placeholder" or "estimate" of potential charges that might be incurred, someday; and that if there was no expense

---

[3] The Amended Classes are set forth in the Declaration of Plaintiffs' Counsel and Affidavits of Class Representative Plaintiffs in Support of Plaintiffs' Amended Motion for Class Certification (ECF 372).

to prepare or repair the vehicle for sale, then the amount listed in the NORs as the redemption/reinstatement amount would be "overstated" or "overinflated" if not actually incurred. (**Exhibit 21,** Fries dep at pgs. 12, 44-45, 60, 68, 69, 76, 97, 99, 101, 103-104, 120, 134, and 226). Similarly, Deborah Peck, who served in various roles in the Repossessions Department and Collections Department at M&T since 2008, most recently as Supervisor of the Repossessions Department, also testified that the $200 Prepare/Repair Expense is an estimate of potential costs that may be incurred in the future to prepare the repossessed vehicle for auction. (**Exhibit 22**, Peck dep., p. 186). Thomas Thornton, an employee in M&T's customer asset management department and who worked as a remarketing specialist, also admitted that the $200 prepare/repair expense in the NORs was simply an estimate. (**Exhibit 23**, Thornton Depo., pp. 17-20, 74-75).

As Plaintiffs Complaint alleges, the UCC independently, and *in pari materia* with the MVSFA only allow expenses *actually incurred by M&T as of the date the NORs were sent* to be listed as part of the amount required to redeem/reinstate. Even assuming, that the use of such an arbitrary "placeholder" or "estimate" was otherwise legally permissible (which it is not), the NOR's improperly characterized this fee as an "expense". Indeed, the NORs specifically advises that this amount will have to be paid in order to redeem/reinstate ("As of the date of this notice, the amount required to redeem the Vehicle is:" and "To redeem the Vehicle you must pay the total redemption amount set forth below … Plus any expenses incurred and less any refunds received after the date of this notice." (**Exhibit 8**)).  It is also important to note that the NORs state that the borrower must pay the full amount the borrower owes in order to redeem "including our expenses." Thus, M&T explicitly states in the NORs that the amounts listed are its actual expenses (as required by the UCC and MVSFA), when M&T was actually listing amounts that it had not incurred.

Plaintiffs plead several theories of liability under the UCC individually and *in pari materia* due to M&T's inclusion of this fictitious $200 Prepare/Repair "Expense" in the NORs, giving rise for monetary, declaratory, and other equitable damages pursuant to 13 Pa. C.S.A. 1103 and 9625.  A review of the applicable law demonstrates the ease of establishing class liability, which likely will be an issue for summary judgment.

### *First Theory of Liability*

M&T violated the UCC 13 Pa.C.S.A. §§9614, 9623(b) and 9615(a)(1). Thirteen Pa. C.S.A. 9623(b) provides:

> **Requirements for redemption. --**To redeem collateral, a person shall tender:
> (1)  fulfillment of all obligations secured by the collateral; and
> (2)  the reasonable expenses and attorney fees described in section 9615(a)(1) (relating to application of proceeds).

13 Pa. C.S.A. §9615 provides:

> The reasonable <u>expenses</u> of retaking, holding, preparing for disposition, processing and disposing and, to the extent provided for by agreement and not prohibited by law, reasonable attorney fees and legal expenses <u>incurred by the secured party</u>."

*13 Pa. C.S.A. §9615(a)(1) (Emphasis added).*  Pursuant to these statutes, M&T's NORs can only include expenses <u>actually incurred</u> by M&T.[4]  The inclusion of the made-up $200 Prepare/Repair Expense in the NORs violates the UCC. This is a straightforward class-wide violation that does not require any fact intensive analysis or showing of "commercial reasonableness" as an element of liability. Liability under the UCC does not require any showing of harm to the putative class members, or any reliance. Rather, "<u>every</u> noncompliance with the requirements of Part 6 in a consumer-goods transaction results in liability, <u>regardless of any injury</u>

---

[4] The "safe harbor" language contained in 13 Pa. S.C.A. 9614(3) contains langue further clarifying that only expenses **actually incurred** by the secured creditor can be passed on to the borrower. ("You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses." 13 Pa. S.C.A. 9614(3)).

that may have resulted." Official Comment 4 to 13 Pa.C.S. §9625 (Emphasis added). Further, the "notice requirement protects the debtor, and therefore should be construed strictly." *White & Summers, Uniform Commercial Code§*34-12(b)(5th ed.).

Plaintiffs have pled subset theories of liability asserting that as a result of these class-wide UCC NOR violations, M&T has acted in a per se commercially unreasonable manner in violation of 13 Pa.C.S. §9610(b), and has failed to provide a "reasonable authenticated notice of disposition [i.e., NOR]" in violation of 13 Pa.C.S. §9611(b).[5]

### *Second Theory of Liability*

Plaintiffs' second Prepare/Repair Expense theory of liability is that listing the fictitious $200 Prepare/Repair Expense violated the MVSFA, 12 Pa.C.S. §§6254(c)(2) and 6256(2). These violations of the MVSFA, in turn, constitute per se violations of the UCC, 13 Pa.C.S. §§9610(b) and 9611(b). Twelve Pa.C.S. §6254(c)(2) requires that a NOR include "An itemized statement of the total amount required to redeem the motor vehicle by reinstatement or payment of the contract in full [i.e., by redemption]." Twelve Pa.C.S. §6256(2) and (3) state that if a motor vehicle is repossessed other than by legal process, "the buyer shall be liable for costs incurred by the holder in retaking, storing and repairing the motor vehicle only IF… (2) The costs are actual, necessary and reasonable… [and] (3) The costs are supported by receipts or other satisfactory evidence of payment." As stated above, M&T included unincurred amounts in its NORs. This Court has previously held:

> Under Pennsylvania law, "[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable." 13 Pa. Cons.Stat. §9610(b). Furthermore, "a secured party that disposes of collateral under §9610 (relating to disposition after default) shall send...a reasonable authenticated notification of disposition." 13 Pa. Cons.Stat. §9611(b). The Pennsylvania Uniform

---

[5] Note that Plaintiffs' claims under 13 Pa.C.S. §§9614, 9615(a)(1), and 9623(b) do not require a showing of unreasonableness or commercial unreasonableness.

Commercial Code ("UCC") does not define "reasonable" notice, but Pennsylvania courts define the term by looking to statutes governing vehicle finance and repossession. *See Indus. Valley Bank and Trust Co. v. Nash,* 349 Pa.Super. 27, 502 A.2d 1254, 1263 (Pa.Super.Ct.1985). The relevant section of Pennsylvania's Motor Vehicle Sales Finance Act ("MVSFA") states:

[w]hen repossession of a motor vehicle, which is the subject of an installment sale contract, is effected otherwise than by legal process, the holder shall immediately furnish the buyer with a written 'notice of repossession' .... [that] shall set forth the buyer's right as to reinstatement of the contract, if the holder extends the privilege of reinstatement and redemption of the motor vehicle [and] shall contain an itemized statement of the total amount required to redeem the motor vehicle.

69 Pa. Cons.Stat. § 623D; *see Nash,* 502 A.2d at 1263 (nothing that Article 9 and the MVSFA should be construed together).

*Cosgrove v. Citizens Auto. Fin., Inc.*, 2011 WL 3740809, at *1 (E.D. Pa., 2011); *See also, McCall*

*v. Drive Financial Services, L.P.*, 00005 (Phil. CCP. January Term 2006)("The UCC does not

itself define what is "reasonable" but looks to other sources for definition. The MVSFA is the

Pennsylvania statute designed to cover repossessions and protect consumers from abuses…."). A

creditor's failure to comply with the MVSFA is per se commercially unreasonable.[6] *See Dudo v.*

*Capital One Finance, N.A.*, 296-2020-CD (CCP Jefferson County, 2020) (citing *Ryan v. Tidewater*

*Finance Co.*, 03529-2017 (Phil. CCP, 2018)). (**Exhibit 24**). Here, M&T's violations of the

MVSFA renders M&T's conduct per se commercially unreasonable in violation of 13 Pa.C.S.

§9610(b), and these violations also render the NORs per se unreasonable in violation of 13 Pa.C.S.

§9611(b).

---

[6] Further, even if such a violation did not render the notices commercially unreasonable "per se", any commercial reasonableness analysis of the notices would be the same classwide, with no individualized issues, because the violation is class wide.

### *Third Theory of Liability*

M&T violated the UCC and MVSFA *in pari materia* by including the made-up $200 Prepare/Repair Expense.[7] Repossessors of vehicles, such as M&T, are required to comply with both the MVSFA and the UCC, which must be applied *in pari materia. Indus. Valley Bank & Trust Co. v. Nash*, 349 Pa. Super. 27, 502 A.2d 1254 (1985). "Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things" and should be "construed together, if possible, as one statute". 1 Pa.C.S. §1932(a) and (b). The MVSFA and the UCC both set forth notice requirements for secured parties who conduct self-help repossessions (other than by legal process with writ of replevin). *See Cosgrove, supra,* 2011 WL 3740809, at *1. These statutes relate to the same persons or things and/or to the same class of persons or things – i.e., borrowers whose vehicles were repossessed outside the judicial process. Plaintiffs claim that M&T violated the MVSFA and the UCC (as set forth above) by including the $200 Prepare/Repair Expense in the NORs. And because the statutes are *in pari materia*, M&T is subject to damages under the UCC for all such violations.

### *Fourth Theory of Liability*

Lastly, M&T Bank failed to fulfill its obligation of good faith under the UCC, which requires <u>honesty in-fact</u> and the observance of reasonable commercial standards of fair dealing. 13 Pa.C.S. §§1201(b)(20); 13 Pa.C.S. §1304. Listing unincurred, completely fictitious expenses, and the resulting inaccurate amount required to redeem/reinstate, is not honesty in-fact. Listing fictitious expenses in the NOR is also not consistent with the clear terms of the RISCs (See RISC

---

[7] This is in contrast to the second theory, which is that a violation of the MVSFA is a violation of the UCC because it is a per se commercially unreasonable act.

templates attached as **Exhibit 6**), nor with the "our expenses" language in the NORs.[8] Thus, M&T failed to act in accordance with its obligation of good faith.

All of these theories of liability are straightforward, are based on class wide conduct, and the facts and law at issue are common across the putative class. There are no individualized issues in these claims.

### 2.   Unincurred and/or Inflated Storage Expenses in Every NOR

In every NOR sent to Plaintiffs and the putative class members, M&T included an itemized amount for purported storage expenses as part of the amount required to redeem/reinstate. The amount is stated as a total with the number of days and a set daily storage rate in parentheses. For example, Plaintiff Daisey's Notice of Repossession lists "Expense of storing the Vehicle: $175.00 (5 days, at $35.00 per day)", and Plaintiff Abbott's Notice of Repossession lists "Expense of storing the Vehicle: $75.0 (3 days, at $25.00 per day" as part of the reinstatement amount, then shortens it to "Storage expenses: +$75.00" under the "Right to Redeem" section.

The Storage Expenses listed were not incurred by M&T at the time the NORs were sent. The evidence in this case shows that M&T's contracts with its repossession vendors provide M&T with an initial period of free storage during the class period – typically ten (or more) free days, but *at least* three free days. (**Exhibit 18**, Vendor Contract Table; **Exhibit 25**, email from M&T

---

[8] Also, M&T violated its Obligation of Good Faith by violating M&T's Code of Business Conduct and Ethics (SAC, Exhibit 1), including Section 5 of such code, which states in part: "Obeying the law, both in letter and in spirit, is the foundation on which M&T's ethical standards are built…M&T Personnel should endeavor to respect the rights of and deal fairly with M&T's <u>customers</u>,…M&T personnel should not take unfair advantage of, or exert undue influence over, anyone through manipulation, <u>concealment</u>, abuse of privileged information, <u>misrepresentation of material facts</u> or any other intentional unfair-dealing practice." (Emphasis added). The Bank's Corporate Designee, Michael Ryan, stated in its deposition on April 13, 2021 that this Code of Business Conduct and Ethics (referencing Ex. 1 of SAC) applies throughout the putative class period. (**Exhibit 11**, 30(b)(6) dep., p. 16). "The creditor who defines its responsibility had better follow its own rules." White and Summers, *Uniform Commercial Code*, §24-12(d)(5th Ed. 2002).

employee Bob Franz to vendors; **Exhibit 26**, Affidavit of Carin Trice; **Exhibit 27**, Affidavit of Donald Dayton.) This was confirmed by M&T employee, Deborah Peck. (See, **Exhibit 22**, Deborah Peck dep., pp. 105-108, 250-253); *See also,* **Exhibit 11**, 30(b)(6) dep., p. 146-147). Further, auctions never charged M&T for storage. (**Exhibit 11**, 30(b)(6) dep., p. 111-112). Because the vehicles were normally redeemed/reinstated or moved from the vendors' lots before the expiration of M&T's free storage period, M&T almost never incurred storage fees from a vendor when a class member redeemed/reinstated. Plaintiffs have located only three accounts in the revised sample – Sampled Account No.'s 29, 92, and 473 – where M&T had incurred Storage Expenses at the time the NORs were sent. These accounts were anomalies involving storage liens on abandoned or impounded vehicles. However, even the NORs M&T sent for these accounts failed to list the actual impound storage fee M&T incurred. (**Exhibit 28**, NORs and Invoices for Accts. 29, 92 and 473). Not a single sample NOR in the Revised Sample complied with the law.

When the consumer borrowers redeemed/reinstated, they would be charged for all days that the repossessed vehicle was stored by the repossession vendor, however M&T did not contractually incur these storage amounts. Deborah Peck testified that during the first few years of the class period, M&T's repossession vendors collected the Storage Expenses (as well as any redemption fees and personal property fees) directly from borrowers who redeemed/reinstated. Then, in mid-2013, M&T changed this procedure so that M&T would act as the collection agent for these Storage Expenses (as well as any redemption fees and personal property fees) on behalf of their repossession vendors. In this regard, M&T would have its repossession vendors invoice it for storage, and would then either (1) collect these charges from the borrower prior to the redemption/reinstatement, and then turn them over to the vendors, or (2) advance these fees to the vendors and then collect these charges from the borrowers. (See, **Exhibit 22**, Peck dep., pp. 106-

112, 188-190; **Exhibit 25**, email from M&T employee Bob Franz to vendors.  This also comports with the redemption documents M&T produced for the sample.[9]

Thus, M&T only actually incurred storage fees from its repossession vendors if the vehicle remained on the repossessors lot after the expiration of its free storage period, as shown in the attached invoices. (**Exhibit 28**; See also, **Exhibit 11**, 30(b)(6) dep., p. 146-147). This was not stated in the NORs as required.  And after M&T's free storage period expired, M&T was charged a lower daily storage rate than was charged to its borrowers that redeemed/reinstated.

Plaintiffs plead several theories of liability under the UCC individually and *in pari materia* with the MVSFA due to M&T's inclusion of this purported Storage "Expenses" in the NORs, giving rise for monetary, declaratory, and other equitable damages pursuant to 13 Pa. C.S.A. §§1103 and 9625.

### *First Theory of Liability*

First, M&T violated the UCC, specifically 13 Pa.C.S. §§9614, 9615(a)(1), and 9623(b) by listing unincurred Storage Expenses in the NORs.

Like the prepare/repair expense, this unincurred storage expense is also a straightforward class-wide violation of the UCC, independently, and of the UCC and MVSFA *in pari materia*. As stated above, liability under the UCC does not require a showing of harm to the putative class members (Official Comment 4 to 13 Pa.C.S. §9625). Plaintiffs have also pled subset theories of

---

[9] Per the sample discovery, there were several different redemption templates (forms from M&T telling the third party what to charge the borrower) utilized by M&T during the class period. During the early part of the class period M&T used forms that stated "AGENT IS TO COLLECT FROM CUSTOMER" followed by check boxes for the fees to be collected from the borrower, e.g., "repo & storage fees", "storage fees", etc. (**Exhibit 9**). These fees were not incurred by M&T. During the latter part of the class period, M&T used forms that stated either "M&T has obtained payment from the customer as follows" or "AGENT IS TO INVOICE BANK ALL FEES OWED BY CUSTOMER" followed by the amount of the fees. (**Exhibit 9**).

liability that, as a result of these class-wide NOR violations, M&T has per se acted commercially unreasonable in violation of 13 Pa.C.S. §9610(b), and has failed to provide a "reasonable authenticated notice of disposition [i.e., NOR]" in violation of 13 Pa.C.S. §9611(b). Although, the UCC imposes strict liability and the specific amount of the incorrect fees does not have to be shown, Significantly, all NOR Templates do not state that the per diem storage expense is *location* or *time* specific (i.e., only pertains to the time period when the repossessed vehicle is located at the repossessor's lot, not the auction) or that it ends once the repossessed vehicle is moved from the repossessors' lot to the auction. All NOR Templates properly state that the borrower can redeem "at any time prior to sale of the Vehicle," which dictates that the per diem storage rate would accrue. Plaintiffs list the total amounts from the sample to show the magnitude of M&T's violations.  The Amended Sample Data Table ("ASDT") (**Exhibit 7**), shows that M&T:

(a)  <u>Listed</u> storage fees of $38,865.00 in the NORs of the revised sample even though the Bank routinely enjoyed free storage from its repossessors or repossession brokers for the time periods listed in the NORs;

(b)  <u>But only incurred</u> storage fees <u>as of the date of the NOR</u> on only three (3) accounts of the revised sampled accounts as listed in the Table in which the repossessed vehicle was sold[10], an amount of $2,660.00 as of the date of the NOR. Even for this account the amount listed in the NOR was not accurate;

(c)  <u>Paid</u> storage fees on only twelve (12) sample accounts, as listed in the ASDT in which the repossessed vehicle was sold, totaling $3,464.00;

(d)  Did not pay for any storage <u>($0) at auctions</u> as a matter of policy and practice, which runs contrary to its "per diem" storage rate representation in each of its NORs at issue (**Exhibit 11**, 30(b)(6) dep., p. 111-112).

(e)  Applying the per diem storage fees as stated in the NOR to the time period from the date of repossession through the date of sale of the repossessed vehicle, the excess amount is $ 497,916.47 just for the 10% sample, equating to an additional (overcharge) of approximately $4,979,164.70 for the entire class.

---

[10] This data is limited to accounts where the vehicle was sold because the borrowers were charged the storage fees upon redemption/reinstatement, charged either directly by the vendor or via M&T acting as a collection agent for the vendor.

### *Second Theory of Liability*

The Storage Expenses claim is also based on distinct violations of the MVSFA, which constitute per se UCC violations. Because the Storage Expenses listed in the NORs as part of the amount required to redeem/reinstate were not incurred and were not actual, necessary, and reasonable, they violate the MVSFA, 12 Pa.C.S. §§6254(c)(2) and 6256(2). This renders the NOR's per se commercially unreasonable in violation of the UCC, 13 Pa.C.S. §9610(b), and also renders the NORs per se unreasonable in violation of 13 Pa.C.S. §9611(b).

### *Third Theory of Liability*

Third, M&T violated the UCC and MVSFA *in pari materia* by listing unincurred Storage Expenses in its NORs. The MVSFA and UCC similarly set forth notice requirements for secured lenders and relate to the same class of persons (borrowers whose vehicles were repossessed outside the judicial process). Because M&T violated both the UCC and the MVSFA as set forth above, and because the statutes are *in pari materia*, M&T is subject to damages under the UCC for all such violations.  Again, these violations render the NORs per se commercially unreasonable in violation of the UCC, 13 Pa.C.S. §9610(b), and also violates 13 Pa.C.S. §9611(b).

### *Fourth Theory of Liability*

Lastly, M&T failed to fulfill its obligation of good faith which requires honesty in-fact and the observance of reasonable commercial standards of fair dealing. (13 Pa.C.S. §§1201(b)(20), 1304). Listing storage expenses in the NORs for days that M&T received for free from its repossession vendors is not honesty in-fact, nor is permitting its repossession vendors to charge its borrowers a daily storage rate that was higher than M&T would incur (after expiration of the initial free storage period that M&T received).

All of these theories of liability are straightforward, and the facts and law at issue are common across the putative class. There are no individualized issues in these claims.

### 3.  Impermissible and Undisclosed Fees to Borrowers that Redeemed or Reinstated

This undisclosed fee claim is tangential to Plaintiffs' main NOR claims, but is included as an additional factor rendering M&T's actions per se unreasonable class wide. M&T's contracts with its repossession vendors permit them to charge a fee to borrowers who redeem/reinstate or get their personal property back ("Redemption Fees" or "Administrative Fees" and "Personal Property Fees"). These fees that are not actual, necessary, or reasonable and are not actually incurred by M&T, thus, requiring them as a precondition to getting their vehicle or personal property back violates the UCC, 13 Pa.C.S. §§9615(a)(1) and 9623(b)(2)), individually, and *in pari materia* with the MVSFA (12 Pa.C.S. §6256), which as stated above, only permits reasonable expenses incurred by M&T to be charged to borrowers in order to redeem/reinstate.

M&T employees Thomas Thornton and Deborah Peck testified that the Bank permitted vendors to assess charges for Personal Property Fees, Redemption Fee, and an Administrative Fee to the borrowers who exercised their right of redemption, despite the fact that these fees were not stated in the NORs. (**Exhibit 22**, Peck dep. p. 192-194, **Exhibit 23**, Thornton dep. at pgs. 124-129) The contracts between M&T and its vendors have attached fee lists that show that third-party vendors routinely charged one or more of these fees. (**Exhibit 19**). Because these fees were not listed in the NORs, the total amount listed to redeem/reinstate was inaccurate, which is a violation of the MVSFA, 12 Pa.C.S. §6254(c)(2), that requires NORs to require an itemized statement of the total amount required to redeem/reinstate the vehicle.

## II.  DAMAGES

Plaintiffs and the putative class members are entitled to recover statutory minimum damages under the UCC for M&T's failure to comply with the UCC requirements of 13 Pa. C.S.A.

§§9610(b), 9611, 9614, 9623(b), and 9615(a)(1) independently and *in pari materia* with 12 Pa. C.S. §§6254(c)(2) and 6256(2), as applicable.[11]

Thirteen Pa.C.S. §9625(c)(2) entitles consumer borrowers such as Plaintiffs and putative class members to recover statutory minimum damages of not less than the credit service charge plus 10% of the principal amount of the obligation or the time-price differential plus 10% of the cash price. The two figures needed to compute these statutory damages (finance charges and loan amount) appear on the face of each borrower's retail installment sale contract. The Official Comment 4 to 13 Pa. C.S.A. §9625(c) makes clear that the minimum statutory damages do not require any actual loss, but instead create strict and uniform liability for "every noncompliance … regardless of any injury that may have resulted."

Plaintiffs also request equitable relief pursuant to 13 Pa.C.S. §1103(b), expressly permitting principles of equity to supplement its provisions, and 9625(a) which states:

> **(a) Judicial orders concerning noncompliance.** If it is established that a secured party is not proceeding in accordance with this division, <u>a court may order or restrain collection</u>, enforcement or disposition of collateral on appropriate terms and conditions. (Emphasis added.)

As part of this permanent restraint, and as part of Plaintiffs' request that this Court "[g]rant such other and further relief as may be deemed just and proper."[12] (SAC, p. 32), Plaintiffs are requesting that the Court (1) a declaration that the deficiency balances are void and that any refinanced

---

[11] Plaintiffs are no longer seeking actual damages under 13 Pa.C.S. §9625(b). See *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492 (E.D. Pa. 2009), permitting representative plaintiffs to pursue only statutory damages so long as the class notice provided opt out provisions. Notwithstanding the foregoing, Plaintiffs also seek declaratory and injunctive relief.

[12] Unless displaced by the particular provisions of this title [the UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy and other validating or invalidating cause, supplement its provisions. 13 Pa.C.S. §1103(b).

deficiency balance is void,[13] (2) impose a constructive trust on all monies received from any class member as a payment towards a disputed deficiency balance (including refinanced deficiencies[14]) and disgorgement of all such monies, (3) enjoin submission of these deficiencies on Plaintiffs' and class members' credit reports, and (4) require M&T to request a deletion of the tradelines relating to the repossession and alleged deficiency on all class members' credit reports.

## III.   THE CLASSES SHOULD BE CERTIFIED

Plaintiffs' proposed class definitions are set forth in the attached Declaration (ECF 372, incorporated herein).

### A. Burden for Certification

The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence. *Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d. Cir 2012) citing to *Hydrogen Peroxide*, 552 F.3d 305 (E.D.  PA  2008).  District courts have discretion

---

[13] Plaintiffs are no longer relying on *Savoy v. Beneficial Consumer Disc. Co.*, 503 Pa. 74, 468 A.2d 465 as an additional basis for extinguishment of the deficiency balances, but rather on 13 Pa. C.S. §§9625(a) and 1103 and the Court's general power of equity. *Savoy* and its progeny dealt with a different issue and an earlier version of the UCC which was not in effect during the class period. The application and remedies in the UCC must be applied "liberally…to promote its underlying purposes and policies….and to modernize the law governing commercial transactions." *Id*.  In *Savoy,* the Court held that a challenge to the commercial reasonableness of the sale price creates a presumption that the value of the collateral equals the indebtedness secured unless the secured party rebuts the presumption. *Savoy,* 503 Pa. at 78, 468 A.2d at 467. Here, Plaintiffs are not seeking extinguishment of the deficiency balances based on any challenge to the sale price and rebuttable presumption relating to same. At the time *Savoy* was decided, 13 Pa.C.S. §9-507 only allowed a court to restrain "disposition" (i.e., sale) of the collateral. *Savoy* recognized that the UCC at that time was silent as to whether Courts should permit collection of a deficiency balance in the face of a UCC violation. Now, however, Section 9625(a) (former Section 9-507) explicitly provides this Court with the equitable power to restrain the "collection" of the disputed deficiency balances based on any violation of Article 9 of the UCC.

[14] Class discovery will reveal the frequency and amount of the Bank's refinancing of deficiency balances; however, the Bank sent form solicitations to its class members enticing them to do so. (**Exhibit 29)** (Exhibit 17 to SAC)

under Rule 23 to certify a class. *Beck v. Maximus, Inc*., 457 F.3d 291 (3d Cir. 2006); citing to

*Califano v. Yamasaki*, 442 U.S. 682, 703, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

### B.  Form Notice Class Actions

Cases involving the use of form documents are particularly appropriate for class treatment.

*Orloff v. Syndicated Office Systems, Inc.*, 2004 WL 870691 at *3-4 (E.D. Pa., 2004).  Given their

confluence of form documents and uniform and easily determined statutory damages, cases

involving defective repossession notices, like this one, are routinely certified. e.g., *Jordan v.*

*Commonwealth Fin. Sys., Inc.*, 237 F.R.D. 132, 137 (E.D. Pa. 2006) (finding that courts in this

district confer commonality on lawsuits hinging upon standardized mailings of illegal form letters

to members of the proposed class); *Good v. Nationwide Credit, Inc.*, 314 F.R.D. 141, 151–52 (E.D.

Pa. 2016)(finding that actions where the defendants have engaged in standardized conduct towards

members of the proposed class by mailing them allegedly illegal form letter or documents satisfy

commonality). The Court should note that similar UCC post-repossession consumer disclosure

notice class actions have repeatedly been certified in Pennsylvania courts, both state and federal.[15]

---

[15] *See also, Langer, et al., v. Capital One, N.A.,* 2:16-CV-06130-HB, ECF 109 (E.D. Pa. 2019); *Brennan v. Community Bank, 13-CV-02939 (M.D. Pa. 2016); Maszgay, et al., v. First Commonwealth Bank,* 15-CV-686 (Jefferson County 2018); *Antonik, et al v. First National Community Bank, et al.*, 13-CV-4438 (Lackawanna County 2013); *Cosgrove v. Citizens Auto. Finance, Inc.*, 2011 WL 3740809 (E.D. Pa. 2011); *Simonson v. American Heritage Fed. Credit Union*, No. 11003762 (Philadelphia County 2011); *Hartt v. Flagship Credit Corp., 10-CV-0822-NS (E.D. Pa. 2010); Haggerty v. Citadel Fed. Credit Union*, 11-cv-11003725 (Philadelphia County 2011); *Spry v. Police & Fire Fed. Credit Union*, 11-cv-110900007 (Philadelphia County 2011); *Zawislak v. Beneficial Savings Bank*, 11-cv-110303622 (Philadelphia County 2011); *McCall v. Drive Fin. Services, L.P.*, 236 F.R.D. 246 (E.D. Pa. 2006); *Cooley, et al. v. FNB, et al.,* 03-CV-10010 (Lawrence County 2003). Some of these cases were unopposed settlement certifications, however, as the Third Circuit stated in *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013): "[O]ur policy in favor of voluntary settlement does not alter the "rigorous analysis" needed to ensure that the Rule 23 requirements are satisfied. Dukes, 131 S.Ct. at 2551; see also Sullivan, 667 F.3d at 335 ('The same analytical rigor is required for litigation and settlement certification....') (Scirica, J., concurring)."

This case, dealing with the legality of Defendant's form notices, that all contain the same defects discussed above and distributed throughout Pennsylvania, will be very straightforward and ideally suited for class treatment. Upon certification, the merits and damages of this action will likely be inclined towards class-wide resolution by summary judgment. These class claims readily meet the requirements for class certification.

## C. Requirements of FRCP 23

In order for a class action to be certified, Fed. R. Civ. P. 23(a) requires a showing that:

(1)  The class is so numerous that joinder of all members is impracticable;
(2)  There are questions of law or fact common to the class;
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and,
(4) The representative parties will fairly and adequately protect the interest of the class.

Fed. R. Civ. P. 23(b) states that a class action may be maintained if Rule 23(a) is satisfied and (1) the court finds that prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, or (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, or (3)  the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(1) The class members' interests in individually controlling the prosecution or defense of separate actions;
(2) The extent and nature of any litigation concerning the controversy already begun by or against class members;
(3) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,

(4) The likely difficulties in managing a class action.

Each of the requisites for class certification is easily met here.

### 1. The Class Is Sufficiently Numerous That Joinder Is Impracticable

Under the original class definitions, there were approximately 7,324 putative class members who were borrowers or coborrowers on 5,863 loan accounts. (**Exhibit 2**, M&T's Amended Response to Interrogatory No. 9 of Plaintiffs' First Set of Post-Removal Discovery). This amount has been reduced due to Plaintiffs' proposed revised class definitions (ECF 372). Extrapolating from the sample accounts, there are over 4,000 accounts, with a larger number of class members (as some accounts have co-borrowers). Joinder and litigation of individual lawsuits for thousands of class members is impractical. The numerosity requirement is clearly satisfied here.  See *Jackson v. Southeastern Pa. Trans. Authority*, 260 F.R.D. 168, 185 (E.D. Pa. 2009); *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3rd Cir. 2001).

### 2. There are Questions of Law and Fact Common to the Class

Commonality does not require that every question of law or fact be common to every member of the class; rather, the commonality requirement "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class... Because the requirement may be satisfied by a single common issue, it is easily met... Furthermore, class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994) (emphasis in original) (internal citations omitted). In other words, commonality requires that the claims of the class "depend upon a common contention...of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke." *Id*. Commonality can be met even if there are legal and factual differences between class members, so long as they were subject to the same conduct by the defendant. *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382–83 (3d Cir. 2013)

Here, the issues are common across the class, including (1) whether Plaintiffs and the Class entered into a form RISC in Pennsylvania, and financed a motor vehicle primarily for personal, family or household use through M&T, or had their retail installment loan contract was assigned to M&T; (2) whether M&T or its agents repossessed the financed vehicle or ordered it to be repossessed in Pennsylvania; (3) whether the NORs in question violated the UCC independently, violated the MVSFA thus rendering them per se commercially unreasonable in violation of the UCC, and/or if they violated the UCC and MVSFA *in pari materia* by engaging in a systemic misrepresentation of expenses in the NORs; and, (4) The minimum statutory damages for each putative class member. Further, the claims are drawn from the same course of conduct. The form NORs Defendant sent to the Plaintiffs and the putative class members are the same or substantially similar and contained one or more of the same violations of the UCC. (i.e. the $200 estimated prepare/repair expense, and a storage expense greater than $0). *Piper v. Portnoff Law Associates*, 215 F.R.D. 495, 502 (E.D. Pa. 2003). This Court has previously noted:

> Commonality, the second requirement of Rule 23(a), requires a showing of the existence of "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). A single common question is sufficient to satisfy this requirement. *See In re Prudential Ins. Co.,* 148 F.3d 283, 310 (3d Cir.1998). A common question is one arising from a common nucleus of operative facts… "Common nuclei of fact are typically manifest where...the defendants <u>have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents</u>."

*Saunders v. Berks Credit & Collections, Inc.*, 2002 WL 1497374, at *6 (E.D. Pa., 2002), *quoting Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998); *See also, Bonett v. Educ. Debt Servs., Inc.*, 2003 WL 21658267, at *2 (E.D. Pa., 2003); *Orloff v. Syndicated Off. Sys., Inc.*, 2004 WL 870691,

at *3 (E.D. Pa., 2004). This also shows that M&T has met the Rule 23 requirement that it acted or refused to act on grounds that apply generally to the class (i.e., sent NORs to every class member with the same deficiencies), so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

### 3.   The Class Representatives' Claims are Typical of the Class Claims

As with the test for commonality, the test for typicality is not demanding. Its purpose is to "assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees'' interests will be fairly represented" and "to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of absentees." *Baby Neal, supra*. at 57. A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016). The threshold is not high. *Id*.

Here, all of the core claims arise from M&T's (1) statutorily deficient NORs. The statutory requirements are uniform across the class. The Plaintiffs' and putative class members' NORs all contain the same estimated prepare/repair expense that Plaintiffs' claim violates the law. The notices either satisfy the UCC, independently, and/or MVSFA and UCC *in pari materia* or they do not. Each class member, and each Plaintiff, is in the same situation. The Complaint states no claims that are particular to any named Plaintiff such that they would be atypical or antagonistic to any other class member. There is no requirement that Plaintiffs or class members show an injury, and there is no individualized analysis required that would differentiate Plaintiffs and the putative

class members. The statutory damage formula for the insufficient UCC notices is also the same for all class members and Plaintiffs, set out in 13 Pa.C.S. §9625(c)(2).

### 4.  The Named Plaintiffs are Adequate Class Representatives

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interest of the class." Adequacy under Rule 23(a)(4) relates to: (1) whether the proposed class representatives have interests antagonistic to the class, and (2) whether the proposed class counsel has the competence to undertake the litigation at issue. See *General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*, 55 F.3d 768, 800 (3rd Cir. 1995). This element is generally characterized as an inquiry into whether the attorneys together with the named plaintiff will act diligently on behalf of the class and whether any potential conflicts of interest exist or are likely to arise between the named plaintiffs and class members. *Amchem*, 117 S. Ct. at 2251, & n.20.

A class representative need only possess "a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007), citing *Szczubelek v. Cendant Mortgage Corp*., 215 F.R.D. 107, 119 (D.N.J.2003). In assessing the Class Representative's knowledge, the Court considers "the proposed representative's knowledge of the case, interest in and enthusiasm for the litigation and for representing the class, her willingness to respond to interrogatories and depositions, and her understanding of the role and duties of a class representative." *Bordeaux v. LTD Fin. Servs., L.P.*, 2017 WL 6619226, at *4 (D.N.J. 2017). Plaintiffs meet these requirements.

Mr. Daisey understands that he is a named plaintiff in the underlying action and that he represents a class of thousands of people. He also understands what conduct M&T is accused of in this matter.  (**Exhibit  12**, Daisey affidavits; See also, **Exhibit 30**, Daisey dep., p. 116-117, 122,

155-156). Mr. Daisey has been actively involved in the case and stays current on its status. He has attended numerous depositions, including of M&T Representatives, and he is willing to testify.

Mr. Flynn also understands the issues in this case and that he is representing the class. He has spent considerable time reviewing the documents associated with the underlying cause of action, and meeting and/or discussing it with counsel. He understands his responsibility to protect the class, understands that any recovery will have to be approved by the court, and is willing to testify in this matter. **Exhibit 12**, Flynn affidavits; See also, **Exhibit 31**, Flynn dep., p. 35, 130-131, 134, 239-240, 247-256. Flynn is willing to remain informed regarding the status of the case, and has also attended numerous depositions, including of M&T representatives.

Likewise, Mr. Abbott understands that he is representing a class and his responsibilities as a named plaintiff. He understands the issues in this case, that he may have to testify in the matter, and that any settlement requires court approval. He has already spent a considerable amount of time reviewing documents and conferencing with Plaintiffs' Counsel. Mr. Abbott is pursuing this case to help himself and others in his position, and to prevent M&T from sending out NORs in the future that contain "expenses" not incurred by M&T. (**Exhibit 12**, Abbott affidavits; See also, **Exhibit 32**, Abbott dep., p. 116, 117-118, 124-128, 130-131, 192, 247-253, 258, 260-261, 277). Abbott has also attended several depositions in this case. Similarly, Percy and Janene Chapman understand their duties as class representatives and what this case is about.[16] (**Exhibit 12**).

Plaintiff Flynn testified that he was not aware that he had a claim against M&T at the time of his bankruptcy. (**Exhibit 31**, Flynn Dep., p. 243-244). Plaintiff Abbott testified

---

[16] The Chapmans are substitute representative plaintiffs (for former Plaintiff Hosick) and were substituted without any amendments to the operative complaint, as specifically ordered by this Court. (ECF 259, ¶4). No amendments were necessary as the Chapmans were, indisputably, putative class members in the SAC and also are in the Amended Classes.

that he was not aware of his claim against M&T until he talked with Plaintiffs' counsel (**Exhibit 32**, Abbott Dep., p. 91-92), which was after Abbott filed for bankruptcy in 2016. Abbott alerted the Bankruptcy Court to the existence of this case in 2018 when moving to employ special counsel. (**Exhibit 13**). Further, Flynn has amended his bankruptcy petitions to reflect this claim against M&T, despite the Bankruptcy Court and its creditors possessing knowledge of this claim when Affiant was granted leave to represent Mr. Flynn. (**Exhibit 13**). And all monies to satisfy M&T's claim in Abbott's case is being held in escrow. **Exhibit 13**.

Class Counsel is also adequate to represent the class. The undersigned regularly engages in consumer class action litigation similar to the present case, and other complex litigation, and has dedicated substantial resources as set forth in Plaintiffs' Counsel's Declaration. (ECF 372). Mr. Haggerty also comes to this litigation with the qualifications to represent these Amended Classes. See, Affidavit of James Haggerty (**Exhibit 17**).

### 5. Predominance, Superiority, Fairness, Efficiency, & Manageability

A class action is the superior method of resolving large scale claims if it will "achieve economies of time, effort, and expense, and promote…uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 117 S. Ct. at 2246. One reason that a class action is the superior method of proceeding in a case of this type is that it allows the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "requires that common issues predominate over issues affecting only individual class members. *In re Ins. Brokerage Antitrust Litigation*, 579 F.3d 241, 258 (3rd Cir. 2009). Specifically, F.R.C.P. 23(b) requires that the questions of law or fact common

to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.

Here, the central and predominant question of this lawsuit is whether the NORs in question violate the UCC individually and/or the UCC *in pari* materia with the MVSFA. This common question predominates over questions affecting only individual members. The UCC recognizes that the lack of proper notice itself is the injury here, stating that non-compliance with the requirements of a consumer goods transaction "results in liability, regardless of any injury that may have resulted." (13 Pa.C.S. 9625, Cmt. 4). *See e.g.,* the recent approval of a similar class action before Judge Bartle certifying a class action against Capital One Bank, in *Langer v. Capital One Auto Finance*, 2:16-cv-06130-HB (E.D. Pa., 2019), which stated that "the lawsuit principally challenges the content of the post-repossession consumer disclosure notices and is not based on actual harm you may have suffered." (**Exhibit 33**, p. 9 of Class Notice).

These claims have no predominating individualized or fact-intensive questions. These are UCC and MVSFA violations which are readily apparent from the face of the NOR's, admissions by M&T and its employees, and the vendor contracts.[17] All of the subject NORs list a fictitious

---

[17] ECF 372, Declaration of Plaintiffs' Counsel; **Exhibit 18**, Vendor Contract Table; **Exhibit 25**, email from M&T employee, Bob Franz, to repossession vendors; See, also, (**Exhibit 35**, Responses to Interrogatory No. 13 and Requests for Production No.'s 1, 2, and 3); (**Exhibit 21**, Kenneth Fries dep. pp. 68-69, 76, 97, 99, 101, 103-104); (**Exhibit 22** Peck dep. p. 106-109).

$200 Prepare/Repair "Expense" and storage expenses that were systematically <u>not</u> incurred as of the date the NORs were sent. These itemizations inflate, as a matter of practice, the amount required to redeem/reinstate. The existence and amount of each false expense in the NOR's and the resulting incorrect redemption amount does *not* require item-by-item or a complete file analysis. It is the consistent use of these unincurred "expenses" in M&T's **form** NOR's which creates liability for statutory damages under UCC §9625. *Bonett v. Educ. Debt Svcs., Inc.*, 2003 WL 21658267 at *4 (E.D. Pa., 2003).  Further, Plaintiffs also aver theories of liability that the violations alleged render the notices per se unreasonable, and render the disposition per se commercially unreasonable.  Plaintiffs would only have to prove the NOR violations under their theory, without any individualized analysis.

Proceeding as a class in this matter is the most fair and efficient way to litigate these claims. Most members of the putative class are likely unaware that Defendant has violated their legal rights, and therefore, would not seek relief on an individual basis. Members of the class may be unable to locate or hire lawyers experienced in this area of the law. Further, the cost of proceeding on an individual basis would not be practical or economical given the potential size of individual awards. See 7A Wright, Miller & Kane, Federal Practice and Procedure (2d ed. 1986), at 518, §177 (a class action enables those who have small claims that might not be worth litigating individually to combine their resources and vindicate their rights collectively). The fact that putative class members may be unwilling to or unable individually to pursue the relatively small amount of damages to which they may be entitled (versus M&T's endless resources to litigate), weighs in favor of a class action. *Cliett v. City of Phila.*, 1985 WL 3181 (E.D. Pa. 1985). Overall, members of the putative classes will benefit by proceeding on a class basis.

In addition, this forum is particularly appropriate for addressing the claims as a class, as potentially thousands of individual actions for relief would not only burden the courts unnecessarily, but might result in inconsistent interpretations of the UCC and MVSFA, subjecting the individuals to unequal treatment and providing no guidance to businesses as to how they must comply with the UCC, independently, and/or the UCC and MVSFA *in pari materia*. Here, a class action ensures one decision on the applicable law.

This case presents no difficulties that would affect the management of this matter on a class action basis. The claims raised are simple and are based entirely on the operative documents, which are standardized across the class. Defendant's business records contain the identities of class members and the information necessary to calculate their damages. Variations in damages do not defeat predominance. *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 203 (E.D. Pa. 2015); *Vista Healthplan, Inc. v. Cephalon, Inc.*,2015 WL 3623005, at 22 (E.D. Pa., 2015)

**6. The Classes are Readily Ascertainable**

The ascertainability inquiry requires Plaintiffs to demonstrate that a proposed class is "defined with reference to objective criteria," and in Third Circuit cases, that there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 355 (3d Cir. 2013), *citing* Marcus, 687 F.3d at 593-94. The court may not certify a class if it cannot identify class members "without extensive and individualized fact-finding or 'mini-trials.'" *Marcus*, 687 F.3d at 593. But, the ascertainability analysis is exceedingly narrow and wholly distinct from other class certification requirements. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 165 (3d Cir. 2015) *as amended.* Ascertainability demands only that courts be able to identify putative class members, without exacting precision or the capability to find *all* class members at the moment of class certification. *Id.* at 163 (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 fn. 2 (3d Cir. 2013)).

M&T has already provided very specific answers to discovery and detailed information regarding the total number of people who comprise each class, as defined in the SAC. (**Exhibit 2**, M&T's Amended Responses to Plaintiffs' First Set and Second Set of Post-Removal Discovery, Interrog. No. 9). The proposed changes to the class definitions, as discussed herein, do not significantly alter the ascertainability of putative class but instead substantially narrow the scope of potential class members. First, Plaintiffs proposed revised class definitions exclude NOR' that contain neither the $200 prepare/repair fee nor a per diem (daily) storage rate that is greater than $0. And because M&T stopped listing the made-up $200 prepare/repair fee on May 13, 2019, Plaintiffs have proposed that the class period end on May 13, 2019. Second, the new proposed class definitions add the requirement that M&T sent the NOR's to a Pennsylvania address, and the RISC was entered into in Pennsylvania, which further limits the NORs M&T will have to review.

Third, the new proposed class definitions track the definition of "consumer goods" and "consumer goods transaction" from the UCC and specify that putative class members include those that bought the vehicle primarily for personal, family, or household purposes. (See 13 Pa.C.S. §9102). Plaintiffs requested and M&T produced "exemplars of each [RISC] that was assigned to [M&T] at any time during the CLASS PERIOD" (**Exhibit 2**, M&T's Amended Response to Plaintiffs' First Set of Post-Removal Discovery, Request for Production 9) and these templates all have either (1) a check box for whether the vehicle is being purchased for business, agricultural, or "personal, family, or household" (i.e., consumer) use, or (2) a FTC holder rule notice identifying the RISC as a "consumer credit contract" (denoting that the purchase is not for a business use).

Lastly, the revised proposed class definitions and exclude putative class member whose retail installment sales contract contains an arbitration provision or class action waiver, which further narrows the proposed classes.

28

If M&T cannot somehow electronically identify accounts where the NOR's were sent to Pennsylvania addressees and include either the $200 Prepare/Repair Expense or a daily storage rate, or identify these accounts through the mail merge spreadsheets that exist for each template, a quick review of the NOR's – limited to those accounts where the repossessions occurred in Pennsylvania during the relevant period, will confirm whether the accounts meet those elements of the class definitions. It takes only about 15 seconds to review a NOR to determine if it was sent to a Pennsylvania address, and whether it lists the fictional $200 Prepare/Repair Expense or "lists a daily storage rate greater than $0." Moreover, the Third Circuit has explicitly held that "the need to review individual files to identify its members [is] not [a] reason[ ] to deny class certification" and that "To hold otherwise would seriously undermine the purpose of a Rule 23(b)(3) class to aggregate and vindicate meritorious individual claims in an efficient manner." *Byrd*, 784 F.3d at 170-171 (emphasis added). M&T's employee, Frederick Surface, explained how he identified the putative class as defined in the SAC, beginning by locating accounts involving vehicles repossessed in Pennsylvania.

> I created a SQL query for the Locus application (i.e., M&T's system of record for repossession and remarking), that would identify all accounts that met the following criteria:
>
> …
>
> b. The repossession occurred in the Commonwealth of Pennsylvania;
>
> > i. Programming language: "and [RecoveryAddress_State] = 'PA'".
> >
> > ii. Plain English: This means all accounts where the repossession took place in Pennsylvania.
> >
> > iii. Problematic Results and Corrections: This search did not return any accounts with a repossession date prior to May 2012. This is because Rapids (the system M&T used for repossessions prior to Locus) did not have a database field for the location of repossession. As a result, when the data from Rapids was ported into Locus, the "Recovery Address_State" database field was left blank. M&T then ran a supplemental search of a related Locus field that contains this data but pulls from a different data table ([AutoIMS_RecoveryAddress]). For those pre-May 2012 repossession accounts that did not have any data in either recovery address data field, M&T used the

customer's primary address ([Account_PrimaryCustomer State]) as a proxy in order to approximate the limitation of Plaintiffs' proposed classes to those persons whose vehicles were repossessed in Pennsylvania. This data point was chosen as a proxy because over 97% of accounts that had Pennsylvania in the "RecoveryAddress_State" or "AutoIMS_RecoveryAddress" database field also had Pennsylvania as their primary address.

(**Exhibit 3**, ECF 167-2) (*Emphasis added*). Since M&T can narrow the accounts to vehicles repossessed in Pennsylvania, as shown in Surface's Affidavit, this substantially decreases the number of NORs M&T would potentially have to review to ascertain the class.

## IV.  CONCLUSION

In sum, this is a model case for the application of the class action mechanism. It should be permitted to proceed in the only reasonable, feasible form in which it can proceed as a class action. This is the sort of controversy for which the mechanism of class adjudication was designed. Accordingly, Plaintiffs respectfully requests that this Court enter an order certifying the case as a class action, appointing Class Counsel and the Representative Plaintiffs, and approving Plaintiffs' proposed class notice (**Exhibit 33**).

Respectfully submitted,

SHENKAN INJURY LAWYERS, LLC.         HAGGERTY, GOLDBERG, SCHLEIFER &
*/s/ Richard Shenkan*                          KUPERSMITH, LLC.
Richard Shenkan                                */s/ James Haggerty*
*Co-Counsel for Plaintiffs*                     *Co-Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been sent, as filed, to all counsel of record through the Court's ECF system, which all counsel of record subscribe to.

SHENKAN INJURY LAWYERS, LLC.
*/s/ Richard Shenkan*
Richard Shenkan
*Attorney for Plaintiffs*